**No. 23-2198**
**(Opposition No. 91226943)**

---

United States Court of Appeals
for the Federal Circuit

---

SFERRA FINE LINENS, LLC,
*Appellant,*

v.

SFERA JOVEN S.A.
*Appellee*

---

*Appeal from the United States Patent and Trademark Office,*
*Trademark Trial and Appeal Board*

---

# BRIEF OF APPELLANT

---

Philip R. Bautista
JoZeff W. Gebolys
TAFT STETTINIUS & HOLLISTER LLP
200 Public Square, Suite 3500
Cleveland, Ohio 44114
pbautista@taftlaw.com
jgebolys@taftlaw.com
(216) 241-2838
*Counsel for Appellant*
*Sferra Fine Linens, LLC*

DECEMBER 6, 2023

# CERTIFICATE OF INTEREST

Counsel for Appellant Sferra Fine Linens, LLC certifies as follows:

1. The full name of every party represented by Taft Stettinius & Hollister LLP ("Taft") is: **Sferra Fine Linens, LLC.**

2. The name of the real party in interest (if different than above) represented by Taft is: **N/A**.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by Taft are: **LLCP V Alternative SFERRA, LLC; SFERRA Acquisitions, LLC.**

4. The names of all law firms and the partners or associates that appeared for the parties represented by Taft in the agency or are expected to appear in this Court and who have not or will not enter an appearance in this case are:

> **Taft Stettinius & Hollister LLP: O. Joseph Balthazor, Jr. (expected to appear); Amanda Wilcox, Amy L. Wright, Elizabeth Z. Baumhart (formerly of).**

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal: **None**.

Dated: December 6, 2023

TAFT STETTINIUS & HOLLISTER LLP

*/s/ Philip R. Bautista*
Philip R. Bautista
*Counsel for Appellant*
*Sferra Fine Linens, LLC*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .......... i

TABLE OF AUTHORITIES .......... iv

STATEMENT OF RELATED CASES .......... 1

JURISDICTIONAL STATEMENT .......... 1

STATEMENT OF THE ISSUES .......... 2

STATEMENT OF THE CASE .......... 3

FACTS .......... 6

I. Appellant and its SFERRA and SFERRA BROS. Marks .......... 6

A. Appellant has a 130-year history of selling various products under the SFERRA and SFERRA BROS. brands. .......... 6

B. Appellant owns registrations for SFERRA and SFERRA BROS. .......... 11

II. Appellee Applied for Registration of SFERA Well After Appellant's Use of its Marks. .......... 12

A. Appellee files an intent-to-use application for SFERA .......... 12

SUMMARY OF THE ARGUMENT .......... 14

ARGUMENT .......... 18

I. Standards of Review of the Board's Decision on Likelihood of Confusion. .......... 18

II. Legal Standard for Likelihood of Confusion. .......... 19

III. The Board's Likelihood of Confusion Finding Should be Reversed. .......... 20

A. The Board erred as a matter of law by ruling that it could not consider Appellant's sale of goods related and identical to those of Appellee on the basis of priority, when priority is not relevant as a matter of law......20

B. The Board erred in finding that the parties' trade channels are not similar. ....................................................................................................27

1. The Board erred as a matter of law by refusing to consider evidence of Appellee's sales on the internet and in retail stores when analyzing the similarities of the parties' trade channels. ..........................................28

2. The Board erred in failing to apply the presumption that Appellee uses the normal and usual trade channels for the goods identified in its Application. ..........................................................................33

C. The Board erred in finding that the consumer sophistication factor was neutral despite concluding that consumers are not sophisticated and overlap. ..................................................................................37

D. The Board erred in finding that Applicant's mark is only "commercially somewhat strong." .........................................................................39

E. The Board erred as a matter of law in finding that consumers are unlikely to confuse SFERRA and SFERA. ..............................................41

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ..............................42

CERTIFICATE OF COMPLIANCE...................................................................44

CERTIFICATE OF SERVICE ..........................................................................45

ADDENDUM…………………………………………………………………..46

# TABLE OF AUTHORITIES

## Cases

*American University v. American University of Kuwait*,
2020 WL 919246 (TTAB Jan. 30, 2020) ....................................................30

*Bose Corp. v. QSC Audio Prods., Inc.*,
293 F.3d 1367 (Fed. Cir. 2002)). .................................................... 34, 40, 41

*CBS Inc. v. Morrow*,
708 F.2d 1579 (Fed. Cir. 1983) ....................................................................34

*Century 21 Real Est. Corp. v. Century Life of Am.*,
970 F.2d 874 (Fed. Cir. 1992) ......................................................................41

*Coach Servs., Inc. v. Triumph Learning LLC*,
668 F.3d 1356 (Fed. Cir. 2012) ................................................ 19, 33, 35, 39

*Consol. Edison Co. of N.Y. v. N.L.R.B.*,
305 U.S. 197, 59 S. Ct. 206, 83 L.Ed. 126 (1938). ......................................18

*Crash Dummy Movie LLC v. Mattel Inc.*,
601 F.3d 1387 (Fed. Cir. 2010). ...................................................................20

*Dere v. Inst. for Sci. Info., Inc.*,
420 F.2d 1068 (CCPA 1970).........................................................................27

*Gen. Aniline & Film Corp. v. Hukill Chem. Corp.*,
287 F.2d 926 (CCPA 1961)...........................................................................27

*Hewlett-Packard Co. v. Packard Press, Inc.*,
281 F.3d at 1267 (Fed. Cir. 2002) ....................................... 21, 23, 26, 33, 35

*In re Bercut-Vandervoort & Co.*,
229 USPQ 763, 764, 1986 WL 83681 (TTAB 1986) ..................................38

*In re Bayer Aktiengesellschaft*,
488 F.3d 960 (Fed. Cir. 2007) ............................................ 28, 29, 30, 31, 32

*In Re C. H. Hanson Co.*,
116 U.S.P.Q.2d 1351 (TTAB 2015)....................................................21

*In re Cell Therapeutics, Inc.*,
67 U.S.P.Q.2d 1795, 2003 WL 21979838 (TTAB Aug. 7, 2003) ......... 29, 30

*In re E.I. DuPont DeNemours & Co.*,
476 F.2d 1357, 177 USPQ 563 (CCPA 1973) ..................................... passim

*In Re Gerhard Horn Investments Ltd.*,
217 U.S.P.Q. 1181, 1983 WL 51788 (TTAB 1983) .....................................25

*In re Halo Leather Ltd.*,
735 F. App'x 722 (Fed. Cir. 2018)..................................................23

*In re Hughes Furniture Indus., Inc.*,
114 U.S.P.Q.2d 1134 (TTAB 2015)..................................................24

*In re I.AM.Symbolic, LLC*,
866 F.3d 1315 (Fed. Cir. 2017) ....................................................33

*In Re Jose Remacle*,
66 U.S.P.Q.2d 1222, 2002 WL 31563187 (TTAB 2002) ...................... 29, 30

*In Re King Koil Licensing Co., Inc.*,
79 U.S.P.Q.2d 1048 (TTAB 2006)......................................................... 28, 29

*In re Louis Vuitton Malletier*,
777 F. App'x 984 (Fed. Cir. 2019)..................................................34

*In Re Melanie Hart*,
No. 77909807, 2013 WL 3001432 (TTAB Apr. 12, 2013)...........................24

*In Re Pellerin Milnor Corp.*,
221 U.S.P.Q., 5581983 WL 51846 (TTAB 1983) .......................................27

*In Re Phillips-Van Heusen Corp.*,
228 U.S.P.Q. 949, 1986 WL 83642 (TTAB 1986) .......................................25

*In re Seiler*,
289 F.2d 674 (CCPA 1961)..........................................................22

*In re Telechat Network, Inc.*,
2006 WL 1404223 (TTAB May 11, 2006) .......................................... 29, 31

*In re Thor Tech Inc.*,
90 U.S.P.Q.2d 1634 (TTAB 2009)........................................................ 22, 34

*In re Viterra Inc.*,
671 F.3d 1358 (Fed. Cir. 2012) ....................................................................34

*In re Well Living Lab Inc.*,
122 U.S.P.Q.2d 1777, 2017 WL 2876809 (TTAB 2017) ................ 28, 30, 31

*Industria De Diseno Textil, S.A. (Inditex, S.A.) v. Zara Tours Adventures LLC*,
2023 WL 6996329 (TTAB Oct. 23, 2023)....................................................30

*Kimberly-Clark Corp. v. H. Douglas Enter. Ltd*,
774 F.2d 1144 (Fed. Cir. 1989) ....................................................................37

*Lloyd's Food Prod., Inc. v. Eli's, Inc.*,
987 F.2d 766 (Fed. Cir. 1993) ......................................................................19

*New York Yankees Partnership v. Evil Enterprises, Inc.*,
2013 WL 1305332 (TTAB Feb. 8, 2013).....................................................37

*Octocom Sys., Inc. v. Houston Computer Servs., Inc.*,
918 F.2d 937 (Fed. Cir. 1990) ......................................................... 21, 25, 34

*Omaha Steaks Int'l, Inc. v. Greater Omaha Packing Co.*,
908 F.3d 1315(Fed. Cir. 2018) ............................................................... 40, 41

*On-Line Careline, Inc. v. Am. Online, Inc.*,
229 F.3d 1080 (Fed. Cir. 2000) ............................................................. 21, 23

*Packard Press, Inc. v. Hewlett-Packard Co.*,
227 F.3d 1352 (Fed. Cir. 2000) ............................................................. 33, 35

*PC Club v. Primex Technologies, Inc.*,
32 Fed.Appx 576 (Fed. Cir. 2002).................................................................37

*Recot, Inc. v. Becton*,
214 F.3d 1322 (Fed. Cir. 2000) ................................................. 15, 21, 22, 37

*Sterling Drug Inc. v. Sebring*,
515 F.2d 1128 (CCPA 1975) ....................26

*Stone Lion Capital Partners, L.P. v. Lion Capital LLP*,
746 F.3d 1317 ....................18

*Stratus Networks, Inc. v. UBTA-UBET Commc'ns Inc.*,
955 F.3d 994 (Fed. Cir. 2020) ....................19

*S.W. Mgmt., Inc. v. Ocinomled, Ltd.*,
115 U.S.P.Q.2d 1007 (TTAB 2015) ....................24

*The H.D. Lee Co., Inc. v. Maidenform, Inc.*,
87 U.S.P.Q.2d 1715, 2008 WL 1976596 (TTAB 2008) ....................37

*Tiger Lily Ventures Ltd. v. Barclays Cap. Inc.*,
35 F.4th 1352 (Fed. Cir. 2022) .................... 18, 21, 25

*Tuxedo Monopoly, Inc. v. General Mills Fun Group*,
648 F.2d 1335, 209 USPQ 986 (CCPA 1981) ....................21

*Univ. of S. California*,
No. 91125615, 2008 WL 3333839 (TTAB Aug. 1, 2008).................... 22, 24

*Wrangler Apparel Corp.*,
No. 91264198, 2022 WL 17884092 (TTAB Dec. 6, 2022) ....................24

*Yamaha Int'l Corp. v. Hoshino Gakki Co.*,
840 F.2d 1572 (Fed. Cir. 1988) ....................26

*Zheng Cai v. Diamond Hong, Inc.*,
901 F.3d 1367 (Fed. Cir. 2018) ....................19

**Statutes**

15 U.S.C. § 1067 ....................1

15 U.S.C. § 1071(a)(1) ....................1

28 U.S.C. § 1295(a)(4)(B) ....................1

Lanham Act, 15 U.S.C. § 1052(d) and 1125(c) ...................................................1, 19

## STATEMENT OF RELATED CASES

There are no pending cases relating to this case.

## JURISDICTIONAL STATEMENT

This appeal arises from an opposition proceeding before the United States Patent and Trademark (USPTO) Trademark Trial and Appeal Board (the "Board") under 15 U.S.C. § 1067 (the "Opposition"). Appellant Sferra Fine Linens, LLC ("Appellant") asserted that it would be damaged by the registration of Appellee Sfera Joven S.A.'s ("Appellee") applied-for mark, SFERA, and thus opposed the mark, arguing that the mark was confusingly similar to Appellant's SFERRA and SFERRA BROS marks. Appellant initiated the Opposition pursuant to section 2(d) and 43(c) of the Lanham Act, 15 U.S.C. § 1052(d) and 1125(c).

The Board issued a final decision and order dismissing the claims in the Opposition on May 18, 2023 and Appellant timely appealed that decision on July 19, 2023. This Court, therefore, has jurisdiction pursuant to 15 U.S.C. § 1071(a)(1) and 28 U.S.C. § 1295(a)(4)(B).

## STATEMENT OF THE ISSUES

1. When analyzing the "relatedness of goods" likelihood of confusion factor described in *In re E.I. DuPont DeNemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973), did the Board err by ignoring or refusing to consider evidence of Appellant's sale of goods related to those sold by Appellee?

2. When analyzing the "similarity or dissimilarity of trade channels" *DuPont* factor, did the Board err by refusing to consider evidence of Appellee's sale of its trademarked goods on its website and in department stores abroad, despite Appellee's non-use of its mark in the United States and Appellee's concession of its use of those trade channels?

3. When analyzing the "similarity or dissimilarity of trade channels" *DuPont* factor, did the Board err by refusing to apply the presumption that Appellee's goods travel in the "normal and usual channels of trade," even though the description of goods in Appellee's trademark application did not describe trade channel restrictions?

4. When analyzing the "consumer sophistication" *DuPont* factor, did the Board err by concluding that the factor was only neutral for a likelihood of confusion finding, despite the Board's findings that the parties each sell "basic, inexpensive" goods?

5. When analyzing the "fame of the prior mark" *DuPont* factor, did the Board err in concluding that Appellant's mark is only "somewhat" commercially strong because it had no third-party context from which to compare Appellant's sales and advertising expenditures?

6. Given the above errors, did the Board err as a matter of law in finding *no* likelihood of confusion between Appellant's registered SFERRA mark and Appellee's SFERA mark?

## STATEMENT OF THE CASE

Appellant has been using its SFERRA and SFERRA BROS. trademarks in commerce for more than 130 years. What started as a linen business has, over time, turned into a multi-industry brand. Today, Appellant offers a broad array of expanded product offerings, from luxury sheets and bedding used by the Pope to inexpensive consumer goods, including towels, napkins, clothing, décor for the modern home, candles, diffusers, bathrobes, scarves, fragrances, and more. As Appellant's product offerings have expanded over time, so too have its trade channels. What started with a single salesperson has now evolved into a multi-faceted business that sells online, to hotels, in its boutique store, and in department stores worldwide.

To protect the significant value of the brand it has worked to develop over the course of the last 130 years, Appellant applied for and owns registrations on the United States Patent and Trademark Office's principal register: U.S. Reg. No. 3205168 for SFERRA (the "SFERRA Mark") and U.S. Reg. No. 3012913 for SFERRA BROS. Appellant also claims common law ownership over those marks in connection with all of the goods it sells.

More than a century after Appellant started using SFERRA AND SFERRA BROS. in the United States, Appellee—a foreign consumer clothing and apparel company—filed an intent-to-use trademark application, Serial No. 86478809 (the

"Application"), seeking to register SFERA. That Application and the proceedings before the Board that followed serve as the impetus for this appeal.

Notably, Appellee does *not* contest Appellant's ownership of SFERRA or SFERRA BROS. Indeed, Appellee is not even currently using SFERA in the United States—priority is not in dispute. Despite Appellant's uncontested ownership of its marks, Appellee still seeks registration of SFERA with the *intent* to sell a wide array of goods under that mark. Certain of those goods are related to those sold by Appellant, such as perfumery and clothing. Other goods are identical, such as scarves and robes. And while Appellee is not yet selling goods in the United States and has thus not yet established *any* trade channels in the United States, it has acknowledged that it sells its goods under SFERA both online and in retail department stores—just like Appellant—in at least eleven other countries.

In other words, if SFERA registers, it is only a matter of time before Appellee's use begins to directly overlap with Appellant's use in the United States marketplace, selling in retail stores and online just as it does abroad.

For this reason, Appellant opposed the Application under section 2(d) of the Lanham Act, initiating the Opposition on March 9, 2016. Appellant alleged that goods sold under SFERA are likely to be confused with those sold under the SFERRA and SFERRA BROS. marks and that the Application should be cancelled as a result.

In conducting its likelihood of confusion analysis under the *DuPont* factors, the Board acknowledged that the SFERRA Mark is "inherently distinctive" and "somewhat commercially strong," although it erroneously discounted Appellant's advertising and sales figures as lacking in "context" because Appellant did not provide evidence as to how those figures "compare with that for other brands of linens and related products." The Board also acknowledged that the marks at issue were "more similar than dissimilar."[1] But the Board determined that Appellant failed to prove that the parties have goods that are related or offered in overlapping channels of trade. To come to these unsupported findings, the Board disregarded significant portions of the record without justification, misapplied the law as to the admissibility of foreign evidence, and failed to apply applicable presumptions as to trade channels and consumers. Finally, the Board found that the parties had overlapping consumers of a low-level sophistication but then erroneously determined the "consumer sophistication" factor as neutral, despite this finding.

On the basis of these findings, the Board dismissed the Opposition on May 18, 2023, finding that consumers will not confuse goods sold under SFERRA and goods sold under SFERA, after weighing the *DuPont* factors. That decision was based upon significant errors of fact and law, and must be reversed. Thus, on July

[1] The Board only applied the *DuPont* factors as to Appellant's SFERRA mark because it found that if this mark is not likely to be confused with SFERA, then the same analysis would apply as to SFERRA BROS. (Add. 8.)

19, 2023, Appellant appealed the Board's dismissal of its Opposition.

As explained below, Appellant asserts that the Board erred as a matter of law on its likelihood of confusion finding, after incorrectly weighing four of the five *DuPont* factors considered at the Opposition's trial: (i) the "similarity or dissimilarity of the nature of the goods" factor; (ii) the "similarity or dissimilarity of established trade channels" factor; (iii) the "fame of the prior trademark" factor; and the (iv) "purchaser and purchasing conditions" factor. Appellant respectfully requests that this Court either: (1) reverse the Board's decision, vacate the Board's dismissal of the Opposition, and find a likelihood of confusion between the SFERRA Mark and Appellee's SFERA; or, (2) in the alternative, remand this case so that the Board can reconsider its likelihood of confusion analysis and these four *DuPont* factors consistent with the law and the complete record in this case.

## FACTS

### I. Appellant and its SFERRA and SFERRA BROS. Marks

#### A. Appellant has a 130-year history of selling various products under the SFERRA and SFERRA BROS. brands.

Appellant owns the SFERRA and SFERRA BROS. marks (Appx66-67) and it and its predecessors have continuously and exclusively used them in the United States and worldwide for more than 130 years, first with linens and then expanding to other product lines. (Appx96 ¶¶ 7-8, Appx107 ¶ 8, Appx100 ¶ 23, Appx111 ¶ 2, Appx473). SFERRA and the SFERRA word element in SFERRA BROS is

pronounced "sfeh-ruh." (Appx103 ¶ 27, Appx1034).

Appellant's sales first began in 1891, when Gennaro Sferra started selling fine Italian lace under the SFERRA brand to society tastemakers at seaside resorts on the East Coast. (Appx96 ¶¶ 7-8, Appx107 ¶ 8, Appx473, Appx1006). He and his sons later expanded the company to include selling table linens and bed linens. (*Id.*). Through its commitment to using high-quality materials and craftsmanship and its significant sales over the years, Appellant has become a prominent, well-known brand—that is, "famous," for the purposes of a likelihood of confusion analysis. For instance, Sferra linens have been the *de rigeur* bedding for celebrities like Pope John Paul II (Appx97 ¶ 8, Appx473) and have lined tables at Reagan-era state dinners. (*Id.*). Appellant is not only a leader in luxury but also in linen innovation. In 2001, Appellant introduced the world's first-ever 1,020-thread count linens (Appx97 ¶ 9, Appx108 ¶ 9, Appx473) and, in 2008, Appellant debuted a rare Egyptian cotton bedding that has since earned the title as the "Queen of Egyptian Cotton." (*Id.*). Because of those innovations and others, it remains one of the top global providers of luxury linens today. (*Id.*, Appx96 ¶ 6).

Appellant has expanded its product offerings from luxury linens to a variety of other retail consumer goods. (Appx101 ¶ 23, Appx112 ¶ 23, Appx114 ¶ 28, Appx171-172, Appx193, Appx355, Appx404-405, Appx408, Appx460-461, Appx504, Appx523-524, Appx573, Appx723, Appx766, Appx1370). Appellant has

continuously used SFERRA and SFERRA in connection with selling luxury bedding (Appx518-521), sheets (Appx183-191, Appx463, Appx486-488), pillows (Appx184, Appx390), duvets (Appx185), down comforters (Appx412), throws (Appx201), mattresses (Appx376), bath linens (Appx192-193, Appx407), and table linens (Appx194-195, Appx358, Appx400). Appellant also now sells other, less expensive, consumer goods, such as scarves (Appx404-405, Appx563), robes (Appx193, Appx355, Appx408), fragrances (Appx460-461, Appx523-524), candles (Appx461, Appx523-524), and home décor (Appx442-446, Appx452-454, Appx504), as well as offering custom and bespoke embroidery services (collectively, "Appellant's Goods") (Appx112 ¶ 22, Appx172, Appx185, Appx278). Appellant's Goods vary in cost from very inexpensive to expensive, ranging from $16 bath towels to $14,417 duvets. (Appx101 ¶ 23, Appx112 ¶ 23).

Appellant's customers may view and purchase Appellant's products through the ordinary and customary trade channels employed by businesses in the linen industry, including "off-the-rack" in major department and retail stores, such as Bloomingdale's, Nordstrom, Saks-Fifth Avenue, Bergdorf Goodman's, and Neiman Marcus. (Appx99 ¶ 16, Appx110 ¶ 16, Appx476, Appx916-996, Appx1014-1031). Appellant also sells directly to consumers through its websites (www.sferra.com and www.sfferaoutlet.com) and its boutique store in New York. (Appx100 ¶ 19, Appx111 ¶ 19, Appx239-359, Appx364-377, Appx389-392, Appx398-418,

Appx427-488, Appx502-505, Appx517-524, Appx529-531, Appx537-540, Appx909-911). Examples of goods offered for sale on Appellant's website and through its advertising materials can be seen below:












(Appx355, Appx404, Appx461, Appx1370). Moreover, Appellant sells its products directly to hotel consumers, including but not limited to, the Dalmar in Florida, the Tourists in Massachusetts, and the Thompson Hotels in Washington D.C. (Appx490-

492, Appx507-510, Appx415-416, Appx419-422).

As Appellant sells products ranging in cost from inexpensive to expensive, and through various trade channels, Appellant markets and sells its goods to a wide variety of retail consumers, for both non-luxury and luxury goods. (Appx110 ¶ 15, Appx112-13 ¶ 23). Appellant's historical sales and advertising expenditures under the SFERRA and SFERRA BROS. Marks are "significant," as recognized by the Board. (Appx111 ¶ 24, Add. 10.)

### B. Appellant owns registrations for SFERRA and SFERRA BROS.

Appellant is the owner of SFERRA BROS., U.S. Reg. No. 3012913 and SFERRA, U.S. Reg. No. 3205168 for the following goods, without restriction to trade channels or consumers:

> Class 24: table linen; table linen, namely, tablecloths not of paper, coasters, table mats not of paper, napkins, placemats, table runners; bed linen, bed sheets, bedspreads, pillow cases, pillow covers, pillow shams, duvet covers, blankets, throws, lap robes; baby blankets, baby bed linens, baby quilts, shams; guest towels, bath towels, hand towels, washcloths and bath sheets

(Appx66-67). Appellant has used the SFERRA BROS. mark continuously since 1891 and the SFERRA mark continuously since 2004, as evidenced by its offers for sale and sales on the internet. (Appx100 ¶¶ 17-19, Appx111 ¶ 17-19, Appx239-359, Appx364-377, Appx389-392, Appx398-418, Appx427-488, Appx502-505, Appx517-524, Appx529-531, Appx537-540, Appx909-911). As discussed above, in addition to the goods specifically identified in its registrations, Appellant's use of

SFERRA and SFERRA BROS. has expanded to use with robes, scarves, fragrances, and candles, among others goods. (Appx171-172, Appx193, Appx355, Appx404-405, Appx408, Appx460-461, Appx504, Appx523-524, Appx573, Appx723, Appx766, Appx1370).

## II. Appellee Applied for Registration of SFERA Well After Appellant's Use of its Marks.

### A. Appellee files an intent-to-use application for SFERA.

In 2014, more than 120 years after Appellant started using its SFERRA brand, Appellee filed the Application for the stylized mark ( Sfera ) ("Appellee's Mark"). (Appx51-58). Appellee's Mark consists of the word element "sfera" with one "r," making it phonetically identical to SFERRA and giving it an identical pronunciation to SFERRA, as the Board correctly found (Add. 12). (Appx58, Appx1034). Appellee's Mark does not include a color claim and, while it appears in a standard serif typeface with offset parentheses (Appx58), the design elements of this mark are less distinctive than the SFERA word element SFERA, as specifically found by the Board. (Add. 12-13). Through the Application, Appellee seeks to register its SFERA mark for the following goods:

> Class 3: Perfumery, namely, perfume, toilet water, scented water, cologne, essential oils for personal use, cosmetics, namely, body, face and skin moisturizing creams, lotions and tonics.
>
> Class 18: Leather handbags, imitation leather sold in bulk; umbrellas, parasols, walking sticks, whips and harness; billfolds and wallets made of leather.

> Class 25: Clothing, namely, suits, coats, raincoats, pants, dresses, shirts, sweaters, stocking, scarves, shoes, slippers, boots; gloves and hats.

(collectively, "Appellee's Goods"). (Appx51-52).

Appellee filed its application as "intent-to-use" and has not begun using Appellee's Mark in the United States since filing the application in 2014, nearly a decade ago. (Appx55). For this reason, Appellee has no trade channels within the United States. (Appx1191-1192). However, Appellant submitted unrebutted evidence in the proceedings below of Appellee's use of SFERA in Spain, Portugal, and other countries worldwide online (www.sfera.com) and in online department stores. (Appx113 ¶ 26, Appx114 ¶¶ 28-29, Appx114 ¶¶ 28-30, Appx1037, Appx1038-1045, Appx1227-1270, Appx1272-1280). Examples of Sfera's website and offering of goods like fragrances, robes, and scarves is below:











(Appx1236, Appx1241, Appx1261). For its part, Appellee did not submit any evidence of use during the TTAB proceeding below.

## SUMMARY OF THE ARGUMENT

In dismissing the Opposition, the Board committed at least five reversible errors in analyzing the *DuPont* factors as applied to the overlap between Appellant's SFERRA Mark and Appellee's SFERA, all of which contributed to its final and

ultimate reversible error—its finding that consumers are not likely to confuse the parties' marks.

***First***, the Board incorrectly found that the "similarity or dissimilarity of the nature of the goods" factor weighed against a likelihood of confusion finding. In doing so, the Board did not consider Appellant's evidence of certain similar, related goods sold by both parties (Add. 15) because Appellant's use did not predate the Application's filing date—i.e., Appellee did not have priority of use as to those related and, in some cases, identical goods. However, Appellant did, in fact, present evidence of sales of clothing prior to Applicant's filing date (Appx172, Appx573, Appx766, Appx723) and, more to the point, neither the Board nor Appellee cited any authority holding that evidence on priority is required before goods can be considered as part of an analysis on relatedness—and Appellant is not aware of any. As a result of this misapplication of the law, the Board disregarded evidence of Appellant's sale of goods identical and related to those in the Application, such scarves, robes, candles, and diffusers. Relatedness of goods focuses solely on whether the "same goods can be related in the mind of the consuming public as to the origin of the goods" and the Board's finding is thus not supported by substantial evidence. *Recot, Inc. v. Becton*, 214 F.3d 1322, 1329 (Fed. Cir. 2000).

***Second***, the Board found that the "similarity or dissimilarity of established trade channels" factor also weighed against a likelihood of confusion finding. (Add.

15-16). To do so, the Board ignored unrebutted evidence of Appellee's sale of SFERA goods online and in retail stores abroad—the very same trade channels as Appellant. In fact, the Board even disregarded the fact that Appellee conceded these trade channels in its brief. (Appellee Tr. Br. at 22). According to the Board, Appellee's "foreign use is irrelevant in this United States opposition proceeding." (Add. 15). But Appellee's "foreign use" is its *only use* as it relates to the mark at issue and, contrary to the Board's misapplication of Federal Circuit law, foreign website evidence *can* be relevant and probative in opposition and cancellation proceedings on a case-by-case basis. The Board's misapplication of the law led it to disregard unrebutted and obvious evidence on Appellee's trade channels and the Board's finding on this factor is, once again, unsupported by substantial evidence.

***Third***, the Board committed an additional misstep in analyzing the "trade channels" factor by misapplying a presumption that Appellee's SFERA goods will be eventually sold in all "normal and usual" trade channels, based upon its unrestricted Application. (Add. 16). The Board improperly found that this presumption *only* applies when parties' goods are *identical* (*id.* at 16) and then stated that, even if it were to apply, the record did not contain evidence of Appellee's normal and usual trade channels. (*Id.* at 15-16). Both conclusions were incorrect. Appellant presented unrebutted evidence on both its online and retail sales (Appx100 ¶ 19, Appx111 ¶ 19, Appx239-359, Appx364-377, Appx389-392, Appx398-418,

Appx427-488, Appx502-505, Appx517-524, Appx529-531, Appx537-540, Appx909-911; Appx99 ¶ 16, Appx110 ¶ 16, Appx476, Appx916-996, Appx1014-1031) and Appellee's online and retail sales (Appx114 ¶¶ 28-29, Appx113 ¶ 26, Appx114 ¶¶ 28-30, Appx1037, Appx1038-1045, Appx1227-1270, Appx1272-1280), contrary to the Board's finding, and also supplied evidence of identical goods being used by each of the parties. Each of these errors likewise contributed to the Board's incorrect finding that the "trade channels" factor weighed "heavily" against a finding of likelihood of confusion.

***Fourth***, the Board incorrectly found the "purchaser and purchasing conditions" factor as neutral, despite finding that both parties sold their SFERRA and SFERA-branded goods to consumers of inexpensive retail goods. Because the Board's own findings show that this factor weighed in favor of a finding of likelihood of confusion, the Board's finding on this factor was not supported by substantial evidence.

***Fifth***, the Board incorrectly found that Appellant's Sferra Marks were only "somewhat" strong, a decision it arrived at after failing to give proper weight to the commercial strength of Appellant's SFERRA mark. The Board discounted Appellant's evidence of significant sales and advertising expenditures because it did not also submit evidence showing third-party "context" for those sales and expenditures relative to others in the marketplace. But this Court has already rejected

the Board's reliance on this "context" argument in other cases, demonstrating the Board's error. Once again, as with several other factors, this misapplication of the law led the Board to a finding that was unsupported by substantial evidence.

The above errors should be reversed and, in turn, the Board's ***sixth*** and final error—its finding that consumers are not likely to confuse the SFERRA and SFERA marks—should also be reversed as a matter of law. The Board's dismissal of Appellant's Opposition should be vacated and, at a minimum, this Court should remand this case for reconsideration consistent with proper application of law and full consideration of the facts of record.

## ARGUMENT

### I. Standards of Review of the Board's Decision on Likelihood of Confusion.

This Court reviews the Board's legal conclusions *de novo*, its factual findings by determining whether they are supported by "substantial evidence," and the Board's evidentiary rulings under an abuse of discretion standard. *Tiger Lily Ventures Ltd. v. Barclays Cap. Inc.*, 35 F.4th 1352, 1359 (Fed. Cir. 2022) (citations omitted). Evidence is substantial if it is "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Stone Lion Capital Partners, L.P. v. Lion Capital LLP*, 746 F.3d 1317, 1321 (Fed. Cir. 2014) (quoting *Consol. Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938)).

The Board's likelihood of confusion determination is a question of law based on the facts. *Lloyd's Food Prod., Inc. v. Eli's, Inc.*, 987 F.2d 766, 767 (Fed. Cir. 1993). This Court reviews the Board's factual findings on each *DuPont* factor for substantial evidence and its ultimate legal conclusion on likelihood of confusion *de novo*. *Zheng Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 1359 (Fed. Cir. 2018).

## II. Legal Standard for Likelihood of Confusion.

Appellant opposed the registrability of Appellee's mark under section 2(d) of the Lanham Act. Under section 2(d), the United States Patent and Trademark Office may refuse to register a mark if it

> [c]onsists of or comprises a mark which so resembles a mark registered in the [trademark office], or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1052(d). To test likelihood of confusion, the Board employs the thirteen *DuPont* factors. *See Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1366 (Fed. Cir. 2012) (citing *Application of E.I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1361 (CCPA 1973)). Not all factors are relevant to a Board proceeding. For instance, the Board can focus on dispositive factors, such as similarity of the marks. *Coach Servs., Inc.*, 668 F.3d at 1366. Any single factor may control a particular case. *Stratus Networks, Inc. v. UBTA-UBET Commc'ns Inc.*, 955 F.3d 994, 998 (Fed. Cir. 2020). The opposer must establish a likelihood of confusion by a

preponderance of the evidence. *Crash Dummy Movie LLC v. Mattel Inc.*, 601 F.3d 1387, 1391 (Fed. Cir. 2010).

## III. The Board's Likelihood of Confusion Finding Should be Reversed.

The Board focused its likelihood of analysis on the following *DuPont* factors: (i) the "fame" or strength of Appellant's SFERRA mark; (ii) the similarities or dissimilarities between Appellee's Mark and the SFERRA Mark; (iii) the relatedness of the parties' goods; (iv) the similarities or dissimilarities of the trade channels; and (v) the purchaser and purchasing conditions. (Add. 8-16). Appellant appeals the Board's legal conclusions and underlying factual findings on factors (i), (iii), (iv), and (v).[2] The Board's decisions on those factors must be reversed because they are contrary to law and unsupported by the evidence of record that the Board should have considered. Accordingly, the Board's ultimate conclusion as to likelihood of confusion must likewise be reversed or, at a minimum, this case should be remanded to the Board for further consideration.

### A. The Board erred as a matter of law by ruling that it could not consider Appellant's sale of goods related and identical to those of Appellee on the basis of priority, when priority is not relevant as a matter of law.

Under the relatedness of goods *DuPont* factor, "the relevant inquiry considers

[2] Appellant does not challenge the Board's conclusion on the similarity or dissimilarities of the marks and notes that the Board found that the marks at issue were similar.

if the respective products are related in some manner and/or if the circumstances surrounding their marketing are such that they could give rise to the mistaken belief that they emanate from the same source." *Tiger Lily Ventures*, 35 F.4th at 1363 (quotation omitted). Under this analysis, and as both Appellee (Appellee Tr. Br. at 22) and the Board acknowledged (Add. 13), the parties' goods need not be identical, competitive, or even similar in kind to be "related" under the relatedness factor. *Recot, Inc. v. Becton*, 214 F.3d 1322, 1329 (Fed. Cir. 2000). In analyzing relatedness of the parties' goods, the Board should properly ground its determination from the fields or industries for which the goods are created. *Octocom Sys., Inc. v. Houston Computer Servs., Inc.*, 918 F.2d 937, 941 (Fed. Cir. 1990). The Board has refused registration if relatedness exists for as little as *one* common good in the application and shared by the parties. *In Re C. H. Hanson Co.*, 116 U.S.P.Q.2d 1351 (TTAB 2015) (citing *Tuxedo Monopoly, Inc. v. General Mills Fun Group*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981)).

In fact, when an intent-to-use applicant is not yet using its mark in connection with the sale of goods in the United States, as in this case, evidence that a single company ". . . sells the goods and services of both parties . . . is relevant to a relatedness analysis." *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d at 1267 (Fed. Cir. 2002); *On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1086 (Fed. Cir. 2000) (affirming Board's relatedness finding where the parties' goods

"have been shown to be available from a single source," namely, the trademark owner); *see also Univ. of S. California*, No. 91125615, 2008 WL 3333839, at *7 (Aug. 1, 2008) (TTAB Aug. 1, 2008) (finding relatedness based on fact that applicant "itself markets both clothing items and other goods like those identified in [Opposer's] registration"). It follows, then, that if an opposer introduces evidence that it sells the goods and intended goods of *both* parties, that evidence is probative to show relatedness, as showing both goods coming from the same source. *See Recot*, 214 F.3d at 1328 (explaining that evidence that a large food manufacturing company sold both human and pet foods is relevant to whether a consumer will think that applicant's dog treats were related to opposer's human food products); *In re Seiler*, 289 F.2d 674, 675 (CCPA 1961) (finding that a caterer's likely sales of both specialty food goods and catering services supported the conclusion that specialty food goods and catering services were related). Importantly, the "greater degree of similarity between the applicant's mark and the registered mark, the lesser the degree of similarity between the applicant's goods and registrant's goods that is required to support a finding of likelihood of confusion." *In re Thor Tech Inc.*, 90 U.S.P.Q.2d 1634, 1636 (TTAB 2009). *See* (Appx171-172, Appx193, Appx355, Appx404-405, Appx408, Appx460-461, Appx504, Appx523-524, Appx563, Appx573, Appx723, Appx766) (showing sales of related goods from the same source).

Appellant presented this exact case. Both Appellant, under SFERRA, and

Appellee, under SFERA, sell goods in the same general field or industry—retail consumer goods. And the parties' goods have been shown to be available from one source—in this case, Appellant. When taking into account the similarities of the SFERRA and SFERA marks, relatedness has been established under this *proper* analysis. *See On-Line Careline*, 229 F.3d at 1086 (affirming Board's finding of relatedness where (1) the parties' services related to the same field of the internet; (2) consumers "may think that the two are related given the strong similarity of the two marks"; and (3) the parties' goods "have been shown to be available from a single source").

Consistent with *Hewlett-Packard* and *On-Line Careline*, and as evidenced in the record (Appx171-172, Appx193, Appx355, Appx404-405, Appx408, Appx460-461, Appx504, Appx523-524, Appx563, Appx573, Appx723, Appx766, Appx1370), Appellant submitted unrebutted evidence that it sells goods related to those described in Appellee's Application, under what the Board found to be a similar mark. (Add. 13.) Appellant submitted evidence of its sales of related, retail goods such as scarves (Appx404-405, Appx563) and robes (Appx171-172, Appx193, Appx355, Appx408, Appx573, Appx723, Appx766 Appx1370), as well as fragrances (Appx460-461, Appx523-524), each of which is related to the clothing and perfume broadly described in Appellee's Application. *See In re Halo Leather Ltd.*, 735 F. App'x 722, 727 (Fed. Cir. 2018) (affirming finding of relatedness where

retail websites showed "the use of a single mark to identify furniture, bedding fabrics, and placemats" and "retailers selling skins and hides, together with bedding, fabrics, and/or placemats under a single mark"); *Wrangler Apparel Corp.*, No. 91264198, 2022 WL 17884092, at *9 (TTAB Dec. 6, 2022) (stating "Applicant's denim fabrics and textiles related to Opposer's identified dungarees and other clothing items that include its denim goods"); *see also S.W. Mgmt., Inc. v. Ocinomled, Ltd.*, 115 U.S.P.Q.2d 1007, 1025 (TTAB 2015) (explaining that where the goods in an application or registration are broadly described, they are deemed to encompass all the goods of the nature and type described therein); *In re Hughes Furniture Indus., Inc.*, 114 U.S.P.Q.2d 1134, 1137 (TTAB 2015) (stating "Applicant's broadly worded identification of 'furniture' necessarily encompasses Registrant's narrowly identified 'residential and commercial furniture.'").

Moreover, the Board has repeatedly found goods like those at issue in this case to be "related" when analyzing this *DuPont* factor, and the Board could have and should have followed those decisions. *In Re Melanie Hart*, No. 77909807, 2013 WL 3001432, at *3 (TTAB Apr. 12, 2013) (noting that "many cases have recognized different types of clothing items to be related goods"); *Univ. of S. California*, 2008 WL 3333839, at *7 ("Carolina's Class 25 goods are related to the Class 6, 18, and 24 goods identified in California's '953 registration" and noting that this relatedness was "evidenced by the fact that Carolina itself markets both clothing items and other

goods like those identified in California's registration"); *In Re Phillips-Van Heusen Corp.*, 228 U.S.P.Q. 949, 1986 WL 83642 at *2-3 (TTAB 1986) (finding clothing, such as "shirts" and "pajamas," sufficiently related to "towels"); *In Re Gerhard Horn Investments Ltd.*, 217 U.S.P.Q. 1181, 1983 WL 51788, at *2 (TTAB 1983) (considering prior decisions of the Board as establishing "settled law" as relating to relatedness of goods).

The Board thus erred in finding the parties' goods as unrelated after refusing to consider Appellant's sale of goods related to those in the Application, including scarves, robes, candles, and diffusers, and identical goods such as perfume and clothing. (Add. 14-15). The Board so found under the auspices of an improper application of the law, discounting this evidence because "[Appellant's] common law use of its SFERRA mark for bathrobes, scarves, diffusers and candles" was without "any evidence of use prior to Applicant's priority (filing) date." (*Id.*)[3] However, the Board did not cite any authority for this unnecessary and, ultimately, erroneous priority requirement. Appellant has submitted evidence that the parties' retail goods are from the same fields or industries, *Octocom Sys., Inc.* 918 F.2d at 94, and that they are "related in some manner," such that they could give rise to the mistaken belief that they emanate from the same source, *Tiger Lily Ventures Ltd.*,

[3] Appellant was not necessarily addressing priority as to these goods but proving that the goods it sells are related to those Appellee will sell. The Board's analysis as to priority finds no place in analysis of this *DuPont* factor.

35 F.4th at 1363.

In any event, the Board's priority finding was also unsupported by the evidence. Appellant did, in fact, present evidence of its sale of clothing predating the Application. For instance, Appellant introduced evidence of a wholesale pricelist showing sales of monogrammed robes in 1988 (Appx171-172), sales of robes in 2009 online and in retail markets (Appx573, Appx766), sales of its Pasha-line robes in 2012 (Appx723), and sales of robes through the 2014 filing of the Application (Appx355). The Board's decision was thus unsupported by substantial evidence for this additional reason. *See Hewlett-Packard Co*, 281 F.3d at 1267 (reversing Board's conclusion that services were not related where Board failed to compare related goods and services in opposer's registration).

Compounding its error, the Board decided against relatedness despite the fact that Appellee did not submit any evidence controverting Appellant's submissions. This failure further weighs in favor of a relatedness finding. *See Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 1579-80 (Fed. Cir. 1988) ("[A]n opposer alleging likelihood of confusion bears the burden of proof which encompasses not only the ultimate burden of persuasion, but also the obligation of going forward with sufficient proof of the material allegations of the Notice of Opposition, which, *if not countered*, negates [applicant's] right to a registration." (quotation omitted) (emphasis added)); *Sterling Drug Inc. v. Sebring*, 515 F.2d 1128, 1132 (CCPA 1975)

(reversing Board's finding of no relatedness, holding that "*in the absence of any showing that pharmaceutical manufacturers never use the same mark on these two classes of products,* the fact that they are often made by the same manufacturers has a definite bearing on the likelihood that the public will think, when they do appear under the same mark, that they have the same source." (emphasis added)); *Dere v. Inst. for Sci. Info., Inc.*, 420 F.2d 1068, 1069 (CCPA 1970) (affirming likelihood of confusion finding where "applicant took no testimony and presented no evidence in the opposition proceeding" despite arguing marks were not similar and goods not related).

In short, the Board was obligated to resolve any "doubt in favor of [Appellant] as the prior registrant" as to whether the goods are related. *Gen. Aniline & Film Corp. v. Hukill Chem. Corp.*, 287 F.2d 926, 928 (CCPA 1961); *In Re Pellerin Milnor Corp.*, 221 U.S.P.Q., 5581983 WL 51846, at *2 (TTAB 1983). By committing the foregoing errors of both law and findings of fact, the Board did the opposite. The Board thus committed reversible error in finding that the parties' goods are unrelated. The Board's finding should be reversed or, at a minimum, this case must be remanded for the Board to reconsider its findings on this *DuPont* factor in light of *all* of the relevant evidence before it.

### B. The Board erred in finding that the parties' trade channels are not similar.

The Board also erred when analyzing the similarity of the parties' trade

channels for two, independent reasons. First, the Board erred in refusing to consider evidence of Appellee's sale of products on the internet and in retail stores outside of the United States, despite the fact that they were the *only trade channels Appellant could possibly point to*, given Appellee's sales history outside of the United States and the intent-to-use status of its Application. (Add. 15-16). Second, the Board also erred in failing to apply the presumption that Appellee's goods are sold in the "normal and usual" trade channels for its goods, including on the internet and retail stores. (*Id.* at 16).

**1. The Board erred as a matter of law by refusing to consider evidence of Appellee's sales on the internet and in retail stores when analyzing the similarities of the parties' trade channels.**

Both the Board and this Court recognize that evidence of a party's sales outside of the United States, such as internet sales or retail sales, can be considered for a likelihood of confusion analysis. *See, e.g., In re Bayer Aktiengesellschaft*, 488 F.3d 960, 969 (Fed. Cir. 2007); *accord In Re Well Living Lab Inc.*, 122 U.S.P.Q.2d 1777 n.3 (TTAB 2017) (acknowledging that information originating from foreign websites and foreign news publications may be relevant to discern United States consumer impression of a proposed mark); *In Re King Koil Licensing Co., Inc.*, 79 U.S.P.Q.2d 1048 (TTAB 2006) (acknowledging probative value to information on foreign website "that would be accessible by prospective consumers in the United States searching for products available in the United States").

In fact, this Court has rejected a carte blanche rule on irrelevancy of evidence from outside of the United States, relying in part on the Board itself.[4] *In re Bayer Aktiengesellschaft*, 488 F.3d at 969. In *In re Bayer Aktiengesellschaft*, this Court acknowledged that information from websites or news publications can be relevant to a likelihood of confusion analysis, refuting that this evidence should be summarily rejected as irrelevant. *See id.* (acknowledging that "[i]nformation originating on foreign websites or in foreign news publications that are accessible to the United States public may be relevant to discern United States consumer impression of a proposed mark."). In *In re Bayer Aktiengesellschaft*, this Court recognized why internet evidence is probative—the availability for news and information from around the world through the internet at consumers' finger tips. Consumers' ability to access this limitless source of information illustrates how use and sales *outside of the United States* impact consumer perception *in the United States*. *Id.* The holding and rationale in *In re Bayer Aktiengesellschaft* contradicts the Board's carte blanche ruling in this case that "references originating in foreign countries are not probative for purposes of this proceeding." *Id*. at 969.

---

[4] The Court relied upon *In Re King Koil Licensing Co., Inc.*, 79 U.S.P.Q.2d 1048 (TTAB 2006), *In Re Jose Remacle*, 66 U.S.P.Q.2d 1222, 2002 WL 31563187, at *2 (TTAB 2002), *In re Cell Therapeutics, Inc.*, 67 U.S.P.Q.2d 1795, 2003 WL 21979838, *3-4 (TTAB Aug. 7, 2003), and *In re Telechat Network, Inc.*, 2006 WL 1404223, *2-3 (TTAB May 11, 2006). *See In re Bayer Aktiengesellschaft*, 488 F.3d at 969.

In fact, the Board has agreed with and applied the holding and rationale of *In re Bayer Aktiengesellschaft* when considering websites outside of the United States. *See, e.g.*, *In re Well Living Lab Inc.*, 122 U.S.P.Q.2d 1777 n.10, 2017 WL 2876809, n.10 (TTAB 2017) (citing *Bayer*). In *In re Well Living Lab*, the Board considered foreign evidence originating from Canadian websites as probative on the term "well-living" and the trademark Appellee's services. *Id.* The Board did not hold that this evidence was irrelevant but, rather, held that foreign websites were probative of the commercial impression of the Appellee's mark to consumers in the United States, given that consumers in the United States could access that foreign website. *Id. Accord Industria De Diseno Textil, S.A. (Inditex, S.A.) v. Zara Tours Adventures LLC*, 2023 WL 6996329, at *36 n.48 (TTAB Oct. 23, 2023) (acknowledging probative value to foreign websites); *American University v. American University of Kuwait*, 2020 WL 919246, at *5-6 (TTAB Jan. 30, 2020) (acknowledging probative value to foreign website evidence). Indeed, the Board, like this Court, has also recognized the growing use of and increasing access to the internet an additional basis to consider foreign evidence as relevant and has an established pattern and practice of considering foreign evidence. *In Re Jose Remacle*, 66 U.S.P.Q.2d 1222 n.5, 2002 WL 31563187, at *2 (TTAB 2002) (determining that foreign internet or website information is acceptable because internet is a widely-available resource to "the general public in the United States"); *In re Cell Therapeutics, Inc.*, 67

U.S.P.Q.2d 1795, 2003 WL 21979838, *3-4 n.5 (TTAB Aug. 7, 2003) (relying on evidence from foreign wire services given the widespread use of personal computers that increase access to such sources); *In re Telechat Network, Inc.*, 2006 WL 1404223, *2-3 (TTAB May 11, 2006) (same).

Against this significant backdrop, Board committed clear error by refusing to consider Appellant's evidence on the parties' similar trade channels based upon Appellee's foreign uses. (Add. 15-16). Similar to Appellant's online and retail sales (Appx100 ¶ 19, Appx111 ¶ 19, Appx239-359, Appx364-377, Appx389-392, Appx398-418, Appx427-488, Appx502-505, Appx517-524, Appx529-531, Appx537-540, Appx909-911; Appx99 ¶ 16, Appx110 ¶ 16, Appx476, Appx916-996, Appx1014-1031), Appellee sells its goods online on its website (www.sfera.com) (Appx114 ¶¶ 28-29, Appx113 ¶ 26, Appx114 ¶¶ 28-30, Appx1037, Appx1227-1270) to at least *eleven* different countries and in online department stores and retail stores (Appx114 ¶¶ 28-29, Appx113 ¶ 26, Appx114 ¶¶ 28-30, Appx1038-1045, Appx1272-1280).[5] In fact, Appellee has even conceded

---

[5] In considering the probative value of a foreign website, the Board considers whether a website is in English or has an optional English language version and whether the nature of the goods or services makes it more or less likely that U.S. consumers will encounter foreign websites in the field in question. *In Re Well Living Lab Inc.*, 122 U.S.P.Q.2d 1777 n.10, 2017 WL 2876809, n.10 (TTAB 2017) (quoting *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 969 (Fed. Cir. 2007)). Sfera.com's website has an English language version (Appx1227) and was viewed by Klein and McRorie from the United States. (Appx114 ¶¶ 28-29, Appx113 ¶ 26, Appx114 ¶¶ 28-30, Appx1227-1270).

these trade channels. (Appellee Tr. Br. at 19, 22, 23). Yet, despite the applicable law and Appellee's unrebutted evidence, the Board rejected Appellee's submissions out-of-hand despite its past consideration of this form of evidence, finding that "Applicant's foreign use is irrelevant in this United States opposition proceeding." (Add. 15).

The Board's unexplained rationale for excluding Appellant's foreign trade channels evidence cannot be correct as it relates to "intent to use" applications like Appellee's. Appellant's evidence on Appellee's trade channels is *the only* evidence of Appellee's use that Appellant could have possibly identified because *Appellee's only use is foreign.* For the Board to then reject that kind evidence places an opposer like Appellant in an untenable position. If the Board is correct, an opposer cannot rely upon irrefutable evidence of use outside of the United States to show an applicant's likely trade channels in the United States but, on the other hand, an applicant will be permitted to argue that trade channel uses by third parties do not apply to them.

Instead of the Board's carte blanche approach, the Board should determine whether trade channels overlap based on foreign evidence on a case-by-case basis. *In re Bayer Aktiengesellschaft*, 488 F.3d at 969. Appellee concedes that it currently sells retail consumer goods online and in retail stores. The "essential nature" of Appellee's consumer goods and Appellant's unrebutted evidence in this regard leads

to only one "logical inference"—that Appellee will sell its goods online and in retail stores in the United States as well, similar to Appellant.

Thus, the Board erred as a matter of law by summarily refusing to consider Appellant's evidence on Appellee's online and retail store trade channels and by finding that the similarities in trade channels factor weighed *heavily* against a likelihood of confusion finding. As a result of this error of law, the Board did not have substantial evidence to find that that the parties' trade channels do not overlap. The Board's finding should be reversed or, at a minimum, this case must be remanded for the Board to reconsider its findings on this *DuPont* factor in light of *all* of the relevant evidence before it.

**2. The Board erred in failing to apply the presumption that Appellee uses the normal and usual trade channels for the goods identified in its Application.**

An applicant's goods are presumed to travel in the normal channels of trade to the same class of purchasers, absent restrictions of trade channels in a trademark application. *In re I.AM.Symbolic, LLC*, 866 F.3d 1315, 1327 (Fed. Cir. 2017) (stating "[i]n the absence of meaningful limitations in either the application or the cited registrations, the Board properly presumed that the goods travel through all usual channels of trade and are offered to all normal potential purchasers."). This is settled law. *See Coach Servs.*, 668 F.3d at 1370; *Hewlett-Packard*, 281 F.3d at 1268; *Packard Press, Inc. v. Hewlett-Packard Co.*, 227 F.3d 1352, 1361 (Fed. Cir. 2000).

Further, when analyzing if an application restricts trade channels, an Appellee's description of its goods must be construed in the light most favorable to an opposer. *CBS Inc. v. Morrow*, 708 F.2d 1579, 1581 n.3 (Fed. Cir. 1983) (citation omitted).

Finally, and while it is true that the Board applies this presumption in cases where the parties offer identical goods, *e.g.*, *In re Viterra Inc.*, 671 F.3d 1358, 1362 (Fed. Cir. 2012), the presumption does not *require* that the goods be identical or even related. The Board simply applies the trade channels presumption, reviews the good identified in an application or registration, and determines whether it contains a trade channel restriction. *CBS Inc.*, 708 F.2d at 1581; *see also, In re Louis Vuitton Malletier*, 777 F. App'x 984, 989 (Fed. Cir. 2019) (stating that this court "look[s] to the registration to identify the applicable channels of trade" (citing *Bose Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367, 1377 (Fed. Cir. 2002)). In fact, if a registration or application lacks a specific restriction on trade channels, evidence of record on specific trade channels, while admissible, does not limit the presumption's broad scope. *See, e.g., Octocom Sys.*, 918 F.2d at 943 (stating "an application with an identification of goods having no restriction on trade channels obviously is not narrowed by testimony that the applicant's use is, in fact, restricted to a particular class of purchasers."); *In Re Thor Tech, Inc.*, 90 U.S.P.Q.2d at 1634 ("[The Board] may not limit or restrict the [goods] listed in the cited registration based on extrinsic evidence.").

The Board did not specifically analyze whether Appellee restricted the trade channels in the Application in its Order. However review of the Application's description of goods demonstrates that Appellee did *not* include trade restrictions or consumer restrictions, for that matter:

> Class 3: Perfumery, namely, perfume, toilet water, scented water, cologne, essential oils for personal use, cosmetics, namely, body, face and skin moisturizing creams, lotions and tonics.
>
> Class 18: Leather handbags, imitation leather sold in bulk; umbrellas, parasols, walking sticks, whips and harness; billfolds and wallets made of leather
>
> Class 25: Clothing, namely, suits, coats, raincoats, pants, dresses, shirts, sweaters, stocking, scarves, shoes, slippers, boots; gloves and hats.

Despite this point, the Board refused to properly apply the necessary presumption (Add. 16), resulting in a confusing and, ultimately, erroneous finding.

The Board first held that the trade channels presumption only applies where the parties' identified goods are "identical." (Add. 16). However, as explained above, that finding was erroneous as a result of a misstatement and misapplication of the law. *Hewlett-Packard*, 281 F.3d at 1268; *see Coach Servs.*, 668 F.3d at 1370 (holding that "[t]he Board correctly recognized that, because Triumph's description of goods is not limited to sales to educational professionals, the goods are presumed to travel in all normal channels and to all prospective purchasers for the relevant goods."); *Packard Press*, 227 F.3d at 1360-61 (stating "[w]hen the registration does not contain limitations describing a particular channel of trade or class of customer,

the goods or services are assumed to travel in all normal channels of trade.”).

The Board then appeared to acknowledge this error by applying the trade channels presumption. (Add. 16). The Board applied the presumption that Applicant will use “normal trade channels,” only to then find that “Opposer has not provided any evidence regarding the ‘normal’ channels of trade for Appellee’s identified goods in the United States” and that this factor weighs against a likelihood of confusion (*Id.*). Contrary to the Board’s finding and as stated above in section B above, Appellant introduced evidence of both its normal trade channels of its goods (Appx100 ¶ 19, Appx111 ¶ 19, Appx239-359, Appx364-377, Appx389-392, Appx398-418, Appx427-488, Appx502-505, Appx517-524, Appx529-531, Appx537-540, Appx909-911; Appx99 ¶ 16, Appx110 ¶ 16, Appx476, Appx916-996, Appx1014-1031) and Appellee’s similar website and retail trade channels. (Appx114 ¶¶ 28-29, Appx113 ¶ 26, Appx114 ¶¶ 28-30, Appx1037, Appx1038-1045, Appx1227-1270, Appx1272-1280).

As a result of its error of law, the Board did not have substantial evidence to find that that the parties’ trade channels do not overlap for this second, independent reason. The Board’s finding should be reversed or, at a minimum, this case must be remanded for the Board to reconsider its findings on this *DuPont* factor in light of the above referenced presumption and evidence.

### C. The Board erred in finding that the consumer sophistication factor was neutral despite concluding that consumers are not sophisticated and overlap.

Consumer confusion is more likely with goods that are inexpensive and purchased without careful consideration. *See PC Club v. Primex Technologies, Inc.*, 32 Fed.Appx576, 579 (Fed. Cir. 2002) (stating that the risk of likelihood of confusion is increased when the products are relatively low-priced and subject to impulse buying, because purchasers are held to a lesser standard of purchasing care (citing *Recot*, 214 F.3d at 1329, and *Kimberly-Clark Corp. v. H. Douglas Enter. Ltd*, 774 F.2d 1144, 1146 (Fed. Cir. 1989)). As a result, where the goods at issue involve relatively inexpensive items, the Board typically determines consumers exercise little care in making purchases. *See, e.g., New York Yankees Partnership v. Evil Enterprises, Inc.*, 2013 WL 1305332, at *7 (TTAB Feb. 8, 2013) (stating that "t-shirts and many of the other casual, everyday items of wearing apparel…are relatively inexpensive and are therefore likely to be purchased by consumers on impulse, and without a great deal of care….[t]his *du Pont* factor favors oppose").

In addition, the Board's typical practice is to conclude that both parties' products "may be inexpensive and bought by ordinary consumers" when their respective registrations and applications lack restrictions as to consumers. *See The H.D. Lee Co., Inc. v. Maidenform, Inc.*, 87 U.S.P.Q.2d 1715, 1719, 2008 WL

1976596, at *11 (TTAB 2008) ("In determining the conditions under which the products at issue are sold and the consumers who buy them, we note there are no restrictions or limitations in the description of goods in either the application or opposer's registration. Therefore, the clothing products of both parties may be inexpensive and bought by ordinary consumers."); *see also In re Bercut-Vandervoort & Co.*, 229 USPQ 763, 764, 1986 WL 83681, at *2 (TTAB 1986) (disregarding extrinsic evidence demonstrating that the relevant goods at issue were expensive wines sold to discriminating purchasers given the absence of any such restrictions in the application or registration).

Review of the Application and Appellant's SFERRA registration reveals that neither are specifically restricted to any kind of consumer and, indeed, the Board agreed, finding that Appellant does not limit its goods to luxury items. (Add. 16-17.) The Board further conceded that the parties share consumers of "basic, inexpensive" goods. (*Id.* at 17). Appellant also presented evidence that both parties offer, among other goods, off-the-rack and inexpensive retail goods, as described in the SFERRA Registration and the Application. (Appx171-172, Appx193, Appx355, Appx404-405, Appx408, Appx460-461, Appx504, Appx523-524, Appx573, Appx723, Appx766; Appx99 ¶ 16, Appx110 ¶ 16, Appx476, Appx916-996, Appx1014-1031; Appx114 ¶¶ 28-29, Appx113 ¶ 26, Appx114 ¶¶ 28-30, Appx1037, Appx1038-1045, Appx1227-1270, Appx1272-1280).

The Board nonetheless found this factor to be "neutral," a finding unsupported by substantial evidence given the Board's findings. Instead, the consumer sophistication factor weighs in favor of a likelihood of confusion finding. The Board's finding should be reversed or, at a minimum, this case should be remanded for the Board to reconsider its findings on this *DuPont* factor.

### D. The Board erred in finding that Applicant's mark is only "commercially somewhat strong."

As to "commercial strength" for determining the overall "strength" of a party's trademark under a *DuPont* analysis, the Board recognized that:

> Fame or commercial strength "of a mark may be measured indirectly, among other things, by the volume of sales and advertising expenditures of the goods traveling under the mark, and by the length of time those indicia of commercial awareness have been evident. (citation omitted).[6]

(Add. 10). Likewise, the Board's findings as to "commercial strength" have a significant impact on the overall likelihood of confusion analysis because "[t]he stronger the mark, the greater the scope of protection to which it is entitled." (Add. 9, noting that "[w]hen a mark is famous or very strong, that plays a dominant role in

[6] "Fame for likelihood of confusion and fame for dilution are distinct concepts, and dilution fame requires a more stringent showing." *Coach Servs*, 668 F.3d at 1373. "While fame for dilution is an either/or proposition—it either exists or does not—fame for likelihood of confusion is a matter of degree along a continuum. Accordingly, a mark can acquire sufficient public recognition and renown to be famous for purposes of likelihood of confusion without meeting the more stringent requirement for dilution fame." *Id.* (quotations and citations omitted).

the likelihood of confusion analysis.”).

In determining commercial strength, the Board may consider evidence of a party’s volume of sales, advertising expenditures, or other indicia of commercial strength *without* context of third-party sales and expenditures for comparison. *See Omaha Steaks Int’l, Inc. v. Greater Omaha Packing Co.*, 908 F.3d 1315, 1321-22 (Fed. Cir. 2018) (explaining that the Board misreads its prior *Bose* decision where it requires third-party “context” for sales figures, explaining that the holding in *Bose* “was not so narrow”). *Omaha Steaks* thus made clear that the Board errs where it “discount[s]…evidence of fame” simply because a party does not “provide any context for its ‘raw’ sales figures and ad expenditures” through the submission of third-party evidence. *Id.* at 1321. Doing so constitutes reversible error. *Id.* at 1322.

The Board found that Applicant’s sales figures were “significant” and that Applicant’s “advertising expenses [were] also high enough that we would expect [Applicant’s] promotional efforts to have reached an appreciable number of relevant consumers.” (Add. 10.) And, just as in *Omaha Steaks*, the Board acknowledged that Appellant provided context of its advertising through declarations and representative samples of its advertisements from the 1980’s through present. (Add. 11; *see also* Appx159-179, Appx100-101). But, directly contrary to the holding in *Omaha Steaks*, the Board *discounted* that evidence because Appellant lacked evidence of record as to “other brands of linens and related products.” The Board erroneously

held that this "lack of context" somehow diminished the impact of Appellant's otherwise strong evidence of commercial strength, improperly citing *Bose* in support of its decision to do so. (*Id.*) Just as in *Omaha Steaks*, the Board's decision to improperly discount Appellant's evidence of fame due to a lack of third-party "context" in this case renders its decision "legally flawed" and unsupported by "substantial evidence." *Omaha Steaks*, 908 F.3d at 1321.

The Board properly found that the "strength of the mark" *DuPont* factor favored a likelihood of confusion determination (Add. 12); however, it erred in discounting the commercial strength of Appellant's SFERRA Mark. This *DuPont* factor should instead weigh heavily in favor of a finding of likelihood of confusion. The Court should reverse the Board's finding to the contrary or, at a minimum, remand so as to allow the Board to conduct a proper analysis of this factor.

### E. The Board erred as a matter of law in finding that consumers are unlikely to confuse SFERRA and SFERA.

The Board determined that, on balance, a likelihood of consumer confusion between goods sold under Appellant's SFERRA Mark and Applicant's mark is unlikely. The Board's dismissal of Applicant's Opposition should be reversed. *See Century 21 Real Est. Corp. v. Century Life of Am.*, 970 F.2d 874, 878 (Fed. Cir. 1992) ("Any doubts about likelihood of confusion . . . must be resolved against Appellee as the newcomer."). As explained above, the Board's numerous errors of law and fact clouded its analysis on four of the five *DuPont* factors, even despite

finding in Appellant's favor on the important "similarity of the marks" factor. A proper application of the law and weighing of the relevant evidence as to each of the five likelihood of confusion factors the Board considered properly results in a finding of likelihood of confusion. This Court can and should reverse the Board's decision and find a likelihood of confusion on *de novo* review or, in the alternative, the Court should remand this case to the Board for further consideration consistent with a proper application of the law and facts in evidence.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

The Board erred as a matter of law on its likelihood of confusion finding, after erroneously weighing four of the five *DuPont* factors: (i) the "fame of the prior trademark" factor; (ii) the "similarity or dissimilarity of the nature of the goods" factor; (iii) the "similarity or dissimilarity of established trade channels;" and the (iv) "purchaser and purchasing conditions" factor. Based upon the substantial evidence and following correction of the Board's errors of law discussed above, each of these *DuPont* factors favor Appellant.

Appellant respectfully requests that this Court reverse the Board's decision on *de novo* review and find a likelihood of confusion. In the alternative, the case should be remanded with instructions that the Board must reconsider its likelihood of confusion analysis and these four *DuPont* factors, as discussed above.

Dated: December 6, 2023

Respectfully submitted,

By: */s/ Philip R. Bautista*

Philip R. Bautista
JoZeff W. Gebolys
TAFT STETTINIUS & HOLLISTER LLP
200 Public Square, Suite 3500
Cleveland, Ohio 44114
pbautista@taftlaw.com
jgebolys@taftlaw.com
(216) 241-2838

*Counsel for Appellant Sferra Fine Linens, LLC*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and Fed. Cir. R. 32(b)(1). The brief contains 9,348 words, excluding parts exempted by the Fed. R. App. P. 32(f). The word count includes the words counted by the Microsoft Word 2010 function.

This motion also complies with the typeface and type style requirements of Fed. R. App. P. 32(a). The motion has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point font of Times New Roman.

Dated: December 6, 2023

*/s/ Philip R. Bautista*
Philip R. Bautista

*Counsel for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2023, a true and correct copy of the foregoing BRIEF OF APPELLANT was filed with the Clerk of the United States Court of Appeals for the Federal Circuit and served on all counsel of record by the Court's CM/ECF system.

*/s/ Philip R. Bautista*
Philip R. Bautista

*Counsel for Appellant*

130066037

**No. 23-2198**
**(Opposition No. 91226943)**

United States Court of Appeals
for the Federal Circuit

SFERRA FINE LINENS, LLC,
*Appellant*,

v.

SFERA JOVEN S.A.
*Appellee*

*Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board*

# ADDENDUM TO BRIEF OF APPELLANT

Philip R. Bautista
JoZeff W. Gebolys
TAFT STETTINIUS & HOLLISTER LLP
200 Public Square, Suite 3500
Cleveland, Ohio 44114
pbautista@taftlaw.com
jgebolys@taftlaw.com
(216) 241-2838
*Counsel for Appellant Sferra Fine Linens, LLC*

DECEMBER 6, 2023

## ADDENDUM OF APPELLANT – TABLE OF CONTENTS

Trademark Trial and Appeal Board Final Decision,
dated May 18, 2023 ............ ADD1-17

*Industria De Diseno Textil, S.A. (Inditex, S.A.) v. Zara Tours Adventures LLC*,
2023 WL 6996329 (TTAB Oct. 23, 2023) ............ ADD18-53

*Wrangler Apparel Corp.*, No. 91264198, 2022 WL 17884092
(TTAB Dec. 6, 2022) ............ ADD54-65

*American University v. American University of Kuwait*, 2020 WL 919246
(TTAB Jan. 30, 2020) ............ ADD66-106

*In Re Melanie Hart*, No. 77909807, 2013 WL 3001432
(TTAB Apr. 12, 2013) ............ ADD107-111

*New York Yankees Partnership v. Evil Enterprises, Inc.*, 2013 WL 1305332
(TTAB Feb. 8, 2013) ............ ADD112-120

*Univ. of S. California*, No. 91125615, 2008 WL 3333839
(TTAB Aug. 1, 2008) ............ ADD121-159

*In re Telechat Network, Inc.*, 2006 WL 1404223
(TTAB May 11, 2006) ............ ADD160-164

This Opinion is Not a
Precedent of the TTAB

Mailed: May 18, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———

Trademark Trial and Appeal Board

———

*Sferra Fine Linens, LLC*
*v.*
*Sfera Joven S.A.*

———

Opposition No. 91226943

———

Elizabeth Z. Baumhart and Amanda H. Wilcox of Taft, Stettinius & Hollister LLP for Sferra Fine Linens, LLC.

Samuel F. Pamias Portalatin of Hoglund & Pamias, P.S.C. for Sfera Joven S.A.

———

Before Adlin, Coggins and Allard, Administrative Trademark Judges.

Opinion by Adlin, Administrative Trademark Judge:

Applicant Sfera Joven S.A. seeks registration of the mark shown below for: "perfumery, namely, perfume, toilet water, scented water, cologne, essential oils for personal use, cosmetics, namely, body, face and skin moisturizing creams, lotions and tonics," in International Class 3; "leather handbags, imitation leather sold in bulk; umbrellas, parasols, walking sticks, whips and harness; billfolds and wallets made of leather," in International Class 18; and "clothing, namely, suits, coats, raincoats, pants, dresses, shirts, sweaters, stocking, scarves, shoes, slippers, boots; gloves and hats," in International Class 25:

( Sfera ) .[1]

In its notice of opposition, Opposer Sferra Fine Linens, LLC alleges prior use and registration of the allegedly “famous” marks SFERRA[2] and SFERRA BROS.[3], in standard characters and typed form, respectively,[4] both for “table linen; table linen, namely, tablecloths not of paper, coasters, table mats not of paper, napkins, placemats, table runners; bed linen, bed sheets, bedspreads, pillow cases, pillow covers, pillow shams, duvet covers, blankets, throws, lap robes; baby blankets, baby bed linens, baby quilts, shams; guest towels, bath towels, hand towels, washcloths and bath sheets,” in International Class 24. As grounds for opposition, Opposer alleges, under Trademark Act Sections 2(d) and 43(c), 15 U.S.C. §§ 1052(d) and

---

[1] Application Serial No. 86478809, filed December 12, 2014, under Section 44(e) of the Trademark Act, 15 U.S.C. § 1126(e), based on European Union Registration No. 4563541. The application includes this translation statement: “The English translation of ‘SFERA’ in the mark is ‘SPHERE’.” It also includes this description of the mark: “The mark consists of the word ‘SFERA’ written between parentheses, the left parenthesis appearing slightly above and the right parenthesis slightly below the word.”

[2] Registration No. 3205168, issued February 6, 2007 (the “’168 Registration”); renewed.

[3] Registration No. 3012913, issued November 8, 2005 with a Section 2(f) claim of acquired distinctiveness as to the entire mark (the “’913 Registration”); renewed.

[4] There is no substantive difference between “standard character” marks and marks in “typed” form. *In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1909 n.2 (Fed. Cir. 2012) (“until 2003, ‘standard character’ marks formerly were known as ‘typed’ marks, but the preferred nomenclature was changed in 2003 to conform to the Madrid Protocol … we do not see anything in the 2003 amendments that substantively alters our interpretation of the scope of such marks”).

1125(c), that use of Applicant's mark would be likely to cause confusion with, and dilute, Opposer's marks, but because Opposer did not pursue its dilution claim, it is waived. *Alcatraz Media, Inc. v. Chesapeake Marine Tour Inc.*, 107 USPQ2d 1750, 1753 (TTAB 2013), *aff'd*, 565 F. App'x 900 (Fed. Cir. 2014). In its answer, Applicant denies the salient allegations in the notice of opposition and asserts a number of "Affirmative Defenses," most of which merely amplify its denials. And, because Applicant did not pursue its true affirmative defenses, they are waived. *Miller v. Miller*, 105 USPQ2d 1615, 1616 n.3 (TTAB 2013); *Baroness Small Estates Inc. v. Am. Wine Trade Inc.*, 104 USPQ2d 1224, 1225 n.2 (TTAB 2012).

## I. The Record and Evidentiary Objection

The record consists of the pleadings, and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the file of Applicant's involved application. In addition, Opposer introduced:

> Testimony Declaration of Michelle Klein, its President and Chief Executive Officer, and the exhibits thereto ("Klein Dec."). 55 TTABVUE 2-11, 25-952.[5]
>
> Testimony Declaration of Christopher McRorie, its Vice President, Secretary and General Counsel, and the exhibits thereto ("McRorie Dec."). 55 TTABVUE 13-952.[6]

---

[5] Citations to the record are to TTABVUE, the Board's online docketing system. Specifically, the number preceding "TTABVUE" corresponds to the docket entry number(s), and any number(s) following "TTABVUE" refer to the page number(s) of the docket entry where the cited materials appear.

[6] Opposer's testimony declarations are essentially identical. In fact, the witnesses give essentially identical testimony using the same wording/language, and their declarations cite to identical exhibits.

> Notice of Reliance ("NOR") on official records, Applicant's responses to Opposer's discovery requests, printed publications and Internet printouts.[7] 57 TTABVUE.

Applicant did not take any testimony or introduce any other evidence.

In its Trial Brief, Applicant objects, for the first time, to unspecified "information and evidence that was requested in Applicant's Set of Interrogatories and Request for Documents and Things, that was untimely produced by Opposer." 68 TTABVUE 7-8. *See* TRADEMARK BOARD MANUAL OF PROCEDURE ("TBMP") § 527.01(e) (discussing the estoppel sanction). The objection is overruled. Applicant concedes that Opposer timely served its written discovery responses on the January 18, 2022 deadline, and its complaint is merely that Opposer did not serve the responsive documents themselves until one day later. 68 TTABVUE 10-11, 30-31. As Opposer points out, however, it is typical, and contemplated by the applicable Rules, that written responses are served prior to the applicable deadline, but responsive documents may be served thereafter, often following some negotiation regarding the time, place and manner of production. *See* Fed. R. Civ. P. 34(b)(2)(B). More importantly and substantively, Applicant admits that it received the discovery documents three months before Opposer filed its trial evidence, so has suffered no prejudice.

---

[7] Neither "product packaging" nor financial records are admissible via notice of reliance, Trademark Rule 2.122(e)(1) (printed publications and official records), except to the extent they may fall within Trademark Rule 2.122(e)(2) (Internet materials). Because Opposer's product packaging and financial records submitted with its NOR (the financial records submitted confidentially in 58 TTABVUE) do not fall within Trademark Rule 2.122(e)(2), they have not been considered. In any event, Opposer introduced the same financial records via witness testimony, and those have been considered. Opposer's discovery responses submitted with its own NOR "may be submitted and made part of the record only by the receiving or inquiring party …, " Trademark Rule 2.120(k)(5), and have therefore not been considered.

## II. Relevant Facts

Opposer supplies "a wide range of luxury linen related goods, including, but not limited to, sheets, bedding, towels, napkins, décor, and more, to customers globally, including in the United States." 55 TTABVUE 3 (Klein Dec. ¶ 6). It began using its SFERRA BROS. mark in 1891, and "shortened" the mark to SFERRA in 2004. *Id.* (Klein Dec. ¶ 7). Since Opposer's founding, "ownership of the company and the SFERRA BROS. and SFERRA trademarks have changed hands several times." *Id.* (Klein Dec. ¶ 8).

Opposer "markets its SFERRA Goods to consumers of all types in the market for luxury linen goods, and sells through ordinary trade channels employed by companies in the linen industry, including online trade channels, major department stores and retailers, and directly to the hospitality industry." *Id.* at 6 (Klein Dec. ¶ 15). Opposer's "luxury" linens and linen-related products are, not surprisingly, expensive. For example: table runners are priced from $44-$144; bedding collections from $95-$4298; mattresses from $3,725-$6,995; bed pillows from $87-$7,331; and dog beds at $245. *Id.* at 8-9 (Klein Dec. ¶ 23).

Applicant did not introduce any evidence, but according to Opposer "Applicant is an apparel and fashion company based in Madrid, Spain .... Its parent company, El Corte Ingles S.A. also based in Madrid, Spain, sells SFERA branded apparel goods in its department store locations in Spain and Portugal and online." *Id.* at 10 (Klein Dec. ¶ 26).

## III. Entitlement to a Statutory Cause of Action

Entitlement to a statutory cause of action is a requirement in every inter partes case. *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020), *cert. denied*, 142 S.Ct. 82 (2021) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26 (2014)). A party in the position of plaintiff may oppose registration of a mark when doing so is within the zone of interests protected by the statute and it has a reasonable belief in damage that would be proximately caused by registration of the mark. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at *6-7 (Fed. Cir. 2020), *cert. denied*, 141 S.Ct. 2671 (2021) (holding that the test in *Lexmark* is met by demonstrating a real interest in opposing or cancelling a registration of a mark, which satisfies the zone-of-interests requirement, and a reasonable belief in damage by the registration of a mark, which demonstrates damage proximately caused by registration of the mark). Here, Opposer's pleaded registrations establish that it is entitled to oppose registration of Applicant's mark on the ground of likelihood of confusion. 55 TTABVUE 4-5, 462-63 (Klein Dec. ¶ 11 and Ex. 7); *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000) (registration establishes "standing").

## IV. Priority

Because Opposer's pleaded registrations are of record, and Applicant has not counterclaimed to cancel either of them, priority is not at issue with respect to the marks and goods identified therein. *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974).

Opposer also introduced evidence that it offers bathrobes, scarves, diffusers and candles. 55 TTABVUE 21, 262, 311-12, 367-68 (Klein Dec. ¶ 28 and Ex. 5). However, there is no evidence concerning when Opposer started offering these goods, and therefore Opposer has not established common law use of either of its pleaded marks for these goods prior to Applicant's priority/filing date of December 12, 2014. *See Cent. Garden & Pet Co. v. Doskocil Mfg. Co.*, 108 USPQ2d 1134, 1140 (TTAB 2013) ("for when an application or registration is of record, the party may rely on the filing date of the application for registration, *i.e.*, its constructive use date").

## V. Likelihood of Confusion

Our determination under Section 2(d) is based on an analysis of all of the probative evidence of record bearing on the likelihood of confusion. *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) (setting forth factors to be considered); *see also In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks.").

Opposer bears the burden of establishing that there is a likelihood of confusion by a preponderance of the evidence. *Cunningham*, 55 USPQ2d at 1848. We consider the likelihood of confusion factors about which there is evidence and argument. *See In re Guild Mortg. Co.*, 912 F.3d 1376, 129 USPQ2d 1160, 1162-63 (Fed. Cir. 2019).

We focus our analysis on the mark in Opposer's pleaded '168 Registration (SFERRA). If we find confusion likely between that pleaded mark and Applicant's involved mark, we need not consider the likelihood of confusion between Applicant's mark and Opposer's other pleaded mark. On the other hand, if we find no likelihood of confusion between the mark in the pleaded '168 Registration and Applicant's mark, we would not find confusion likely between Applicant's mark and Opposer's other pleaded mark. *In re Max Cap. Grp.,* 93 USPQ2d 1243, 1245 (TTAB 2010).

### A. Strength of Opposer's Mark

We first consider the strength of Opposer's mark, to determine the scope of protection to which it is entitled. There are two types of strength: conceptual and commercial. *In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010) ("A mark's strength is measured both by its conceptual strength … and its marketplace strength ….").

Turning first to conceptual strength, "[t]he SFERRA trademark originates from the brand's founder, Genaro Sferra, who immigrated into the United States in 1891 and began selling SFERRA BROS. branded linen goods up and down the East Coast." 55 TTABVUE 3 (Klein Dec. ¶ 8). While surnames such as SFERRA may be considered conceptually weak, this is not always the case. *Wet Seal Inc. v. FD Mgt. Inc.*, 82 USPQ2d 1629, 1639 n.20 (TTAB 2007) ("The fact that ARDEN is a surname does not automatically render the mark weak or entitled to only a narrow scope of protection."). Here, Opposer's SFERRA mark is registered on the Principal Register without a claim of acquired distinctiveness under Section 2(f), and entitled to the

presumptions of Section 7(b) of the Act, including that it is valid/distinctive. Moreover, Applicant has not introduced any evidence showing that Opposer's SFERRA mark is anything other than inherently distinctive. We therefore find that Opposer's mark is not conceptually weak, and that it is entitled to the normal scope of protection accorded to inherently distinctive marks.

Turning to commercial strength, Opposer argues that its pleaded SFERRA mark is "famous." 67 TTABVUE 26-28. Fame is not "an all-or-nothing" proposition, however. *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 122 USPQ2d 1733, 1734-35 (Fed. Cir. 2017). We must determine where to place SFERRA on the "spectrum" of marks, which ranges from "very strong to very weak." *Palm Bay Imps. Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005) (quoting *In re Coors Brewing Co.*, 343 F.3d 1340, 68 USPQ2d 1059, 1063 (Fed. Cir. 2003)). The stronger the mark, the greater the scope of protection to which it is entitled. *Tao Licensing, LLC v. Bender Consulting Ltd.*, 125 USPQ2d 1043, 1056 (TTAB 2017) ("A very strong mark receives a wider latitude of legal protection in the likelihood of confusion analysis."); *Nike, Inc. v. WNBA Enters., LLC*, 85 USPQ2d 1187, 1198 (TTAB 2007). When a mark is famous or very strong, that plays a dominant role in the likelihood of confusion analysis. *Bose Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002) (quoting *Recot,* 54 USPQ2d at 1897; *Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992).

Fame or commercial strength "of a mark may be measured indirectly, among other things, by the volume of sales and advertising expenditures of the goods traveling under the mark, and by the length of time those indicia of commercial awareness have been evident." *Bose,* 63 USPQ2d at 1305. Other relevant factors include "length of use of the mark, market share, brand awareness, licensing activities, and variety of goods bearing the mark." *Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1720 (Fed. Cir. 2012).

Here, Opposer's evidence falls short of establishing that its pleaded SFERRA mark is famous or very strong. The mark's longstanding use is certainly impressive, and Opposer's confidential sales figures are significant. 55 TTABVUE 3 and 56 TTABVUE 7, 9, 26-95 (Klein Dec. ¶¶ 8, 17-19, 24 and Ex. 12). Opposer's advertising expenses are also high enough that we would expect Opposer's promotional efforts to have reached an appreciable number of relevant consumers. 56 TTABVUE 7, 26 (Klein Dec. ¶ 20 and Ex. 12). Nonetheless, "[w]e have no context for opposer's advertising and sales figures," or its other evidence of strength, "such as how the figures for [products bearing Opposer's pleaded marks] compare with that for other brands of" linens and related products. *Lebanon Seaboard Corp. v. R&R Turf Supply Inc.*, 101 USPQ2d 1826, 1831 (TTAB 2012); *see also Bose*, 63 USPQ2d at 1309 ("some context in which to place raw statistics is reasonable"); *Fossil Inc. v. Fossil Grp.*, 49 USPQ2d 1451, 1457 (TTAB 1998) ("Raw sales and advertising figures unless they are extraordinarily large, which is not the case with opposer's FOSSIL products are simply not sufficient by themselves to establish that the mark is famous.").

Furthermore, public exposure to Opposer and its mark via social and traditional media is underwhelming, and suggestive of the SFERRA mark enjoying a moderate rather than high level of commercial strength. For example, while the record does not reveal how many people have "followed" or "liked" Opposer on Facebook, Opposer's individual Facebook posts generally receive relatively few, if any, "likes," "shares" or comments. 55 TTABVUE 5, 465-549 (Klein Dec. ¶ 13 and Ex. 8). Similarly, Opposer has only a few thousand followers on Twitter and its individual "tweets" have received few if any comments, "likes" or "retweets." *Id.* at 5, 552-680 (Klein Dec. ¶ 13 and Ex. 9). While Opposer has almost 13,000 Instagram followers, even this higher number falls well short of what would be expected for "famous" or very strong marks. *Id.* at 5, 682-810 (Klein Dec. ¶ 13 and Ex. 9). While Opposer's advertisements have appeared in FORBES LIFE, TOWN & COUNTRY, ARCHITECTURAL DIGEST and other publications, Opposer failed to introduce circulation figures for these publications, and the record reveals scant unsolicited media attention. *Id.* at 7-8, 68-87, 816-22, 905-11, 918-20 (Klein Dec. ¶ 21 and Exs. 2, 11).[8]

Nonetheless, Opposer appears to be a successful business and the record reveals that many consumers of what Ms. Klein refers to as "luxury linen related goods" have

---

[8] Opposer's website and Trial Brief tout Opposer's "luxurious advancements" in the linen field, which according to Opposer make its identified goods "prized enough to become the in-flight bedding for Pope John Paul II, the elegant table linens of Reagan-era state dinners, and the de rigeur bedding found in celebrity linen closets." 55 TTABVUE 380 (Klein Dec. Ex. 5); 67 TTABVUE 11, 27. However, the website evidence that Opposer's goods are "prized" by famous people is not supported by witness testimony. We have not considered Opposer's website evidence for the truth of the assertions therein, unless those assertions are supported by witness testimony. *Safer Inc. v. OMS Inv. Inc.*, 94 USPQ2d 1031, 1037 n.14 and 1040 (TTAB 2010). In any event, even if we had considered this information, it would not change our finding regarding the SFERRA mark's level of commercial strength.

been exposed to Opposer's SFERRA mark. We therefore find that Opposer's mark is commercially somewhat strong, and that this weighs in favor of finding a likelihood of confusion.

**B. The Marks**

The marks are more similar than dissimilar in "appearance, sound, connotation and commercial impression." *Palm Bay Imps. Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005) (quoting *du Pont*, 177 USPQ at 567). Indeed, the only difference between Opposer's mark and the literal element of Applicant's mark is that Applicant's mark is spelled with one "r" while Opposer's is spelled with two. Marks that differ by a single letter are often found confusingly similar. *See e.g. Apple Comput. v. TVNET.net, Inc.*, 90 USPQ2d 1393, 1396 (TTAB 2007) (VTUNES.NET vs. ITUNES); *Interlego AG v. Abrams/Gentile Entm't Inc.*, 63 USPQ2d 1862, 1863 (TTAB 2002) (LEGO vs. MEGO); *In re Total Quality Grp. Inc.*, 51 USPQ 1474, 1476 (TTAB 1999) (STRATEGYN vs. STRATEGEN).

Because of their similarities, the marks look quite similar. We would also expect them to be pronounced similarly or identically, and Opposer has introduced evidence suggesting as much. 55 TTABVUE 10, 941-42 (Klein Dec. ¶ 27 and Ex. 13).

We have not ignored the "parentheses" design element of Applicant's mark, but the parentheses would likely have no impact on how Applicant's mark is pronounced, and the design's effect on the mark's appearance is merely to highlight the term "SFERA," which differs from Opposer's mark by only one letter. In any event, the design element of Applicant's mark is less significant in our analysis because

consumers are likely to call for Applicant's goods by the term "SFERA," the mark's only literal element. *In re Viterra Inc.,* 671 F.3d 1358, 101 USPQ2d 1905, 1911 (Fed. Cir. 2012) ("the verbal portion of a word and design mark likely will be the dominant portion"); *In re Appetito Provisions Co. Inc.*, 3 USPQ2d 1553, 1554 (TTAB 1987) (holding that "if one of the marks comprises both a word and a design, then the word is normally accorded greater weight because it would be used by purchasers to request the goods or services" and "because applicant's mark shares with registrant's mark that element responsible for creating its overall commercial impression, the marks are confusingly similar").

We recognize that the marks will convey different meanings, at least to some Spanish speaking United States consumers, because "sfera" is Spanish for "sphere," while SFERRA is Opposer's founder's surname. We find this difference outweighed, however, by the marks' similarities in appearance and sound. Moreover, Spanish speaking consumers who merely hear the marks (especially if they are not pronounced by Spanish speakers) rather than seeing them may not perceive any difference in meaning. Moreover, we must also be concerned with United States consumers who do not speak Spanish (as well as Spanish speakers who do not "stop and translate" Applicant's mark), and these relevant consumers may not perceive any difference between the marks in meaning or commercial impression.

In short, we find the marks' similarities more important than their dissimilarities. This factor also weighs in favor of finding a likelihood of confusion.

### C. The Goods and Their Channels of Trade and Classes of Consumers

In considering the goods, we have kept in mind that they need not be identical or even competitive in order to find a likelihood of confusion. Rather, the question is whether the goods are marketed in a manner that "could give rise to the mistaken belief that [the] goods emanate from the same source." *Coach Services Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012) (quoting *7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1724 (TTAB 2007)). *See also Hewlett-Packard Co. v. Packard Press Inc.*, 227 F.3d 1261, 62 USPQ2d 1001, 1004 (Fed. Cir. 2002) ("Even if the goods and services in question are not identical, the consuming public may perceive them as related enough to cause confusion about the source or origin of the goods and services."); *Recot, Inc. v. Benton*, 214 F.3d 1322, 54 USPQ2d 1894, 1898 (Fed. Cir. 2000) ("even if the goods in question are different from, and thus not related to, one another in kind, the same goods can be related in the mind of the consuming public as to the origin of the goods"); *Kohler Co. v. Baldwin Hardware Corp.*, 82 USPQ2d 1100, 1109 (2007).

Here, however, Opposer has failed to introduce any evidence that the goods are related, or that they are marketed in a manner that could give rise to the mistaken belief that they emanate from the same source. In fact, in the sections of its Trial Brief subtitled "Applicant's Intended Goods are Highly Similar to Sferra's Goods" and "Applicant's Trade Channels Are Likely to Be the Same as Those Used By Sferra," Opposer cites only: the involved application and pleaded registrations and their identifications of goods; Opposer's common law use of its SFERRA mark for bathrobes, scarves, diffusers and candles, without including any evidence of use prior

to Applicant's priority (filing) date; materials from Opposer's NOR; Opposer's "belief" that Applicant has not yet used its involved mark in the United States; Applicant's foreign use of its involved mark; and Opposer's channels of trade and advertising practices. 67 TTABVUE 21-25 & fns. 25-34.

The cited evidence is of no help to Opposer. In fact, the goods for which Opposer has not established prior use are irrelevant to its likelihood of confusion claim. The materials in Opposer's NOR which are not supported by accompanying testimony are not admissible for the truth of the matters asserted therein, but instead are admissible only for what they show on their face. *Safer*, 94 USPQ2d at 1037 n.14 and 1040. Opposer's channels of trade and advertising practices are insufficient to establish that the parties' channels of trade and classes of consumers overlap, when Opposer provides evidence of only Applicant's foreign use the involved mark, because Applicant's foreign use is irrelevant in this United States opposition proceeding. *See Double J of Broward Inc. v. Skalony Sportswear GmbH*, 21 USPQ2d 1609, 1612-13 (TTAB 1991) ("Information concerning applicant's foreign activities, including foreign trademark applications and/or registrations, is not relevant to the issues in an opposition proceeding.").

That leaves Opposer with nothing more than attorney argument that the goods are related and travel in similar channels of trade to the same classes of consumers. But mere attorney argument is of no help either. *Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1799 (Fed. Cir. 2018) ("Attorney argument is no substitute for evidence.") (quoting *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 424 F.3d 1276, 1284, 76

USPQ2d 1616, 1622 (Fed. Cir. 2005)); *see also In re U.S. Tsubaki, Inc.*, 109 USPQ2d 2002, 2006 (TTAB 2014) (finding that there was no proof to support the statements in the record by counsel).

Furthermore, Opposer's argument that the goods are "presumed to travel in the same channels of trade to the same class of purchasers," 67 TTABVUE 24, is misplaced. The presumption Opposer cites applies when the identified goods are identical, but here, as explained above, there is no evidence that the parties' goods are even related. *See In re Viterra Inc.,* 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012); *Am. Lebanese Syrian Associated Charities Inc. v. Child Health Research Inst.,* 101 USPQ2d 1022, 1028 (TTAB 2011). While we may presume that the parties' goods will be "offered in all channels of trade which would be normal therefor," *In re Jump Designs, LLC*, 80 USPQ2d 1370, 1374 (TTAB 2006), Opposer has not provided any evidence regarding the "normal" channels of trade for Applicant's identified goods in the United States.

In short, Opposer has not established that the goods are related or that they are offered in overlapping channels of trade to the same consumers. These factors weigh heavily against finding a likelihood of confusion.

### D. Consumer "Sophistication"

Applicant argues that "Opposer's consumers are sophisticated," and would therefore "not think that [the parties' goods] come from the same source," pointing out that Opposer refers to its products as "luxury linens." 68 TTABVUE 22-23 (citing 67 TTABVUE 11). The problem for Applicant is that in this case Opposer is relying primarily on its registration rights, and we must therefore base our decision on the

"least sophisticated potential purchasers" for the goods identified in the pleaded registration. Opposer does not identify its goods as "luxury" items in its registration, and its identification of goods does not limit the channels of trade or classes of consumers for those goods. Thus, as identified in Opposer's pleaded registrations, those goods could encompass basic, inexpensive linens, as well as luxury linens. *Stone Lion Cap. Partners, LP v. Lion Cap. LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1162-63 (Fed. Cir. 2014). We therefore find this factor neutral.

**VI. Conclusion**

Although the marks are similar and Opposer's pleaded mark enjoys some commercial strength, Opposer has not shown that the goods are related, or that they travel in the same channels of trade to the same classes of consumers, and this failure is dispositive. Here, because the goods are not related, confusion is unlikely notwithstanding that the marks are similar. *See Kellogg Co. v. Pack'em Enters. Inc.*, 951 F.2d 330, 21 USPQ2d 1142, 1145 (Fed. Cir. 1991) ("We know of no reason why, in a particular case, a single *duPont* factor may not be dispositive."); *Local Trademarks Inc. v. The Handy Boys Inc.*, 16 USPQ2d 1156, 1158 (TTAB 1990) ("even though opposer's services and applicant's product are or can be marketed to the same class of customers, naming plumbing contractors, these services and goods are so different that confusion is not likely even if they are marketed under the same mark"); *Quartz Radiation Corp. v. Comm/Scope Co.*, 1 USPQ2d 1668, 1669-70 (TTAB 1986) (opposition dismissed because the goods were "quite different," notwithstanding that the marks were the same).

**Decision:** The opposition is dismissed.

2023 WL 6996329 (Trademark Tr. & App. Bd.)

This Opinion is Not a Precedent of the TTAB

Trademark Trial and Appeal Board

Patent and Trademark Office (P.T.O.)

INDUSTRIA DE DISEÑO TEXTIL, S.A. (INDITEX, S.A.)
v.
ZARA TOURS ADVENTURES LLC

Opposition No. 91245732
October 23, 2023

***1** Ricardo Fischer, Ross Q. Panko, and Laura E. Zell of ArentFox Schiff LLP for Industria de Diseño Textil, S.A. (Inditex, S.A.).
Burton S. Ehrlich of Ladas & Parry LLP for Zara Tours Adventures LLC.

Before Cataldo, Larkin, and Cohen
Administrative Trademark Judges
Opinion by Larkin
Administrative Trademark Judge:

Zara Tours Adventures LLC ("Applicant") seeks registration on the Principal Register of the mark shown below:




for the following services:
Escorting of travellers; transport of passengers; arranging transport for travellers; organizing transport for travellers; transport services for sightseeing tours; providing transport for excursions; providing transport for guided tours; transport by rail, boat and air; transportation reservation services; travel ticket reservation service; ticket reservation and booking services for recreational and leisure events, namely, safaris and trekking; rental of vehicles; providing travel information to travellers regarding fares, timetables and public transport; arranging of cruises; agency services for arranging cruises; boat cruises; travel guide services; travel information services; travel and transport information service; booking of travel tickets; travel route planning; organization of travel; travel booking agencies; booking of seats for travel; providing a website featuring information on travel; providing of information about travel, via the Internet; organizing travel for others; arranging of transportation for travel tours; coordinating travel arrangements for individuals and for groups; travel agency services, namely, making reservations and bookings for transportation for tourists; providing transport for expeditions; transportation consulting, in International Class 39;


WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Arranging, provision and conducting of outdoor expeditions and safaris, guided sightseeing and travel tours; conducting guided safaris; ticket reservation and booking services for recreational and leisure events, namely, safaris, trekking, and sightseeing tours; consulting services in the field of the aforementioned services, in International Class 41; and

Hotel services; resort lodging services; providing temporary accommodation; booking of temporary accommodation; reservation of temporary accommodation; providing information in the field of temporary accommodations for travellers, in International Class 43. [1]

***2** Industria de Diseño Textil, S.A. (Inditex, S.A.) ("Opposer") opposes registration of Applicant's mark in all three classes on two grounds: (1) under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that Applicant's mark so resembles various registered ZARA and ZARA-formative marks as to be likely, when used in connection with the services identified in each class in the application, to cause confusion, to cause mistake, or to deceive; and (2) under Section 43(c) of the Trademark Act, 15 U.S.C. § 1125(c), on the ground that Applicant's mark is likely to dilute the distinctiveness of the allegedly famous ZARA marks by blurring.

Only Opposer submitted evidence and filed a brief. [2] We sustain the opposition as to Class 43 in the application and dismiss the opposition as to Classes 39 and 41 in the application.

**I. The Record** [3]

The record consists of the pleadings, [4] and the file history of Applicant's application, by operation of Trademark Rule 2.122(b)(1), 37 C.F.R § 2.122(b)(1), and the following materials submitted by Opposer during its trial period: [5]

• The testimony declaration of Dilip Patel, the Officer-President of Opposer's subsidiary Zara USA, Inc., and Exhibits 1-19 thereto, 26 TTABVUE 1-265 (Exs. 1-7); 14 TTABVUE 1-80 (Exs. 8-10); [6] 15 TTABVUE 1-62 (Ex. 10 (cont.)); 16 TTABVUE 1-170 (Exs. 10 (cont.)-12); 17 TTABVUE 1-124 (Exs. 12 (cont.)-14); 18 TTABVUE 1-306 (Exs. 14 (cont.)-15); 19 TTABVUE 1-234 (Exs. 16-19); [7]

• Notice of Reliance on Registrations, and Exhibit 20 thereto, 21 TTABVUE 2-35;

• Notice of Reliance on Official Records, and Exhibits 21-26 thereto, 22 TTABVUE 1-294;

• Notice of Reliance on Printed Publications, and Exhibits 27-34 thereto, 27 TTABVUE 1-226 (Exs. 27-29), 23 TTABVUE 1-333 (Exs. 30-31), 24 TTABVUE 1-206 (Exs. 32-34); and

• Notice of Reliance on Discovery Responses, including certain pages from the discovery deposition of Applicant's Rule 30(b)(6) designee and Sales and Marketing Representative, U.S. Kathleen Dalsaso Mitchler, [8] and Exhibits 35-36 thereto, 25 TTABVUE 1-273.

**II. The Parties and Their Marks**

**Opposer**

Opposer is a Spanish company that adopted the ZARA trademark in Spain in 1975. Patel Decl. ¶ 10 (26 TTABVUE 5). As of the time when trial began in 2020, Opposer operated more than 2,200 ZARA retail stores in 96 markets worldwide. Patel Decl. ¶ 10 (26 TTABVUE 5).

Opposer opened its first retail store in the United States in 1989 and has used the ZARA mark continuously since then on a variety of goods and services. Patel Decl. ¶ 12 (26 TTABVUE 5). Opposer owns multiple registrations of ZARA and ZARA-formative marks for various goods and services. Patel Decl. ¶¶ 8-9; Ex. 1 (26 TTABVUE 4, 16-46).

**Applicant**

***3** As noted above, Applicant did not submit evidence or a brief, but Opposer made of record Applicant's discovery responses, and the deposition testimony of Ms. Mitchler, which together provide some background regarding Applicant and its mark.

In its interrogatory responses, Applicant stated that its parent company, Zara Tanzania Adventures, was founded by Roger Ansell and Zainab Ansell and started operating in Tanzania in Africa in 1986, and that the word "ZARA" in Applicant's mark was adopted at that time and "is an acronym consisting of letters from the founders' names: 'Z' from Zainab; 'A' from Ansell; 'R' from 'Roger;' and again 'A' from Ansell." 25 TTABVUE 8 (Response to Interrogatory No. 2). Ms. Mitchler testified that it was her understanding that "ZARA" was selected by the Ansells because "[i]t's their initials Zainab Ansell, Z-A; Roger Ansell, R-A. It's their company." Mitchler Tr. 59:6-11 (25 TTABVUE 39).

Applicant was created in May 2014, Mitchler Tr. 49:10-12 (25 TTABVUE 29), to "help U.S. and English-speaking agents and customers book directly with" Zara Tours in Tanzania. Mitchler Tr. 72:23-73:15 (25 TTABVUE 47-48). Applicant claims to have been operating as a tour company in the United States since 2014. 25 TTABVUE 8 (Response to Interrogatory No. 3).

**III. Opposer's Entitlement to a Statutory Cause of Action**

"Entitlement to a statutory cause of action is a requirement in every inter partes case." *Monster Energy Co. v. Lo*, 2023 USPQ2d 87, at *11 (TTAB 2023) (citing *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020) (*citing Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 109 USPQ2d 2061, 2066 (2014)), *civil action filed*, No. 5:23-cv-00549-GW-PVC (C.D. Cal. Mar. 28, 2023). "A party in the position of plaintiff may oppose registration of a mark when doing so is within the zone of interests protected by the statute and it has a reasonable belief in damage that would be proximately caused by registration of the mark." *Id.* (citing *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at * 6-7 (Fed. Cir. 2020)). Opposer must prove its entitlement to oppose by a preponderance of the evidence. *Shenzhen IVPS Tech. Co. v. Fancy Pants Prods., LLC*, 2022 USPQ2d 1035, at *4 (TTAB 2022). [9]

Opposer does not address its entitlement to oppose in its brief, but Opposer's nine pleaded registrations of its ZARA and ZARA-formative marks, 1 TTABVUE 15, were made of record during trial, 21 TTABVUE 2-35, and were valid and subsisting and owned by Opposer when trial began in the summer of 2020. These registrations form the basis of a likelihood of confusion claim that is not wholly without merit, and establish Opposer's entitlement to oppose Applicant's application. *N.Y. Yankees P'Ship v. IET Prods. & Servs., Inc.*, 114 USPQ2d 1497, 1501 (TTAB 2015) ("Although neither party addressed standing, Opposer's standing is established with respect to its likelihood of confusion and dilution claims by its . . . registrations . . ., which the record shows to be valid and subsisting, and owned by Opposer.") (citing *Cunningham v. Laser Golf Corp.*, 222 F.3d 1842, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000)).

**IV. Opposer's Dilution Claim**

***4** We begin with Opposer's claim of dilution under Section 43(c) of the Trademark Act because it potentially provides Opposer the broadest relief. If Opposer establishes all elements of its dilution claim, it can prevail "regardless of the presence or absence of actual or likely confusion [or] of competition," 15 U.S.C. § 1125(c)(1), because "[d]ilution does not involve confusion of the

public, but rather provides extraordinary protection to owners of 'the select class of marks - those with such powerful consumer association that even non-competing uses can impinge on their value."' *Advance Mag. Publishers, Inc. v. Fashion Elecs., Inc.*, 2023 USPQ2d 753, at *14-15 (TTAB 2023) (quoting *Toro Co. v. ToroHead, Inc.*, 61 USPQ2d 1164, 1179 (TTAB 2001) (internal quotation omitted)).

To prevail on its dilution claim, Opposer must show "that: (1) it owns a famous mark that is distinctive;[10] (2) Applicant is using a mark in commerce that allegedly dilutes Opposer's famous mark; (3) Applicant's use of its mark began after Opposer's mark became famous; and (4) Applicant's use of its mark is likely to cause dilution by blurring or tarnishment." *Id.*, at *14.

The "threshold question in a federal dilution claim is whether the mark at issue is 'famous."' *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1724 (Fed. Cir. 2012). The requirement of proof of ownership of a "famous" mark is an exacting one following the amendment in 2006 of the dilution provisions of the Trademark Act through the Trademark Dilution Revision Act ("TDRA"). "Under the TDRA, a mark is famous if it 'is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." *Id.* (quoting 15 U.S.C. § 1125 (c)(2)(A)).

Opposer "has the burden of establishing that its mark has become famous." *Chanel, Inc. v. Makarczyk*, 110 USPQ2d 2013, 2019 (TTAB 2014). "It is well-established that dilution fame is difficult to prove." *Coach Servs.*, 101 USPQ2d at 1724. "An opposer must show that, when the general public encounters the mark 'in almost any context, it associates the term, at least initially, with the mark's owner,"' *TiVo Brands LLC v. Tivoli, LLC*, 129 USPQ2d 1097, 1103 (TTAB 2018) (quoting *Coach Servs.*, 101 USPQ2d at 1725), and that the mark has "become a 'household term [with] which almost everyone is familiar."' *Id.* at 1112 (quoting *Toro*, 61 USPQ2d at 1181). "Fame" for purposes of eligibility for protection against dilution "is an either/or proposition--fame either does or does not exist . . . ." *Joseph Phelps Vineyards LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 122 USPQ2d 1733, 1734 (Fed. Cir. 2017) (quoting *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005)).

***5** Opposer appears to focus its dilution claim on its ZARA word mark, and we will do so as well.[11] Opposer did not discuss or provide evidence of any civil cases in which it has enforced its ZARA mark, but did make of record USPTO and TTABVUE electronic records regarding inter partes Board proceedings in which Opposer has been the plaintiff. 22 TTABVUE 10-151. Mr. Patel also testified about these enforcement efforts. Patel Decl. ¶¶ 44-45; Ex. 17 (26 TTABVUE 11-13; 19 TTABVUE 46-187).[12] In all of these cases, the applicant either defaulted, was sanctioned, or withdrew its application, or the parties settled.

The *Benzara* case noted above appears to be the only Board case involving Opposer's ZARA mark that has gone the distance to final decision. In *Benzara*, the Board considered the fame or strength of Opposer's ZARA and ZARA HOME marks for purposes of Opposer's likelihood of confusion claim, but did not address dilution. 64 TTABVUE 33 (Opp. No. 91242880). The Board found in *Benzara* that the ZARA mark had "attained significant commercial success and renown when used in association with [Opposer's] clothing and fashion line," *id.* at 21-22, but noted that "[u]nlike for dilution fame, fame for likelihood of confusion purposes does not require the opposer to show fame among every segment of the U.S. population." *Id.* at 16.[13]

The Board's discussion of fame in *Benzara* provides useful guidance in our analysis of the evidence of fame in this case for both dilution and likelihood of confusion purposes. Opposer's evidence in the *Benzara* case was submitted on September 24, 2020, a little more than a month after Opposer submitted its evidence in this case, and based on the Board's description in its decision of the record in *Benzara*, *id.* at 16-20, it appears that the records in that case and in this one are basically identical with respect to Opposer's evidence of the fame of its ZARA mark.

In determining whether the ZARA mark is famous for purposes of Opposer's dilution claim, we consider:
(i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties;

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark;

(iii) The extent of actual recognition of the mark; and

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

***6** *Advance Mag. Publishers*, 2023 USPQ2d 753, at *15 (quoting 15 U.S.C. § 1125(c)(2)(A). [14]

With respect to fame factor (i) regarding advertising and publicity, Opposer argues that

for more than three decades, [Opposer] has engaged in extensive nationwide advertising and promotion of its ZARA marks, including through its websites, electronic catalogs, mobile applications, and record-boasting social media followings on Twitter, Facebook, Instagram, YouTube, and Pinterest. . . . From 2014-2018, [Opposer] invested [an amount in the very low nine figures in U.S. dollars [15] globally to advertise and promote products sold under its ZARA marks. Moreover, [Opposer's] www.zara.com website has been recognized as one of the "most visited e-commerce sites" and its ZARA brand is among the "best brands on Instagram." . . . [T]he ZARA marks have received substantial media attention, including for [Opposer's] charitable efforts, and for the many celebrities who wear and express their enthusiasm for ZARA goods. In light of this evidence, the public's exposure to the ZARA marks has been substantial and widespread over many decades, which supports a finding of fame for dilution purposes. [16]

55 TTABVUE 42 (record citations omitted).

Mr. Patel testified that from 2014-2018, Opposer's approximate "global advertising expenditures for the ZARA brand" were in the very low nine figures, [17] Patel Decl. ¶ 27 (20 TTABVUE 8), but he did not break this aggregate figure down by country or region, and did not provide even an estimate specific to the United States. This is problematic because Opposer is headquartered in Spain and as of the time of trial operated in 96 markets worldwide. Patel Decl. ¶ 10 (26 TTABVUE 5). In *Benzara*, the Board commented on what appear to be the same 2014-2018 advertising figures as follows:

> Opposer failed to identify how many dollars were spent on U.S. advertising for its ZARA fashion line and its ZARA HOME furniture and home furnishings in the United States; instead, Opposer merely provided its worldwide advertising figures. Without this breakdown in U.S. sales and U.S. advertising figures, it is difficult to ascertain the consumer exposure of Opposer's ZARA and ZARA HOME marks individually in the United States.

64 TTABVUE 21 (Opp. No. 91242880). We agree with this critique, which applies with even greater force here on Opposer's dilution claim, where the issue is the extent of the exposure of the ZARA mark by advertising not just to clothing purchasers in the United States, but to members of the general public at large.

Mr. Patel did not identify any printed publications or specific electronic media in which Opposer has advertised its goods in the United States other than Opposer's own electronic catalogs distributed to consumers on a seasonal basis via newsletter. Patel Decl. ¶ 31; Ex. 10 (26 TTABVUE 9; 14 TTABVUE 37-80; 15 TTABVUE 2-62; 16 TTABVUE 2-22). He testified that the

ZARA newsletter is distributed to approximately 1,175,900 U.S. consumers and the ZARA HOME newsletter is distributed to more than 95,000 U.S. consumers. Patel Decl. ¶ 31 (26 TTABVUE 9).[18] There is no evidence that the general public in the United States has been exposed to the ZARA mark through advertising in general-circulation publications or indeed in any publications at all, or on television or radio. *Cf.* Chanel, 110 USPQ2d at 2021 (discussing exposure of the CHANEL mark through advertising in the United States in 66 different magazines with a national circulation, as well as 14 regional publications, and 10 trade publications, including fashion magazines, general interest magazines, newspapers with a large, general circulation such as *The New York Times*, and on television).

***7** Mr. Patel testified at length about Opposer's presence on social media, including its own Zara app, which in 2019 was downloaded almost 1,500,000 times, and on Twitter (now X), Instagram, YouTube, Facebook, and Pinterest. Patel Decl. ¶¶ 32-37; Ex. 11 (26 TTABVUE 9-10, 16 TTABVUE 23-106). The numbers of "followers," "likes," and subscribers regarding Opposer's social media pages as of August 2020 are quite impressive, and Opposer's social media presence has been noted in various media. Patel Decl. ¶ 38; Ex. 12 (26 TTABVUE 10; 16 TTABVUE 107-70; 17 TTABVUE 2-32).[19] According to Mr. Patel, Opposer's zara.com website received more than 2.3 billion unique visits in 2019. Patel Decl. ¶ 30 (26 TTABVUE 8).

The *Benzara* panel considered the same evidence of Opposer's social media activities and recognition, 64 TTABVUE 18-20 (Opp. No. 91242880), and found that

although the record demonstrates that Opposer has had extensive traffic on its social media platforms, Opposer failed to identify how many of those visits, "likes," "follows," and retweets are by U.S. consumers. As such, this evidence has diminished value because it is likely that non-U.S. consumers are included in the total number of social media traffic, particularly in light of the fact that Opposer has a global brand.

*Id.* at 21. In that regard, we note that part of Exhibit 12 to Mr. Patel's declaration is a May 2018 report regarding "traffic" on the zara.com website, and it appears to show that United States visitors accounted for only 14.3% of all visits during the reporting period, with the vast majority of visits being those of visitors from other countries. Patel Decl. ¶ 38; Ex. 12 (26 TTABVUE 10; 16 TTABVUE 109).

Mr. Patel also testified that the ZARA brand is consistently ranked among the world's most valuable brands, Patel Decl. ¶ 39 (26 TTABVUE 10), citing rankings in Interbrand; Brandz (80th in 2010, 35th in 2013, 34th in 2017, and 42nd in 2018);[20] Forbes (the 93rd most reputable worldwide company in 2014 and the 46th most valuable worldwide brand in 2018);[21] Brand Finance Global (the 92nd most valuable worldwide brand in 2019);[22] and other lists. Patel Decl. ¶ 39; Ex. 13 (26 TTABVUE 10, 17 TTABVUE 33-107). The Board considered this evidence in *Benzara*, 64 TTABVUE 18 (Opp. No. 91242880), finding that ZARA "has been named a top clothing brand by the industry." *Id.* at 21.

As in *Benzara*, 64 TTABVUE 20 (Opp. No. 91242880), Mr. Patel testified that many celebrities have been photographed in, or in connection with, ZARA products, including singer and actress Selena Gomez; actresses Katie Holmes, Sienna Miller and January Jones; models Bella Hadid and Emily Ratjkowski; former First Lady Melania Trump; Duchess of Cambridge Kate Middleton and her sister, Pippa Middleton; Queen Letizia Rocasolano of Spain; and fashion designer Olivia Palermo, among many others. Patel Decl. ¶ 41; Ex. 15 (26 TTABVUE 10-11; 18 TTABVUE 66-306).[23] He also testified regarding Opposer's charitable efforts. Patel Decl. ¶ 42; Ex. 16 (26 TTABVUE 11; 19 TTABVUE 2-45).

***8** Finally, Mr. Patel testified that the ZARA brand has been featured in *The New York Times*, *Forbes*, and other publications. Patel Decl. ¶ 40; Ex. 14 (20 TTABVUE 10; 17 TTABVUE 108-24; 18 TTABVUE 1-65.[24] The 2019 *Forbes* article described Opposer as "the world's largest clothing retailer," 18 TTABVUE 35, and stated that the company operated in 2,213 stores across 93 markets and 30 online markets. *Id.* at 36. A 2011 article on cnn.com stated that as of 2000, Opposer had 350 shops in Europe, 18 in the Middle East, 52 in the Americas, and five in Asia. *Id.* at 40. A 2018 article on businessinsider.com stated that "Zara

is part of the biggest fashion company in the world," *id.* at 53, and called ZARA "one of the best-known global fashion brands, with more than 2,000 stores around the world." *Id.* at 55. There is no evidence that the ZARA brand has regularly been discussed in general-circulation publications in the United States, and no evidence of the sort of "pervasive" discussion of the ZARA mark that would cause it to find "its way into the popular culture at all levels . . . ." *Nike*, 100 USPQ2d at 1024 (finding Nike's JUST DO IT mark to be famous for dilution purposes based in part on numerous articles and other cultural references regarding the mark). *See also Chanel*, 110 USPQ2d at 2021-22 (finding that the CHANEL mark was famous for dilution purposes based in part on its appearance in books, exhibitions, magazines and newspapers, and movies and television shows).

With respect to fame factor (ii) regarding sales, Mr. Patel testified that Opposer's sales in the United States between 2014 and 2019 were in the very high nine figures in 2014 and 2015 and in the very low ten figures in 2016, 2017, 2018, and 2019. Patel Decl. ¶ 21 (20 TTABVUE 7). Sales steadily increased annually during this period. We agree with the Board's characterization of these figures in *Benzara* as "quite significant and impressive." 64 TTABVUE 17 (Opp. No. 91242880).

Once again, however, these figures have minimal probative value regarding the fame of Opposer's mark as of June 1, 2014, a date less than halfway through the first year of the referenced period. Mr. Patel testified that the ZARA mark has been in use in the United States continuously since 1989, Patel Decl. ¶ 12 (26 TTABVUE 5), but did not provide any sales figures for the 25-year period preceding 2014. In the absence of such figures, we agree with the Board's finding in *Benzara* that "the length of time Opposer has used its ZARA and ZARA HOME marks in U.S. commerce for the goods and services listed in its pleaded registrations, standing alone, is insufficient to establish that its marks have achieved such commercial renown that it may be considered a very strong mark." 64 TTABVUE 20 (Opp. No. 91242880). [25]

***9** With respect to fame factor (iii), Opposer argues that in light of its "substantial advertising, promotion, and sales under the ZARA marks and the significant media attention given to the marks over several decades, the Board can infer that the ZARA marks have significant actual recognition among the general public." 56 TTABVUE 43 (citations omitted). We have discussed above, in connection with fame factors (i) and (ii), the evidence on which Opposer bases this argument.

Finally, with respect to fame factor (iv), Opposer correctly argues that its ZARA mark has been registered repeatedly on the Principal Register. *Id.* at 44. This factor thus favors a finding that ZARA is famous, but it is the least significant factor because while millions of marks are registered on the Principal Register, very few belong to "'the select class of marks - those with such powerful consumer association that even non-competing uses can impinge on their value,'" *Advance Mag. Publishers*, 2023 USPQ2d 753, at *14-15, that are famous for purposes of protection against dilution.

Opposer's strongest evidence of dilution fame is its brand rankings, *see Spotify AB v. U.S. Software Inc.*, 2022 USPQ2d 37, at *25 (TTAB 2022); *Chanel*, 110 USPQ2d at 2021, but Opposer's brand rankings purport to reflect the worldwide prominence of the ZARA mark, which is used in nearly 100 markets in addition to the United States, rather than its prominence in the United States per se. The Board in *Benzara* considered these rankings, and the other evidence in the record there (and here), and found that "Opposer has demonstrated that its ZARA mark has attained significant commercial success and renown when used in association with its clothing and fashion line." 64 TTABVUE 21-22 (Opp. No. 91242880). Based on the comparable record here, we also make that finding in our discussion below of fame for purposes of Opposer's Section 2(d) claim, but we cannot find that before either June 1, 2014 or March 28, 2018, the ZARA mark "enjoy[ed] widespread recognition among the general public and [was] a 'household name' synonymous with high fashion and style for the products and services identified in its pleaded registrations" in the United States. *Chanel*, 110 USPQ2d at 2022 (finding the CHANEL mark to be famous for purposes of protection against dilution).

Because Opposer failed to prove fame, the threshold element of its dilution claim, Opposer cannot prevail on that claim.

**V. Opposer's Section 2(d) Claim**

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

Section 2(d) of the Trademark Act prohibits the registration of a mark that "[c]onsists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d). "To prevail on its Section 2(d) claim, Opposer must prove, by a preponderance of the evidence, that it has priority in the use of its pleaded marks and that use of Applicant's mark is likely to cause confusion, mistake, or deception as to the source or sponsorship of [Applicant's] . . . services . . . ." *DC Comics*, 2022 USPQ2d 1249, at *20-21 (citations omitted).

**A. Priority**

***10** As discussed above, Opposer's pleaded registrations of its ZARA-formative marks are of record and Applicant did not counterclaim to cancel them. "The pleaded registrations that establish Opposer's entitlement to maintain this opposition also establish that priority is not an issue as to the marks and the goods and services covered by the registrations." *Id.*, at *21.

**B. Likelihood of Confusion**

Our determination of the likelihood of confusion under Section 2(d) of the Trademark Act is based on an analysis of all probative facts in the record that are relevant to the likelihood of confusion factors set forth in *E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*DuPont*"). We consider each *DuPont* factor for which there is argument and evidence. *See*, *e.g.*, *In re Guild Mortg. Co.*, 912 F.3d 1376, 129 USPQ2d 1160, 1162-63 (Fed. Cir. 2019).

"In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the [goods and] services." *Monster Energy*, 2023 USPQ2d 87, at *14 (citing *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA (1973)). Opposer discusses the key two first *DuPont* factors, 56 TTABVUE 28-37, as well as the third and fourth factors, the "similarity or dissimilarity of established, likely-to-continue trade channels," and the "conditions under which and buyers to whom sales are made, i.e., 'impulse' vs. careful, sophisticated purchasing," *DuPont*, 177 USPQ at 567, 56 TTABVUE 37-38; the fifth factor, the "fame of the prior mark (sales, advertising, length of use)," *DuPont*, 177 USPQ at 567, 56 TTABVUE 21-28; the sixth factor, the "number and nature of similar marks in use on similar goods," *DuPont*, 177 USPQ at 567, 56 TTABVUE 39-40; [26] the eighth factor, the "length of time during and conditions under which there has been concurrent use without evidence of actual confusion," *DuPont*, 177 USPQ at 567, 56 TTABVUE 40; [27] and the ninth factor, the "variety of goods on which a mark is or is not used (house mark, 'family' mark, product mark)." *DuPont*, 177 USPQ at 567. 56 TTABVUE 38-39.

***11** As noted above, Opposer has pleaded and made of record registrations of various ZARA and ZARA-formative marks. We will focus our *DuPont* analysis on Opposer's standard-character ZARA mark, which is registered for various goods in Classes 9, 14, 16, 20, 21, 24, 25, 26, and 28, and various services in Class 35 in Registration No. 1922163, 21 TTABVUE 6-8, Registration No. 2392637, *id.* at 9-11, Registration No. 2603674, *id.* at 12-14, Registration No. 2956372, *id.* at 18-21, Registration No. 4030529, *id.* at 24-29, and Registration No. 5614476. *Id.* at 32-35. The standard-character ZARA mark "has the most points in common with Applicant's mark," *Monster Energy*, 2023 USPQ2d 87, at *12, and if we find a likelihood of confusion as to the ZARA word mark, "we need not find it as to Opposer's other registered marks; conversely, if we do not find a likelihood of confusion as to Opposer's [ZARA] mark . . . we would not find it as to Opposer's other registered marks for the goods [and services] identified therein." *New Era*, 2020 USPQ2d 10596, at *9-10.

"Because each class in Applicant's multi-class application is, in effect, a separate application, we consider each class separately, and determine whether Opposer has shown a likelihood of confusion with respect to each." *N. Face Apparel Corp. v. Sanyang Indus. Co.*, 116 USPQ2d 1217, 1228 (TTAB 2015).

**1. Strength of Opposer's ZARA Mark** [28]

"Before we evaluate the similarity or dissimilarity of the parties' marks, we first consider the strength of Opposer's asserted marks" because "the fifth *DuPont* factor enables Opposer to prove that its pleaded marks are entitled to an expanded scope of protection by adducing evidence of '[t]he fame of the prior mark (sales, advertising, length of use)'." *Made in Nature*, 2022 USPQ2d 557, at *20-21 (quoting *DuPont*, 177 USPQ at 567). "The strength of Opposer's marks affects the scope of protection to which they are entitled. Thus, we consider Opposer's marks' conceptual strength, based on the nature of the marks themselves, and their commercial strength, based on marketplace recognition of the marks." *Id.*, at *21 (citing *In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010)).

**a. Conceptual Strength**

The conceptual strength of Opposer's ZARA mark is a function of the nature of the mark itself. *Monster Energy*, 2023 USPQ2d 87, at *21. The six registrations of the mark discussed above all issued "on the Principal Register without a claim of acquired distinctiveness under Trademark Act Section 2(f), 15 U.S.C. § 1052(f), [and] they are presumed to be inherently distinctive for the goods and services recited in those registrations." *Monster Energy*, 2023 USPQ2d 87, at *21 (citing *New Era*, 2020 USPQ2d 10596, at *10). Applicant has submitted no evidence of the conceptual weakness of the ZARA mark. We agree with the Board in *Benzara* that the ZARA mark is inherently distinctive and is presumptively "entitled to the normal scope of protection accorded inherently distinctive marks." *Benzara*, 64 TTABVUE 13 (Opp. No. 91242880). [29]

**b. Commercial Strength**

***12** "We now turn to Opposer's arguments and evidence that its [ZARA mark has] acquired commercial strength and [is] famous through use and recognition in the marketplace." *Made in Nature*, 2022 USPQ2d 557, at *30. As noted above, "[l]ikelihood of confusion fame varies along a spectrum from very strong marks to very weak marks." *Id.* (citing *Joseph Phelps Vineyards*, 122 USPQ2d at 1734). "Because of the extreme deference that we accord a famous mark in terms of the wide latitude of legal protection it receives, and the dominant role fame plays in the likelihood of confusion analysis, it is the duty of the party asserting that its mark is famous to clearly prove it." *Id.*, at *31 (citing *Coach Servs.*, 101 USPQ2d at 1720 (internal citation omitted)).

Unlike dilution fame, likelihood of confusion strength involves a market-specific inquiry focused on whether a "significant portion of the relevant consuming public recognizes the mark as a source indicator." *Id.*, at *22. A mark may be commercially strong in connection with some goods and services, but not in connection with others. *Id.*, at *23-25 (noting that the applicant did not dispute that the opposer's MONSTER ENERGY mark was famous for energy drinks, but finding that the mark did not have "any notable commercial strength" for restaurant services). In addition, and of particular relevance here, "a mark can acquire 'sufficient public recognition and renown to be famous for purposes of likelihood of confusion without meeting the more stringent requirement for dilution fame."' *Coach Servs.*, 101 USPQ2d at 1724 (quoting *7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1722 (TTAB 2007)).
Commercial strength may be measured indirectly "by the volume of sales and advertising expenditures in connection with the goods sold under the marks, for example, and other factors such as length of time of use of the mark; widespread critical assessments; notice by independent sources of the products identified by the marks; and the general reputation of the products and services.

*Monster Energy*, 2023 USPQ2d 87, at *22.

Opposer argues that "the ZARA marks have attained an extraordinarily high degree of recognition among consumers as a result of [Opposer's] more than three decades of United States use, advertising, promotion, and enforcement." 56 TTABVUE 23. [30] Opposer relies on the evidence discussed above in connection with Opposer's dilution claim. [31]

As the Board found in *Benzara*, we find that the comparable evidence here clearly shows that Opposer's "ZARA mark has attained significant commercial success and renown when used in association with its clothing and fashion line." 64 TTABVUE 21-22 (Opp. No. 91242880). We place the ZARA mark for clothing "on the much higher end of the commercial strength spectrum 'from very strong to very weak'," *New Era*, 2020 USPQ2d 10596, at *12 (quoting *Joseph Phelps Vineyards*, 122 USPQ2d at 1734), "amongst a 'significant portion of the relevant U.S. consumers.'" *Id.* (quoting *Palm Bay Imps.*, 73 USPQ2d at 1694). The fifth *DuPont* factor "weighs in favor of finding a likelihood of confusion." *Id.*

**2. Similarity or Dissimilarity of the Marks**

***13** "Under the first *DuPont* factor, we consider 'the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.'" *Sabhnani v. Mirage Brands, LLC*, 2021 USPQ2d 1241, at *26 (TTAB 2021) (quoting *Palm Bay Imps.*, 73 USPQ2d at 1691). "'Similarity in any one of these elements may be sufficient to find the marks confusingly similar.'" *Id.* (quoting *In re Inn at St. John's, LLC*, 126 USPQ2d 1742, 1746 (TTAB 2018) (quoting *In re Davia*, 110 USPQ2d 1810, 1812 (TTAB 2014)), *aff'd mem.*, 777 F. App'x 516 (Fed. Cir. 2019).

"The proper test regarding similarity 'is not a side-by-side comparison of the marks, but instead whether the marks are sufficiently similar in terms of their commercial impression such that persons who encounter the marks would be likely to assume a connection between the parties.'" *Id.* (quoting *Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1801 (Fed. Cir. 2018) (quoting *Coach Servs.*, 101 USPQ2d at 1721)).

"The proper perspective on which the analysis must focus is on the recollection of the average customer, who retains a general rather than specific impression of marks." *Id.* (quoting *In re i.am.symbolic, llc*, 127 USPQ2d 1627, 1630 (TTAB 2018)). In discovery, Applicant identified the "general consumer" of its services as someone "interested in travel, tours, safaris and the services identified in the application," 25 TTABVUE 15 (Response to Interrogatory No. 17), which includes members of the general public.

Opposer's ZARA mark in the registrations discussed above is a standard-character mark. We reproduce Applicant's composite word-and-design mark again below:




Opposer argues generally that the "parties' marks are highly similar in sight, sound, and meaning because Applicant's Mark wholly incorporates and prominently features [Opposer's] 'ZARA' mark, and Applicant's mere stylization of ZARA with the suffix 'Tours Adventures' does not sufficiently distinguish the marks." 56 TTABVUE 28.

Opposer argues that the marks are similar in appearance because "consumers will notice and remember ZARA given its prominent position and size over the global design," *id.* at 29 (citation omitted), and that "the combination of the display of ZARA in large, all capital green letters results in the visual emphasis of ZARA while obscuring the presence of 'TOURS' and 'ADVENTURES, which are in a different color and smaller font." *Id.* at 30 (citation omitted). Opposer argues that the marks are "highly similar phonetically because Applicant admits that the 'ZARA' portion of its mark is pronounced the same as

'ZARA' in [Opposer's] marks." *Id.* at 31 (record citation omitted). Finally, Opposer argues that "the marks have no perceptible difference in meaning," *id.* at 32, because "[a]lthough Applicant claims 'ZARA' was adopted to refer to the names of Applicant's owners, Zainab Ansell and Roger Ansell," there is "no evidence that U.S. consumers understand that the word ZARA as used by Applicant refers to the names of the Ansells, nor any evidence that Applicant has made any effort to educate the U.S. consuming public as to that supposed meaning." *Id.* (record citation omitted). According to Opposer, "consumers are likely to mistakenly perceive Applicant's Mark as being affiliated with the famous ZARA brand, which creates a likelihood of confusion." *Id.*

***14** In analyzing the similarity or dissimilarity of the involved marks, "[w]hile the marks must be considered in their entireties, 'in articulating reasons for reaching a conclusion on the issue of confusion, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties.'" *Sabhnani*, 2021 USPQ2d 1241, at *30 (quoting *In re Detroit Athletic Co.*, 903 F.3d 1297, 128 USPQ2d 1047, 1050 (Fed. Cir. 2018) (internal quotation and quotation marks omitted)). We agree with Opposer that the word ZARA is the dominant portion of Applicant's composite mark.

"In marks 'consisting of words and a design, the words are normally accorded greater weight because they are likely to make a greater impression upon purchasers, to be remembered by them, and to be used by them to request the goods.'" *Id.*, at *31 (quoting *In re Aquitaine Wine USA, LLC*, 126 USPQ2d 1181, 1184 (TTAB 2018) (citing *In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012); *CBS Inc. v. Morrow*, 708 F.2d 1579, 218 USPQ 198, 200 (Fed. Cir. 1983)). That general principle applies with full force here, where the design elements serve primarily as a "carrier" or background for the words. *Id.*, at *32. ZARA is the most prominent word in the verbal portion of the mark because of its central "position, size and bolding," *Aquitaine Wine USA*, 126 USPQ2d at 1185, and because it is the only word in the mark "with source-identifying significance" with respect to the involved services given the disclaimer of the words TOURS and ADVENTURES. *Sabhnani*, 2021 USPQ2d 1241, at *33.

In that regard, Applicant has made multiple uses of ZARA alone to identify itself and its services. As shown below, Applicant has identified itself on its website simply as "ZARA":




24 TTABVUE 184, and Ms. Mitchler acknowledged multiple uses of ZARA alone as a shorthand for the company on Applicant's website and in social media. Mitchler Tr. 114:21-116:25, 117:2-118:10; Exs. 13, 19-20 (25 TTABVUE 68-71, 210-29; 241-50). We can infer from Applicant's own frequent use of ZARA alone that consumers will use the shorthand ZARA to identify and refer to Applicant and its services.

We find that the word ZARA "dominates the commercial impression of Applicant's mark," *Aquitaine Wine USA*, 126 USPQ2d at 1185, and turn now to the required comparison of the marks in their entireties, giving greater weight in that comparison to the word ZARA in Applicant's mark than to the other verbal and visual elements of the mark.

***15** Opposer's ZARA mark is registered in standard characters and "'may be used in any particular font style, size, or color,' including 'the same font, size and color as the literal portions of [Applicant's] mark."' *In re OSF Healthcare Sys.*, 2023 USPQ2d 1089, at *2 (TTAB 2023) (quoting *Aquitaine Wine USA*, 126 USPQ2d at 1186 (quoting Trademark Rule 2.52(a), 37 C.F.R. § 2.52(a)). As a result, we must assume that Opposer's ZARA mark could be depicted in exactly the same green stylized font in which the word ZARA is depicted in Applicant's mark, as shown again below:




32

A consumer with a general impression in the mind's eye of Opposer's ZARA mark displayed in this manner (or even simply in block letters) who separately sees Applicant's mark is likely to view the marks as similar in appearance notwithstanding the peripheral visual differences arising from the modest design elements and the word TOURS and ADVENTURES in Applicant's mark.

With respect to sound, Opposer's mark is the word ZARA and Applicant's mark, when verbalized, begins with the word ZARA, and Ms. Mitchler testified that she believed that ZARA would be pronounced the same in both marks. Mitchler Tr. 121:6-9 (25 TTABVUE 75). The marks are similar in sound if verbalized as "Zara" and "Zara Tours [and] Adventures," respectively, and are identical in sound if consumers "engage in 'the penchant to shorten marks,"' *Sabhnani*, 2021 USPQ2d 1241, at *36 (quoting *In re Bay State Brewing Co.*, 117 USPQ2d 1958, 1961 (TTAB 2016)), and drop the non-source identifying words TOURS and ADVENTURES when verbalizing Applicant's mark, as Applicant has frequently done in identifying itself as "ZARA."

Finally, with respect to meaning, we agree with Opposer that ZARA is likely to be perceived as having the same vaguely exotic meaning in both marks even if the exact meaning is uncertain or unknown. There is nothing on the face of Applicant's mark reflecting its claimed origin and "no evidence here, or other reason to find, that [ZARA] has one meaning when used with [clothing and bags], and a second and different meaning when used" for Applicant's various services. *In re Embiid*, 2021 USPQ2d 577, at *21 (TTAB 2021).

The marks are similar in all means of comparison, and the first *DuPont* factor supports a conclusion that confusion is likely.

**3. Similarity or Dissimilarity of the Goods and Services, and Channels of Trade**

The second and third *DuPont* factors respectively consider "'[t]he similarity or dissimilarity and nature of the goods or services as described in an application or registration,"' and "'the similarity or dissimilarity of established, likely-to-continue trade channels."' *Sabhnani*, 2021 USPQ2d 1241, at *15 (quoting *Detroit Athletic Co.*, 128 USPQ2d at 1051-52 (quoting *DuPont*,

177 USPQ at 567)). As discussed above, because Applicant's three-class application is, in effect, three separate applications, we must consider the evidence of relatedness of the goods and services, channels of trade, and classes of consumers on a class-by-class basis. *Cf. OSF Healthcare*, 2023 USPQ2d 1089, at *3 (considering relatedness on a class-by-class basis on an ex parte refusal to register a mark in three classes of services).

**a. Similarity or Dissimilarity of the Goods and Services**

***16** It is not necessary that the goods and services "'of the parties be similar or even competitive to support a finding of a likelihood of confusion."' *Coach Servs.*, 101 USPQ2d at 1722 (quoting *7-Eleven*, 83 USPQ2d at 1724). They need only be "related in some manner and/or if the circumstances surrounding their marketing are such that they could give rise to the mistaken belief that they emanate from the same source." *Id.* (quoting *7-Eleven*, 83 USPQ2d at 1724).

"'Evidence of relatedness may include news articles or evidence from computer databases showing that the relevant goods [or services] are used together or used by the same purchasers; advertisements showing that the relevant goods [or services] are advertised together or sold by the same manufacturer or dealer; or copies of prior use-based registrations of the same mark for both applicant's goods [or services] and the goods [or services] listed in the cited registration."' *OSF Healthcare*, 2023 USPQ2d 1089, at *3 (quoting *Embiid*, 2021 USPQ2d 577, at *22-23 (internal quotation omitted)).

Applicant's three-class application identifies numerous services. Under current application examination practice, "semicolons 'should generally be used to separate distinct categories of goods or services within a single class."' *Monster Energy*, 2023 USPQ2d 87, at *15 n.35 (citing TRADEMARK MANUAL OF EXAMINING PROCEDURE ("TMEP") Section 1402.01(a)). There are 32 distinct services separated by semicolons in Applicant's Class 39 identification, four distinct services in Applicant's Class 41 identification, and six distinct services in Applicant's Class 43 identification. Opposer need not show that each service in each class in Applicant's application is related to each good or service identified in the subject registrations of ZARA for confusion to be likely. "'[I]t is sufficient for finding a likelihood of confusion if relatedness is established for any [service] encompassed by the identification of [services] within a particular class in the application."' *OSF Healthcare*, 2023 USPQ2d 1089, at *3 (quoting *In re St. Julian Wine Co.*, 2020 USPQ2d 10595, at *3-4 (TTAB 2020) (internal quotation omitted)). *See also Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp.*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981). Accordingly, to prevail as to each entire class in the application, Opposer is only required to show that one of the identified services is related to one or more goods or services identified in Opposer's registrations of ZARA.

In assessing relatedness, "we must construe the [goods and] services identified in [Opposer's] registration[s] as broadly as reasonably possible 'to include all [goods and services] of the nature and type described therein,"' *OSF Healthcare*, 2023 USPQ2d 1089, at *4 (quoting *In re Solid State Design Inc.*, 125 USPQ2d 1409, 1413 (TTAB 2018)), and "we must resolve any ambiguities regarding their coverage in favor of [Opposer] 'given the presumptions afforded the registration[s] under Section 7(b)' of the Trademark Act." *Id.* (quoting *In re C.H. Hanson Co.*, 116 USPQ2d 1351, 1355 (TTAB 2015) (citing 15 U.S.C. § 1057(b)). "[W]e must also give the services identified in the application their full scope in our analysis of the second *DuPont* factor." *Id.* (citing *In re Country Oven, Inc.*, 2019 USPQ2d 443903, at *5-6 (TTAB 2019)).

***17** As discussed in detail below, Opposer relies heavily on third-party registrations and uses to show relatedness. In *OSF Healthcare*, the Board reiterated some basic principles governing the evaluation of such evidence. "When we consider third-party registrations, 'just as we must consider the full scope of the goods and services as set forth in the application and registration under consideration, we must consider the full scope of the goods and services described in a third-party registration."' *Id.*, at *10 (quoting *Country Oven*, 2019 USPQ2d 443903, at *9). "[W]ith respect to Internet evidence, in determining exactly what [goods or] services are offered through the respective websites, we acknowledge that [goods or] services may not be explicitly described at all, or may be described in colloquial language that does not track the technical language of acceptable identifications of goods and services in applications and registrations, including those involved here." *Id.*, at *8 (citing TMEP § 1402). "In such instances, we must determine the nature of the [goods or] services that are offered, and decide whether they

fall within the full scope of the language in the involved identifications." *Id.* (citing *In re Dare Foods, Inc.*, 2022 USPQ2d 291, at *6 (TTAB 2022)).

As discussed below, Opposer argues broadly that its "goods and services are all related and complementary to Applicant's **travel and hotel services**." 56 TTABVUE 34 (emphasis added). Although "hotel services" appear in Applicant's Class 43 identification, there are no services identified simply as "travel services" in any of the three classes in the application. As the Board explained in *OSF Healthcare*, we must determine relatedness based on the services actually identified in the application, not on broader or generalized characterizations or descriptions of the identified services. *OSF Healthcare*, 2023 USPQ2d 1089, at *10 (holding that "[w]e must determine whether Applicant's Class 44 services are related to the specific 'training in patient-centered, evidence-based community health worker-centered healthcare' identified in the cited registration" and noting that the "Examining Attorney effectively broadened and generalized that identification of services and submitted evidence addressed to the broader identification, not the actual one."). Accordingly, we will evaluate Opposer's evidence of relatedness on a class-by-class basis by reference to the services actually identified in Applicant's application. [33]

Opposer's overall position is that the parties' respective goods and services are (1) complementary because they are used together and (2) related because they commonly emanate from the same source. 56 TTABVUE 32. Opposer specifically argues that its ***18** ZARA registrations cover: (i) travel-related goods, including "travel trunks and travel bags, leather travel cases, and garment bags for travel"; (ii) travel related services, such as "retail store services in the field of luggage and bags"; (iii) a wide-variety of "clothing" and "accessories" that are worn and marketed to travelers; and (iv) a wide-variety housewares and related products, such as "bed blankets, comforters . . . liquid handsoaps" that are commonly associated with hotels. . . . As such, [Opposer's] goods and services are all related and complementary to Applicant's travel and hotel services.

*Id.* at 33-34 (record citation omitted).

Opposer further argues that certain of the goods for which its mark is registered have been advertised to travellers, including clothing and accessories that "are targeted to travellers," and that are "designed for use by consumers who engage in adventure travel activities such as hiking and safari," including "hiking boots, hiking key chains, and safari jackets." *Id.* at 34 (record citations omitted). Opposer also argues that Applicant itself "uses the mark ZARA on goods covered by [Opposer's] registrations, including t-shirts worn by their [sic] employees/agents with solely the word ZARA printed on them." *Id.* (record citation omitted).

Opposer claims that its "sale of travel products under its ZARA marks and its travel-inspired marketing and collections have been the subject of substantial media coverage," including "by prominent travel publications, including *Conde Nast* and *Travel and Leisure*," and its "ZARA clothing items have also been featured and suggested as clothing items to wear and pack when traveling and on vacation . . ." *Id.* at 34-35 (record citations omitted). Opposer concludes that its "connection to and with the travel industry is not unique, as the public is accustomed to encountering fashion brands in the travel services industry." *Id.* at 35 (record citations omitted).

Opposer also cites third-party uses and registrations of marks "covering goods and services of the type offered by [Opposer], on the one hand, and Applicant, on the other" as "relevant to show the relatedness of the parties' goods and services." *Id.* Opposer "summarizes [its] evidence of third-party registrations and uses of marks for the goods and services at issue" in the following table in its brief:

| **Parties' Goods and Services** | **Third-party Registrations** | **Third-party Internet Websites** |
| --- | --- | --- |

| | | |
|---|---|---|
| Luggage / travel bags (Inditex's goods)<br><br>Travel and/or tour services (Applicant's services) | 22 TTABVUE 152-174 | 27 TTABVUE 6-40 |
| Clothing (Inditex's goods)<br><br>Travel and/or tour services (Applicant's services) | 22 TTABVUE 175-189 | 27 TTABUE 41-93 |
| Clothing (Inditex's goods)<br><br>Hotel services (Applicant's Services) | 22 TTABVUE 217-276 | 27 TTABVUE 167-226; |
| Housewares (Inditex's goods)<br><br>Hotel services (Applicant's services) | 22 TTABVUE 277-294 | 23 TTABVUE 165-333 |
| Luggage / travel bags/ umbrellas (Inditex's goods)<br><br>Hotel and/or Tour services (Applicant's services) | 22 TTABVUE 190-216 | 27 TTABVUE 94-166 |

***19** *Id.* at 36.[34] According to Opposer, this evidence "resoundingly demonstrates that the parties' goods and [services] typically emanate from a single source, and thus they are related." *Id.* (citations omitted).[35]

As reflected in its table, Opposer's third-party registration and use evidence is offered with respect to two basic categories of services: (1) "Travel and/or tour services" and (2) "Hotel services," both of which are described by Opposer as "Applicant's services."[36] The first category appears to pertain to Classes 39 and 41 in the application, while the second category appears to pertain to Class 43 in the application, which contains services actually identified as "hotel services."

In reviewing the evidence on a class-by-class basis, we will begin in each class with Opposer's third-party mark evidence and will then discuss the evidence that Opposer offers to show that the goods and services are complementary.[37]

**i. Class 39**

Applicant's lengthy Class 39 identification is reproduced again below:

> Escorting of travellers; transport of passengers; arranging transport for travellers; organizing transport for travellers; transport services for sightseeing tours; providing transport for excursions; providing transport for guided tours; transport by rail, boat and air; transportation reservation services; travel ticket reservation service; ticket reservation and booking services for recreational and leisure events, namely, safaris and trekking; rental of vehicles; providing travel information to travellers regarding fares, timetables and public transport; arranging of cruises; agency services for arranging cruises; boat cruises; travel guide services; travel information services; travel and transport information service; booking of travel tickets; travel route planning; organization of travel; travel booking agencies; booking of seats for travel; providing a website featuring information on travel; providing of information about travel, via the Internet; organizing travel for others; arranging of transportation for travel tours; coordinating travel arrangements for individuals and for groups; travel agency services, namely, making reservations and bookings for transportation for tourists; providing transport for expeditions; transportation consulting. [38]

Opposer does not refer specifically to any of these Class 39 services, or specify which of the 32 services in Class 39 are related to the goods for which Opposer has registered its ZARA mark.

We begin our analysis with the third-party registrations cited by Applicant. 56 TTABVUE 36 (citing 22 TTABVUE 152-74 ("Luggage/travel bags") and 175-89 ("Clothing")). Opposer's Notice of Reliance on Official Records lists 11 third-party registrations that Opposer claims cover both luggage or travel bags and what Opposer calls Applicant's "travel and/or tour services." 22 TTABVUE 4-5.

***20** Only seven of the cited registrations, owned by six different registrants, cover services in Class 39. We describe them below:

• Registration No. 4004909 covers "carry-all bags" and "arranging, organizing and conducting tours by bicycle," *id.* at 155-56;

• Registration No. 3881722 covers a variety of bags and "arranging for travel visas, passports and travel documents for persons traveling abroad; arranging travel tours; coordinating travel arrangements for individuals and groups; organisation [sic] of travel; organization of excursions, sightseeing tours, holidays, tours and travel; providing information, news and commentary in the field of travel; providing reviews of travel service providers; travel agency services, namely, making reservations and bookings for transportation; travel and tour information service," *id.* at 157-58;

• Registration No. 3694869 covers "backpacks, duffel bags and all purpose carrying bags" and "arranging and conducting tours and expeditions," *id.* at 161-62;

• Registration No. 1325324 covers "tote bags" and "duffle bags" and "Transportation Services-namely, taxi service, luggage service, carriage service, bicycle and horse livery and golf cart livery," *id.* at 163-64;

• Registration No. 1869465 covers "plastic shopping bags in the nature of an all purpose carrying bag" and "organizing and conducting diving trips and expeditions," *id.* at 165-66; and

• Registration Nos. 5209472 and 5348778 cover "tote bags" and "travel cases," and "vehicle parking." *Id.* at 171-74. [39]

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

Four of these registrations do not cover any of the specific services identified in Class 39 in the application, and one does not cover the bags for which Opposer has registered its ZARA mark.[40] These five registrations have no probative value on the relatedness of the bags for which Opposer has registered its mark and the Class 39 services for which Applicant seek registration. *OSF Healthcare*, 2023 USPQ2d 1089, at *11, 14 (discussing the lack of probative value of third-party registrations that do not cover the relevant classes). Only Registration Nos. 3881722 and 1325324 are relevant to that issue.

The record contains three other registrations that were not specifically cited by Opposer that cover one or more of the services identified in Class 39 in the application (or equivalents), as well as one or more of the bags for which Opposer has registered its ZARA mark. We describe them below:

***21** • Registration No. 4664488 covers "tote bags" and "organization, booking and arrangement of excursions, day trips and sightseeing tours" and "travel information services," 22 TTABVUE 197-98;

• Registration No. 3106040 covers "carry-on bags, shoulder bags" and "travel bags," and "arranging travel tours and providing travel information services; consulting services in the field of travel," *id.* at 278-79; and

• Registration No. 4387065 covers "all-purpose carrying bags," "luggage," and "tote bags," and "organization of sightseeing tours," "travel agency services, namely, making reservations and bookings for transportation," and "travel and tour ticket reservation service." *Id.* at 280-82.

We find that there are five third-party registrations that cover one or more of the bags identified in Registration No. 1869465 and one or more of the Class 39 services (or equivalents) identified in the application.

With respect to clothing, Opposer's Notice of Reliance on Official Records lists seven third-party registrations that Opposer claims cover both those goods and what Opposer calls Applicant's "travel and/or tour services." 22 TTABVUE 5. Only one of these registrations, Registration No. 1325324 discussed above, which covers bags and also covers "clothing-namely, sport jackets, ties, caps, sweaters and shirts" and "Transportation Services-namely, taxi service, luggage service, carriage service, bicycle and horse livery and golf cart livery," covers one or more of the services identified in Class 39 in the application (or equivalents) and one or more of the clothing items for which Opposer has registered its ZARA mark. Because that registration covers both clothing and bags, we will count it only once in our analysis of the number of relevant third-party registrations.

In sum, we find that there are five third-party registrations that cover one or more of the bags or clothing items for which Opposer has registered its ZARA mark and one or more of the Class 39 services (or equivalents) identified in the application.

We turn next to Opposer's third-party use evidence. 56 TTABVUE 36 (citing 27 TTABVUE 6-93). Opposer's Notice of Reliance on Printed Publications states that Exhibits 27-28 thereto are offered to show the relatedness of "luggage and travel bags" and "clothing," respectively, to Applicant's "travel and/or tour services." 27 TTABVUE 2.

The cited exhibits are very difficult to read, even when enlarged, as illustrated by the page reproduced below:[41]




*id.* at 87, and many of the websites "are only partially legible." *DC Comics*, 2022 USPQ2d 1249, at *9.

***22** "'The party that submits Internet materials must ensure that the evidence is legible.'" *Id.* (quoting TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE ("TBMP") Section 704.08(b)). *See also* *RxD Media, LLC v. IP Application Dev. LLC*, 125 USPQ2d 1801, 1806 n.16 (TTAB 2018) ("Illegible evidence is given no consideration."), *aff'd*, 377 F. Supp. 3d 588 (E.D. Va. 2019), *aff'd*, 986 F.3d 361, 2021 USPQ2d 81 (4th Cir. 2021); *Alcatraz Media, Inc. v. Chesapeake Marine Tours, Inc.*, 107 USPQ2d 1750, 1758 (TTAB 2013) (citing *Hard Rock Cafe Licensing Corp. v. Elsea*, 48 USPQ2d 1400, 1404 (TTAB 1998) ("it is opposer's responsibility to review the documents it submits as evidence to ensure that such submissions meet certain basic requirements, such as that they are legible . . . .")), *aff'd mem.*, 565 F. App'x 900 (Fed. Cir. 2014). "Illegible materials are of no help to the Board or anyone else in deciding registrability questions before the Board," *DC Comics*, 2022 USPQ2d 1249, at *9, and "[w]e consider the evidence, or a portion of the evidence, only if it clear and legible," *id.*, and only to the extent that "we are able to read the entire context of the evidence." *Alcatraz Media*, 107 USPQ2d at 1758.

Opposer's Notice of Reliance on Printed Publications does not identify the various websites, 27 TTABVUE 2-3, but it appears that Opposer has simply made of record the websites of nine of the owners of the third-party registrations in the record. [42] As discussed above, four of the registrations do not cover Class 39, and to the extent that we can read anything on the corresponding websites, there is nothing that supports the relatedness of any of the bags identified in Opposer's Registration No. 5614476 and any of Applicant's Class 39 services (or equivalents). [43]

One of the websites is owned by Galveston Island Park Board of Trustees, 27 TTABVUE 29-30, the owner of Registration Nos. 5209472 and 5348778 discussed above, 22 TTABVUE 171-74, which cover vehicle parking services in Class 39, and which we have found above not to be probative. To the extent that we can read anything on the website, there is nothing that supports the relatedness of any of the bags identified in Opposer's Registration No. 5614476 and any of Applicant's Class 39 services (or equivalents). Another website is owned by The Road Less Traveled, Inc., 27 TTABVUE 32-38, the owner of Registration No. 3694869 discussed above and below, which we have found above not to be probative of the relatedness of any of the bags identified in Opposer's Registration No. 5614476 and any of Applicant's Class 39 services (or equivalents). This website is legible, but there is nothing that supports the relatedness of any of the bags identified in Opposer's Registration No. 5614476 and any of Applicant's Class 39 services (or equivalents). [44]

***23** The remaining three websites are those of the Grand Hotel, 27 TTABVUE 18-20, which is the owner of Registration No. 1325324 discussed above, 22 TTABVUE 163-64; [45] Samantha Brown, 27 TTABVUE 21-25, the owner of Registration No. 3881722 discussed above, 22 TTABVUE 157-58; [46] and Rick Steves' Europe, 27 TTABVUE 39-40, the owner of Registration No. 3106040 discussed above. We have found all of these registrations to be probative of the relatedness of the bags identified in Opposer's Registration No. 5614476 and one or more of Applicant's Class 39 services (or equivalents), but we will not "double count" the three websites showing registered marks as uses of additional marks because the relevant inquiry is the number of third-party marks for the involved goods and services. There are thus five third-party marks used and registered for bags and one or more of Applicant's Class 39 services (or equivalents).

With respect to clothing, Opposer made of record what appear to be 10 different websites, some of which are owned by the registrants discussed above. 27 TTABVUE 41-93. The websites of Horse Country, Inc., Field Station Dinosaurs LLC, Tri-County Bicycle Association, and Grand Hotel appear again. *Id.* at 79-83, 84-86, 87-93. The first three of these websites involve uses reflected in the registrations discussed above, which do not cover Class 39, and to the extent that we can read the websites, there is nothing that supports the relatedness of any of the clothing items for which Opposer has registered its ZARA mark and any of Applicant's Class 39 services (or equivalents). The Grand Hotel website is probative of the relatedness of clothing and Applicant's Class 39 services.

Two of the remaining seven websites do not offer clothing, and thus are not probative of the relatedness of clothing to any of Applicant's Class 39 services (or equivalents). [47] Two other websites offer some form of clothing, but do not appear to offer any services that fit comfortably within the full scope of any of the Class 39 identifications. [48]

The website at mylucayan.com, which appears to be associated with Registration No. 4387065 discussed above, offers both clothing and what appears to be assistance in booking accommodations and ground transportation in the Bahamas and the Turks and Caicos Islands, which are ground transportation booking services that fall within the full scope of the one or more of the Class 39 services identified in the application. 27 TTABVUE 53-56. We will again not "double count" this registered mark.

To sum up, there are five third-party marks used in connection with one or more of the bags or clothing items for which Opposer has registered its ZARA mark and one or more of the Class 39 services (or equivalents) identified in the application.

We turn next to the evidence offered by Opposer in support of its argument that its goods and Applicant's Class 39 services are complementary. As discussed above, Opposer argues generally that its registrations cover "travel-related goods, including 'travel trunks and travel bags, leather travel cases, and garment bags for travel,"' 56 TTABVUE 33, "travel related services, such as 'retail store services in the field of luggage and bags,"' *id.*, "a wide variety of 'clothing' and accessories' that are worn and marketed to travelers," *id.*, and "a wide variety [of] housewares and related products, such as 'bed blankets, comforters [and] liquid handsoaps' that are commonly associated with hotels." *Id.* at 33-34. According to Opposer, these goods and services "are all related and complementary to Applicant's travel and hotel services," *id.* at 34, essentially because Opposer's goods are used when a consumer uses "travel and hotel services."

***24** The Federal Circuit has held that where the relatedness of goods and services "is not evident, well-known or generally recognized," establishing relatedness requires a showing of "'something more' than the mere fact that the goods and services are 'used together.'" *In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1087 (Fed. Cir. 2014) (quoting *Shen Mfg. Co. v. Ritz Hotel, Ltd.*, 393 F.3d 1238, 73 USPQ2d 1350, 1356 (Fed. Cir. 2004)). In *St. Helena Hosp.*, the Board had found that "consumers are likely to believe that health care services and 'similarly marked' printed materials come from the same source or are somehow connected with or sponsored by a common company based on several examples of organizations that render health care services and distribute printed materials." *Id.* at 1086 (citation omitted). The Federal Circuit noted that the involved evidence of relatedness showed "that printed materials are used 'in connection' with various health services programs," *id.* (citations omitted), but reiterated that "the mere fact that goods and services are 'used together' does not, on its own, show relatedness." *Id.*

Here, Opposer does not rely solely on the fact that the involved goods and services are used together, but as discussed above, we have found only a handful of third-party uses of marks for bags and/or clothing, and any of the services in Applicant's Class 39 identification (or equivalents), suggesting that the relatedness of those goods and services "is not evident, well-known or generally recognized." *Id.*; *cf. Country Oven*, 2019 USPQ2d 443903, at *13 (finding that the "something more" principle discussed in *St. Helena Hosp.* did not apply to the analysis of the relatedness of bakery services and bread buns "because the relationship between baked goods, including bread buns, and bakeries is the opposite of obscure, unknown, or generally unrecognized . . . .").

Opposer's evidence of complementary use consists of Mr. Patel's testimony, 56 TTABVUE 34, Applicant's deposition testimony that certain t-shirts are worn by Applicant's employees with the ZARA mark on them, *id.*,[49] articles regarding the wearing of Opposer's ZARA clothing while traveling, *id.* at 35, and articles regarding what Opposer calls "encountering fashion brands in the travel services industry." *Id.*

***25** Mr. Patel testified that Opposer sells "a wide range of items that are used for travel," Patel Decl. ¶ 13 (26 TTABVUE 5), including various bags and umbrellas, Patel Decl. ¶ 13; Ex. 2 (26 TTABVUE 5, 47-114), that many of these goods "are marketed to and worn by travelers," Patel Decl. ¶ 15 (26 TTABVUE 6), and that Opposer "also advertises and sells ZARA products that are designed for use by consumers who engage in adventure travel activities such as hiking." Patel Decl. ¶ 15 (26 TTABVUE 6).

Opposer also made of record as Exhibits 32 and 33 to its Notice of Reliance on Printed Publications what it described respectively as (1) "a collection of various news articles and press coverage discussing or referring to goods sold or offered for sale under or in connection with the ZARA Marks in connection with or associated with travel and travel services" to "demonstrate Opposer's use of the ZARA Marks and the similarity and relatedness of the parties' goods and services," and (2) "a collection of various news articles discussing the fashion industry's entrance and emergence in the travel services industry . . . offered in evidence to demonstrate the similarity and relatedness of the parties' goods and services." 27 TTABVUE 3.[50]

In the absence of corroborating testimony, which Opposer does not provide, news articles are hearsay and cannot be considered for the truth of any statements in them. *Shenzhen IVPS Tech.*, 2022 USPQ2d 1035, at *47-48 (citing *Ricardo Media Inc. v. Inventive Software, LLC*, 2019 USPQ2d 311355, at *2 (TTAB 2019); *WeaponX Performance Prods. Ltd. v. Weapon X Motorsports, Inc.*, 126 USPQ2d 1034, 1043 (TTAB 2018)); *see also Spiritline Cruises LLC v. Tour Mgmt. Servs., Inc.*, 2020 USPQ2d 48324, at *2 (TTAB 2020) ("[W]e consider Internet printouts and other materials properly introduced under a notice of reliance without supporting testimony only for what they show on their face rather than for the truth of the matters asserted therein."). We apply this rule "whether there is an objection or not." *WeaponX*, 126 USPQ2d at 1040 n.18. Accordingly, we cannot consider the articles as substantive evidence, including as evidence of "the fashion industry's entrance and emergence in the travel services industry," 27 TTABVUE 3, although we can consider them for what they show on their faces. *Shenzhen IVPS Tech.*, 2022 USPQ2d 1035, at *47.

The articles in Exhibit 32 show on their faces various clothing items and bags bearing the ZARA mark, and other marks, being worn and used in the context of situations such as going to the airport, going on a safari in Zambia, traveling in Ireland, traveling on a cruise ship, visiting the Hamptons on Long Island, and traveling comfortably in the summer and fall. 24 TTABVUE 2-80. One of the articles shows a ZARA store at Heathrow Airport in London. *Id.* at 53-54.

***26** The articles in Exhibit 33 show on their faces the use of fashion brands such as FENDI, KARL LAGERFELD, DIOR, VERSACE, BVLGARI, RALPH LAUREN, and ARMANI in the names of hotels and resorts, or specific rooms in hotels and resorts, in the United States and abroad. *Id.* at 82-183. As discussed below, these pages aid Opposer with respect to Applicant's Class 43 “hotel services,” but the articles show no uses of fashion marks in connection with any of the services identified in Class 39 (or equivalents).

In the final analysis, Opposer's evidence of the claimed complementary nature of the involved goods and services essentially shows that its clothing and bags (like numerous other goods and services) may be used while traveling, but as the Federal Circuit reiterated in *St. Helena Hosp.*, “the mere fact that goods and services are ‘used together’ does not, on its own, show relatedness.” *St. Helen Hosp.*, 113 USPQ2d at 1087 (citation omitted). This evidence is not bolstered significantly by Opposer's thin evidence of third-party marks used and registered in connection with the bags and clothing for which Opposer has registered its ZARA mark and any of the Class 39 services identified in the application (or equivalents). *Cf. Country Oven*, 2019 USPQ2d 443903, at *8-11 (15 third-party registrations owned by 14 different entities were “sufficient in both quality and quantity to provide a reasonable predicate supporting the Examining Attorney's position on relatedness” and were bolstered by 11 third-party websites, as well as the applicant's own website).

Even if the “something more” standard set forth in *St. Helena Hosp.* is not applied here, we find that the second *DuPont* factor does not support a conclusion that confusion is likely with respect to any of the specific services identified in Class 39 in the application in the general categories of (1) providing and arranging for transportation, (2) transportation-related booking and reservation services, (3) cruise-related services, (4) travel-information related services, and (5) guide, travel route planning, travel organization and coordination, and transportation consulting services.

**ii. Class 41**

Applicant's Class 41 identification is reproduced again below:

> Arranging, provision and conducting of outdoor expeditions and safaris, guided sightseeing and travel tours; conducting guided safaris; ticket reservation and booking services for recreational and leisure events, namely, safaris, trekking, and sightseeing tours; consulting services in the field of the aforementioned services. [51]

Once again, it is not clear which of these four distinct Class 41 services Opposer claims are related to the goods for which Opposer has registered its ZARA mark. Of the nearly 20 third-party registrations cited by Opposer and discussed above in connection with Class 39, only eight cover Class 41. We describe them below:

***27** • Registration No. 4736180 covers “bags for sports, book bags, wallets, tote bags, messenger bags, satchels, travel bags and backpacks,” “t-shirts and shirts” and hats and caps,” and “amusement park and theme park services; entertainment in the nature of theme park rides; entertainment in the nature of live stage performances and concerts featuring music, dance, comedy, magicians and sporting exhibits; education in the nature of classes, guided tours, lectures and workshops in the fields

of paleontology, dinosaurs, fossils, skeletons, prehistoric mammals and reptiles, natural science and history," 22 TTABVUE 153-54, 186-87;

• Registration No. 4004909 also covers "educational services, namely, conducting cycling classes," *id.* at 155-56;

• Registration No. 5668283 covers "tote bags," "shirts," and "arranging guided tour services of horse farms, equine hospitals and related attractions," *id.* at 159-60, 184-85;

• Registration No. 3694869 also covers "educational services, namely, conducting programs in the field of leadership training, foreign language studies, disaster relief, language immersion and exposure, community service, cultural immersion, cooking, dance, wildlife and environmental conservation, environmental sustainability, sustainable and green building and wilderness medical training and certification," *id.* at 161-62;

• Registration No. 1325324 also covers "entertainment services-namely, golfing services, recreational swim services, rental services for audio-visual equipment, presenting performances by entertainers [ ] such as singers, comics, dances, and the like," *id.* at 163-64;

• Registration No. 5787815 covers "wine bags with handles for carrying or holding wine," "shirts," and "conducting guided tours of a winery; entertainment services, namely, wine tastings," *id.* at 167-68;

• Registration No. 5685075 covers "tote bags," "baseball caps and hats; graphic t-shirts," and "provision of information in the field of leisure activities, namely, organization of long-distance bicycle tours," *id.* at 169-70, 182-83; and

• Registration Nos. 5209472 and 5348778 also cover "providing facilities for recreation activities." *Id.* at 171-74.

When given their full scope, only the Class 41 services in Registration No. 5668283, "arranging guided tour services of horse farms, equine hospitals and related attractions," and in Registration No. 5787815, "conducting guided tours of a winery," are encompassed within the full scope of the Class 41 services identified in the application as "arranging, provision and conducting of . . . guided sightseeing and travel tours," which are unlimited with respect to subject matter. As a result, there are only two third-party registrations that are probative of the relatedness of any of the goods for which Opposer has registered its ZARA mark and any of the Class 41 services in the application (or equivalents). *See OSF Healthcare*, 2023 USPQ2d 1089, at *11, 14 (discussing lack of probative value of third-party registrations that do not cover relevant classes).

***28** With respect to third-party uses, Opposer cites the same 10 websites that we discussed in detail above in connection with Class 39. 56 TTABVUE 36; 27 TTABVUE 2. The websites of the owners of Registration Nos. 5668283 and 5787815, Horse Country, Inc. and Montaluce Estate & Winery, respectively, do not appear to offer either clothing or bags for sale. 27 TTABVUE 7-11, 12-14. To the extent that we can read the other websites, none of them appears to be probative of the relatedness of any of the goods for which Opposer has registered its ZARA mark and any of the Class 41 services in the application (or equivalents).

Opposer also argues that the involved goods and Class 41 services are complementary. Mr. Patel testified that Opposer has used its ZARA mark on products that are designed for use by consumers who engage in adventure travel activities such as hiking, including hiking boots, hiking key chains, and safari jackets, and that Opposer has advertised apparel with travel- or safari-related themes, such as a collection of "safari-style" animal print clothing. Patel Decl. ¶ 15; Ex. 4 (26 TTABVUE 6, 121-28, 141-60, 193-207). For her part, Ms. Mitchler testified that ponchos, socks, gloves, sweaters, underwear, hiking boots, hats, and other clothing items, as well as duffle bags and daypacks, can be rented by a United States consumer from Applicant's website in connection with a trip to Tanzania. Mitchler Tr. 86:24-87:25; Ex. 14 (25 TTABVUE 53, 231). She further testified, however, that Applicant and its parent company do not regularly give t-shirts bearing the ZARA mark to consumers, that U.S. consumers who buy a Tanzania trip through Applicant do not receive such a t-shirt, and that she was unaware that such t-shirts

could be purchased, Mitchler Tr. 97:15-23 (25 TTABVUE 62), and that when Applicant's representatives attend trade shows in the United States, they do not wear clothing bearing the mark ZARA TOURS ADVENTURES and do not give away such clothing. Mitchler Tr. 135:14-23 (25 TTABVUE 87).

Opposer's evidence of complementarity shows that various types of clothing, footwear, bags, and other goods are used when travelers are on safaris, treks, and tours, but that evidence again shows little more than that the goods and Class 41 services are used together, and it is not bolstered significantly by Opposer's thin evidence of third-party marks used in connection with both the bags and clothing for which Opposer has registered its ZARA mark and one or more of the Class 41 services identified in the application (or equivalents). Even if the “something more” standard set forth in *St. Helena Hosp.* is not applied here, we find that the second *DuPont* factor does not support a conclusion that confusion is likely with respect to any of the specific services identified in Class 41 in the application

**iii. Class 43**

***29** Applicant's Class 43 identification is reproduced again below:

> Hotel services; resort lodging services; providing temporary accommodation; booking of temporary accommodation; reservation of temporary accommodation; providing information in the field of temporary accommodations for travellers.

Unlike with respect to Classes 39 and 41, Opposer focuses here on the “hotel services” that are actually identified in Class 43. Opposer cites numerous third-party registrations that it claims show the relatedness of “hotel services” and clothing, 22 TTABVUE 6-7, 217-76, which fall into two general categories: (1) registrations owned by entities whose primary business appears to be providing hotel and lodging services, and (2) registrations owned by entities (like Opposer) whose primary business appears to be selling clothing.

The first category of marks owned by hotel companies contains:

• Registration No. 1905234 of THE RITZ CARLTON and design for “visors, golf caps, robes for use by and sale to hotel guests, golf shirts, tennis shirts, shorts, T-shirts, sweat shirts” and “hotel services,” *id.* at 218-19;

• Registration No. 2694849 of W HOTELS for “clothing, namely, men's and women's bath robes, shirts, polo shirts, jackets, anoraks, hats and shoes” and Registration No. 2294753 of W HOTELS for “hotel and restaurant services,” *id.* at 220-23;

• Registration No. 5658009 of HOTEL ZACHARY CHICAGO for “robes; bathrobes” and “hotel, bar and restaurant services,” *id.* at 224-25;

• Registration No. 4856422 of POTAWATOMI HOTEL & CASINO and design for “athletic apparel, namely, shirts; business wear, namely, shirts” and “hotel, restaurant and catering services,” *id.* at 226-27;

• Registration No. 4538666 of ACE HOTEL for numerous items of clothing and “hotel accommodation services,” *id.* at 228-29;

• Registration No. 1909483 of HARD ROCK HOTEL for “hotel services” and Registration No. 2038394 of HARD ROCK HOTEL for numerous items of clothing, *id.* at 230-32;

• Registration No. 5256548 of HYATT for "clothing, namely, shirts, jackets, loungewear and robes; slippers; hats; caps; headwear; aprons" and Registration No. 1646414 of HYATT HOTELS & RESORTS and design for "hotel and restaurant services," *id.* at 235-38; [52] and

• Registration No. 3239555 of FOUR SEASONS HOTEL for "clothing, namely, shirts, knit shirts and headwear" and Registration No. 1195412 of FOUR SEASONS HOTELS for "providing personalized lodging services to business travellers." *Id.* at 243-44, 250-51. [53] Opposer also made of record registrations of different marks owned by Hershey Chocolate & Confectionary LLC for different HOTEL HERSHEY-formative marks for "robes; bath robes" and "hotel services." *Id.* at 252-57.

***30** The second category of marks owned by clothing companies contains:

• Registration No. 4362717 of DIOR for "hotels," *id.* at 233-34; [54]

• Registration No. 1081795 of GIORGIO ARMANI for "clothing for men and women-namely, dresses, suits, jackets, coats, cloaks, trousers, talleurs, capes, skirts, scarves, neckerchieves and neckties" and Registration No. 4123685 of ARMANI HOTELS & RESORTS for "hotels;" [55]

• Registration No. 5486656 of BVLGARI for "hotel services" and Registration No. 2954459 of BVLGARI for "belts, ties, scarves, shawls, and stoles," *id.* at 266-67, 270; [56]

• Registration No. 4409049 of FENDI for numerous items of clothing and "hotel services and hotel accommodation," *id.* at 271-72; [57] and

• Registration No. 1123748 of Gianni Versace (stylized) for numerous items of clothing and Registration No. 4948163 of VERSACE for "hotel, motel, restaurant, bar and catering services." *Id.* at 273-76. [58]

These third-party registrations suggest that it is common for hotels to use their marks on collateral goods such as clothing, but less common for clothing companies such as Opposer to provide "hotel services." In that regard, there is no registration of DIOR for clothing in the record, and the registrations of BVLGARI and VERSACE for "hotel services" are not based on use in commerce, leaving two registrations reflecting actual use of the same (or similar) clothing marks for hotel services.

Opposer also points to third-party registrations covering both "hotel services" and what Opposer describes as "Housewares" and "Luggage/travel bags/umbrellas." 56 TTABVUE 36 (citing 22 TTABVUE 190-216, 277-94). We describe the pertinent ones below:

• Registration No. 5658009 of HOTEL ZACHARY CHICAGO (discussed above) for "umbrellas" and "hotel, bar and restaurant services," 22 TTABVUE 224-25;

• Registration No. 5106641 of THE WATERGATE HOTEL and design for "all purpose carrying bags, travel bags, handbags, umbrellas" and "hotel services," *id.* at 193-94;

• Registration No. 4856422 of POTAWATOMI HOTEL & CASINO and design (discussed above) for "luggage" and "hotel, restaurant and catering services," *id.* at 195-96;

• Registration No. 3212536 of MORGANS HOTEL GROUP for "umbrellas" and "hotel, bar, and restaurant services," *id.* at 201-02;

***31** • Registration Nos. 4554786 of W HOTELS for "umbrellas" and Registration No. 2294753 of W HOTELS (discussed above) for "hotel and restaurant services," *id.* at 203-04, 222-23;

• Registration No. 1905234 of THE RITZ CARLTON and design (discussed above) for various bags and "golf umbrellas" and "hotel services," *id.* at 205-06;

• Registration No. 2046905 of THE MANDARIN HOTEL for "travelling bags; garment bags for travel and duffle bags both made of leather and imitations of leather" and "hotel management services," *id.* at 215-16;

• Registration No. 4387065 of LUCAYAN SEA for "all-purpose carrying bags," "luggage," and "tote bags" and "making reservations and bookings for temporary lodging," *id.* at 280-82; and

• Registration No. 4409049 of FENDI (discussed above) for various types of bags and "hotel services and hotel accommodation." *Id.* at 293-94.

The other registrations referenced in Opposer's table do not cover "hotel services" (or an equivalent or other service identified in Class 43), *id.* at 197-98, 207-08, 278-79, or "housewares" and "luggage/travel bags/umbrellas." *Id.* at 199-200, 287-88.

These registrations also suggest that it is common for hotels to sell bags and umbrellas under their marks, but again less common for companies whose primary business is selling such goods to provide hotel services.

Opposer also cites third-party uses of marks for what it claims are "Hotel and/or Tour services" and "Clothing," "Housewares," or "luggage/travel bags/umbrellas." 56 TTABVUE 36 (citing 23 TTABVUE 2-333, 27 TTABVUE 94-226). The cited webpages reflect sales of clothing and, in a few instances, bags, umbrellas, and other goods, by the W Hotel, 23 TTABVUE 3-19, 309-17, 27 TTABVUE 211-26; [59] the Potawatomi Hotel & Casino, 23 TTABVUE 20; Hotel Hershey, *id.* at 21-23; Enchantment Resort, *id.* at 24-32; Sundance Mountain Resort, *id.* at 33-37; Hotel Emma, *id.* at 39-46, 230-37; Sanctuary Resort, *id.* at 47-52; Sofitel hotel, *id.* at 54-65, 256-71; Renaissance hotel, *id.* at 66-73, 292-301; Ace Hotel, *id.* at 75-76, 27 TTABVUE 165-66; Gaylord Hotels, 23 TTABVUE 77-81, 282-87; Kimpton Hotels & Restaurants, *id.* at 82-97, 199-217; Marriott, *id.* at 98-110, 188-98; [60] Hard Rock Hotel, *id.* at 113-49; 27 TTABVUE 95-148; St. Regis, 23 TTABVUE 288-91, 27 TTABVUE 178-80; Waldorf Astoria, 23 TTABVUE 244-49, 27 TTABVUE 207-10; The Mark, 23 TTABVUE 250-55, 27 TTABVUE 149-52, 181-92, and the Ritz-Carlton. 23 TTABVUE 274-81; 27 TTABVUE 153-57, 198-203. These websites also include those of hotels bearing the marks of Armani, *id.* at 154-60, and Bvlgari. 23 TTABVUE 161-64. [61]

***32** As discussed above, Opposer also made of record articles that show the use of designer clothing marks in connection with hotels. Four of those uses are displayed below:




24 TTABVUE 82.




*Id.* at 104.




*Id.* at 83.




*Id.* at 87. The articles show that the traveling public has been exposed to multiple examples of clothing companies extending the use of their marks into hotels.

Mr. Patel testified that Opposer uses its ZARA mark in connection with a variety of clothing and other items that are typically offered in hotels, including robes, slippers, and towels. Patel Decl. ¶ 17; Ex. 6 (26 TTABVUE 6, 237-56). [62]

The record as a whole, including the multiple third-party marks used and registered for both hotel services and clothing, and the articles displaying the use of clothing marks in connection with hotels and resorts, is sufficient to show the relatedness of various types of clothing for which Opposer has registered its ZARA marks, and hotel services. The second *DuPont* factor supports a conclusion of a likelihood of confusion with respect to Class 43 in the application.

**b. Similarity or Dissimilarity of the Channels of Trade**

Opposer argues that the third *DuPont* factor supports a conclusion of a likelihood of confusion because "there are no restrictions in the parties' registrations and applications," and the "Board must presume that the parties' goods travel through the ordinary

channels of trade and distribution for those goods, and are purchased by the same customers." 56 TTABVUE 37 (citations omitted). What Opposer calls this "presumption," *id.* at 38, is not entirely accurate. Opposer is correct that there are no channel-of-trade or class-of-consumer restrictions in the parties' identifications, and this means that we must presume that the goods and services "move in all channels of trade that would be normal for such goods [and services] and to all usual prospective purchasers for goods [and services] of that type." *DeVivo v. Ortiz*, 2020 USPQ2d 10153, at *39-41 (TTAB 2020)). But Opposer's further claim that this means that the goods and services "are purchased by the same customers," 56 TTABVUE 37, is incorrect because that "presumption is only valid if and to the extent the goods [and services] at issue are identical, or, at minimum, closely-related," *DeVivo*, 2020 USPQ2d 10153, at *13, and we have found above that the goods and services are only related with respect to one of the three classes in the application.

***33** Opposer further argues that Applicant's "services are advertised and marketed through their [sic] website and social media accounts including Facebook, Twitter, and Pinterest," 56 TTABVUE 38 (citing 25 TTABVUE 13-15),[63] and that Opposer "likewise sells its products to ordinary end user consumers through Internet and brick-and-mortar channels." *Id.* This argument is also unavailing because "the mere fact that Applicant and Opposer have their own Internet websites advertising or offering their goods [and services] is not a sufficient basis to find overlapping trade channels." *Shenzhen IVPS Tech.*, 2022 USPQ2d 1035, at *51. We find that the channels of trade for the goods identified in Opposer's registrations of ZARA for clothing and bags do not overlap with the channels of trade for the services identified in Classes 39 and 41 in the application. The third *DuPont* factor does not support a conclusion that confusion is likely with respect to the services identified in Classes 39 and 41 in the application.

With respect to Class 43, the record discussed above shows that some of the goods for which Opposer has registered its ZARA mark may be offered in hotels in connection with the rendition of the "hotel services" identified in the application. The third *DuPont* factor supports a conclusion that confusion is likely with respect to the Class 43 services identified in the application.

**4. Conditions of Purchase and Purchaser Sophistication**

The fourth *DuPont* factor considers "the conditions under which the goods and services are likely to be purchased, e.g., whether on impulse or after careful consideration, as well as the degree, if any, of sophistication of the consumers." *KME Ger. GmbH v. Zhe Jang Hailiang Co.*, 2023 USPQ2d 1136, at *7 (TTAB 2023). "'Purchaser sophistication may tend to minimize likelihood of confusion. Conversely, impulse purchases of inexpensive items may tend to have the opposite effect."' *Id.* (quoting *Palm Bay Imps.*, 73 USPQ2d at 1695).

Opposer's entire argument under the fourth factor is that "since the parties' registrations and applications do not contain price restrictions, the Board must assume the parties' [sic] sell relatively inexpensive items." 56 TTABVUE 38 n.2.[64] For purposes of this proceeding, Applicant does not sell any "items," but rather provides the various services identified in Classes 39, 41, and 43 in its application. On its Section 2(d) claim, Opposer advances a theory of forward confusion in which a consumer familiar with Opposer's commercially strong ZARA mark for various goods is exposed to Applicant's mark for the involved services and believes mistakenly that those service originate with, or are sponsored or authorized by, Opposer, the senior user. *See generally In re FCA US LLC*, 126 USPQ2d 1214, 1227 (TTAB 2018) (discussing forward and reverse confusion). In this forward confusion scenario, it is the sophistication of the purchasers of Applicant's services that matters under the fourth *DuPont* factor. Opposer offers no argument, and there is nothing in the record suggesting, that purchasers of any of Applicant's services, which all involve travel and lodging, are likely to purchase those services on impulse or without at least an ordinary degree of care. We find that the fourth *DuPont* factors is neutral in our analysis of the likelihood of confusion.

**5. The Variety of Goods on Which the ZARA Mark is Used**

***34** The ninth *DuPont* factor "requires us to consider '[t]he variety of goods on which a mark is or is not used (house mark, 'family' mark, product mark).'" *KME Ger.*, 2023 USPQ2d 1136, at *18 (quoting *DuPont*, 177 USPQ at 567). "If a party in the position of plaintiff uses its mark on a wide variety of goods or services, then purchasers are more likely to view a defendant's

related goods or services under a similar mark as an extension of the plaintiff's line." *Monster Energy*, 2023 USPQ2d 87, at *39. This factor, "in essence, is used to show relatedness of the goods and services." *KME Ger.*, 2023 USPQ2d 1136, at *18. *See also Monster Energy*, 2023 USPQ2d 87, at *39 ("This factor may favor a finding that confusion is likely if the goods or services are not obviously related, but has less impact if the parties' goods or services in issue are identical or closely related."). It is unnecessary to consider this factor with respect to Class 43 in the application because we have found above that Opposer's goods and the "hotel services" identified in Class 43 are related, *see Made in Nature*, 2022 USPQ2d 557, at *60, but we will consider it with respect to Classes 39 and 41 in the application.

Opposer argues that it "offers a wide variety of clothing, accessories, furniture, home goods, and travel-related items under its ZARA marks," 56 TTABVUE 39, and that "[d]ue to the wide range of goods available under the ZARA marks, this factor also favors" Opposer. *Id.* We agree with Opposer that it offers a wide range of goods under its ZARA mark, but Opposer offers no argument or authority showing why this makes it likely that consumers would view Applicant's Class 39 or Class 41 services "as an extension of [Opposer's product] line." *Monster Energy*, 2023 USPQ2d 87, at *39. The ninth *DuPont* factor is neutral in our analysis of the likelihood of confusion with respect to Classes 39 and 41 in the application.

**6. Summary of *DuPont* Factors**

The involved marks are similar and Opposer's mark ZARA is conceptually and commercially strong and thus entitled to a scope of protection greater than that accorded to an inherently distinctive mark. The first and fifth *DuPont* factors thus support a conclusion that confusion is likely as to all three classes in the application, while the fourth, sixth, eighth, and ninth *DuPont* factors are neutral with respect to all three classes.

***35** The clothing and bags for which Opposer has registered its ZARA mark are related to the "hotel services" identified in Class 43 in the application and are sold in channels of trade that overlap with those in which "hotel services" are rendered. Thus, all applicable *DuPont* factors support a conclusion that confusion is likely as to Class 43 in the application, and we conclude that consumers who are familiar with Opposer's strong ZARA mark for clothing and bags who encounter Applicant's mark for hotel services are likely to believe mistakenly that those services originate with, or are sponsored or authorized by, Opposer.

The clothing and bags for which Opposer has registered its ZARA mark are not related to any of the services identified in Classes 39 and 41 in the application and are not sold in channels of trade that overlap with those in which the services in Classes 39 and 41 are rendered. The second and third *DuPont* factors thus support a conclusion that confusion is not likely with respect to Classes 39 and 41, while the first and fifth *DuPont* factors support the opposite conclusion. When our findings under specific *DuPont* factors point in different directions with respect to the ultimate conclusion regarding the likelihood of confusion, we are required to explain our weighing of those factors in reaching our ultimate conclusion. *In re Charger Ventures LLC*, 64 F.4th 1375, 2023 USPQ2d 451, at *7 (Fed. Cir. 2023). Here, we conclude that our findings that Opposer's goods and the services in Classes 39 and 41 are not related, based on the lack of sufficient evidence that they are commonly offered under the same mark, and the limited probative value of the fact that they may be used together, and that the channels of trade for those services do not overlap meaningfully simply because the involved goods and services are promoted and sold through the Internet, outweigh the similarity of the marks and the strength of Opposer's ZARA mark, and make confusion unlikely as to the source or sponsorship of the services in Classes 39 and 41 in the application.

**VI. Conclusion**

Opposer proved by a preponderance of the evidence that it has a statutory entitlement to assert its dilution and likelihood of confusion claims against the application to register Applicant's mark.

Opposer failed to show that its ZARA mark is "famous" for purposes of eligibility for protection against dilution, and its dilution claim is dismissed with prejudice.

Opposer showed that it has priority of use of its ZARA mark and that there is a likelihood of confusion as to the services identified in Class 43 in the application, and its Section 2(d) claim is sustained as to that class. Opposer did not show that there is a likelihood of confusion as to the services identified in Classes 39 and 41 in the application, and its Section 2(d) claim is dismissed with prejudice as to those classes.

***36 Decision**: The opposition is sustained as to Class 43 in the application and dismissed as to Classes 39 and 41 in the application.

## Footnotes

1 Application Serial No. 87853904 was filed on March 28, 2018 under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), based on Applicant's claimed first use of the mark and first use of the mark in commerce in all three classes at least as early as June 1, 2014. Applicant has disclaimed the exclusive right to use TOURS and ADVENTURES apart from the mark as shown, and describes its mark as follows: "The mark consists of a globe design with the visible countries shown in beige. There is a green arcuate bar above the globe with the word 'TOURS' in yellow and a green arcuate bar below the globe with the word 'ADVENTURES' in yellow. Across the center of the globe element and extending into the areas not covered by the arcuate bars is the wording 'ZARA' in green. The white color in the background is not claimed as part of the mark." The colors green, yellow, and beige are claimed as a feature of the mark.

2 Only Opposer was required to file a brief, Trademark Rule 2.128(a)(1), 37 C.F.R. § 2.128(a)(1), and to submit evidence. Opposer bears the burden of proving that Applicant is not entitled to a registration "even in the absence of contrary evidence or argument." *DC Comics v. Cellular Nerd LLC*, 2022 USPQ2d 1249, at *21 (TTAB 2022) (citing *Threshold TV, Inc. v. Metronome Enters., Inc.*, 96 USPQ2d 1031, 1040 (TTAB 2010)). Citations in this opinion to Opposer's brief and other materials in the case docket refer to TTABVUE, the Board's public online docketing system. *See New Era Cap Co. v. Pro Era, LLC*, 2020 USPQ2d 10596, at *2 n.1 (TTAB 2020). The number preceding TTABVUE corresponds to the docket entry number, and any numbers following TTABVUE refer to the page(s) of the docket entry where the cited materials appear. The numbers following TTABVUE usually do not correspond to the numbered pages of documents, particularly briefs. Opposer's redacted brief appears at 56 TTABVUE. Its unredacted brief containing confidential information appears at 55 TTABVUE.

3 Even though the record was made unilaterally by Opposer, it contains more than 2,500 pages of testimonial and documentary evidence.

4 The pleadings are Opposer's Notice of Opposition, 1 TTABVUE, and Applicant's Answer. 4 TTABVUE. Applicant denied the salient allegations of Opposer's Notice of Opposition and did not assert any affirmative defenses.

5 Opposer's trial period ended on August 11, 2020. 12 TTABVUE 1; 13 TTABVUE 1. Following its close, the case was dormant for more than two years because the parties obtained 11 consecutive extensions of the remaining trial dates to pursue settlement, 33-54 TTABVUE, the last of which was granted on September 22, 2022 and resulted in the final resetting of the remaining trial dates. 54 TTABVUE 1-2.

6 Exhibit 9 consists of video advertisements and marketing campaigns, which we have reviewed.

7 Mr. Patel's declaration was filed in both redacted and unredacted form. The unredacted version of his declaration appears at 20 TTABVUE. We will cite his declaration by paragraph and exhibit number as well as by TTABVUE pages.

8 We will cite the Mitchler transcript by page and line number and exhibit number, as well as by TTABVUE numbers.

9 Our decisions have previously analyzed the requirements of Trademark Act Sections 13 and 14, 15 U.S.C. §§ 1063, 1064, under the rubric of "standing." We now refer to this inquiry as entitlement to a statutory cause of action. Despite the change in nomenclature, our prior decisions and those of the Federal Circuit interpreting Trademark Act Sections 13 and 14 remain applicable. *Spanishtown Enters., Inc. v. Transcend Res., Inc.*, 2020 USPQ2d 11388, at *2 (TTAB 2020).

10 Opposer's ZARA mark is inherently distinctive. "It is registered on the Principal Register without a claim of acquired distinctiveness, and is therefore presumed distinctive." *Advance Mag. Publishers*, 2023 USPQ2d 753, at *15.

11 Opposer made of record six registrations of ZARA, two registrations of ZARA HOME, and one registration of ZARA BASIC. 21 TTABVUE 1-35. If we find that the ZARA word mark is famous, we need not consider the fame of ZARA HOME and ZARA BASIC. If we find that the ZARA word mark is not famous, we would not find that the other marks are famous because the Board previously found on what appears to be a substantially identical evidentiary record in *Industria de Diseno Textil, S.A. (Inditex, S.A.) v. Benzara Inc.*, Opp. Nos. 91242880 and 91246000 (consolidated) (TTAB Apr. 11, 2022) ("*Benzara*"), that ZARA HOME is weaker commercially than ZARA alone, 64 TTABVUE 21-22 (Opp. No. 91242880), and Opposer makes no argument in this case that ZARA BASIC is famous on either of its claims.

12 Opposer submitted the USPTO and TTABVUE records both under notice of reliance and as exhibits to Mr. Patel's declaration. The Board views the practice of submitting the same evidence by different means with disfavor because it needlessly adds bulk to the record and wastes the Board's time in reviewing the evidence. *Made in Nature, LLC v. Pharmavite LLC*, 2022 USPQ2d 557, at *12-13 (TTAB 2022) (citing *Calypso Tech. Inc. v. Calypso Cap. Mgmt. Inc.*, 100 USPQ2d 1213, 1218 (TTAB 2011)).

13 As noted above, the Board found in *Benzara* that the ZARA HOME mark has attained only "a modest amount of commercial strength or renown." 64 TTABVUE 22 (Opp. No. 91242880).

14 Opposer must prove that its ZARA mark was famous when Applicant's use of its mark began. 15 U.S.C. § 1125(c)(1). In the opposed application, which was filed on March 28, 2018, Applicant claimed first use of its mark in all three classes at least as early as June 1, 2014. Opposer cites Applicant's interrogatory responses claiming first use on June 1, 2014 and referencing an invoice from 2016, 56 TTABVUE 44 (citing 25 TTABVUE 11-12 (Responses to Interrogatory Nos. 7-8)), and argues that "by either date (June 1, 2014 or 2016), [Opposer's] ZARA brand was already included on many 'most valuable brand' lists" and that the mark was "famous prior to Applicant's alleged first use in June 2014 . . . ." *Id.* Because Opposer purports to show that its ZARA mark had become famous by June 1, 2014, we will consider whether the mark had become famous by that date as well as by March 28, 2018, Applicant's constructive use filing date.

15 We have expressed the referenced confidential advertising expenditures and, where appropriate, other information designated confidential, in general terms consistent with our need to discuss the record in the course of explaining our decision. *Kohler Co. v. Honda Giken Kogyo K.K.*, 125 USPQ2d 1468, 1475 (TTAB 2017) (citing *Noble House Home Furnishings, LLC v. Floorco Enters., LLC*, 118 USPQ2d 1413, 1416 n.2 (TTAB 2016)).

16 Media articles of the sort referenced by Opposer are more commonly discussed under the third fame factor, the extent of actual recognition of the mark. *See*, *e.g.*, *Nike, Inc. v. Maher*, 100 USPQ2d 1018, 1024-26 (TTAB 2011). Opposer mentions media coverage under the third factor, 56 TTABVUE 43, but discusses that evidence primarily under the first factor, *id.* at 42, so we will do so as well.

17 These figures obviously have minimal probative value on the issue of the fame of Opposer's mark as of June 1, 2014, a date less than halfway through the first year of the referenced period.

18 These same figures were considered in *Benzara*. 64 TTABVUE 19 (Opp. No. 91242880).

19 These articles are from both before and after June 1, 2014. The ones after that date have no probative value on the issue of the fame of Opposer's mark as of Applicant's claimed date of first use.

20 The 2013, 2017, and 2018 rankings listed Zara as the first or second apparel brand worldwide, respectively, and the fourth or fifth most valuable brand in Continental Europe, but it was not in the top ten in the United States in any ranking. 17 TTABVUE 49-50, 52.

21 *Id.* at 55.

22 *Id.* at 90. This ranking stated that there were 1,600 Zara stores in 77 countries and 1,325 retail venues in 86 markets. *Id.* at 91-92.

23 Several of these persons were shown wearing or shopping for Zara clothing outside the United States on irishnews.com, 18 TTABVUE 67-78, cosmopolitan.com/uk, *id.* at 95-106, whowhatwear.co.uk, *id.* at 199-225, elle.co/au, *id.* at 231-40, harpersbazaar.com.au, *id.* at 241-47, dailymail.co.uk, *id.* at 262-67, and harpersbazaar.com/uk. *Id.* at 301-06.

24 One of these articles at drapersonline.com discusses the cost of Zara clothing in pounds rather than U.S. dollars. 17 TTABVUE 109-11.

25 The Board also observed in *Benzara* that "Opposer failed to delineate which sales are attributed to its fashion/clothing line offered under its pleaded ZARA mark versus which sales are attributed to the furniture and home furnishings sold under its pleaded ZARA HOME mark." 65 TTABVUE 21 (Opp. No. 91242880). This deficiency is not particularly significant for purposes of determining if Opposer's ZARA mark is famous for dilution purposes.

26 The sixth factor is typically asserted by defendants in inter partes cases because it allows them "to contract [the] scope of protection [of the plaintiff's mark] by adducing evidence of '[t]he number and nature of similar marks in use on similar goods.'" *Made in Nature*, 2022 USPQ2d 557, at *21 (quoting *DuPont*, 177 USPQ at 567). We consider it in our analysis below of the strength of Opposer's ZARA mark under the fifth *DuPont* factor.

27 Like the sixth factor, the eighth factor is typically asserted by defendants in inter partes cases. *See*, *e.g.*, *Monster Energy*, 2023 USPQ2d 87, at *38 (discussing and rejecting the applicant's argument that three years of coexistence without instances of actual confusion made likelihood of confusion "highly dubious") (citation omitted). We find that the eighth factor is neutral in our analysis of the likelihood of confusion.

28 As the Board noted recently in *Monster Energy*, "[w]hile *DuPont* factor five specifies the 'fame' of the mark, the Court of Appeals for the Federal Circuit also considers the 'strength' of the mark under that factor." *Monster Energy*, 2023 USPQ2d 87, at *19 n.39 (citing *Stone Lion Cap. Partners, LP v. Lion Cap. LLP*, 746 F.3d 1313, 110 USPQ2d 1157, 1160 (Fed. Cir. 2014) and *Kenner Parker Toys Art Indus. v. Rose Art Indus., Inc.*, 963 F.2d 22 USPQ2d 1453, 1458 (Fed. Cir. 1992)). Because we have found above that Opposer's ZARA mark is not "famous" within the meaning of Section 43(c)(1) of the Trademark Act, 15 U.S.C. § 1125(c)(1), and because "likelihood of confusion fame 'varies along a spectrum from very strong to very weak,'" *Joseph Phelps Vineyards*, 122 USPQ2d at 1734 (quoting *Palm Bay Imps.*, 73 USPQ2d at 1694), we will use the term "strength" in connection with Opposer's Section 2(d) claim.

29 Here, as in *Benzara*, "there are no third-party registrations of record for marks that comprise, in whole or in part, Opposer's ZARA . . . mark [ ] for goods identical or similar to those listed in Opposer's pleaded registrations" and thus "no evidence to demonstrate that Opposer's pleaded marks are conceptually weak . . . ." 64 TTABVUE 14 (Opp. No. 91242880).

30 Opposer appears to focus on all of its pleaded marks, including the ZARA HOME mark shown in Registration Nos. 2987219 and 4586706 (21 TTABVUE 21-23, 29-31), which the Board found in *Benzara* "has attained a modest amount of commercial strength or renown" for home furnishings. 64 TTABVUE 22 (Opp. No. 91242880). We concern ourselves here with the commercial strength of the ZARA word mark.

31 Opposer argues in particular that "[t]he commercial strength of the ZARA marks is further demonstrated by [Opposer's] trademark enforcement efforts, which have ensured that the ZARA marks are not infringed or diluted by similar marks."

56 TTABVUE 27. “[T]he mere fact that [proceedings] were filed is not reasonably probative of the fame inquiry, which is focused on whether the mark has achieved ‘extensive public recognition and renown’ . . . not on enforcement efforts.” *Omaha Steaks Int'l, Inc. v. Greater Omaha Packing Co.*, 908 F.3d 1315, 128 USPQ2d 1686, 1693 (Fed. Cir. 2018) (quoting *Coach. Servs.*, 101 USPQ2d at 1720).

32 As noted above, the color green is claimed as a feature of Applicant's mark.

33 In inter partes cases involving Section 2(d) challenges to multi-class registrations or applications, the parties should discuss the relatedness of the involved goods or services on a class-by-class basis by reference to specific identified goods or services. *Cf. OSF Healthcare*, 2023 USPQ2d 1089, at *3 (“On the appeal of a refusal to register directed to all classes in a multi-class application such as this one, examining attorneys and applicants should facilitate the Board's review by discussing the evidence of relatedness on a class-by-class basis.”). Opposer conflates Classes 39 and 41 in discussing the evidence of relatedness.

34 Although Opposer mentions the retail store services for which its ZARA mark is registered, it focuses in this table and in its arguments on the goods for which the mark is registered.

35 Opposer cites numerous non-precedential decisions of the Board in connection with its arguments, including one offered for the proposition that third-party marks used for the relevant goods and services may show relatedness, 56 TTABVUE 35, a proposition for which there is a well-developed body of precedential case law, and four in which hotel services were found to be related to various other services or goods. *Id.* at 36-37. “Citing nonprecedential cases should be done judiciously and rarely,” *DC Comics*, 2022 USPQ2d 1249, at *9, and the Board has noted the limited utility of citing past decisions in which particular goods or services have been found to be related. *Embiid*, 2021 USPQ2d 577, at *26. “We must examine the record in this case to determine whether the particular [goods and services] at issue are related.” *Id.*

36 Evidence in the last row in Applicant's table is offered in both categories.

37 We will describe the third-party mark evidence in detail in our discussion of Class 39 and will then refer back to that evidence as appropriate in our discussion of Class 41.

38 We must consider each discrete service separately, but the 32 identified services fall into five general categories: (1) providing and arranging for transportation (“Escorting of travellers;” “transport of passengers;” “arranging transport for travellers;” “organizing transport for travellers;” “transport services for sightseeing tours;” “providing transport for excursions;” “providing transport for guided tours;” “transport by rail, boat and air;” “rental of vehicles;” “arranging of transportation for travel tours;” and “providing transport for expeditions”); (2) transportation-related booking and reservation services (“transportation reservation services;” “travel ticket reservation services;” “ticket reservation and booking services for recreational and leisure events, namely, safaris and trekking;” “booking of travel tickets;” “travel booking agencies;” “booking of seats for travel;” and “travel agency services, namely, making reservations and bookings for transportation for tourists);” (3) cruise-related services (“arranging of cruises;” “agency services for arranging cruises;” and “boat cruises”); (4) travel-information related services (“providing travel information to travellers regarding fares, timetables and public transport;” “travel information services;” “travel and transport information service;” “providing a website featuring information on travel;” and “providing of information about travel, via the Internet”); and (5) other travel-related services (“travel guide services;” “travel route planning;” “organization of travel;” “organizing travel for others;” “coordinating travel arrangements for individuals and for groups;” and “transportation consulting”).

39 These two registrations show different marks, but have a common owner.

40 The services of “arranging, organizing and conducting tours by bicycle” identified in Registration No. 4004909 and “arranging and conducting tours and expeditions” identified in Registration No. 3694869, and the “vehicle parking services” identified in Registration Nos. 5209472 and 5348778, are not encompassed within the full scope of any of Applicant's Class 39 services. The “plastic shopping bags in the nature of an all[-]purpose carrying bag” identified in

Registration No. 1869465 are not encompassed within the full scope of any of the bags in Registration No. 5614476, including “bags for climbers and campers in the nature of all-purpose carrying bags,” “leather shopping bags,” and “wheeled shopping bags” identified therein. 21 TTABVUE 32-35.

41 Most of the rest of Opposer's Notice of Reliance on Printed Publications, as well as some parts of Opposer's other filings, have the same problem.

42 As discussed below in note 47, there is a page from a tenth website, but it does not appear to be connected to any of the other nine and has no probative value standing alone.

43 These websites are owned by Montaluce Estate & Winery, 27 TTABVUE 7-11, the owner of Registration No. 5787815, 22 TTABVUE 167-68; Horse Country, Inc., 27 TTABVUE 12-14, the owner of Registration No. 5668283, 22 TTABVUE 159-60; Tri-County Bicycle Association, 27 TTABVUE 15-17, the owner of Registration No. 5685075, 22 TTABVUE 169-70; and Field Station Dinosaurs LLC, 27 TTABVUE 26-28, the owner of Registration No. 4736180. 22 TTABVUE 153-54.

44 The website does not show any bags.

45 The website shows a tote bag and discusses “Group Tours” offered by the hotel. 27 TTABVUE 19-20.

46 The website shows various bags, although we cannot read the primary text of the portions of the website discussing travel per se.

47 The website at rent30a.com discusses renting properties for vacation or leisure, but does not display clothing. 27 TTABVUE 51-52. There is a single page from the website at livewell30agear.com that shows a hoodie bearing the mark LIVE WELL 30A and design, but it is not clear that this is the same company that offers rental properties at rent30a.com, as the logos appearing on the websites are not the same. *Id.* at 49. The website at hollandamerica.com offers cruises with numerous amenities and shore excursions, but does not display clothing for sale. *Id.* at 57-78.

48 The website at discoveringroutes.com offers t-shirts bearing the slogan “My Roots Are Filipino” and tours of the Philippines. 27 TTABVUE 42-44. It is not clear whether these shirts bear the company's own marks. The website at lidl.com refers to hotels in Ireland and expresses prices in Euros, but it appears to be accessible to United States consumers who wish to visit Ireland, and we will consider it for whatever probative value it may have. *See In re Well Living Lab Inc.*, 122 USPQ2d 1777, 1781 n.5 (TTAB 2017) (discussing the circumstances in which the Board will consider foreign websites). The lidl.com website offers socks and shorts and what it describes as “great hotel breaks in over 350 three and four star hotels around Ireland.” 27 TTABVUE 46-48.

49 We do not find the cited testimony probative of the relatedness of t-shirts and travel services because it pertains to activities outside the United States. Mitchler Tr. 91:14-93:3 (25 TTABVUE 57-59). As discussed below, Ms. Mitchler also testified that Applicant does not use its mark in the United States on clothing given, sold, or exposed to United States customers.

50 The articles themselves appear at 24 TTABVUE 1-182.

51 When examined about the portion of the Class 41 identification covering “conducting guided safaris,” Ms. Mitchler testified that “[w]e don't conduct. But all of the other words we do,” Mitchler Tr. 66:2-11 (25 TTABVUE 41), and that “that's meant that we actually conduct. We do the conducting. But at current, we do not conduct” but rather “arrange the conducting,” which is done by Applicant's parent company. Mitchler Tr. 12-23 (25 TTABVUE 41). We must determine relatedness based on the identification as written, not as “edited” by Ms. Mitchler's testimony.

52 Opposer made of record two additional registrations of HYATT-formative marks for hotel services and related services. 22 TTABVUE 239-42.

53 Opposer made of record two additional registrations of FOUR SEASONS-formative marks for hotel services and related services. *Id.* at 245-48.

54 This registration issued under Section 66A of the Trademark Act, 15 U.S.C. § 1141f, without proof of use of the registered mark in commerce. Such non-use based registrations are initially not probative of relatedness, *see*, *e.g.*, *Made in Nature*, 2022 USPQ2d 557, at *25-26, but this registration appears to have been maintained under Section 71 of the Trademark Act, 15 U.S.C. § 1141k, based on subsequent use in commerce.

55 The first registration issued in 1978 under Section 44 of the Trademark Act, 15 U.S.C. § 1126, without proof of use in commerce, but it was still subsisting at the time of trial in the summer of 2020, indicating post-issuance maintenance based on use in commerce. The second registration issued under Section 66A of the Trademark Act, but it was subsequently maintained based on use in commerce. We have considered these registrations for whatever probative value they may have. Opposer also made of record Registration No. 4685419 of ARMANI for "consultancy services related to the interior and exterior decoration of hotels, exterior and interior design consultancy services related to the visual appearance and display of hotels, interior design consultancy services related to the styling of furniture for hotels," 22 TTABVUE 258-61, and Registration No. 4407426 of ARMANI for various goods in Classes 9, 18, and 24. *Id.* at 262-63.

56 The first registration issued in 2018 under Section 44 of the Trademark Act, and there is no evidence that it has been maintained based on a showing of use in commerce, although there is evidence below of use of the BVLGARI mark in connection with hotels outside the United States. Opposer also made of record Registration No. 1694380 of BVLGARI for various goods in Class 18. 22 TTABVUE 268-69.

57 This registration issued in 2013 under Section 66A of the Trademark Act without proof of use in commerce, but it was still subsisting at the time of trial in the summer of 2020, indicating post-issuance maintenance based on use in commerce. We have considered it for whatever probative value it may have.

58 The second registration issued in 2016 on the Supplemental Register under Section 44 of the Trademark Act without proof of use in commerce and there is no evidence of such use as of the time of trial.

59 Some of the webpages of these hotels were made of record more than once. As discussed above, doing so needlessly enlarges the record and hinders the Board's review of it. *Made in Nature*, 2022 USPQ2d 557, at *12.

60 Marriott's affiliates operate hotels under various marks in addition to or other than Marriott, such as Gaylord.

61 The Armani and Bvlgari hotels are located in Milan, Italy, but the websites are in English and appear to be directed toward United States consumers interested in traveling to Italy. Most of the articles discussed below reflecting the use of clothing designer marks in connection with hotel also discuss hotels outside the United States, but they too appear to be directed to United States consumers.

62 Mr. Patel also testified about Opposition No. 91234944, in which Opposer opposed an application to register ZARA for hotel services and other services, Patel Decl. ¶ 44 (26 TTABVUE 13). The opposition was sustained when the applicant defaulted, and the Board did not decide the case on the merits. Patel Decl. ¶ 45; Ex. 17 (26 TTABVUE 13; 19 TTABVUE 72-78).

63 In the cited discovery responses, Applicant identified its channels of trade as its Internet website, its social media pages, it office in Golden, Colorado, and trade shows. 25 TTABVUE 13 (Response to Interrogatory No. 11). Ms. Mitchler testified that 98 percent of Applicant's sales are through its website at zaratoursadventures.com. Mitchler Tr. 114:7-13, 16-20 (25 TTABVUE 68).

64 Opposer cites *Bay State Brewing*, *supra*, which involved goods identified as "beer," and *In re La Peregrina, Ltd.*, 86 USPQ2d 1645 (TTAB 2008), which involved goods identified as "jewellery [sic]; precious stones; pearls in loose pieces,

pairs and strands; pearl jewellery," as cases in which the Board found that the identified goods could include inexpensive ones.

2023 WL 6996329 (Trademark Tr. & App. Bd.)

End of Document © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 17884092 (Trademark Tr. & App. Bd.)

THIS OPINION IS NOT A PRECEDENT OF THE TTAB

Trademark Trial and Appeal Board

Patent and Trademark Office (P.T.O.)

WRANGLER APPAREL CORP.
v.
DENIMCI DIS TICARET PAZARLAMA ANONIM SIRKETI

Opposition No. 91264198
December 6, 2022

***1** Paul J. Kennedy and Sean P. McConnell of Troutman Pepper Hamilton Sanders LLP for Wrangler Apparel Corp.
Alexander S. Lazouski of Lazouski IP LLC for Denimci Dis Ticaret Pazarlama Anonim Sirketi

Before Zervas, Lynch and Pologeorgis
Administrative Trademark Judges
Opinion by Lynch
Administrative Trademark Judge:

### I. Background and Evidentiary Record

Denimci Dis Ticaret Pazarlama Anonim Sirketi ("Applicant") seeks registration on the Principal Register of the mark,




(DENIM disclaimed), for the following goods and services:
Woven or non-woven textile fabrics, namely, denim fabric, adhesive fabric for application by heat, billiard cloth, brocades, buckram, calico, canvas for tapestry or embroidery, cheese cloth, chenille fabric, cotton fabrics, damask, esparto fabric, fabric for footwear, fabric, namely, fustian fabric that is impervious to gases for aeronautical balloons, fabric of imitation animal skins, fabrics for textile use, felt, fiberglass fabrics for textile use, hemp cloth, hemp fabric, jute fabric, knitted fabric, linen cloth, lingerie fabric, lining fabric for footwear, muslin fabric, non-woven textile fabrics, printed calico cloth, ramie fabric, rayon fabric, shrouds, silk fabrics for printing patterns, sleeping bag liners, traced cloth for embroidery, upholstery fabrics, velvet, woolen cloth; textile goods for household use, namely, bath linen except clothing, bath mitts, bed covers, bed blankets, bed covers of paper, bed linen, bed valances, blankets for household pets, bolting cloth, cloths for removing make-up, coasters of textile, covers for cushions, curtain holders of textile material, curtains of textile or plastic, door curtains, face towels of textile, fitted toilet lid covers of fabric, furniture coverings of plastic, handkerchiefs of textile, household linen, mattress covers, mosquito nets, net curtains, oilcloth for use as tablecloths, picnic blankets, pillowcases, pillow shams, place mats of textile, printers' blankets of textile, shower curtains of textile or plastic, tablecloths, not of paper, table linen, not of paper, tablemats of textile, table napkins of textile, table runners, not of paper, towels of textile, tulle, wall hangings of textile; flags, pennants, labels

of textile; swaddling blankets; sleeping bags for camping; All of the aforementioned goods made in whole or in significant part denim in International Class 24;

Clothing, including underwear and outer clothing, other than special purpose protective clothing, namely, ascots, bathing caps, bathing suits, bathing trunks, bath robes, bibs, not of paper, boxer shorts, brassieres, breeches for wear, camisoles, chasubles, coats, corselets, cuffs, detachable collars, dresses, dressing gowns, dress shields, fingerless gloves, fishing vests, fur stoles, gaiters, garters, girdles, hairdressing capes, heelpieces for stockings, hosiery, judo uniforms, jumper dresses, karate uniforms, kimonos, leotards, liveries, mantillas, masquerade costumes, mittens, neckties, overalls, overcoats, pajamas, panties, parkas, pelerines, pelisses, petticoats, pockets for clothing, pocket squares, ponchos, saris, sarongs, sashes for wear, scarfs, shawls, shirt fronts, shirts, shirt yokes, short-sleeve shirts, ski gloves, skirts, skorts, sleep masks, socks, sock suspenders, sports jerseys, sports singlets, stockings, stocking suspenders, suits, sweat-absorbent socks, sweat-absorbent stockings, sweat-absorbent underwear, sweaters, tee-shirts, tights, trousers, trouser straps, turbans, underpants, underwear, uniforms, vests, wet suits for water-skiing, wimples; footwear, shoes, slippers, sandals, namely, ankle boots, bath sandals, bath slippers, beach shoes, boots, boots for sports, boot uppers, esparto shoes or sandals, football boots, footwear, footwear uppers, galoshes, gymnastic shoes, half-boots, heelpieces for footwear, heels, inner soles, lace boots, sandals, shoes, ski boots, slippers, soles for footwear, sports shoes, studs for football boots, tips for footwear, welts for footwear, wooden shoes; headwear, hats, caps with visors, berets, caps being headwear, skull caps; All of the aforementioned goods made in whole or in significant part denim in International Class 25; and

***2** Advertising, marketing and public relations; organization of exhibitions and trade fairs for commercial or advertising purposes; design for advertising; provision of an online marketplace for buyers and sellers of goods and services; business management, business administration and business consultancy; accounting; commercial consultancy services; personnel recruitment, personnel placement, employment agencies, import-export agencies; temporary personnel placement services; auctioneering; the bringing together, for the benefit of others, of a variety of goods, namely, perfumery, non-medicated cosmetics, fragrances, deodorants for personal use and animals, clothing for protection against accidents, irradiation and fire, safety vests and life-saving apparatus and equipment, eyeglasses, sunglasses, optical lenses and cases, containers, parts and components thereof, jewelry, imitation jewelry, gold, precious stones and jewelry made thereof, cufflinks, tie pins, statuettes and figurines of precious metal, clocks, watches and chronometrical instruments, chronometers and their parts, watch straps, goods made of leather, imitations of leather or other materials, designed for carrying items, bags, wallets, boxes and trunks made of leather or stout leather, keycases, trunks [luggage], suitcases, woven or non-woven textile fabrics, namely, denim fabric, adhesive fabric for application by heat, billiard cloth, brocades, buckram, calico, canvas for tapestry or embroidery, cheese cloth, chenille fabric, cotton fabrics, damask, esparto fabric, fabric for footwear, fabric, fustian, impervious to gases, for aeronautical balloons, fabric of imitation animal skins, fabrics for textile use, felt, fiberglass fabrics for textile use, hemp cloth, hemp fabric, jute fabric, knitted fabric, linen cloth, lingerie fabric, lining fabric for footwear, muslin fabric, non-woven textile fabrics, printed calico cloth, ramie fabric, rayon fabric, shrouds, silk fabrics for printing patterns, sleeping bag liners, traced cloth for embroidery, upholstery fabrics, velvet, woolen cloth, textile goods for household use, namely, bath linen, except clothing, bath mitts, bed covers, bed blankets, bed covers of paper, bed linen, bed valances, blankets for household pets, bolting cloth, cloths for removing make-up, coasters of textile, covers for cushions, curtain holders of textile material, curtains of textile or plastic, door curtains, face towels of textile, fitted toilet lid covers of fabric, furniture coverings of plastic, handkerchiefs of textile, household linen, mattress covers,

mosquito nets, net curtains, oilcloth for use as tablecloths, picnic blankets, pillowcases, pillow shams, place mats of textile, printers' blankets of textile, shower curtains of textile or plastic, tablecloths, not of paper, table linen, not of paper, tablemats of textile, table napkins of textile, table runners, not of paper, towels of textile, tulle, wall hangings of textile, flags, pennants, labels of textile, swaddling blankets, sleeping bags for camping, clothing, including underwear and outer clothing, other than special purpose protective clothing, namely, ascots, bathing caps, bathing suits, bathing trunks, bath robes, bibs, not of paper, boxer shorts, brassieres, breeches for wear, camisoles, chasubles, coats, corselets, cuffs, detachable collars, dresses, dressing gowns, dress shields, fingerless gloves, fishing vests, fur stoles, gaiters, garters, girdles, hairdressing capes, heelpieces for stockings, hosiery, judo uniforms, jumper dresses, karate uniforms, kimonos, leotards, liveries, mantillas, masquerade costumes,

mittens, neckties, overalls, overcoats, pajamas, panties, parkas, pelerines, pelisses, petticoats, pockets for clothing, pocket squares, ponchos, saris, sarongs, sashes for wear, scarfs, shawls, shirt fronts, shirts, shirt yokes, short-sleeve shirts, ski gloves, skirts, skorts, sleep masks, socks, sock suspenders, sports jerseys, sports singlets, stockings, stocking suspenders, suits, sweat-absorbent socks, sweat-absorbent stockings, sweat-absorbent underwear, sweaters, tee-shirts, tights, trousers, trouser straps, turbans, underpants, underwear, uniforms, vests, wet suits for water-skiing, wimples, footwear, shoes, slippers, sandals, namely, ankle boots, bath sandals, bath slippers, beach shoes, boots, boots for sports, boot uppers, esparto shoes or sandals, football boots, footwear, footwear uppers, galoshes, gymnastic shoes, half-boots, heelpieces for footwear, heels, inner soles, lace boots, sandals, shoes, ski boots, slippers, soles for footwear, sports shoes, studs for football boots, tips for footwear, welts for footwear, wooden shoes, headgear, hats, caps with visors, berets, caps [headwear], skull caps, enabling customers to conveniently view and purchase those goods, such services may be provided by retail stores, wholesale outlets, by means of electronic media or through mail order catalogues; all of the aforementioned items and services provided in relation to items made in whole or in significant part denim in International Class 35. [1]

***3** The application contains the following description: “The mark consists of a stylized ‘W’ above the word ‘DENIM’ all in blue.” The color blue is claimed as a feature of the mark.

In its Notice of Opposition, Wrangler Apparel Corp. (“Opposer”) opposes registration of Applicant's mark under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), based on common law rights and numerous registered marks, [2] including the following we consider most relevant (“Opposer's W Registrations” for “Opposer's W Marks”):



for:

Headgear, namely, caps in International Class 25; [3] and Clothing, namely, tops; belts, also in International Class 25. [4]



for men's, ladies' Western style dungarees [5] in U.S. Class 39. [6]



, under Section 2(f), for jeans, casual pants, shorts, skirts, shirts, blouses, vests, jackets, diaper covers in International Class 25. [7]

In its Answer, Applicant denied the salient allegations in the Notice of Opposition.

The record includes the pleadings and pursuant to Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the file of the opposed application. Opposer supplemented the record with TSDR records of its pleaded registrations and then-pending application, attached to the Notice of Opposition pursuant to Trademark Rule 2.122(d)(1), 37 C.F.R. § 2.122(d)(1), online and printed publications filed under a notice of reliance,[8] as well as a testimony declaration with exhibits.[9] Opposer filed a brief.[10] Applicant did not submit any evidence or file a brief, but Applicant is not required to do so. The burden rests on Opposer to establish its statutory entitlement to oppose and to prove its claim by a preponderance of the evidence. *See B&B Hardware, Inc. v. Hargis Ind., Inc.*, 575 U.S. 138, 113 USPQ2d 2045, 2049 (2015) ("The party opposing registration bears the burden of proof, see § 2.116(b), and if that burden cannot be met, the opposed mark must be registered, see 15 U.S.C. § 1063(b)").

**II. Statutory Entitlement to Oppose**[11]

To establish statutory entitlement to oppose under Section 13 of the Trademark Act, 15 U.S.C. § 1063, Opposer must demonstrate a real interest in the proceeding and a reasonable belief of damage. *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837 at *3 (Fed. Cir. 2020), *cert. denied*, 142 U.S. 82 (2021); *see also Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014); *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1727 (Fed. Cir. 2012); *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025 (Fed. Cir. 1999).

***4** Opposer attached to the Notice of Opposition TSDR records of its pleaded registrations. Opposer's ownership of the pleaded registrations identified above, for which status and title are established, support its plausible likelihood of confusion claim against the involved application, thereby showing its real interest in this proceeding and a reasonable basis for Opposer's belief of damage. Opposer therefore has established its entitlement to a statutory cause of action. *See Coach Servs.*, 101 USPQ2d at 1727-28; *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000).

**III. Priority and Likelihood of Confusion**

**A. Priority**

Because Opposer has made the subsisting registrations identified above of record, and Applicant has not counterclaimed to cancel them, priority is not an issue as to the marks and goods covered by those registrations. *See Top Tobacco LP v. N. Atl. Op. Co.*, 101 USPQ2d 1163, 1169 (TTAB 2011) (citing *King Candy, Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 82 USPQ 108 (CCPA 1974)); *see also Massey Junior Coll., Inc. v. Fashion Inst. of Tech.*, 492 F.2d 1399, 181 USPQ 272, 275 n.6 (CCPA 1974) ("prior use need not be shown by a plaintiff relying on a registered mark unless the defendant counterclaims for cancellation"); *Itel Corp. v. Ainslie*, 8 USPQ2d 1168, 1169 (TTAB 1988) ("because of the existence of opposer's valid and subsisting registration, it need not prove prior use as to the services recited therein").

**B. Likelihood of Confusion Background**

The determination under Section 2(d) involves an analysis of all of the probative evidence of record bearing on a likelihood of confusion. *In re E.I. DuPont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) (setting forth factors to be considered, hereinafter referred to as *"DuPont* factors"); *see also In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). A likelihood of confusion analysis often focuses on the similarities between the marks and the similarities between the goods and/or services. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential

characteristics of the goods and differences in the marks.”). Opposer bears the burden of proving its claim of likelihood of confusion by a preponderance of the evidence. *Cunningham,* 55 USPQ2d at 1848.

***5** We decide likelihood of confusion based on Opposer's W Registrations. Opposer's W Marks are more similar to Applicant's mark, and/or cover goods more related to Applicant's goods and services than Opposer's other pleaded registrations. The priority established through the presumptions afforded Opposer's W Registrations avoids the assessment of priority of use based on common law rights. Therefore, we need not reach likelihood of confusion based on the remaining registered marks or Opposer's alleged common law rights. *Cf. In re Davey Prods.*, 92 USPQ2d 1198, 1201 (TTAB 2009) (“In this case, our Section 2(d) findings and analysis need be and shall be based on only one of the cited registrations”); *see also Palm Bay Imps. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005) (where the likelihood of confusion determination is reversed as to one pleaded mark, but affirmed as to the other two pleaded marks, registration is refused).

**C. Strength of Opposer's W Marks**

Before we turn to the similarity of the marks, we consider Opposer's contention that its marks are well known and entitled to a broad scope of protection. In determining the strength of a mark, we consider conceptual strength, based on the nature of the marks themselves, and commercial strength, based on marketplace recognition of the marks. *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010). “A mark with extensive public recognition and renown deserves and receives more legal protection than an obscure or weak mark,” *Omaha Steaks Int'l, Inc. v. Greater Omaha Packing Co.*, 908 F.3d 1315, 128 USPQ2d 1686, 1689 (Fed. Cir. 2018) (quoting *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992)), and a “very strong mark receives a wider latitude of legal protection in the likelihood of confusion analysis.” *Tao Licensing, LLC v. Bender Consulting Ltd.*, 125 USPQ2d 1043, 1056 (TTAB 2017) (citing *Palm Bay Imps.*, 73 USPQ2d at 1694).

We consider Opposer's W Marks conceptually strong based on this record. We have no indication that they have any recognized meaning in the industry. Also, Opposer's W marks, except for its stitching mark registration that does include a Section 2(f) claim, otherwise are registered on the Principal Register without a claim of acquired distinctiveness. We therefore treat Opposer's W Marks in the registrations without claims of acquired distinctiveness as inherently distinctive, and the stitching mark as distinctive. Trademark Act Section 7(b), 15 U.S.C. § 1057(b); *Tea Bd. of India v. Republic of Tea, Inc.,* 80 USPQ2d 1881, 1889 (TTAB 2006); *see also Alcatraz Media, Inc. v. Chesapeake Marine Tours Inc. dba Watermark Cruises*, 107 USPQ2d 1750, 1764 (TTAB 2013) (“The presumption of validity that attaches to a registration issued pursuant to Section 2(f) includes a presumption that the registered mark has acquired distinctiveness”).

***6** Turning to commercial strength, we find it where “a significant portion of the relevant consuming public . . . recognizes the mark as a source indicator.” *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 122 USPQ2d 1733, 1734 (Fed. Cir. 2017) (citing *Palm Bay Imps.*, 73 USPQ2d at 1694). This type of strength of a mark is measured “‘along a spectrum from very strong to very weak.”’ *Id.* (internal citations omitted). Commercial strength may be measured indirectly by the volume of sales and advertising expenditures in connection with the goods sold under the marks, and other factors such as length of time of use of the marks; widespread critical assessments; notice by independent sources of the goods identified by the marks; and the general reputation of the goods. *Weider Publ'ns, LLC v. D & D Beauty Care Co.*, 109 USPQ2d 1347, 1354 (TTAB 2014); *see also Bose Corp. v. QSC Audio Prods. Inc.,* 293 F.3d 1367, 63 USPQ2d 1303, 1308 (Fed. Cir. 2002) (recognizing indirect evidence as appropriate proof of strength).

Opposer presented a variety of evidence regarding strength. Through the testimony declaration of its Vice President & General Manager -- Western Wrangler, Allen Montgomery, Opposer provided confidential worldwide sales and advertising figures for “WRANGLER (All Brands).”[12] However, given that the figures are not limited to the relevant U.S. market, and given that they do not appear to be limited to sales and advertising under the marks at issue in this case, we cannot accord the evidence much probative value. *See Sunnen Prods. Co. v. Sunex Int'l Inc.*, 1 USPQ2d 1744, 1748 n.16 (TTAB 1987) (fame of opposer's mark not established by trial testimony that was “deficient in that it does not indicate under what mark the foreign or domestic

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

sales were made. (The question was not asked.).”); *Olin Corp. v. Hydrotreat, Inc.*, 210 USPQ 63, 68 (TTAB 1981) (criticizing testimony that did not distinguish between opposer's domestic and foreign sales and advertising).

Mr. Montgomery testified that “Wrangler's iconic ‘W’ mark” was “first introduced in connection with authentic western jeans in 1947.” [13] According to Mr. Montgomery, “Wrangler's product line featuring W Marks has consistently included denim, casual pants, shorts, woven shirts, knit shirts, boots, jackets, outdoor apparel, hats, and accessories, all for at least the last 40 years. The W Marks are regularly featured on both the clothing products themselves, as well as on product labels and tags.” [14] He states that Opposer has used look-for advertising “that calls attention to its iconic W Marks,” and provides “historical advertisements and articles” as examples. [15] There is some look-for advertising pointing to the W Marks, rather than to the WRANGLER mark (for which there is considerably more). The record shows the W Marks featured on jeans as well as pockets of shirts and jackets, and Mr. Montgomery's declaration makes clear that Opposer's products are widely available, but without specifying how much of that availability pertains to products with the W Marks rather than the WRANGLER mark. Mr. Montgomery also points to the marketing and promotion of “WRANGLER and W Marks widely across nearly every available media outlet,” Opposer's use of celebrity brand ambassadors and celebrity collaborations featuring “Wrangler and its W Marks.” [16] Again, the documentary evidence suggests that the ambassadors and other celebrity endorsements feature WRANGLER more, and generally more prominently, than the W Marks. The record, especially Opposer's social media uses, shows some standalone uses of the W marks, or uses where the W mark is more prominent than, or equal in prominence to, the WRANGLER house mark.

***7** Overall, under the considerations discussed in *Bose*, 63 USPQ2d at 1305-09, and *Omaha Steaks*, 128 USPQ2d at 1689-92, the record in this case supports some degree of commercial strength of Opposer's W Marks, although not the highest on the spectrum. Opposer's length of use, manner and reach of use, and examples of promotion of Opposer's W Marks and some media articles about them support strength, but the lack of more probative sales and advertising figures and the greater prominence of the WRANGLER mark in many of the promotional campaigns and materials, as well as in media coverage, weigh against finding Opposer's W Marks famous, with the highest degree of commercial strength. We therefore accord Opposer's W Marks somewhat more than “the normal scope of protection to which inherently distinctive marks are entitled.” *Bell's Brewery, Inc. v. Innovation Brewing*, 125 USPQ2d 1340, 1347 (TTAB 2017).

**D. Similarity of the Marks**

Turning to the first *DuPont* factor, we must compare the marks “in their entireties as to appearance, sound, connotation and commercial impression.” *Palm Bay*, 73 USPQ2d at 1691 (quoting *DuPont*, 177 USPQ at 567). “Similarity in any one of these elements may be sufficient to find the marks confusingly similar.” *In re Inn at St. John's, LLC*, 126 USPQ2d 1742, 1746 (TTAB 2018), *aff'd mem.*, (No. 18-2236) (Fed. Cir. September 13, 2019) (quoting *In re Davia*, 110 USPQ2d 1810, 1812 (TTAB 2014), *aff'd mem.*, 777 F. App'x 516 (Fed. Cir. Sept. 13, 2019). The test assesses not whether the marks can be distinguished in a side-by-side comparison, but rather whether their overall commercial impressions are so similar that confusion as to the source of the goods offered under the respective marks is likely to result. *Coach Servs.*, 101 USPQ2d at 1721; *see also Edom Labs. v. Lichter*, 102 USPQ2d 1546, 1551 (TTAB 2012).

Applicant's mark is



, with DENIM disclaimed. Applicant describes its mark as including a "stylized W" along with the word DENIM. Opposer's marks on which we focus are



,



and



. We bear in mind that Opposer's W Marks do not claim color as a feature of the marks, and therefore could appear in the same color used in Applicant's mark. We find the marks visually and phonetically similar because they consist of or prominently feature the stylized letter W. Applicant's mark also includes the disclaimed generic or descriptive word DENIM, but DENIM is subordinate in the mark. This is because DENIM appears in relatively smaller font beneath the much more prominent W, and because the disclaimed word carries less significance in the likelihood of confusion analysis, as consumers are less likely to rely on descriptive or generic wording to indicate source. *See In re Dixie Rests., Inc.*, 105 F.3d 1405, 41 USPQ2d 1531, 1533-34 (Fed. Cir. 1997) (in comparing THE DELTA CAFÉ to DELTA, the generic term CAFÉ lacks sufficient distinctiveness to create a different commercial impression); *see also Presto Prods., Inc. v. Nice-Pak Prods., Inc.*, 9 USPQ2d 1895, 1897 (TTAB 1988) (first part of a mark "is most likely to be impressed upon the mind of a purchaser and remembered."). For rational reasons, we may give more or less weight to a particular feature of a mark, such as a common dominant element, provided the ultimate conclusion rests on a consideration of the marks in their entireties. *In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012). So, while we do not ignore DENIM in the analysis, "the non-source identifying nature of the word[] and the disclaimer[] thereof constitute rational reasons for giving [that] term[] less weight in the analysis." *In re Detroit Ath. Co.*, 903 F.3d 1297, 128 USPQ2d 1047, 1049 (Fed. Cir. 2018).

***8** Also, although the particular stylization of the W's differs among the marks and Applicant's stylization may be somewhat suggestive of jeans, the "verbal portion of the mark is the one most likely to indicate the origin of the goods to which it is affixed." *Viterra*, 101 USPQ2d at 1908 (quoting *CBS, Inc. v. Morrow*, 708 F.2d 1579, 218 USPQ 198, 200 (Fed. Cir. 1983)); *see also In re Aquitaine Wine USA, LLC*, 126 USPQ2d 1181, 1184 (TTAB 2018) ("In the case of marks, such as Applicant's, consisting of words and a design, the words are normally accorded greater weight because they are likely to make a greater

impression upon purchasers, to be remembered by them, and to be used by them to request the goods.”). Consumers would call for the goods under all these marks using the W, and the stylization is immaterial when the marks are pronounced. In addition, Opposer's W shown above on the far left, the mark in Registration Nos. 3777026 and 4656517, has a stylization quite similar to Applicant's, particularly considering that Opposer's W could appear in the same shade of blue. Overall, we find the marks similar in appearance and sound because Applicant's dominant W sounds the same as and looks similar to Opposer's W Marks, and Applicant's additional generic or descriptive word DENIM does not distinguish the marks.

The marks also share similar connotations and commercial impressions. Each of the marks conveys the meaning and impression of the letter W, with Applicant's mark adding the additional nuance of a reference to denim. Consumers would attribute the same meaning to, and derive the same impression from, the W in Applicant's marks as they would in Opposer's W Marks. The additional word DENIM in Applicant's marks merely refers to a feature of the identified goods and services, and thus only minimally contributes to the overall meaning and connotation of Applicant's mark, and does not change the meaning or impression of W. Given that Opposer's W Marks, one of which is registered for dungarees (clothes usually made of blue denim), frequently are used in connection with denim goods, and derive much of their commercial strength through association with denim goods, consumers likely would view Applicant's




mark as another variation of Opposer's Wrangler W marks, specifically for denim goods or denim-related services.

We remain mindful of the commercial strength of Opposer's W Marks and that “marks must be considered in light of the fallibility of memory and not on the basis of side-by-side comparison.” *In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1085 (Fed. Cir. 2014). Given the resemblance in sound, appearance, connotation and commercial impression, when viewed in their entireties, we find Applicant's mark similar to Opposer's W Marks. This factor weighs in favor of likely confusion.

**E. The Goods and Services**

***9** “[L]ikelihood of confusion can be found ‘if the respective goods [or services] are related in some manner and/or if the circumstances surrounding their marketing are such that they could give rise to the mistaken belief that they emanate from the same source.’” *Coach Servs.*, 101 USPQ2d at 1722 (internal citations omitted). Under this factor, we must “focus on the application and registrations rather than on real world conditions, because ‘the question of registrability of an Applicant's mark must be decided on the basis of the identification of goods set forth in the application.’” *Stone Lion Capital Partners v. Lion Capital LLP,* 746 F.3d 1317, 110 USPQ2d 1157, 1162 (Fed. Cir. 2014). We need not consider the relatedness of each good in Applicant's application to each good in the pertinent registrations. “[I]t is sufficient for finding a likelihood of confusion if relatedness is established for any item encompassed by the identification of goods within a particular class in the application.” *In re Aquamar, Inc.*, 115 USPQ2d 1122, 1126 n.5 (TTAB 2015) (citing *Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp.*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981)).

Opposer's and Applicant's Class 25 goods are legally identical in part, as to certain clothing goods, such as caps, skirts, tops/shirts, vests, coats/jackets and trousers/casual pants. Broadly identified goods encompass all types of such goods, so that any clothing items in Opposer's W Registrations that are not restricted as to material composition include such items made in whole or significant part of denim, as identified by Applicant. *See S.W. Mgmt., Inc. v. Ocinomled, Ltd.*, 115 USPQ2d 1007, 1025 (TTAB 2015) (where the goods in an application or registration are broadly described, they are deemed to encompass all the goods of the nature and type described therein); *In re Hughes Furniture Indus., Inc.*, 114 USPQ2d 1134, 1137 (TTAB 2015) (“Applicant's broadly worded identification of ‘furniture’ necessarily encompasses Registrant's narrowly identified ‘residential and commercial furniture.’”).

As to Applicant's Class 24 fabrics and textiles identified as "in whole or in significant part denim," we note that Opposer's Registration No. 634868 covers dungarees, clothing usually made of blue denim. Also, Opposer's testimony and evidence makes clear that its identified clothing items often are made of denim. For example, Mr. Montgomery testified that Opposer's "W Marks [are used] across an entire line of denim,"[17] and "Wrangler's product line featuring W Marks has consistently included denim... for at least the last 40 years."[18] Opposer's predecessor's website highlighting the Wrangler brand refers to "Denim" as one of four "PRIMARY PRODUCTS."[19] The same website identifies Wrangler as the "#3 Men's Denim Brand in the U.S."[20] A 2013 article from Business of Fashion refers to Opposer as a "historic denim brand" and one of the "Big Three of Denim."[21] Opposer's evidentiary record overall shows that not only does Opposer's identified clothing often come in denim, Opposer's clothing line focuses heavily on denim, and much of its commercial strength is associated with its denim goods. Based on the foregoing, we find Applicant's denim fabrics and textiles related to Opposer's identified dungarees and other clothing items that include its denim goods.

***10** Applicant's Class 35 identification recites "the bringing together, for the benefit of others, of a variety of goods," made in whole or in significant part of denim, including some of the same types of goods identified in Opposer's W Registrations. As discussed above, some of Opposer's goods are identical or legally identical to the goods featured in Applicant's Class 35 retail service. Inherent relatedness often exists when the services in question include or focus on the sale of the particular goods in question. *See In re Hyper Shoppes (Ohio), Inc.*, 837 F.2d 463, 6 USPQ2d 1025, 1026 (Fed. Cir. 1988) ("applicant's 'general merchandise store services' would include the sale of furniture and the evidence introduced by the applicant in voluminous quantity makes it clear--though its arguments attempt to play down the fact--that it does in fact sell furniture. What else it sells is irrelevant; there is overlap."); *In re Country Oven, Inc.*, 2019 USPQ2d 443903 (TTAB 2019) (Applicant's COUNTRY OVEN for bread buns was likely to cause confusion with the cited registration for COUNTRY OVEN for retail bakery shops. "[T]he relevant line of case law holds that confusion may be likely to occur from the use of the same or similar marks for goods, on the one hand, and for services involving those goods, on the other."); *In re Accelerate s.a.l.*, 101 USPQ2d 2047, 2050 (TTAB 2012) ("applicant's broadly worded 'providing food and drink' could encompass a coffee house ... [so that] applicant's services, as recited, are sufficiently related to [Registrant's] coffee"). We therefore find Opposer's goods related to at least this retail service of Applicant's in International Class 35.

Each of the classes in the opposed application includes one or more items that overlap with or is related to Opposer's goods. This *DuPont* factor weighs in favor of a likelihood of confusion.

**F. Trade Channels and Classes of Consumers**

Opposer points to no evidence regarding the trade channels for Applicant's Class 24 textile and fabric goods. With no evidentiary basis upon which to make a finding of fact under this factor as to the Class 24 goods, we consider it neutral.

Because Applicant's goods Class 25 goods are in-part legally identical to Opposer's, we must presume that they travel in the same channels of trade to at least some of the same classes of consumers. *See Viterra*, 101 USPQ2d at 1908 (identical goods are presumed to travel in same channels of trade to same class of purchasers); *In re Inn at St. John's,* 126 USPQ2d at 1745 ("Because the services described in the application and the cited registration are identical, we presume that the channels of trade and classes of purchasers are the same.").

***11** Turning to Applicant's Class 35 services that include retail services featuring denim clothing, we consider that Opposer's channels of trade include selling its goods through its own website, as well as "through a network of nearly 900 retail outlets around the world, including mass retailers such as Target, Walmart, K-Mart, JCPenney, Kohl's, and Sears."[22] Opposer submitted documentary evidence of this availability, as an exhibit to the Montgomery Declaration.[23] These trade channels for Opposer's goods are the same as what Applicant recites in International Class 35 as to its retail stores including "by means of electronic

media" and its provision of an "online marketplace for buyers and sellers of goods." Thus, we find that the trade channels of Applicant's Class 35 services would include the same channels of trade in which Opposer's goods travel.

This factor weighs heavily in favor of a likelihood of confusion as to Applicant's Class 25 goods and Class 35 services, and is neutral as to Applicant's Class 24 goods.

**G. Purchasing Conditions**

Applicant argues that "ordinary clothing items" such as those at issue "are not going to be purchased with anything more than ordinary care by ordinary consumers."[24] Given this representation, and the lack of evidence regarding the degree of care in purchasing the other goods and services at issue, we consider this factor neutral.

**H. Range of Goods on Which Opposer's Marks Are Used**

"The ninth *DuPont* factor takes into account the variety of goods on which a mark is or is not used." *DeVivo v. Ortiz*, 2020 USPQ2d 10153, *15 (citing *DuPont*, 177 USPQ at 567). "If a party in the position of plaintiff uses its mark on a wide variety of goods, then purchasers are more likely to view a defendant's related good under a similar mark as an extension of the plaintiff's line." *Id.*

Opposer argues:

> As noted above, Wrangler has long sold a wide ranging line of clothing and accessories, including pants, shirts, tops, hats, dresses, underwear, socks, and shoes. (Supra, p. 6). It would, therefore, be common for Wrangler to incorporate any number of its W Marks on its clothing designs, and for consumers to expect to see such Wrangler's W Marks. Accordingly, this factor favors Wrangler.[25]

Opposer's items, all in the field of clothing, cannot be considered a wide variety that would render consumers more likely to view other types of goods and services (such as Applicant's non-overlapping Class 24 goods and Class 35 services) as coming from Opposer. We consider this factor neutral.

**I. Absence of Actual Confusion**

***12** While Opposer has acknowledged the lack of actual confusion evidence, given that we have no indication that Applicant has used its proposed mark in commerce, there has been no opportunity for actual consumer confusion to occur. *See DuPont*, 177 USPQ at 567 (identifying seventh and eighth *du Pont* factors as "[t]he nature and extent of any actual confusion," and "[t]he length of time during and conditions under which there has been concurrent use without evidence of actual confusion"). Accordingly, we agree that the seventh and eighth *DuPont* factors must be considered neutral.

**IV. Conclusion**

The legally identical-in-part goods, and other goods and services in all three International Classes in the challenged application that are related to Opposer's goods, and the overlapping channels of trade and classes of consumers as to Classes 25 and 35, weigh in favor of likely confusion. Also, Applicant's mark is similar to Opposer's W Marks on which we focused and to which we attribute some degree of commercial strength, entitling Opposer's W Registrations to a broader than normal scope of protection.

Given that the relevant *DuPont* factors weigh in favor of likely confusion, or are otherwise neutral, consumer confusion is likely as to all classes of goods and services in the challenged application.

**Decision**: The opposition based on likelihood of confusion is sustained.

## Footnotes

1 Application Serial No. 79271371 is a request for extension of protection of International Registration No. 1496878 under Section 66(a) of the Trademark Act, 15 U.S.C. § 1141f(a).

2 Opposer's pleaded current registrations that are of record are: Registration Nos. 634868, 3322277, 3777026, 4090286, 4572699, 4656517. Opposer's pleaded Registration No. 3985886 and Registration No. 4782316 were cancelled after the institution of this proceeding because Opposer did not make the required maintenance filings. Although Opposer pleaded its then-pending Application Serial No. 88149303, and submitted a copy of the TSDR record with its Notice of Opposition, Opposer did not subsequently introduce the resulting registration, so we have not considered it. *See* TRADEMARK MANUAL OF EXAMINING PROCEDURE § 704.03(b)(1)(A) n. 4 (2022) and cases cited therein.

3 Registration No. 3777026 issued April 20, 2010 and has been maintained. The registration includes a description of the mark that states, "[t]he mark consists of a stylized 'W'." Color is not claimed as a feature of the mark.

4 Registration No. 4656517 issued December 16, 2014 and has been maintained. Color is not claimed as a feature of the mark.

5 We take judicial notice of the definition of "dungarees" as "clothes made usually of blue denim." Merriam-Webster.com entry for "dungarees," accessed December 2, 2022. The Board may take judicial notice of definitions from dictionaries, including online dictionaries that exist in printed format. *E.g., In re S. Malhotra & Co. AG*, 128 USPQ2d 1100, 1104 n.9 (TTAB 2018).

6 Registration No. 634868 issued September 25, 1956 and has been maintained.

7 Registration No. 3322277 issued October 30, 2007 and has been maintained. The registration contains the following description: "The mark consists of Stitching in shape of W." Color is not claimed as a feature of the mark.

8 23 TTABVUE.

9 17-22 TTABVUE.

10 24-25 TTABVUE.

11 Despite the shift in nomenclature from "standing," our prior decisions and those of the Court of Appeals for the Federal Circuit that refer to "standing" in interpreting Section 13 remain applicable.

12 22 TTABVUE 4 (confidential).

13 17 TTABVUE 3.

14 *Id.* at 4.

15 *Id.* at 6; 21 TTABVUE 65-147 (Exhibit 18).

16 *Id.* at 5-6.

17 17 TTABVUE 3.

18 17 TTABUVE 4.

19 17 TTABVUE 20.

20 17 TTABVUE 44.

21 23 TTABVUE 12 (contify.com).

22 17 TTABVUE 6 (Montgomery Declaration).

23 21 TTABVUE 150-184.

24 24 TTABVUE 31 (Opposer's Brief). While Opposer argues this would weigh in favor of likely confusion, that weighing would occur when consumers make impulse purchases of very inexpensive items, rather than when the consumers exercise ordinary care, as Opposer asserts here. *See DuPont*, 177 USPQ at 567.

25 24 TTABVUE 32 (Opposer's Brief).

2022 WL 17884092 (Trademark Tr. & App. Bd.)

End of Document © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 919246 (Trademark Tr. & App. Bd.)

THIS OPINION IS NOT A PRECEDENT OF THE TTAB

Trademark Trial and Appeal Board

Patent and Trademark Office (P.T.O.)

AMERICAN UNIVERSITY
v.
AMERICAN UNIVERSITY OF KUWAIT

Cancellation No. 92049706
January 30, 2020

***1** Stephanie Bald of Kelly IP, for American University.
Robert Ludwig of Ludwig & Robinson PLLC, for American University of Kuwait.

Before Wolfson, Greenbaum and Larkin
Administrative Trademark Judges
Opinion by Wolfson
Administrative Trademark Judge:

American University of Kuwait (Respondent) owns a Principal Register registration for the mark depicted below for "Educational services, namely, providing courses of instruction at the college level" in International Class 41: [1]




The colors maroon and gold are claimed as features of the mark, and "AMERICAN UNIVERSITY OF KUWAIT" has been disclaimed. [2]

American University (Petitioner) petitioned to cancel the registration under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that Respondent's use of the mark would be likely to cause confusion with Petitioner's AMERICAN UNIVERSITY marks registered in International Class 41: [3]

• Registration No. 2878419 for the mark AU in stylized form, displayed as



, for “Educational services, namely, providing courses of instruction at the college and graduate level, distributing course materials in connection therewith, conducting educational conferences and educational research in the fields of politics, science, history, languages, computer technology, math, arts, music; entertainment services, namely, radio programming for a university setting; organizing exhibitions of university-level athletics” and ancillary goods; [4]

• Registration No. 3337869 for the mark **AU** (typeset) for “Educational services, namely, providing courses of instruction at the college and graduate level, distributing course materials in connection therewith, conducting educational conferences and educational research in the fields of politics, science, history, languages, computer technology, math, arts, music; entertainment services, namely, radio programming for a university setting; organizing exhibitions of university-level athletics” and ancillary goods; [5]

• Registration No. 3559022 for the mark **A NEW AMERICAN UNIVERSITY** (standard characters; UNIVERSITY disclaimed; acquired distinctiveness claimed as to “AMERICAN UNIVERSITY”) for “Educational services, namely, providing courses of instruction at the college and graduate level, distributing course materials in connection therewith, conducting educational conferences and educational research in the fields of politics, science, history, languages, computer technology, math, arts, music; entertainment services, namely, radio programming for a university setting; organizing exhibitions of university-level athletics”; [6] and

***2** • Registration No. 4774583 for the mark **AMERICAN UNIVERSITY** (standard characters; “UNIVERSITY” disclaimed; acquired distinctiveness claimed in whole) for “Educational services, namely, providing courses of instruction at the college and graduate level, namely, distributing course materials, conducting educational conferences and educational research in the fields of politics, science, history, languages, computer technology, math arts, music; entertainment services, namely, radio programming for a university setting; entertainment services, namely, organizing exhibitions of university-level athletics” and ancillary goods. [7]

In its Answer, as amended, Respondent denied the salient allegations of the Petition to Cancel, and asserted the affirmative defenses of unclean hands, estoppel by acquiescence, laches, and “fraud on the Board.” [8] Respondent also counterclaimed to cancel Petitioner's pleaded registrations that contain the phrase AMERICAN UNIVERSITY, on the ground that the phrase is generic or “commonly descriptive” without the ability to acquire distinctiveness. [9] Petitioner denied Respondent's counterclaims. [10]

**I. Procedural Background**

This case commenced on July 25, 2008 with the filing of Petitioner's cancellation petition. On January 30, 2009, proceedings were suspended pending the disposition of Cancellation No. 92031743, *Am. Univ. v. Am. Univ. of the Caribbean*. [11] Proceedings were resumed on December 30, 2014, following dismissal of that cancellation proceeding. [12] On April 1, 2015, Respondent amended its answer (Respondent's first amended answer, 20 TTABVUE) to include counterclaims for cancellation of Petitioner's Registration Nos. 2986715, [13] 3559022, and 4127891, [14] on the ground that the term AMERICAN UNIVERSITY is either generic or highly descriptive without acquired distinctiveness. Respondent again amended its answer on February 9, 2016 [15] to include a counterclaim for cancellation of the International Class 41 services in Registration No. 4774583 on the same ground. [16]

On May 1, 2017, Petitioner filed an answer to the counterclaims. [17] The following day, Petitioner moved for leave to amend the petition to cancel to allege that Respondent's Registration No. 3387226 is void ab initio because Respondent was not using its mark in commerce in association with the recited services at the time it filed its application. [18] The Board granted the request and allowed Respondent time to answer the amended petition to cancel. [19] Respondent timely filed its third amended answer denying Petitioner's claims and reasserting Respondent's counterclaims. [20] Because the reasserted counterclaims are identical to those submitted on February 9, 2016, Petitioner's previous answers, submitted May 1, 2017, are deemed Petitioner's operative answers to the amended counterclaims.

***3** The claims, affirmative defenses, and counterclaims in this case are thus as follows:

• Petitioner's claims of likelihood of confusion under Section 2(d) and that Respondent's Reg. No. 3387226 is void ab initio under Section 1(a).

• Respondent's affirmative defenses of unclean hands, estoppel by acquiescence, laches, and "fraud on the Board."

• Respondent's counterclaim that AMERICAN UNIVERSITY is generic or descriptive without acquired distinctiveness for educational services and that:

○ Petitioner's Registration No. 4774583 (AMERICAN UNIVERSITY), should be partially cancelled (as to Class 41); and

○ Petitioner's Registrations Nos. 2986715 (AMERICAN INTERNATIONAL UNIVERSITY), 3559022 (A NEW AMERICAN UNIVERSITY), and

4127891 (

), should be amended to delete the Section 2(f) claims as to the term AMERICAN UNIVERSITY in favor of a disclaimer of the term.

The parties agreed to proceed under the Board's Accelerated Case Resolution (ACR) procedure. [21] Pursuant to their agreement, both parties filed testimony and documentary evidence by sworn declaration concurrently with their ACR briefs, or as an exhibit

to the brief, and each party filed an ACR Reply Brief with additional evidence or testimony.[22] The parties stipulated that the Board may decide any issues of material fact in dispute and make a final determination on the ACR record.[23]

**II. Objections to the Record**

Petitioner makes several objections to Respondent's declarations and evidence.[24] We decide them below, but note that some of the key benefits of ACR are lost when the Board must cope with numerous evidentiary objections that could likely have been avoided in the process of formulating the parties' ACR agreement. *See Kemi Organics, LLC v. Gupta*, 126 USPQ2d 1601, 1602 n.3 (TTAB 2018) ("To obtain the full benefits of ACR, it is important that parties draft clearly-worded stipulations regarding procedures, claims and defenses, and the factual record."); TRADEMARK BOARD MANUAL OF PROCEDURE (TBMP) § 528.05(a)(2) (June 2019) ("To optimize ACR efficiencies and streamline the case at final decision, parties should avoid excessive evidentiary objections. . . .").

**A. Objection to Respondent's resubmission of certain declarations and evidence as untimely**

Petitioner argues that Respondent went beyond the scope of Petitioner's consent to an extension of time that was only intended to enable Respondent to re-file declarations with exhibits that it had inadvertently failed to attach to its June 5-6, 2018 submissions.[25] Petitioner argues that when Respondent filed new declarations on August 3, 2018, it added new exhibits not contemplated within the scope of the original declarations. Respondent argues that it merely corrected the declarations to reflect exhibit references and include the missing exhibits.[26] The exhibits at issue are:

***4** • Exhibit 1 to the Corrected Declaration of Rawda Awwad (181 TTABVUE);

• Exhibits 1-25 to the Corrected Declaration of Dale Eickelman (182-83 TTABVUE); and

• Exhibits 1-135 to the Corrected Declaration of Amal Al-Binali (184-88 TTABVUE).[27]

The motion to extend that included the parties' stipulation stated:

> The parties represent that good cause exists for this extension, namely, to allow [Petitioner] to review, consider, and address [Respondent's] exhibits that [Respondent] inadvertently did not include with certain of its Main ACR Brief declarations. [Petitioner] has not yet received these exhibits, but [Respondent] expects to provide them to [Petitioner] this week.[28]

At the time the motion to extend was filed on July 31, 2018, Petitioner's Rebuttal ACR brief was due August 1, 2018,[29] (i.e., the following day), and it had been almost two months since Respondent filed its Main ACR brief. We agree with Petitioner that Respondent should be limited to only those new exhibits that were within the scope of statements made in the original declarations (the declarations themselves are substantively unchanged). New exhibits that go beyond the scope of the original declarations, or which have not been identified, are excluded as set forth below:

• Corrected Declaration of Rawda Awwad

Exhibit No. 1 to the corrected declaration of Rawda Awwad has been considered only in support of Awwad's testimony that she taught two interactive courses in 2009 in a “cross-border open classroom experience.”

• Corrected Declaration of Dale Eickelman

The following exhibits to the corrected declaration of Dale Eickelman are excluded: Exhibit No. 13 (previously unidentified), No. 14 (previously unidentified), No. 15 (does not relate to the proposition for which it has been cited), No. 17 (mostly illegible; considered to the extent it can be read), Nos. 19-22 (previously unidentified), and No. 23 (does not relate to the proposition for which it has been cited).

• Corrected Declaration of Al-Binali

The following exhibits to the corrected declaration of Amal Al-Binali are excluded: Exhibit No. 5 (does not relate to the proposition for which it has been cited); No. 6 (to the extent it contains hearsay); Nos. 20 and 21 (not mentioned in the declaration); No. 23 (illegible); and No. 25 (irrelevant).

The parties stipulated to the authenticity of documents filed with their briefs so long as they were attached to a witness declaration and “admissible under Notice of Reliance regardless of whether produced during discovery” [30] or “produced in response to written discovery requests served in this proceeding.” [31] Because Respondent alleges without objection that all documents were produced in response to discovery requests, we consider the remaining exhibits admissible (with the exception of 57 pages that it identified as AUK004143-99, discussed more fully below). However, their relative strength or weakness varies considerably, and in weighing the evidence we have taken their limitations into account, including whether they are being offered for the truth of the matter stated therein without proper testimonial support. *See* *Luxco, Inc. v. Consejo Regulador del Tequila, A.C.,* 121 USPQ2d 1477, 1479 (TTAB 2017) (“the Board is capable of weighing the relevance and strength or weakness of the objected-to testimony and evidence, including any inherent limitations”).

**B. New document production**

***5** Respondent alleges that all documents were produced in response to discovery requests with the exception of 57 pages that it identified as AUK004143-99. [32] We agree with Petitioner that their submission is untimely and exclude them from the record. These include the following pages that were attached to the above-noted corrected declarations:

• Al-Binali Declaration (184 TTABVUE) - Exhibits 26, 35, 56, 57, 76, 127, 128, 130, 132, 133. [33]

• Eickelman Declaration (182 TTABVUE) - Exhibit 16. [34]

**C. Objections to Internet evidence and publications on hearsay grounds**

Petitioner objects to Respondent's reliance on website printouts and other printed publications for the truth of the matters asserted therein. [35] We have long held that such evidence is only considered for what it shows on its face, i.e., that the publication or webpage was available on the date accessed and that the information printed thereon was available to the public on such date. *Safer Inc. v. OMS Invs. Inc.,* 94 USPQ2d 1031, 1040 (TTAB 2010) (evidence from the Internet is admissible “only to show what has been printed, not the truth of what has been printed”). We do not outright exclude the material as Internet printouts,

and printed publications may be competent on their face to show public perceptions "regardless of whether the statements are true or false." *Harry Winston, Inc. v. Bruce Winston Gem Corp.*, 111 USPQ2d 1419, 1428 (TTAB 2014). However, the websites are of "limited probative value," as they are not evidence that the marks shown therein are in use. *Sports Auth. Mich. Inc. v. PC Auth. Inc.,* 63 USPQ2d 1782, 1798 (TTAB 2002); *see also* *WeaponX Performance Prods. Ltd. v. Weapon X Motorsports, Inc.*, 126 USPQ2d 1034, 1041 (TTAB 2018) (Internet evidence insufficient to establish priority of use); *Life Zone Inc. v. Middleman Grp., Inc.,* 87 USPQ2d 1953, 1959 (TTAB 2008) (website evidence "is not evidence that opposer is using its mark on any goods or services displayed or discussed on the site.").

**D. For failure to provide URL or date accessed**

Petitioner objects to Exhibits A6(d)-(e), A7(a), A19(a)-(c) to the Housey Decl. A [36] as not indicating their URL or access date. We overrule the objection as the information was provided in the declaration itself.

**E. Evidence from outside the United States**

Petitioner argues that most of Respondent's evidence consists of "Internet printouts or other documents and testimony about institutions located outside the United States," which have no evidentiary value in determining how relevant consumers in the U.S. perceive the term AMERICAN UNIVERSITY. [37] Respondent counters that the website excerpts it has submitted are targeted to prospective U.S. students; are in English; and show how the term is perceived not only in the U.S., but around the world. [38]

***6** Here, we are only concerned with how the term AMERICAN UNIVERSITY is perceived in the United States, but do not exclude the evidence because it would likely be viewed by prospective consumers in the U.S., such as prospective transfer or exchange students. *See* *In re Well Living Lab Inc.,* 122 USPQ2d 1777, 1781 n. 10 (TTAB 2017) ("We evaluate the probative value of foreign information sources on a case-by-case basis.") (citing *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 82 USPQ2d 1828, 1835 (Fed. Cir. 2007)). In view thereof, the objection is overruled, except with respect to the portions of Housey Decl. A [39] that are in Spanish. "Board proceedings are conducted in English. If a party intends to rely upon any submissions that are in a language other than English, the party should also file a translation of the submissions. If a translation is not filed, the submissions may not be considered." TBMP § 104; *see also* *Swiss Watch Int'l Inc. v. Fed. of the Swiss Watch Indus.*, 101 USPQ2d 1731, 1734 n.8 (TTAB 2012) (printed publications submitted in a foreign language without translations have no probative value). Because no translation was provided, we exclude the evidence in Spanish.

**F. Google search engine results**

Petitioner objects to Exhibit C1 to Housey Decl. C, 162 TTABVUE 8-17. The exhibit is a search summary-results list from the Google® search engine purporting to show results for a search of "American University of Kuwait." These webpages have little probative value, because such a list "does not show sufficient context in which the term is used on the listed web pages." *Couch/Braunsdorf Affinity, Inc. v. 12 Interactive, LLC,* 110 USPQ2d 1458, 1461 n.10 (TTAB 2014). Nevertheless, we have considered the "hit list" to the extent that we can glean from it any evidence of value.

**G. Third-party registrations**

Petitioner objects to Respondent's submission of third-party registrations for marks containing the term AMERICAN UNIVERSITY and for marks containing the words AMERICAN and UNIVERSITY on the ground that the registrations are not admissible to show public use or exposure of the marks. Some of the marks are for educational services and some are for other goods and services. We have considered all the registrations for which proper status and title have been demonstrated for whatever probative value they have, not as evidence of use of the marks in the marketplace but to demonstrate that the terms may have commonly accepted meanings. *See* *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGaA v. New Millennium Sports,*

*S.L.U.,* 797 F.3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct. 982, 194 L. Ed.2d 5 (2016); *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1675 (Fed. Cir. 2015); *Institut Nat'l Des Appellations D'Origine v. Vinters Int'l Co.,* 958 F.2d 1574, 22 USPQ2d 1190, 1196 (Fed. Cir. 1992) ("[T]hird party registrations show the sense in which the word is used in ordinary parlance and may show that a particular term has descriptive significance as applied to certain goods or services.").

***7** We have not considered the registrations listed in the TESS printout submitted by Respondent at Housey Decl. A, Exhibit 73,[40] as introducing the registrations referenced therein. The search result list provides only the application serial number or registration number, mark, and status of the applications or registrations ("live" or "dead"). Such a list, without copies or electronic printouts of the applications or registrations, is insufficient to properly make the applications or registrations of record. *See, e.g., In re Smith and Mehaffey*, 31 USPQ2d 1531, 1532 n.3 (TTAB 1994). The list itself, while admissible, has little probative value.

**H. Excerpts from scholarly books and articles**

Petitioner objects to Respondent's submission of excerpts from books or articles in academic literature, on the grounds that there is no evidence of record that prospective consumers of the parties' services may encounter these publications or that they reflect current understanding of the term AMERICAN UNIVERSITY.[41] Many are alleged to be "many decades old" and "have no bearing on how the relevant consuming public in the United States views American University's AMERICAN UNIVERSITY mark."[42] Respondent argues to the contrary that the excerpts "are competent evidence of exposure of [AMERICAN UNIVERSITY] to the public and the meaning the public is likely to associate with the term."[43]

We agree such materials are relevant to show public exposure of the words "American" and "university" in connection with academic literature and have considered the evidence in light of its likely impact on consumers, keeping in mind the age of the materials, their subject matter, and intended academic audience.

**I. Objection to Housey Declarations A and E as improper expert opinion**

Housey's declarations contain statements regarding her opinion of whether the term AMERICAN UNIVERSITY is generic or highly descriptive. Petitioner objects to admission of Housey's opinions. Respondent contends that the testimony merely authenticates documents and explains their relevancy.

Whether or not considered expert testimony, the Board does not give consideration to statements that go to an ultimate question of law, such as whether Petitioner's mark is generic or whether a likelihood of confusion exists. The opinions of witnesses, even expert witnesses, on such questions are entitled to no weight. "[W]e will not substitute the opinion of a witness, even an expert witness, for our evaluation of the facts." *Edwards Lifesciences Corp. v. VigiLanz Corp.*, 94 USPQ2d 1399, 1402 (TTAB 2010) (citing *Mennen Co. v. Yamanouchi Pharm. Co.*, 203 USPQ 302, 305 (TTAB 1979) (holding the "opinions of witnesses, including those qualified as expert witnesses, on the question of likelihood of confusion are entitled to little if any weight and should not be substituted for the opinion of the tribunal charged with the responsibility for the ultimate opinion on the question.")). Accordingly, we give no weight to Housey's opinions on ultimate questions of law.

**J. Objection to exhibits to Housey, Al-Binali, and Eickelman declarations due to lack of foundation, personal knowledge; mischaracterization**

***8** Petitioner objects under Fed. R. Evid. 602 to certain exhibits attached to the Housey, Al-Binali, and Eickelman declarations as the witnesses allegedly have no personal knowledge of the contents thereof. Petitioner further objects to certain mischaracterizations allegedly in the declarations. Respondent argues that under the parties' ACR Stipulation, personal knowledge is not required for the admission of exhibits, in that the Stipulation allows parties to submit materials "admissible

under Notice of Reliance" as exhibits to a witness declaration whether or not such material was produced during discovery, and that materials produced during discovery will be considered authentic whether or not they qualify as admissible under Notice of Reliance.

As noted above, Respondent contends, without objection, that all the material attached to its brief was produced during discovery. Thus, we consider the evidence authenticated under the terms of the Stipulation. We consider its probative value according to whether the materials attached to declarations support the witnesses' statements, whether statements in the declarations appear to be based on personal knowledge or are unsupported by exhibits, and whether documents, while deemed authenticated under the Stipulation, would typically require testimonial verification for the truth of any matter asserted therein. As to the declarations themselves, the Board is capable of weighing the relevance and strength or weakness of the testimony, and this precludes the need to strike it from the record.

**K. Objections Raised During 30(b)(6) Perillo and Alston Depositions**

Petitioner raised numerous objections to questions posed by Respondent's counsel during the Fed. R. Civ. P. 30(b)(6) depositions of Perillo and Alston.[44] To the extent the resultant testimony was not based on personal knowledge or appeared to be speculative, or where the question posed assumed facts not in evidence or called for a legal conclusion, we sustain Petitioner's objections and do not consider the testimony.[45] We have considered the remaining testimony with an eye to Petitioner's objections and as to whether the testimony is outcome-determinative, and accord it whatever probative weight it merits.

**L. Objections to Respondent's amended responses to Petitioner's requests for admissions**

Petitioner seeks to rely on Respondent's initial responses to Petitioner's first and second sets of request for admissions, and objects to Respondent's amended responses, in particular to amended response Nos. 2, 42, 49, 51, 52, and 68-71. Petitioner contends that Respondent was required to file a motion for leave to amend or withdraw its admissions pursuant to Fed. R. Civ. P. 36(b), which provides that "matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Respondent contends that it did not need to file a motion to amend its initial responses but simply amended them by way of supplemental discovery.

***9** Fed. R. Civ. P. 36(a)(3) provides that requests for admissions are deemed admitted unless written answers or objections thereto are received by the requesting party within 30 days of service of the requests. Here, Respondent served its response to Petitioner's first set of requests for admissions more than thirty days from the date of service, on September 9, 2015 (112 TTABVUE 73, Exhibit 281).[46] Respondent served its response to Petitioner's second set of requests for admissions within thirty days of the date of service, on April 20, 2016 (112 TTABVUE 87, Exhibit 283).[47] Respondent served its supplemental answers to Petitioner's first and second sets on March 3, 2017.[48] (112 TTABVUE 108, Exhibit 286 and 112 TTABVUE 115, Exhibit 287).

Fed. R. Civ. P. 36(b) provides that the court, on motion, may permit admissions to be withdrawn or amended. "[T]he court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." *Id.* Here, Respondent amended its written answers during the discovery period well in advance of the opening of Petitioner's testimony period on April 2, 2018. There is no evidence that Petitioner expressly relied on the original admissions or suffered any legally cognizable prejudice that would arise from withdrawal of Respondent's original admissions. The presentation of the merits of the action will be promoted by admitting the amended answers. Under these circumstances, the Board construes the initial answers as withdrawn and amended by Respondent's supplemental answers served March 3, 2017. *See Checkpoint Sys. v. All-Tag Sec. S.A.,* 711 F.3d 1341, 106 USPQ2d 1234, 1238 (Fed. Cir. 2013) ("a party may rely on an admission as conclusively established unless the admission is recanted") (internal quotations omitted) (*cert. granted, judgment vacated, and case remanded on other grounds, Kobe Props. Sarl v. Checkpoint Sys., Inc.,* 572 U.S. 1097, 134 S. Ct. 2134, 188 L. Ed. 2d 1121 (2014)); *cf. Ajinomoto Co. v. Archer-Daniels-*

*Midland Co.,* 228 F.3d 1338, 56 USPQ2d 1332, 1342 (Fed. Cir. 2000) (pre-trial infringement admissions were binding because accused infringer "offered no correction of these admissions [made in a joint pre-trial statement of stipulated facts] before the court's judgment"); *Giersch v. Scripps*, 85 USPQ2d 1306, 1307-09 (TTAB 2007) ("prejudice...relates to the special difficulties a party may face caused by the sudden need to obtain evidence upon withdrawal or amendment of admission.").

**M. Objections to Respondent's purported claim that the registrations should be cancelled entirely; fraud and abandonment**

***10** Petitioner objects to Respondent's alleged counterclaims to the extent they purport to seek cancellation of Petitioner's registrations in their entireties. Petitioner is correct that with respect to Registration Nos. 2986715, 3559022 and 4127891, Respondent's counterclaims are construed only as a request for restriction under Section 18 to delete any claim under Section 2(f) in favor of a disclaimer of "AMERICAN UNIVERSITY."[49] As for Reg. No. 4774583 for the mark AMERICAN UNIVERSITY, the counterclaim is for partial cancellation; in particular, for deletion of the International Class 41 services from the registration.

Petitioner further objects to inclusion of abandonment and "fraud on the Board" as grounds for Respondent's counterclaims as unpleaded defenses. It is axiomatic that a party may not rely on an unpleaded claim or defense. *See, e.g., UVeritech, Inc. v. Amax Lighting, Inc.*, 115 USPQ2d 1242, 1244 (TTAB 2015) (unpleaded allegations relating to fraud will not be heard); TBMP § 314 and authorities cited therein. Respondent does not directly address Petitioner's objection to its purported fraud defense, arguing that it properly pleaded unclean hands. 201 TTABVUE 22. To the extent Respondent's unclean hands pleading is intended to be a pleading that Respondent's witnesses knowingly gave false testimony and thus committed "fraud on the Board," we find no support for such defense in the witnesses' transcripts and give it no further consideration.

Respondent also argues that because the term "AMERICAN UNIVERSITY" was in use by others when first adopted by Petitioner, Petitioner's application for registration of the term is tainted by fraud in the execution of the application. Suffice it to say, this purported allegation has not been properly pleaded, nor does the evidence show that the issue of fraud was tried.

As for Respondent's alleged abandonment defense, Respondent pleaded, under the heading "acquiescence," that "Petitioner unintentionally abandoned the term AMERICAN UNIVERSITY when Petitioner allowed numerous unrelated and unlicensed parties to use the term AMERICAN UNIVERSITY for many years without objection or action."[50] The statutory definition of "abandonment," Trademark Act Section 45, 15 U.S.C. § 1127, posits two possibilities in this situation: the mark owner's "acts of omission" by failing to challenge others has caused the mark to either: (1) "become the generic name for the goods or services on or in connection with which it is used;" or (2) "to lose its significance as a mark." To the extent Respondent has pleaded an abandonment defense based on a theory that Petitioner's alleged failure to police its mark has caused "AMERICAN UNIVERSITY" to become a generic term or to have lost its significance as a mark, we consider the defense in the context of Respondent's counterclaims and Petitioner's likelihood of confusion claim, and do not entertain a separate abandonment defense.[51] *Cf.* MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 17:17 (5th ed.) (McCarthy) ("[T]he actual relevancy of failure to prosecute others is to the possible impact such failure may have on the strength of the plaintiff's mark.").

**N. Evidence Attached to Respondent's Reply Brief**

***11** The purpose of a reply brief is to address arguments made in the adverse party's main brief, not to supplement the record by submitting evidence that supports a party's own case. New evidence that accompanies or is attached to a reply brief that supports the party's case in chief is untimely and will not be considered. *See, e.g., Johnston Pump/Gen. Valve Inc. v. Chromalloy Am. Corp.,* 13 USPQ2d 1719, 1720 n.3 ("The presentation of one's arguments and authority should be presented thoroughly in the motion or the opposition brief thereto."); Trademark Rule 2.123(l), 37 C.F.R. § 2.123(l) ("Evidence not obtained and filed in compliance with these sections will not be considered."); TBMP § 801.03 (a reply brief "must be confined to rebutting the defendant's main brief" and "limited to the key points in defendant's brief which plaintiff believes require clarification or

response”); *cf. Kellogg Co. v. Pack'Em Enters. Inc.,* 14 USPQ2d 1545, 1549 n.9 (TTAB 1990), *aff'd*, 951 F.2d 330, 21 USPQ2d 1142 (Fed. Cir. 1991) (evidence supporting a motion for summary judgment must be submitted with the motion); *Grote Indus., Inc. v. Truck-Lite Co., LLC,* 126 USPQ2d 1197, 1199 (TTAB 2018) (objections raised for the first time in reply brief are untimely because they effectively foreclose the adverse party from responding to the objections).

With its reply brief as plaintiff on the counterclaims, Respondent submitted Housey Declarations F and G along with accompanying Exhibits F, F1-F35 and G1-G52. This copious additional evidence [52] does not address issues raised in Petitioner's combined reply brief (as plaintiff in the cancellation and defendant on the counterclaims), but constitutes an attempt to supplement the existing record on issues related to Respondent's counterclaim that the term AMERICAN UNIVERSITY is generic. Being procedurally prohibited from responding to the testimony and evidence due to the absence of the right to file a sur-reply, Petitioner is effectively foreclosed from challenging it. Accordingly, we have not considered Housey Declarations F and G or the accompanying Exhibits F, F1-F35 and G1-G52. [53]

**III. The Record**

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the application files for the challenged registrations. [54] In addition, in light of the above evidentiary determinations, the record includes:

**A. Petitioner's Testimony and Evidence**

***12** • Confidential declaration of Justin Perillo, Associate General Counsel at American University, and Exhibits 1-17 (100-06 TTABVUE) [55] (“Perillo Decl. A”);

• Declaration of Michael A. Cajon, Counsel for American University, and Exhibits 1-294 (107-117 TTABVUE) [56] (“Cajon Decl. A”);

• Confidential declaration of Sharon Alston, Vice Provost for Undergraduate Enrollment at American University, and Exhibits 1-235 (118-52 TTABVUE); [57]

• Confidential rebuttal declaration of Justin Perillo and Exhibits 1-14 (189 TTABVUE) (“Perillo Decl. B”);

• Rebuttal Declaration of Michael A. Cajon and Exhibits 1-78 (190 TTABVUE) (“Cajon Decl. B”).

**B. Respondent's Testimony and Documentary Evidence**

• Declaration “A” of Janice Housey, Counsel for American University of Kuwait, and Exhibits A1-A76 (158-159 TTABVUE); [58] Exhibit B (159 TTABVUE 35-41); Exhibits A29a-b, A47, and A52a-b (200 TTABVUE) (“Housey Decl. A”);

• Declaration “B” of Janice Housey and Exhibits B1-B30 (160-61 TTABVUE) (“Housey Decl. B”);

• Declaration “C” of Janice Housey and Exhibits C1-C9 (162 TTABVUE) (“Housey Decl. C”);

• Declaration “D” of Janice Housey and Exhibits D1-D87 (163-66 TTABVUE) (“Housey Decl. D”);

• Declaration “E” of Janice Housey and Exhibits E1-E56 (173-75 TTABVUE) (“Housey Decl. E”);

• Declaration of Amal Al-Binali, Vice President for Admissions and Public Affairs at the American University of Kuwait (167 TTABVUE); [59]

• Declaration of Dale Eickelman, Professor of Anthropology and Human Relations at Dartmouth College and Relationship Coordinator (Director) of the Dartmouth College-American University of Kuwait Program (168 TTABVUE); [60]

• Declaration of Rawda Awwad, Provost and Professor of English at American University of Kuwait (169 TTABVUE);

• Corrected Declarations: [61]
○ Corrected Declaration "D" of Janice Housey and Exhibits D88-D95 (179 TTABVUE) ("Corrected Housey Decl. D"); corrected to renumber exhibit references and include Exhibits D88-95;

○ Corrected Declaration "E" of Janice Housey and Exhibits E26-E27 and E57-E58 (180 TTABVUE) ("Corrected Housey Decl. E"); corrected to reflect exhibit references in ¶¶ 16, 19, 46, 55, 58-59 and include Exhibits E26-27, 57-58.

○ Corrected Declaration of Rawda Awwad and Exhibit Awwad 1 (181 TTABVUE) ("Corrected Awwad Decl."); corrected to reflect exhibit references and include Exhibit 1;

○ Corrected Declaration of Dale Eickelman and Exhibits Eickelman 1-25 (182-183 TTABVUE) [62] ("Corrected Eickelman Decl."); corrected to reflect exhibit references and include Exhibits 1-25;

○ Corrected Declaration of Amal Al-Binali and Exhibits Al-Binali 1-135 (184-88 TTABVUE) [63] ("Corrected Al-Binali Decl."); corrected to reflect exhibit references and include Exhibits 1-135.

***13** • Excerpts from depositions of Justin Perillo (170 TTABVUE); [64]

• American University's third supplemental responses to American University of Kuwait's first set of requests for admissions (171 TTABVUE 2-72);

• Deposition of Sharon Alston (171 TTABVUE 73-132);

• Printout from U.S. News & World Report Best Colleges (172 TTABVUE);

• Confidential Exhibit 11 consisting of American University's supplemental responses to American University of Kuwait's interrogatories nos. 4 and 6 (177 TTABVUE under seal).

**IV. Respondent's Counterclaims**

We turn first to Respondent's counterclaims to cancel Reg. Nos. 2986715, 3559022, 4127891, and 4774583, as the validity of Petitioner's registrations has a bearing on Petitioner's main claims. *Schieffelin & Co. v. The Molson Cos. Ltd.*, 9 USPQ2d 2069, 2071 (TTAB 1989) (electing to first decide applicant's counterclaims because "the validity of opposer's pleaded registrations has been made an issue as a result of applicant's counterclaims"). Respondent argues that the term AMERICAN UNIVERSITY is generic, either as a common term used for a style of education, or as the result of widespread use by unrelated third parties. Alternatively, Respondent claims that the term is merely descriptive without acquired distinctiveness.

**A. Standing**

Standing is a threshold issue that must be proven by the plaintiff in every inter partes case. *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014). As a counterclaim plaintiff, Respondent's standing is inherent; it "need not allege its standing to challenge the pleaded registrations." *Finanz St. Honore B.V. v. Johnson & Johnson*, 85 USPQ2d 1478, 1479 (TTAB 2007); *see also Carefirst of Md., Inc. v. FirstHealth of the Carolinas, Inc.*, 77 USPQ2d 1492 (TTAB 2005); *Bankamerica Corp. v. Invest Am.*, 5 USPQ2d 1076, 1078 (TTAB 1987) (defendant seeking to cancel pleaded registration on ground of descriptiveness or genericness in an opposition based on likelihood of confusion need not allege that it has an interest in using the term sought to be cancelled).

Respondent has standing to assert that the term AMERICAN UNIVERSITY is generic or merely descriptive without secondary meaning. [65]

**B. Respondent's Claim that AMERICAN UNIVERSITY is Generic**

Respondent offers two theories under which it claims the Board may find the term AMERICAN UNIVERSITY to be generic. First, Respondent contends that the term was generic when adopted by Petitioner in the early 1890's. [66] Second, Respondent contends that Petitioner has allowed the term AMERICAN UNIVERSITY to become generic by its failure to police its mark, allowing "numerous unrelated and unlicensed parties to use the term AMERICAN UNIVERSITY for many years without objection or action." [67] Under either theory, the determination of whether the mark has become "the common descriptive name of a class of goods or services" is the same.

***14** "[D]etermining a mark's genericness...requires 'a two-step inquiry: First, what is the genus of goods or services at issue? Second, is the term sought to be registered or retained on the register understood by the relevant public primarily to refer to that genus of goods or services?"' *Princeton Vanguard, LLC v. Frito-Lay North Am., Inc.*, 786 F.3d 960, 114 USPQ2d 1827, 1830 (Fed. Cir. 2015) (citing *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 228 USPQ 528, 530 (Fed. Cir. 1986). Further, "whether the mark is a compound term or a phrase, the applicable test is the same and the Board must consider the record evidence of the public's understanding of the mark as a whole." *Princeton Vanguard*, 114 USPQ2d at 1832 (citing *In re Am. Fertility Soc.*, 188 F.3d 1341, 51 USPQ2d 1832, 1836 (Fed. Cir. 1999). As counterclaim plaintiff, Respondent must establish that AMERICAN UNIVERSITY is generic by a preponderance of the evidence. *Id.* Evidence of the public's understanding of a term may be obtained from any competent source, including testimony, surveys, dictionaries, trade journals, newspapers, and other publications. *Royal Crown Co. v. The Coca-Cola Co.*, 892 F.3d 1358, 127 USPQ2d 1041, 1046 (Fed. Cir. 2018); *In re Cordua Rests., Inc.*, 823 F.3d 594, 118 USPQ2d 1632, 1634 (Fed. Cir. 2016); *Princeton Vanguard*, 114 USPQ2d at 1830. [68]

**1. What is the genus for the services?**

The relevant genus of services is defined by the recitation of services in each of Petitioner's registrations, including "educational services, namely, providing courses of instruction at the college and graduate level and distributing course materials in connection therewith"; "conducting educational conferences in the fields of politics, science, history, languages, computer technology, math arts, music, and law studies"; and "arranging and conducting educational conferences and educational research" [69] all in International Class 41. *Real Foods Pty Ltd. v. Frito-Lay N. Am., Inc.*, 906 F.3d 965, 128 USPQ2d 1370, 1379 (Fed. Cir. 2018) ("The authority is legion that the question of registrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application [,] regardless of what the record may reveal as to the particular nature of an applicant's goods . . . .") (citing *In re Cordua*, 118 USPQ2d at 1636) (internal quotation marks and citation omitted).

***15** Although Reg. Nos. 3559022 and 4774583 include "entertainment services, namely, radio programming for a university setting; organizing exhibitions of university-level athletics," Respondent focuses on "educational services" and does not offer any evidence that could be construed as relevant to showing that AMERICAN UNIVERSITY is generic for Petitioner's

entertainment services. Accordingly, we consider Respondent's counterclaim waived as to entertainment services and focus on Petitioner's educational services, noting that if Petitioner's mark is generic for any one of these services, the registration must be cancelled as to the entire International Class. *Cordua Rests.*, 118 USPQ2d at 1638 ("a term is generic if the relevant public understands the term to refer to part of the claimed genus of goods or services, even if the public does not understand the term to refer to the broad genus as a whole"); *In re Analog Devices Inc.,* 6 USPQ2d 1808, 1988 (TTAB 1988), *aff'd*, 871 F.2d 1097, 10 USPQ2d 1879 (Fed. Cir. 1989) ("There is no logical reason to treat differently a term that is generic of a category or class of products where some but not all of the goods identified in an application fall within that category."); MCCARTHY § 12:57 (5th ed.) ("A registration is properly refused if the word is the generic name of any of the goods or services for which registration is sought."); *see also* Trademark Act Section 15(4), 15 U.S.C. § 1065(4) ("no incontestable right shall be acquired in a mark which is the generic name for the goods or services or a portion thereof, for which it is registered"). We further find that the relevant public consists of men and women who are interested in attending college or graduate level courses at a university or by attending educational conferences.

**2. Was AMERICAN UNIVERSITY generic when adopted by Petitioner?**

Respondent argues that the term AMERICAN UNIVERSITY was generic before Petitioner first adopted its mark in 1892 [70] because two "other schools were using AMERICAN UNIVERSITY to offer college-level instruction," the American University at Cairo (AUC) and the American University of Beirut (AUB). [71] According to Respondent, the American University at Cairo "was known in the U.S. as 'the American University' at least by 1885," and the Syrian Protestant College, allegedly chartered in 1863, [72] was renamed "American University of Beirut" in 1920. [73] Both institutions are located outside of the United States, in Cairo, Egypt, and Beirut, Lebanon respectively. There is no evidence that prior to Petitioner's first use of its mark, any appreciable segment of the United States population was aware of either foreign institution.

***16** Respondent further argues that newspaper articles written in the 19th century before Petitioner opened its doors popularized the term "American university" for a university located in the United States. [74] Petitioner responds that such references "have no bearing on how the relevant consuming public in the United States views" its mark, and that even a 'well-documented 19th Century Protestant American university movement"' would likewise be irrelevant. [75] We find that these earlier usages have little bearing on how the relevant consuming public in the United States views Petitioner's AMERICAN UNIVERSITY mark today. *Alcatraz Media*, 107 USPQ2d at 1763 ("To determine if a mark is generic, we examine the evidence up through the time of trial."); *accord Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1730 (Fed. Cir. 2012) (acquired distinctiveness); *In re Chippendales USA Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010) (inherent distinctiveness); *TiVo Brands LLC v. Tivoli, LLC*, 129 USPQ2d 1097, 1113 n. 69 (TTAB 2018) (dilution).

**3. Is the term AMERICAN UNIVERSITY generic today?**

**a) Does the term denote a style of education?**

A term that is understood by the relevant purchasing public primarily to refer to a type or style of services is unregistrable for that category of services. *See Cordua Rest.,* 118 USPQ2d at 1632 ("Churrasco" is generic for restaurants that specialize "in meat grilled in the churrasco style"). The Federal Circuit has held that "[t]he test is not only whether the relevant public would itself *use* the term to describe the genus, but also whether the relevant public would *understand* the term to be generic." *Id. (*citing *1800Mattress.com*, 586 F.3d 1359, USPQ2d 1682, 1685 (Fed. Cir. 2009) ("[A]ny term that the relevant public understands to refer to the genus . . . is generic."); *see also* MCCARTHY, § 12:23 (5th ed.).

Respondent's Vice President for Admissions and Public Affairs, Amal Al-Binali, testified that "the term 'American University' is used by college administrators throughout the world to denote that an educational institution offers an American-style post-secondary education," and that "universities that use American University as part of the name of their institutions generally do so to broadcast that the school uses an American-style of education." [76] She describes an "American-style of education" as one

that "typically... encompasses the following: educational courses in English with a sequence of general instruction followed by a particular field of study, each with significant emphasis on class instruction, and attainment of a U.S.-equivalent 'Bachelor of Arts' or 'Bachelor of Sciences' degree upon successful completion of required course work."[77] In support, Respondent asserts that it has submitted "numerous authoritative books, newspapers, periodicals, and websites reflecting the use of the term 'American university' generically to mean 'American-style' universities."[78]

***17** Petitioner counters that Respondent "has presented no direct evidence that the relevant consumers primarily understand AMERICAN UNIVERSITY as denoting a genus, species, category, or class of courses of instruction at the college or graduate level."[79] Petitioner correctly points out that whether foreign students understand "American style" or "American model" as referring to an approach to higher education is not an issue in this proceeding. We are concerned with the perception of U.S. consumers. *See* *In re Consol. Cigar Corp.*, 13 USPQ2d 1481, 1483 (TTAB 1989) ("The relevant test is, of course, consumer perception in this country.") (citing *Nature's Way Prods. Inc. v. Nature's Herbs Inc.*, 9 USPQ2d 2077, 2080 n.3 (TTAB 1989) (refusing to infer that foreign uses "have had any material impact on the perceptions of the relevant public in the United States")); *cf.* *Russell Stadelman & Co. v. U.S.*, 242 F.3d 1044, 1050, 22 ITRD 2345 (Fed. Cir. 2001) ("In considering the common, dictionary definition of an HTSUS term [under the Harmonized Tariff Schedule of the United States], only common use of that term in the United States is relevant."); *Well Living Lab,* 122 USPQ2d at 1781 (TTAB 2017) (foreign websites' probative value depends on the extent to which they are accessible to and viewed by U.S. consumers).

Respondent alleges the following factors establish the U.S. public's understanding of the term "AMERICAN UNIVERSITY" as a style of education.

**(1) Accreditation Standards**

Respondent argues that institutions offering university education around the world seek accreditation by a U.S.-based accreditation agency, which standards "often include a requirement that the seeking university be an American-style university."[80] For example, The New England Association of Schools and Colleges requires institutions outside the U.S. to declare themselves to be American-style institutions and meet certain standards "through its name, mission statement, catalog, and other declarations and actions that reflect its commitment to offering an American-style education abroad" before they can be considered for accreditation.[81] Although institutions outside the United States may seek accreditation based on standards they understand to be "American-style," Respondent has not shown that the relevant public is aware of these standards or that universities seek to be "American-style."

**(2) Respondent's self-promotion as an American-style university**

Respondent self-identifies as an "American-style university," and as such, Respondent "uses a traditional American academic calendar year... [and] American-style course numbers" and class-year designations (Freshman, Sophomore, Junior, and Senior); Respondent also conducts classes in English and its graduates complete a minimum of 124 credit hours which is "commensurate with U.S. credit hours" and receive a Bachelor's degree.[82] Respondent belongs to several U.S. professional associations and maintains accreditations from four U.S. accrediting organizations.[83] Respondent's self-promotional efforts likely reach relevant consumers, who may understand Respondent's alignment with the term "American-style" and the use of "American university" to denote such style.

**(3) Petitioner's use of "American-style university" to denote a style of education**

***18** Respondent asserts that Petitioner "has long advised the public, in response to email inquiries, that the term 'American University' means an 'American style' university."[84] Respondent provided copies of five emails from the years 2007, 2011, 2012 (two), and 2013 wherein Petitioner responded to an inquiry about affiliation with other universities using "American

University."[85] In its response to four of the inquiries, Petitioner advised the recipient that foreign institutions unaffiliated with Petitioner use the term to indicate that they are American-style universities.[86] These emails are of limited probative value, as they reflect only the authors' understanding of what "American-style" means; all but one were at least six years old when they were made of record; and they are too few in number to demonstrate public awareness of the meaning of "American university" through Petitioner's actions.

Respondent also asserts that Petitioner has been directly and indirectly involved "in founding American-style universities using the term 'American University.'"[87] Respondent contends that Samih Farsoun, "Professor of Sociology for 30 years and founder of [Petitioner's] Arab Studies Program,"[88] served as Respondent's "founding consultant [] from May 2003 through Spring 2004."[89] Respondent alleges that Petitioner assisted in the founding of two other international schools, the American University of Sharjah (AUS) in the United Arab Emirates and the American University of Nigeria (AUN).[90] Petitioner's alleged connection with AUS is through Farsoun, who "served as AUS's Founding Dean from 1997-1999."[91] Petitioner's alleged connection with AUN is through "Dr. Lou Goodman, Dean of Petitioner's School of International Service and Professor of Sociology," who serves as an AUN trustee.[92] Although Petitioner has not contested Drs. Farsoun's or Goodman's involvement, there is no clear evidence of record that U.S. consumers have been aware of either professor's role. Moreover, the use of "American University" in the names of three foreign universities that are affiliated with Petitioner reinforces the public's understanding that the phrase "American University" has trademark significance.[93]

**(4) Third-party use of "American University" to denote a style of education**

Respondent submitted copies of several third-party university websites that describe their model of education as based on an "American style." The following illustrates how these entities use the expression:

• **American University of Health Sciences** - located in Signal Hill, CA. "AUHS offers an American-style liberal arts education to students of any nationality."[94]

***19** • **American University in Bulgaria** - located in Bulgaria. "...a private American style university."[95]

• **American University of Armenia** - located in Armenia. "The idea of establishing an American-style university in Armenia emerged in a conversation..."[96]

• **American University of Iraq Sulaimani** - located in "Iraqi Kurdistan." "To support its mission of bringing American-style, liberal arts higher education to Iraq, AUIS has set American regional accreditation as a key institutional goal."[97]

• **American University of Science & Technology** - located in Lebanon. "The University strives to provide top-level education at moderate costs to avail needy students of opportunities to receive American-style education."[98]

• **Girne American University** - located in Canterbury, UK. "Girne American University provides American Education Model to the students...."[99]

All of these usages except one are from outside the United States. They tend to show that some foreign universities, and one domestic one, which use "American University" in their name together with a geographic or subject-area term, advertise themselves as providing an "American-style" of education. To the extent that these uses have received exposure in the United States, they are probative of an established meaning of the term "American-style" but do not show that the term "American university" would be understood by United States consumers to denote a unique style of education.

**(5) Media use**

Respondent submitted several media references that purport to use the phrase "American university" generically. For example, a December 11, 2004 Daily Star article reporting Respondent's opening is titled: "Kuwait City is latest Arab capital to get an American University/ AUK joins US-style institutions of higher learning in Cairo, Beirut, Sharjah, and Dubai." [100] The article discusses the Arab institutions, noting that "[c]ontrary to easy assumptions, none are linked into a satellite system of schools and none save AUS bear any connection to the American University in Washington, DC." [101] We accord this article limited probative value because it appears the Daily Star is a United Kingdom publication, it is over ten years old, and the record does not contain information as to any circulation or exposure in the United States. [102]

Respondent submitted a copy of an article from 2004 published in BAZAAR MAGAZINE purporting to interview Farsoun. [103] Readers will encounter the phrases "US style education" and "the style of education reflects the American philosophy," used by the author to describe her interpretation of Farsoun's statements, but the article does not quote Farsoun directly. Respondent also submitted a mission statement of the Association of American Universities (AAU) that explains that it is comprised of 62 universities, two of which are located in Canada. [104] TOWN & COUNTRY creported on the recruitment of students as spies, in an article entitled "How Spy Agencies Use American Universities to Secretly Recruit Students." [105]

***20** These sources have some weight in showing that relevant consumers are familiar with the words "American" and "university(-ies)" used to refer to universities located in the United States or to an American style or philosophy of university education. In contrast, Petitioner submitted "150 representative news articles, wire service articles, and transcripts available to the general public in libraries, newsstands, online, and on NEXIS or PROQUEST databases" that show unsolicited media use of the term AMERICAN UNIVERSITY to refer to Petitioner "between 1928 and 2017 in major U.S. publications and news outlets, such as *The Washington Post*, *The New York Times, CNN Today, Associated Press*, *Chicago Tribune*, and *Washington Business Journal*." [106] Such a "mixture of uses," which on this record skews strongly in favor of trademark use, supports a finding that the term is not generic. *See In re Merrill Lynch, Pierce, Fenner, and Smith, Inc.,* 828 F.2d 1567, 4 USPQ2d 1141, 1143 (Fed. Cir. 1987) ("Mixture of uses" of both generic and non-generic for "Cash Management Account" for brokerage services did not prove that the designation was a generic name); *Luxco*, 121 USPQ2d at 1497 (because record was mixed, evidence failed to show that certification mark had lost significance as designation of geographic origin); *In re Am. Online, Inc.,* 77 USPQ2d 1618, 1623 (TTAB 2006) ("the evidence of generic use is offset by Applicant's evidence that shows not only a significant amount of proper trademark use but also trademark recognition [by third parties]"). Unsolicited media use of "American university" does not show the term has become generic.

**(6) Academic sources**

As discussed, the scholarly and academic sources attached to Housey Decl. Exhibit E [107] that refer to AUC and AUB are mostly dated pre-1920. [108] Respondent has submitted other more recent academic reference works that refer to institutions of higher learning in the United States as "American universities." [109] Many of them harken back to earlier usage of the phrase in connection with "the discussion scholars had conducted in the Protestant American universities of the nineteenth century." [110] Other references use variations, such as "American-style university," [111] to describe universities outside the United States that are attempting to emulate the characteristics of U.S. institutions of higher learning, particularly in Arab countries. Indeed, the term "American-style" as used in these references does not refer only to universities in the United States:

> ***21** While American, Australian, British, and Canadian higher education may differ in content (an American bachelor's degree has two years of general education and two concentrated years, whereas a British bachelor's degree has four concentrated years), they distinguish themselves from Arabic higher

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

> education in their student focus, their use of English textbooks, their English-speaking faculty trained in the West, and their instruction emphasizing critical thinking and analysis. Therefore, in this study, Australian, British, and Canadian in addition to American institutions of higher education are included in the terms "American-style" or "American higher education."

"Studying the American Way/ An Assessment of American-Style Higher Education in Arab Countries," WASHINGTON INSTITUTE FOR NEAR EAST POLICY, June 2007. [112]

Respondent has not shown that an appreciable number of these books or articles are available outside of scholarly or academic circles. Even the excerpts from the more recent works that may appeal to a wider audience do not demonstrate that the primary significance of the term "American university" denotes a style of educational services. [113] At best, the evidence shows geographically descriptive use of the words "American university(-ies)" to describe universities located in the United States, and "American-style" to describe certain characteristics of a type of university located in the United States, Canada, England, or Australia. It does not demonstrate that the mark AMERICAN UNIVERSITY is generic.

**Summary - AMERICAN UNIVERSITY does not denote a style of education**

The preponderance of the evidence does not demonstrate that the term AMERICAN UNIVERSITY has been so widely used to describe a style of educational services that the relevant public in the United States, including scholars, educators, alumni, students, or prospective students, will view the term solely as referring to such style, type, or category of educational services, and not as the name of a particular institution. The mark is not a generic term in the United States for "American-style" education services. *Cf. Cordua Rests.*, 118 USPQ2d at 1637 (a term can be generic for a genus of goods or services if the relevant public "understands the term to refer to a key aspect of that genus").

**b) Is the term generic due to Petitioner's failure to police?**

"The more commonly a phrase is used, the less likely that the public will use it to identify only one source and the less likely that it will be recognized by purchasers as a trademark." *In re Hulting*, 107 USPQ2d 1175, 1177 (TTAB 2013) (citing *In re Eagle Crest Inc.*, 96 USPQ2d 1227, 1229 (TTAB 2010)); *see also In re Steelbuilding.com*, 415 F.3d 1293, 1298, 75 USPQ2d 1420, 1423 (Fed. Cir. 2005) (finding that "steelbuilding" is not commonly used as composite word and therefore is not generic); *In re Gould Paper Corp.*, 834 F.2d 1017, 5 USPQ2d 1110, 1112 (Fed. Cir. 1987) (affirming Board's finding that screenwipe is a generic composite of the "commonly used generic term" wipe coupled with the word screen); *In re Volvo Cars of N. Am., Inc.*, 46 USPQ2d 1455, 1460-61 (TTAB 1998) (DRIVE SAFELY not registrable because it would be perceived only as an "everyday, commonplace safety admonition"); *cf. In re Chippendales*, 96 USPQ2d at 1686 ("The test for inherent distinctiveness depends on whether the mark, or a variation thereof, has been in common use in general or in the particular field.").

***22** Respondent argues that numerous third parties have used the term AMERICAN UNIVERSITY since at least 1925; and that due to such widespread use of the term for educational services, it does not serve to identify Petitioner as a single source: "Literally scores of other universities use or refer to themselves as AMERICAN UNIVERSITY in trademarks and other uses for higher education services, related goods and services." [114] Respondent asserts that there are "more than 70 distinct users of AMERICAN UNIVERSITY to which [Petitioner] appears to have no affiliation, and several more users which appear to have a 'relationship.'" [115] In support, Respondent offers the Housey declaration, [116] which authenticates attached webpage excerpts of many institutions that appear to include "American University" in their trade name. We group them as follows: [117]

**(1) American University followed by descriptive wording:**

• American University for Humanities (Exhibits A1a-1b)

• American University for Leaders (formerly American University in London) (Exhibits A2a-2b)

• American University of Complementary Medicine (Exhibits A15a-15b)

• American University of Culture & Education (Exhibit A70)

• American University of Science & Technology (Lebanon) (Exhibits A25a-25c)

• American University of Technology (Exhibits A69a-69b)

• American University Preparatory School (Exhibits A28a-b)

**(2) American University followed by a geographic term:**

• American University of Afghanistan (AUAF) (Exhibits A6a-6e)

• American University of Antigua (Exhibits A7a-7c)

• American University of Armenia (Exhibits A8a-8c)

• American University of Barbados (Exhibits A9a-9c)

• American University of Beirut (Exhibits A10a-10e)

• American University of the Caribbean (Exhibits A13a-13b) (with permission)

• American University of Central Asia (Exhibit A14)

• American University of Iraq, Baghdad (Exhibit A17d)

• American University of Iraq, Sulaimani (Exhibits A17a-17c)

• American University of Kurdistan (Exhibit A66)

• The American University of London (Exhibit A18)

• American University of Madaba (Exhibits A19a-19c)

• American University of the Middle East, Kuwait (Exhibit A20)

• American University of Nigeria (Exhibits A21a-21c) (under license)

• The American University of Paris (Exhibits A22a-22d)

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

• American University of Puerto Rico (Exhibits A23a-23b)

• American University of Rome (Exhibits A24a-24e)

• American University of Sharjah (Exhibits A26a-26b) (under license)

• American University of St Vincent (Exhibits A27a-27b)

• American University in the Emirates (Exhibits A68a-68c)

• American University in Bulgaria (Exhibits A3a-3c)

***23** • The American University in Cairo (Exhibits A4a-4d)

• American University in Dubai (Exhibits A5a-5e)

**(3) American University preceded by an unrelated term:** [118]

• Allied American University - (Exhibits A64)

• Arab American University (Exhibit A30)

• Aston American University - (Exhibits A76a-76bc)

• California American University (Exhibits A31a-31c)

• Gateway to the American University (Exhibit A32)

• Girne American University - (Exhibits A71a-71b)

• Hellenic American University (Exhibit A33)

• International American University - (Exhibits A72a-72c)

• Irish American University - (Exhibit A34)

• Islamic American University (Exhibit A35a-35c)

• Lebanese American University (Exhibit A36a-36c)

• National American University (Exhibit A37)

• North American University (Exhibits A40a-40b)

• Romanian American University (Exhibits A41)

• Texila American University (Exhibits A67a-67b)

• University of the People Accredited Online American University - (Exhibits A65a-65c)

Corroborating the websites, Respondent offered the testimony of three additional witnesses, Amal Al-Binali, Respondent's Vice President for Admissions and Public Affairs, Dale F. Eickelman, Relationship Coordinator (Director) of the Dartmouth College-American University of Kuwait Program, and Rawda Awwad, Respondent's Provost and Professor of English, who each testified that he/she is "personally familiar" with the above institutions; that they "include" or "use" the term AMERICAN UNIVERSITY and are "currently" or "likewise" offering "educational experiences" under the term. [119] Respondent also submitted Petitioner's "Supplemental Responses to AUK's Interrogatories No. 4 and 6" wherein Petitioner names 17 entities in response to the question "Identify any use, application or registration by anyone other than Petitioner or Registrant of a mark or slogan that includes the word "AMERICA" and the word "UNIVERSITY," regardless of whether these two terms are adjacent in such mark. [120]

The evidence, taken as a whole, does not establish that the relevant public refers to or would understand AMERICAN UNIVERSITY as the name of the relevant genus of services here, i.e., "educational services," "conducting educational conferences" or "educational research." While the raw numbers are impressive, the vast majority of these institutions are located overseas and would be expected to attract students primarily from their regional locale. Contrary to Respondent's assertion that website printouts "show on their face actual use in commerce," [121] the website evidence only shows that potential consumers may have been exposed to the statements made therein. *See WeaponX Performance Prods.,* 126 USPQ2d at 1041 ("Internet evidence is only admissible for what it shows on its face, and because it does not fall within an exception to the hearsay rule, will not be considered to prove the truth of any matter stated therein," including use). Although the corroborating testimony suggests that the universities are currently using the marks, the witnesses' statements notably do not discuss matters such as the size, scope or location of the establishments, whether they have attracted students from the U.S., have a particular history or longevity, a certain size student body, credentials or accreditation status, or the extent (if any) of their exposure to the relevant public in the United States. Moreover, Petitioner's witness testified that Petitioner "has initiated dozens of opposition and cancellation proceedings before the [TTAB], and has sent dozens of cease-and-desist letters to third parties objecting to the use and/or registration of marks containing "AMERICAN" and/or "AMERICAN" and "UNIVERSITY." [122] Twenty-seven Board proceedings were identified by the witness; two of them were actions taken by third parties against Petitioner's marks AMERICAN INTERNATIONAL UNIVERSITY and A NEW AMERICAN UNIVERSITY, which resulted in dismissal. [123] The remainder were actions taken by Petitioner. Fifteen terminated in abandonment or cancellation of the adverse party's application or registration; three resulted in assignment of the marks to Petitioner; four resulted in amendments of the applications or registrations to delete or limit the Class 41 services; and three resulted in confidential settlement agreements. [124]

***24** In total, Petitioner submitted copies of eleven confidential agreements. [125] Because the details of the parties' agreements have been filed under seal, we discuss them only generally. [126] Only one, entered into with AUC School of Medicine B. V. ("AUC"), permitted registration: AUC's registration of the mark "AMERICAN UNIVERSITY OF THE CARIBBEAN" for medical education services. [127] Two are for marks that do not use the composite phrase AMERICAN UNIVERSITY. The remainder include a variety of provisions restricting the third-party's use of the mark. [128] Although Respondent argues that the agreements are sham transactions, we do not find them to be so. The terms generally conform to those found in similar coexistence agreements, subjecting each side to adhere to conditions intended to avoid confusion, such as including disclaimers, registering and using specific forms of the marks, and notifying the other party of any third-party unauthorized use that comes to its attention. *Cf., e.g., In re Four Seasons Hotels Ltd.*, 987 F.2d 1565, 26 USPQ2d 1071 (Fed. Cir. 1993) (reversing Board's affirmance of Section 2(d) refusal on basis of consent agreement, noting that the "self-interest of trademark owners" operates to police trademark use so as to protect the public from confusion); *Bongrain Int'l v. Delice de France,* 811 F.2d 1479, 1 USPQ2d 1775, 1778 (Fed. Cir. 1987) (finding coexistence agreements carry "great weight" in determining lack of likelihood of confusion); *In re Wacker Neuson SE,* 97 USPQ2d 1408, 1412 (TTAB 2010) ("[W]hen those most familiar with use in the marketplace and most interested in precluding confusion enter agreements designed to avoid it, the scales of evidence are clearly

tilted.") (citing *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 568 (CCPA 1973)). Petitioner's enforcement efforts weigh against a finding that Petitioner has allowed its AMERICAN UNIVERSITY mark to lose its significance as a source-indicator.

Justin A. Perillo, Petitioner's Associate General Counsel, testified that "American University has also for decades licensed the AMERICAN UNIVERSITY mark and other marks for use on or in connection with a wide range of branded merchandise products" and that "American University currently licenses its mark to seventy six (76) merchandise licensees." [129] Petitioner's merchandise licensing activities provide additional support for our finding that the mark has not become generic due to Petitioner's failure to police unauthorized uses of term AMERICAN UNIVERSITY. **Summary - The mark is not generic due to Petitioner's failure to police**

***25** The fact that none of the outside entities use AMERICAN UNIVERSITY by itself, together with Petitioner's policing efforts, and a public disclaimer by at least one entity recognizing Petitioner's rights, [130] show that the term AMERICAN UNIVERSITY is not generic as a result of Petitioner's alleged failure to police its marks.

**V. Conclusion - AMERICAN UNIVERSITY is not generic**

We have carefully considered all of Respondent's evidence and arguments. For the reasons discussed above, we conclude that the term AMERICAN UNIVERSITY is not generic for the recited services. Although the term AMERICAN UNIVERSITY is arguably an "apt" name for a university located in the United States, "[a]ptness is insufficient to prove genericness." *In re Am. Fertility Soc'y*, 188 F.3d 1341, 51 USPQ2d 1832, 1836 (Fed. Cir. 1999).

**VI. Are Petitioner's registration nos. 2986715, 3559022, and 4127891 supported by sufficient evidence of acquired distinctiveness?**

**A. Degree of descriptiveness**

Respondent's failure to prove that AMERICAN UNIVERSITY is generic for educational services does not preclude it from showing that the mark has not acquired distinctiveness. *Alcatraz Media,* 107 USPQ2d at 1761-67 (finding that respondent's mark was not generic for respondent's services, but granting petition for cancellation on alternative ground that the involved mark had not acquired distinctiveness). Respondent contends that in each of Petitioner's registrations, "the claim of acquired distinctiveness of AMERICAN UNIVERSITY based on 'substantial exclusivity' under [Trademark Act Section] 2(f) for at least five years before the filing was improper," [131] and that Petitioner cannot meet its burden of showing that AMERICAN UNIVERSITY has acquired distinctiveness. Petitioner counters that Respondent has not met its burden to establish a prima facie showing that the record evidence of acquired distinctiveness presented by Petitioner during prosecution of the applications that matured into the subject registrations failed to prove acquired distinctiveness. [132] In the alternative, Petitioner argues that even if the burden of persuasion were shifted to Petitioner, Petitioner's evidence of acquired distinctiveness proves that AMERICAN UNIVERSITY "had acquired distinctiveness at the time of its registration, which continues to this day." [133]

"The amount and character of evidence required to establish acquired distinctiveness depends on the facts of each case and the nature of the mark sought to be registered." *In re Gen. Mills IP Holdings II, LLC*, 124 USPQ2d 1016, 1018 (TTAB 2017); *see also* *Royal Crown Co.*, 127 USPQ2d at 1047 (court has "long held that 'the applicant's burden of showing acquired distinctiveness increases with the level of descriptiveness; a more descriptive term requires more evidence of secondary meaning.'") (quoting *In re Steelbuilding.com*, 415 F.3d 1293, 75 USPQ2d 1420, 1424 (Fed. Cir. 2005)). Petitioner's claim to the benefit of Section 2(f) in its registrations for the term AMERICAN UNIVERSITY with "UNIVERSITY" disclaimed amounts to an acknowledgment that at the time of registration, AMERICAN UNIVERSITY was merely descriptive as a whole for educational services, and "UNIVERSITY" was generic. *See* *Cold War Museum, Inc. v. Cold War Air Museum, Inc.,* 92 USPQ2d 1626, 1629 (Fed. Cir. 2009) ("an applicant's reliance on Section 2(f) during prosecution presumes that the mark is descriptive"); *Yamaha Int'l Corp.*

v. Hoshino Gakki Co. Ltd., 840 F.2d 1572, 6 USPQ2d 1001, 1005 (Fed. Cir. 1988); *In re Virtual Indep. Paralegals, LLC,* 2019 USPQ2d 111512 (TTAB 2019); *In re Am. Furniture Warehouse CO*, 126 USPQ2d 1400, 1403 (TTAB 2018) (applicant required to disclaim generic component of mark otherwise registrable under Section 2(f)). However, having carefully considered the entire record, [134] and keeping in mind the burdens of proof and persuasion applicable in this case, *Cold War Museum,* 92 USPQ2d at 1629-30, we find that the term AMERICAN UNIVERSITY acquired distinctiveness at least as early as 2009 and maintains its distinctiveness to date. [135]

***26** We make this determination based on all the evidence made of record during prosecution and any additional evidence introduced in the cancellation proceeding.

**B. Petitioner's evidence of acquired distinctiveness**

"To show that a mark has acquired distinctiveness, an applicant must demonstrate that the relevant public understands the primary significance of the mark as identifying the source of a product or service rather than the product or service itself." *Steelbuilding.com*, 75 USPQ2d at 1424. "The considerations to be assessed in determining whether a mark has acquired secondary meaning can be described by the following six factors: (1) association of the [service mark] with a particular source by actual purchasers (typically measured by consumer surveys); (2) length, degree, and exclusivity of use; (3) amount and manner of advertising; (4) amount of sales and number of customers; (5) intentional copying; and (6) unsolicited media coverage of the product embodying the mark...." *Virtual Indep. Paralegals,* 2019 USPQ2d at 11 (quoting *In re SnoWizard, Inc.*, 129 USPQ2d 1001, 1005 (TTAB 2018)). Although "[a]ll six factors are to be weighed together in determining the existence of secondary meaning," *id.,* no single factor on this list is determinative, and not all factors need be considered. Here, the parties have presented evidence on factors 2, 3, 4, and 6, and we address these factors below.

**1. Length, degree, and exclusivity of use of AMERICAN UNIVERSITY**

Sharon Alston, Petitioner's Vice Provost for Undergraduate Enrollment, testified regarding Petitioner's more than 100 years of use of the mark AMERICAN UNIVERSITY. She testified that on February 24, 1893, American University was chartered by an Act of Congress and granted the right to confer college, university, and other degrees. [136] Petitioner began construction of the university in 1902, and its first class was admitted in 1914. [137] The opening of the schools of "Diplomacy, Jurisprudence and Citizenship" was announced in 1920; [138] the School of International Service (SIS) opened in 1957; and at present, American University is home to eight schools and colleges: the School of International Service, College of Arts and Sciences, Kogod School of Business, School of Communication, School of Professional and Extended Studies, School of Public Affairs, School of Education, and the Washington College of Law. [139] Petitioner submitted ten course catalogs from 1926 to 2017 (attached as Alston Decl. Exhibits 9-19) to show its use of the mark; in 1926 the AMERICAN UNIVERSITY Bulletin published the "School of the Political Sciences" annual catalog for 1926-27; [140] and in 2017, the "American University Catalog" was published for the academic year 2017-2018. [141] Petitioner has shown a long period of use of the mark and wide exposure, and while Respondent challenges its exclusivity as previously discussed, no other institution exists, or has existed since 1893, named "American University" alone.

**2. Amount and manner of advertising**

***27** Petitioner has engaged in extensive advertising of its educational offerings. To illustrate, Petitioner submitted copies of numerous print advertisements: one from 1917, at least one for each year from 1920 to 1943, at least one for each year from 1945 to 1953, at least one for each year from 1956-2001 (except for 1962, 1971, and 1974), and one from 2006. These were placed in the WASHINGTON POST (76 ads), THE NEW YORK TIMES (10 ads), THE WALL STREET JOURNAL (8 ads), the ATLANTA JOURNAL-CONSTITUTION (2 ads) and the BALTIMORE SUN (4 ads). [142] Petitioner has also advertised in national magazines such as NEWSWEEK, THE WASHINGTON DIPLOMAT, and the HOLLYWOOD REPORTER, as well

as in publications directed to higher education such as THE CHRONICLE OF HIGHER EDUCATION and INSIDE HIGHER EDUCATION. [143] Petitioner has also run display ads in Washington area Metro stations and at Reagan National Airport in Washington, D.C. [144] Petitioner maintains a presence on Facebook and Twitter social media sites, as well as on YouTube, Instagram, and LinkedIn. "Each of these pages prominently features the AMERICAN UNIVERSITY Mark." [145] Petitioner's following on Facebook has grown from roughly 9,000 total "likes" in 2009, "to over 245,000 in March 2018." [146] Petitioner also advertises on the Internet at such websites as Yahoo.com, Forbes.com and USAToday.com. [147] Petitioner's efforts have garnered several awards in the years 2011 through 2017. [148]

Petitioner has also received exposure through sporting events. "In 1925, American University fielded its first intercollegiate athletics teams, and ever since it has continuously offered sporting events and services under the AMERICAN UNIVERSITY Mark." [149] American University's athletic teams compete across the country and "attract student-athletes from all over the world." [150] Petitioner also "maintains television rights agreements with CBS Sports Network and NBC Sports Washington, which broadcast about 3 to 5 American University Athletic games per year." [151] In 2012, Petitioner entered into a partnership with the Washington Nationals, the major league baseball team in Washington, D.C. Alston asserts that "[t]hroughout the course of this partnership, the Washington Nationals showed American University advertisements prominently featuring the AMERICAN UNIVERSITY Mark on 200 display screens in concession areas, on the Jumbotron and out-of-town scoreboard, on the stadium LED banner that encircles the interior of the stadium, and on rotational signs behind first and third base and home plate." [152]

***28** Petitioner is affiliated with the WAMU radio station, whose predecessor, WAMC, was established in 1947. [153] Thus, "for more than 70 years" the AMERICAN UNIVERSITY mark has been promoted over the radio, "exposing at least tens of millions of listeners to the AMERICAN UNIVERSITY Mark in connection with WAMU's radio programming over the years." [154] Its efforts have resulted in significant exposure for many years.

**3. Amount of sales and number of customers**

Petitioner sells branded merchandise at retail outlets and on its campus, as well as online. [155] Petitioner currently licenses its mark to 76 merchandise licensees. [156] Annual royalty figures show a steady increase of sales since 2012, and net sales from merchandise sold through Petitioner's bookstore, about 85% of which bears the AMERICAN UNIVERSITY mark, topping one million dollars annually since 2012. [157]

We also consider Petitioner's revenue stream and number of college enrollees under this factor. While figures have been produced under seal, we note that Petitioner receives significant "annual unrestricted" sources of income as well as "revenue derived from private sources and endowment income." [158] As of 2018, Petitioner's endowment "stands at $642 million." [159] Petitioner has enrolled "over 10,000 students per year for past 40 years" and during the 2017-2018 academic year, Petitioner's total enrollment "was 13,858 students." [160] In the 2017-2018 school year, Petitioner offered "69 Bachelor's programs, 78 Master's programs, and 10 Doctoral programs in a wide variety of subject matters." [161] Through its Washington Semester Program, Petitioner offers internships to students from around the United States. [162] In 2017, students from 177 colleges and universities participated in the Washington Semester Program, which has over 50,000 alumni. [163] "The Washington Semester Program works with 3,000+ organizations in the Washington D.C. area that promote their internships for students in the program." [164] Petitioner also offers over 150 study abroad programs in 40 countries, including 11 Middle Eastern countries. [165] "American University's study abroad offerings began in 1982 and have been similar in scope to today's offerings since before 2006." [166]

**4. Unsolicited media coverage**

Petitioner has ranked high on the listing of top U.S. universities by U.S. NEWS AND WORLD REPORT. "Since at least 2004, *U.S. News and World Report* has ranked American University among the top 100 best undergraduate universities in the United States." [167] In 2018, Petitioner's school of law tied for sixth place on the list of U.S. NEWS AND WORLD REPORT "Best International Law Programs - 2018." [168]

***29** As discussed above, Petitioner authenticated numerous representative news articles and the like to show unsolicited media use of the term AMERICAN UNIVERSITY to refer to Petitioner. [169] Samples of these articles show exposure to the public of "American University" in their headlines as follows: [170]
8/19/1928 THE WASHINGTON POST, "Political sciences hold unique place: **American University** was founded on pet theory of study;" (Exhibit 10)

11/13/1938 THE NEW YORK TIMES, "15 Foreign fellows in hall of nations: **American University** division stresses our ways with government cooperation"; (Exhibit 13)

6/2/1964 THE WASHINGTON POST, TIMES HERALD, "At Site of Famous 'Peace Speech': Dedication set for monument to JFK on campus of **American University**"; (Exhibit 22)

9/9/1997 CNN TODAY, "Clinton speaks at **American University**; reiterates agenda for second term" by Natalie Allen, Eileen O'Connor; (Exhibit 26)

5/6/2002 CHICAGO TRIBUNE, "Telephone lines coming down: **American University** will go wireless" by Reuters; (Exhibit 31)

4/16/2004 BUSINESS WIRE, "On campus with T-Mobile hotspot; teachers, students, staff and alumni get more/r/: A**merican University** becomes first T-Mobile hotspot campus;" (Exhibit 39)

3/3/2008 THE WASHINGTON POST, "Obama top choice in **American University** survey" by Sakina Rangwala and Liz Anderson; (Exhibit 42)

10/17/2008 THE WASHINGTON POST, "Going out guide: **American University**"; (Exhibit 46)

10/11/2009 THE WASHINGTON TIMES, "Dalai Lama ends D.C. visit; A**merican University** speech caps meetings-packed trip" by Julia Duin; (Exhibit 51)

7/1/2010 CNN NEWSROOM, "Police reopen Gore case; Obama talks immigration reform at A**merican University**; oil spill affecting fourth of July vacations" by Tony Harris, Dana Bash, Casey Wian, Ted Rowlands, Bonnie Schneider; (Exhibit 56)

2/6/2013 THE WASHINGTON POST, "Area colleges score well in Peace Corps rankings; A**merican University** ranked second among mid-size schools, the agency said" by Al Kamen; (Exhibit 65)

9/29/2014 WASHINGTON BUSINESS JOURNAL, "**American University** will cover extended Metro service during Nationals playoff games" by Staff; (Exhibit 84)

3/11/2015 THE WASHINGTON TIMES, "A**merican University** basketball on the cusp of return to the NCAA tournament" by Tom Schad; (Exhibit 90)

9/26/2016 FOX - 2 WJBK, "**American University** professor who has predicted presidential winner since 1984 says Trump will win" by Marina Marraco; (Exhibit 132)

***30** 1/27/2017 THE WASHINGTON POST, "**American University** names new president: Obama cabinet member Sylvia Mathews Burwell" by Nick Anderson; (Exhibit 145)

2/11/2017 THE CHRISTIAN SCIENCE MONITOR, "Video: what is a zero-day?; Melanie Teplinsky, cybersecurity expert and adjunct professor at **American University's** Washington College of Law, explains" by Fallon Schlossman and Evelyn Wang; (Exhibit 150)

3/23/2017 STATES NEWS SERVICE, "Dr. Jane Goodall to address students at **American University** School of International Service" by States News Service; (Exhibit 153)

Petitioner's unsolicited exposure to the public by the media supports a finding that AMERICAN UNIVERSITY acquired distinctiveness as of the registration date and that it presently maintains its distinctiveness. *Milwaukee Elec. Tool Corp.,* 2019 USPQ2d at *16.

**Summary - AMERICAN UNIVERSITY has acquired distinctiveness**

The term AMERICAN UNIVERSITY is conceptually weak but commercially strong, acquired distinctiveness and has maintained its distinctiveness as a mark to the present, signifying a single source of educational services in Petitioner. Accordingly, we find that Respondent has not carried its burden of persuasion to show that the term AMERICAN UNIVERSITY is merely descriptive without acquired distinctiveness. To the contrary, we find that AMERICAN UNIVERSITY acquired distinctiveness that it maintains as of trial. *Cold War Museum,* 92 USPQ2d at 1629-30; *Milwaukee Elec. Tool Corp.,* 2019 USPQ2d at *16.

**VII. Conclusion - Respondent's counterclaims are denied**

Respondent's counterclaims for amendment of Registrations Nos. 2986715, 3559022, and 4127891 to delete the Section 2(f) claims as to the term "AMERICAN UNIVERSITY" in favor of a disclaimer of the term, and for partial cancellation of Registration No. 4774583 as to the International Class 41 services, are **denied**.

**VIII. Is Respondent's registration void ab initio for nonuse?**

Respondent filed the application that matured into its registration on May 15, 2006, under Trademark Act Section 1(a), 15 U.S.C. § 1051(a). Respondent alleged "2003" as its date of first use and date of first use in commerce. Respondent further alleged in the declaration in the application that its mark was in use at the time of filing, as required. 15 U.S.C. § 1051(a); Trademark Rule 2.34(a)(1)(i), 37 C.F.R. § 2.34(a)(1)(i).

In a use-based application reciting services, if an applicant fails to use its mark "in commerce" in association with any of the services in a particular class specified at the time of filing, the application and any resulting registration are void ab initio as to that entire class on the ground of nonuse. *Couture v. Playdom, Inc.,* 778 F.3d 1379, 113 USPQ2d 2042, 2043 (Fed. Cir. 2015) (quoting Trademark Rule 2.34(a)(1)(i), 37 C.F.R. § 2.34(a)(1)(i)); *see Aycock Eng'g, Inc. v. Airflite, Inc.,* 560 F.3d 1350, 90 USPQ2d 1301, 1305 (Fed. Cir. 2009) ("The registration of a mark that does not meet the use requirement is void ab initio."); *United Global Media Grp., Inc. v. Tseng*, 112 USPQ2d 1039, 1044 (TTAB 2014) ("In an application based on use in commerce under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), the applicant must use the mark in commerce on or in connection with all the goods and services listed in the application as of the application filing date."); *ShutEmDown Sports, Inc. v. Lacy*, 102 USPQ2d 1036, 1045 (TTAB 2012) (registration void ab initio where applicant failed to use mark before filing date on any of

the goods or services listed in the application); *Hurley Int'l LLC v. Paul & Joanne Volta*, 82 USPQ2d 1339, 1344-1345 (TTAB 2007) ("[T]he law is clear that an applicant may not claim a Section 1(a) filing basis unless the mark was in use in commerce on or in connection with all the goods or services covered by the Section 1(a) basis as of the application filing date.").

***31** The Court of Appeals for the Federal Court, our primary reviewing court, provides a succinct summary of the requirements for a service mark to be used in "commerce":

For service marks, the "use in commerce" requirement is met when (1) a mark is "used or displayed in the sale or advertising of services" and (2) either (i) the services are "rendered in commerce" or (ii) the services are "rendered in more than one State or in the United States and a foreign country and the person rendering those services is engaged in commerce in connection with the services."

*Aycock Eng'g*, 90 USPQ2d at 1305 (quoting Trademark Act Section 45, 15 U.S.C. § 1127); *Couture v. Playdom*, 113 USPQ2d at 2043.[171]

The "use in commerce" requirement for a mark used in conjunction with services is therefore a two-part requirement. First, the mark must be used or displayed in the sale or advertising of the services. Second, the services rendered must be rendered in more than one state or "in the United States and a foreign country." Respondent's registration is void ab initio if Respondent fails either requirement; that is, if it cannot show that either (1) it has used its mark in the sale or advertising of educational services in commerce prior to May 15, 2006, the filing date of the underlying application, or (2) that it has rendered educational services under the mark in

commerce prior to the filing date. We examine each requirement in turn, starting with whether Respondent displayed its mark in the sale or advertising of its services in commerce. Although we find that Respondent has not demonstrated use of its mark in the sale or advertising of its services in commerce, and thus the mark is void ab initio, for sake of completeness, we also consider the second requirement. There, too, we find that Respondent fails to show that it rendered services in commerce under the registered mark as of May 15, 2006, the filing date of the underlying application.

**A. Did Respondent display its mark in the sale or advertising of educational services prior to its filing date?**

Respondent argues that it has:

> actively used and displayed its mark in advertising its services in the United States and U.S. commerce since 2003 and well prior to its filing date of May 15, 2006, including but not limited to: its website accessible since 2003 in the U.S., and promotional materials distributed to American students, faculty, exchange students, Fulbright and research scholars, and others, as listed in AUK's application under the registered mark, as well as recruitment advertisements and job postings.[172]

Respondent refers to statements made by Al-Binali (Decl. ¶¶ 38-39, 57, 73-80); Awwad (Decl. ¶¶ 22-23, 40); and Eickelman (Decl. ¶¶ 14, 17) in support of its argument.[173] A careful examination of these declarants' statements and the documentary

evidence attached to their declarations leads us to conclude that Respondent did not use its mark in the sale or advertising of the identified services prior to May 15, 2006.

***32** Respondent submitted copious documents - nearly 1,000 pages were attached to Al-Binali's declaration alone - but the majority of Respondent's purported advertising fails to show the mark used or displayed in the sale or advertising of the services before the application filing date. Most of the material fails to display the mark at all. Some documents display a variation of the mark but not the registered mark.[174] Much of the evidence post-dates 2006. Of the remainder, the best evidence uses the mark, advertises the services, and contains on its face a pre-2006 date, but is not supported by testimony that any of the material ever made its way into the United States. The only evidence suggesting that Respondent's advertising was connected to a plan for providing educational services to students from the United States is Respondent's declarants' unsupported testimony. Although the oral testimony even of a single witness may be sufficient to prove the first use of a party's mark when it is based on personal knowledge, is "clear and convincing," and is not characterized by "inconsistencies, contradictions and indefiniteness," *Nat'l Blank Book Co. v. Leather Crafted Prods., Inc.*, 218 USPQ 827, 828 (TTAB 1993), unsupported statements carry little weight. *See Rivard v. Linville,* 133 F.3d 1446, 45 USPQ2d 1374, 1376-1377 (Fed. Cir. 1998) ("*Linville II*") ("A registrant's proclamations of his intent to resume or commence use in United States commerce during the period of nonuse are awarded little, if any, weight."); *Kemi Organics*, 126 USPQ2d at 1607-1608 (oral testimony even of a single witness may be adequate to establish priority, "but only if it is sufficiently probative."); *Exec. Coach Builders, Inc. v. SPV Coach Co.*, 123 USPQ2d 1175, 1184 (TTAB 2017) ("Oral testimony is strengthened by corroborative documentary evidence."); *Liqwacon Corp. v. Browning-Ferris Indus., Inc.*, 203 USPQ 305, 316 (TTAB 1979) (testimony must be clear, convincing, consistent, and sufficiently circumstantial to convince the Board of its probative value).

To the extent Respondent may argue that it satisfies the first element of the "use in commerce" requirement merely by advertising its services in promotions extending to the U.S. from Kuwait, Respondent has not proffered, nor have we found, any precedent for so expansive a reading of Trademark Act Section 45. *Cf. Linville v. Rivard,* 41 USPQ2d 1731, 1736 (TTAB 1996) ("*Linville I"*) ("We reject respondent's argument that through his advertising [on Canadian radio and television stations extending to the U.S. and in Canadian newspapers that reached the U.S.], he has used the mark ULTRACUTS in the United States continuously since 1986."), *aff'd,* 45 USPQ2d at 1377; *Mother's Rests. Inc. v. Mother's Other Kitchen, Inc.,* 218 USPQ 1046, 1048 (TTAB 1983) ("prior use and advertising of a mark in connection with goods or services marketed in a foreign country (whether said advertising occurs inside or outside the United States) creates no priority rights in said mark in the United States as against one who, in good faith, has adopted the same or similar mark for the same or similar goods or services in the United States prior to the foreigner's first use of the mark on goods or services sold and/or offered in the United States."); *accord Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C.,* 182 F.3d 133, 51 USPQ2d 1183 (2d Cir. 1999) ("Mere advertising and promotion of a mark in this country are not enough to constitute 'use' of the mark 'in commerce' so as to bring the activity within the scope of the Lanham Act."); *Buti v. Impressa Perosa, S.R.L.,* 139 F.3d 98, 45 USPQ2d 1985, 1989-1990 (2d Cir. 1998) (promotional activities in the United States by eating establishment located in Italy did not secure for it "any rights in the name under the Lanham Act").

***33** We find Respondent's registration void ab initio based on its failure to use its mark in the sale or advertising of educational services under the mark, in the United States, before May 15, 2006.[175] We next consider whether Respondent has fulfilled the additional requirement for use in commerce under the Act's second requirement - that the services be rendered in commerce "in the United States and a foreign country." 15 U.S.C. § 1127.[176]

**B. Did Respondent render services "in the United States and a foreign country" prior to its filing date?"**

The recitation of services in Respondent's use-based registration reads "educational services, namely, courses of instruction at the college level." Respondent bears the burden to show that it offered these services "in the United States and a foreign country" ("foreign commerce") prior to its May 15, 2006 application filing date, or its registration is void ab initio. *Aycock Eng'g*, 90 USPQ2d at 1305. Respondent argues that it has borne its burden in three ways. First, Respondent alleges that it

rendered educational services to U.S. nationals in Kuwait. [177] Second, Respondent argues that it accepted and processed "cross-border applications." [178] Third, Respondent claims that it rendered educational services in the United States under the "AUK-Dartmouth intern exchange program" and through the "Soliya Connect videoconferencing program based in New York that connected U.S. and foreign students in real-time online." [179] We consider each in turn.

**1. Rendering of educational services in Kuwait**

Al-Binali testifies that since 2004, interns and exchange students from the United States have attended college-level classes at the American University of Kuwait. [180] Similar assertions were made by Awwad. [181] Al-Binali also asserts that Respondent sponsored "American students under its Fulbright program offered under the Subject AUK Mark since 2005, beginning with one that was accepted in 2005/2006." [182] However, there is no evidence of record corroborating the attendance, at the American University of Kuwait, for any students from the United States in the years 2004, 2005 or 2006. Although, as noted, oral testimony may in certain cases be sufficient to prove use, the statements made herein are not sufficiently probative for two reasons. First, the declarants make only bald conclusions in general terms unsupported by any evidence, and we would expect corroboration if such statements were true. Second, even if American students attended Respondent's college in Kuwait prior to May 15, 2006, they would not have attended as part of an exchange program, as none existed at the time. Simply travelling to Kuwait to attend classes in Kuwait is not the type of foreign commerce contemplated by the Trademark Act. Services rendered wholly within a foreign country are not a type of commerce that Congress may regulate, even if the services are provided to citizens of the United States while in the foreign country. *See Linville I,* 41 USPQ2d at 1736 ("[W]e reject respondent's argument that his services are rendered in commerce because commerce is affected by the travel of customers from the United States to respondent's Canadian salons."); *Mother's Rests.,* 218 USPQ at 1048 (rejecting argument that display of a trademark in association with restaurant services provided in Canada to citizens of the United States created priority rights in the United States); *Stagecoach Props., Inc. v. Wells Fargo & Co.*, 199 USPQ 341, 349 (TTAB 1978) (noting that argument that use of a mark on hotel and restaurant services provided in Mexico to "people from the United States" created rights protectable under U.S. law "ignores the fundamental rule that activity outside of the United States is ineffective to create rights in marks within the United States.").

***34** *Linville I* is illustrative. In *Linville I,* the petitioner sought to cancel a registration for the mark ULTRACUTS for hair dressing and beauty salon services owned by respondent, a Canadian citizen, on the ground that because he had never used his mark in the United States, but only in Canada, he had abandoned it. The respondent admitted that he personally made no sales of hair dressing or beauty salon services under the mark in the United States, but argued that he had operated many hair salons successfully in Canada; that he had a large U.S. clientele; that he used hair salon products from the United States in his salons; and that he sold such products to U.S. customers at his salon. The Board "reject[ed] respondent's argument that his services are rendered in commerce because commerce is affected by the travel of customers from the United States to respondent's Canadian salons." *Linville I,* 41 USPQ2d 1736. Further, the Board distinguished two cases (upon which Respondent urges us to rely) for the proposition that its activities affect foreign commerce: *Larry Harmon Pictures Corp. v. Williams Rest. Corp.*, 929 F.2d 662, 18 USPQ2d 1292 (Fed. Cir. 1992), and *Penta Hotels Ltd. v. Penta Tours,* 1988 U.S. Dist. LEXIS 15713, 9 USPQ2d 1081, (D. Conn. 1988). The Board noted that those cases involved services which were actually rendered in the United States, i.e., a restaurant located in Tennessee, which attracted interstate travelers and a hotel in New York, which was affiliated with a European hotel. Like *Linville I*, this case "is readily distinguishable as respondent rendered no [educational services] in the United States during the relevant time period." *Linville I,* 41 USPQ2d at 1736.

Respondent urges us to apply the rationale of the Fourth Circuit in *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco,* 329 F.3d 359, 66 USPQ2d 1705, 1715-16 (4th Cir. 2003), which found that a foreign company's rendering of casino services wholly within the country of Monaco supported the company's trademark infringement and cybersquatting claims against the user of the same mark (CASINO DE MONTE CARLO) in 53 contested domain names for Internet gambling. *Bancorp*, 66 USPQ2d at 1723. A sharply divided panel of the court held that the defendant's advertisement of its services in the United States, coupled with evidence that United States citizens went to Monaco and gambled at its casino, constituted "trade with a foreign nation that Congress may regulate under the Commerce Clause." 66 USPQ2d at 1710. The court affirmed the

district court's award of monetary damages on defendant's trademark infringement claim and transferred 43 of the 53 contested domain addresses on its cybersquatting claim. 66 USPQ2d at 1707.

***35** We decline to follow the analysis of the Fourth Circuit majority laid down in a trademark infringement and cybersquatting context for several reasons. First and foremost, *Bancorp* is not controlling precedent in Board proceedings, and its holding is contrary to the decisions rendered by our primary reviewing court, which require more than the rendering of services to U.S. citizens in a foreign country. *E.g., Linville I,* 41 USPQ2d 1731 (travel by U.S. citizens to Canada for hair dressing and salon services does not establish sufficient nexus to United States). We are bound by Federal Circuit law and as the dissent in *Bancorp* stated, "the Federal Circuit has clearly and repeatedly embraced a rule that directly conflicts with the majority's [rule]." *Bancorp*, 66 USPQ2d at 1729 (Motz, Judge, dissenting). Second, clearly stated in the statute is the requirement that for registration purposes, services must be rendered "in the United States and a foreign country." 15 U.S.C. § 1127. Respondent's services, provided wholly within Kuwait, fall outside the reach of the Commerce Clause and the Trademark Act's definition of "use in commerce." Finally, *Bancorp* is distinguishable on its facts. The court in *Bancorp* relied on defendant's extensive advertising in the United States, and actual travel of U.S. citizens to defendant's casinos in Monaco; here we have no evidence of U.S. advertising or travel by U.S. citizens during the relevant time frame. [183]

**2. Accepting and processing cross-border applications**

Respondent argues that it has taken and accepted college applications through its website since 2003 and that "taking and accept[ing] college applications is...an integral part of providing educational services." [184] In support, Respondent submitted several exhibits to Al-Binali's declaration purporting to show that it displays application forms online for prospective students to print out and mail in to Respondent in Kuwait. [185] None of the exhibits display the registered mark. Accordingly, none of the evidence is probative.

**3. Rendering of educational services in the United States**

In response to Petitioner's Interrogatory No. 16, "Identify each State in the United States in which the Respondent has provided courses of instruction at the college level in connection with the Mark," Respondent answered: "Respondent does not provide courses of instruction at the college level in the United States." [186] However, Respondent argues that "under an AUK-Dartmouth intern exchange program that commenced in 2005, Dartmouth sent students to Kuwait in the Spring 2005, and AUK sent students to Dartmouth beginning June 2006, as arranged pre-May 15, 2006." [187] As noted above, the record evidence is insufficient to show that any such program was operational before May 15, 2006, and none of the evidence in the record associated with the AUK-Dartmouth program displays Respondent's registered mark.

***36** Respondent contends it simultaneously transmitted course instruction through the Soliya Connect program. The Soliya Connect program, "involving videoconferencing and an instructor-guided interconnectivity and interactivity, simulates a cross-border open-space classroom between Soliya in New York and AUK in Kuwait, along with other participating universities." [188] Neither the record evidence nor Respondent's testimony confirms that Respondent provided educational services in connection with the program. [189]

**Summary - Nonuse**

Respondent has not rendered services in the United States. It is well settled under binding Federal Circuit and Board cases that activities wholly outside the United States do not create rights in marks in the United States. *Linville I,* 41 USPQ2d at 1736-37; *Fiat Grp. Automobiles S.p.A. v. ISM, Inc.*, 94 USPQ2d 1111, 1115 (TTAB 2010) ("[A]ctivity solely outside the United States is ineffective to create or maintain rights in marks within the United States.") Respondent's identified services were rendered under the mark entirely in Kuwait prior to the filing date of the application maturing into the subject registration. [190] This does not

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

constitute foreign commerce. To the extent Respondent suggests that its use "affects" foreign commerce, we decline to extend by analogy the holdings in those cases finding commercial activity, conducted wholly within a single state in the United States, to be regulable by Congress on the basis that it affects interstate commerce. With respect to international borders and foreign commerce, "[t]he concept of territoriality is basic to trademark law." *Person's Co. v. Christman,* 900 F.2d 1565, 14 USPQ2d 1477 (Fed. Cir. 1990); *see also Buti v. Perosa,* 45 USPQ2d at 1989 (applying the territoriality rule to service marks).

**IX. Conclusion - Respondent's registration is void ab initio**

Respondent advertises and renders educational services under the mark within Kuwait. To the extent Respondent's advertising may have reached the United States before May 15, 2006, such advertising alone is not enough to support registration; Respondent's services also must have been rendered in commerce. The evidence does not show that Respondent rendered services under the mark in commerce prior to the filing date of the application maturing into Registrant's registration. Failure to satisfy either element of the "use in commerce" test renders a registration void ab initio, and here Respondent has failed to satisfy both. Accordingly, Respondent's registration is void ab initio under Trademark Act Section 1(a).

***37 Decision:** Respondent's counterclaims for amendment of Registrations Nos. 2986715, 3559022, and 4127891 to delete the Section 2(f) claims as to the term "AMERICAN UNIVERSITY" in favor of a disclaimer of the term, and for partial cancellation of Registration No. 4774583 as to the International Class 41 services, are **denied**.

Petitioner has established by a preponderance of evidence that Respondent did not use its mark in commerce within the meaning of Section 45 of the Trademark Act for the services identified in its involved registration prior to May 15, 2006, the filing date of its use-based application. Accordingly, the petition to cancel is **granted** under Section 1(a) and Respondent's registration will be cancelled in due course. [191]

In view thereof, we need not reach Petitioner's claim under Section 2(d). *Multisorb Techs., Inc. v. Pactiv Corp.*, 109 USPQ2d 1170, 1171 (TTAB 2013) (the Board's determination of registrability does not require, in every instance, decision on every pleaded claim).

## Footnotes

1 Registration No. 3387226 issued on February 15, 2008; renewed.

2 The description of the mark reads: "The mark consists of a minaret with a maroon clock face in the middle of the minaret with the wording 'AUK' in maroon underlined in yellow gold underneath the design. The wording 'AMERICAN UNIVERSITY OF KUWAIT' in maroon sits underneath the wording 'AUK,' also in maroon. The color maroon appears in all of the lettering in the mark and inside the window design and the clock design, both of which sit inside the minaret design. The color gold appears in the outline of the minaret design and inside the line that sits underneath the term AUK."

3 In addition to these registrations, Petitioner pleaded Registration No. 2986715 for the mark AMERICAN INTERNATIONAL UNIVERSITY, registered as a collective membership mark used to indicate membership in an International University; issued August 23, 2005, renewed. In its brief, Petitioner notes that "[a]lthough pleaded, it is not relying on Reg. No. 2986715 for purposes of proving its likelihood of confusion claim." 154 TTABVUE 28. Record citations are to TTABVUE, the Trademark Trial and Appeal Board's publicly available docket history system. *See Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014). Confidential documents are referenced where appropriate; however, any confidential information in exhibits or otherwise will only be referred to in general terms.

4 Issued August 31, 2004; renewed. Color is not claimed as a feature of the mark.

5 Issued November 20, 2007; renewed. A typed mark is the legal equivalent of a standard character mark. *In re Viterra, Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1909 n.2 (Fed. Cir. 2012).

6 Issued January 6, 2009; renewed.

7 Issued July 21, 2015. "Ancillary goods" include magnets in Class 9; alarm clocks, jewelry, trophies and watches in Class 14; newsletters, teaching materials, printed awards, binders, decals, stationery, bookmarks, business and greeting cards, pencils, pens and brushes in Class 16; golf umbrellas, book bags, billfolds, purses and luggage tags in Class 18; bulletin boards, picture frames and key chains in Class 20; beverageware in Class 21; bed spreads and pillow cases in Class 24; clothing in Class 25; and playing cards, balls and Christmas tree decorations in Class 28.

8 As discussed more fully below, Respondent also alleged that Petitioner abandoned the mark AMERICAN UNIVERSITY by allowing the term to become generic for educational services.

9 Respondent did not counterclaim to cancel the two pleaded registrations for the "AU" mark, Reg. Nos. 2878419 and 3337869.

10 Petitioner's affirmative defense of unclean hands, and its alleged "defense" that Respondent has failed to state a claim upon which relief may be granted, have not been considered. We give Petitioner's affirmative defense of unclean hands no consideration as Petitioner did not pursue the defense at trial. *See Swiss Watch Int'l Inc. v. Fed'n of the Swiss Watch Indus.,* 101 USPQ2d 1731, 1734 n.4 (TTAB 2012) (affirmative defenses deemed waived where no mention of them in trial brief); *cf. Joel Gott Wines LLC v. Rehoboth Von Gott Inc.,* 107 USPQ2d 1424, 1426 n.3 (TTAB 2013) (failure to pursue pleaded claim results in waiver). We give its assertion that Respondent has failed to state a claim no consideration because it is not a true affirmative defense; it "relates to an assertion of the insufficiency of the pleading of the plaintiff's claim rather than a statement of a defense to a properly pleaded claim." *John W. Carson Found. v. Toilets.com, Inc.*, 94 USPQ2d 1942, 1949 (TTAB 2010) (citing *Hornblower & Weeks Inc. v. Hornblower & Weeks Inc.*, 60 USPQ2d 1733, 1738 n.7 (TTAB 2001)).

11 13 TTABVUE. Respondent was not a party to this proceeding.

12 19 TTABVUE.

13 Although Petitioner is not relying on this mark for purposes of its likelihood of confusion claim, Respondent's counterclaim has not been withdrawn. On the other hand, Respondent has not submitted testimony or evidence on the issue of whether AMERICAN UNIVERSITY is generic for collective membership services, and we therefore consider the claim waived. Further, we disregard Respondent's arguments that the registration was obtained by a sham assignment or should be deemed abandoned due to naked licensing, 176 TTABVUE 46, as based on unpleaded claims and as unsupported by any testimony or documentary evidence.

14 Petitioner did not initially plead Reg. No. 4127891, but Respondent counterclaimed to cancel the registration in its first amended answer, 20 TTABVUE, and reasserted the counterclaim in its second and third amended answers, 42 TTABVUE and 89 TTABVUE. Petitioner made the registration of record at 108 TTABVUE 10-22.

Reg. No. 4127891 for the mark AMERICAN UNIVERSITY WASHINGTON COLLEGE OF LAW (and design) (claiming acquired distinctiveness in part under Section 2(f) as to "AMERICAN UNIVERSITY" and "WASHINGTON COLLEGE OF LAW" with a disclaimer of the terms "UNIVERSITY" and "COLLEGE OF LAW") issued on April 17, 2012, for, inter alia, "educational services, namely, providing courses of instruction at the graduate level and distributing course materials in connection therewith, conducting educational conferences in the field of law studies, arranging and conducting educational conferences, educational research"; Section 8 affidavit accepted on March 30, 2018.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

15 Respondent's second amended answer, 42 TTABVUE.

16 Proceedings had been suspended since May 4, 2015 pending the disposition of Respondent's motion to amend the answer and Petitioner's motion to compel discovery. 23 TTABVUE. Proceedings were resumed on January 6, 2016, contingent upon Respondent's payment of the counterclaim fee, which Respondent made upon filing its second amended answer on February 9, 2016.

17 77 TTABVUE. Proceedings had been re-suspended on June 1, 2016, 57 TTABVUE, and were resumed on March 31, 2017, following disposition of Petitioner's motion for summary judgment and Respondent's motion to compel discovery, 75 TTABVUE.

18 80 TTABVUE.

19 87 TTABVUE. Petitioner's motion to add this claim was granted on September 5, 2017. 87 TTABVUE. Accordingly, Respondent's argument in its brief (filed August 3, 2018), 176 TTABVUE 49, that the motion was granted in error as an abuse of discretion is untimely and will not be further considered. Trademark Rule 2.127(b) ("Any request for reconsideration or modification of an order or decision issued on a motion must be filed within one month from the date thereof.").

20 89 TTABVUE.

21 95 TTABVUE. Approved by Board order, 97 TTABVUE.

22 We approve the parties' stipulation of August 31, 2018, 195 TTABVUE, to exempt the cover page and signature page of their briefs from the page limits as set forth in Trademark Rule 2.128(b), and to consider as timely Respondent's June 5-6, 2018 combined Main ACR Brief. We also have considered Respondent's submission of supplemental authority, 204 TTABVUE, and the cases attached to its filing.

23 95 TTABVUE.

24 192 TTABVUE. (Confidential version at 191 TTABVUE). In its response to Petitioner's objections, 201 TTABVUE 3, and specifically Petitioner's assertion that Respondent has waived any objections to Petitioner's evidence, Respondent argues that it objected to Petitioner's enforcement evidence in its Main ACR Trial Brief (at 176 TTABVUE 15), and Petitioner's actual confusion evidence (at 176 TTABVUE 32). However, Respondent's arguments go to the weight of the evidence and not its admissibility.

25 158-177 TTABVUE. Stipulation at 178 TTABVUE.

26 Respondent also argues that Petitioner should have filed a motion to strike the declarations and exhibits, but Petitioner's objections are not merely procedural or ones that could be cured if raised promptly by a motion to strike. *Compare* TRADEMARK BOARD MANUAL OF PROCEDURE (TBMP) § 707.02(b) (June 2019) (favoring motions to strike for procedural objections that can be cured promptly) *with* TBMP § 707.02(c) (motions to strike generally improper to object to evidence on substantive grounds).

27 Petitioner also objects to "AUK004143 [to] 99" (discussed more fully below) but did not object to exhibits attached to corrected Housey declarations D or E.

28 178 TTABVUE 3.

29 Per stipulation filed May 31, 2018, 157 TTABVUE.

30 95 TTABVUE 5.

31 *Id*.

32 201 TTABVUE 4.

33 Not every page of these exhibits is stamped with a "AUK0041--" number. As identified in the Al-Binali declaration: Exhibit 35 is AUK004147-54; Exhibit 56 is AUK004155-56; Exhibit 57 is AUK0044158; Ex. 126 is AUK004159-60; Ex. 128 is AUK004161-62; Ex. 127 is AUK004165-70; Ex. 132 is AUK004177-86; Ex. 130 is AUK004196-98; and Ex. 133 is AUK004199.

34 Identified in the Eickelman Decl. as AUK004157.

35 Petitioner also objected to Exhibits 6, 7 and 19 to Housey Decl. A as not containing access dates, but as Housey set forth these dates in her declaration, the objection is overruled.

36 158 TTABVUE 74-79, 137-149.

37 192 TTABVUE 68.

38 201 TTABVUE 12.

39 158 TTABVUE 162-165.

40 159 TTABVUE 11-12.

41 192 TTABVUE 75.

42 192 TTABVUE 75-76.

43 201 TTABVUE 15.

44 Objections were properly raised by Petitioner during the depositions of Perillo (170 TTABVUE) and Alston (171 TTABVUE 74-132).

45 For example, *see* 170 TTABVUE 5 and 11, the witness was asked if he was aware of whether a third-party was using a mark in U.S. commerce; at 170 TTABVUE 14 and 17, the witness was asked to describe a use as "a trademark, a name, a generic or descriptive term;" at 171 TTABVUE 88, the witness was asked about usage of "American style of education."

46 Petitioner's first set of requests for admissions was served on November 5, 2008. On that date, Respondent filed a contested motion to suspend proceedings, 7 TTABVUE, and on December 4, 2008, Respondent filed a contested motion for a protective order staying discovery. 9 TTABVUE. The Board granted both motions on January 30, 2009. 13 TTABVUE. Proceedings were resumed following resolution of civil action and prior Board proceedings on December 30, 2014. 19 TTABVUE. The applicable time period for Respondent to have served its response to Petitioner's first set of requests for admissions therefore was 30 days from December 30, 2014, or January 29, 2015.

47 Petitioner served its second set on March 16, 2016.

48 Although the certificates of service for both documents recite February 3, 2017 as the date of service, the answers themselves were signed on March 3, 2017.

49 41 TTABVUE 5. "Inasmuch as Respondent's allegations concern *only portions* of the subject marks [in Reg. Nos. 2986715, 3559022 and 4127891], the Board construes Respondent's claims as one under Trademark Act Section 18, 15 U.S.C. Section 1068, for restriction of Petitioner's registrations."

50 89 TTABVUE 17.

51 Because of the public interest in having registrations which are void ab initio stricken from the register, Respondent's asserted affirmative defense of laches is unavailable against Petitioner's claim of nonuse. *Saint-Gobain Abrasives Inc. v. Unova Indus. Automation Sys. Inc.*, 66 USPQ2d 1355, 1359 (TTAB 2003) ("[T]his interest or concern cannot be waived by the inaction of any single person or concern no matter how long the delay persists.").

52 Housey Declarations F and G together with accompanying Exhibits F, F1-F35 and G1-G52 total 924 pages: 196 TTABVUE (245 pages); 197 TTABVUE (259 pages); 198 TTABVUE (127 pages); 199 TTABVUE (199 pages); and 200 TTABVUE (94 pages).

53 The parties' ACR stipulation, 95 TTABVUE, allowed the parties to offer into evidence witness testimony with exhibits filed concurrently with their ACR briefs. We read this language as allowing only proper rebuttal evidence to be attached to a party's reply brief, and not as allowing case-in-chief evidence to be attached to a party's reply brief. Further, to the extent Respondent seeks to rely on the parties' stipulation that allowed Respondent to attach evidence inadvertently omitted from its main trial brief, 178 TTABVUE, the stipulation does not apply to its reply brief. The purpose of admitting evidence under that stipulation was to allow Petitioner to "review, consider, and address exhibits that [Respondent] inadvertently did not include with certain of its Main ACR Brief declarations," not to add new exhibits. 178 TTABVUE 3.

54 In light of the above determinations, there are no remaining affirmative defenses to any pleaded claim or counterclaim.

55 The record includes a redacted version of the declaration. 101 TTABVUE. Exhibits 28 and 31-34 are confidential; 104, 106 TTABVUE.

56 Exhibits 291-292 and 295-296 are confidential; 113, 117 TTABVUE.

57 The record includes a redacted version of the declaration at 119 TTABVUE. Exhibits 39, 131, 146, 153, 165, 189, 191, and 234-235 are confidential; 126, 135, 137, 139, 141, 143, 145, & 152 TTABVUE.

58 Excluding Exhibit No. 23A at 158 TTABVUE 162-165.

59 Excluding Exhibit Nos. 35, 56, 57, 76, 26, 127, 128, 130, 132, 133.

60 Excluding Exhibit No. 16.

61 For each of the corrected declarations, we have considered all the exhibits, including those attached to the original declarations that have been superseded.

62 Excluding Exhibit Nos. 13, 14, 15, 17, 19-22 and 23. Note, 183 TTABVUE was filed under seal; Exhibits 2-8, 11, 16, and 25 are confidential.

63 Excluding Exhibit Nos. 5, 6, 20, 21, 23, and 25. Note, 188 TTABVUE was filed under seal; Exhibits 19, 35, 36, 56, 74-76, 99, 113, 115, 117, 121, 127, 129, 130, and 134 are confidential.

64 As noted above, we do not consider statements from the Perillo or Alston depositions that are not based on personal knowledge, are speculative, assumed facts not in evidence or called for a legal conclusion.

65 Respondent's standing includes its standing to counterclaim against Reg. No. 4127891.

66 Petitioner was incorporated in 1891 as "The American University" under the laws of the District of Columbia. Alston Decl., 119 TTABVUE 5. It was formally chartered under the name "The American University" in 1893 by an Act of Congress, signed by President Benjamin Harrison.

67 Respondent's Answer, 89 TTABVUE 17.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

68 Respondent argues that "in the field of higher education, AMERICAN has meant a generic type of university"; that "the word UNIVERSITY is generic"; and that therefore AMERICAN UNIVERSITY as a whole is generic for "an American-style university." 176 TTABVUE 26. While we may consider the meanings of each term individually, ultimately our decision rests on consideration of the mark in its entirety. *Princeton Vanguard,* 114 USPQ2d at 1832.

69 Although the recitation of educational services for each of Petitioner's registrations varies slightly, each covers an aspect of educational services and therefore falls within the same genus. An exception is Reg. No. 2986715, which is registered as a collective membership mark "used to indicate membership in an International University." The genus in that case is collective membership in an "international university" and the consumers of these services are individuals with a common interest in the activities of the university.

70 In September 1892, Petitioner began publishing a newspaper under the title "The American University Courier." 119 TTABVUE 5.

71 176 TTABVUE 14.

72 Respondent's support for this date is a printout from AUB's website. Exhibit 10 from Housey Decl. A, 158 TTABVUE 97. However, because Housey did not verify the date contained in the printout, the printout is competent to show only that the public has been exposed to the date and not for the truth of the matter. It is included here to show the purported basis for Respondent's allegation that AMERICAN UNIVERSITY was generic prior to 1892. *See* Fed. R. Evid. 801(c); *Barclays Capital Inc. v. Tiger Lily Ventures Ltd.*, 124 USPQ2d 1160, 1165 (TTAB 2017) ("However, such reports have limited probative value, because they may only be used for what they show on their face and not for the truth of the matter asserted in the reports, and also because the extent of exposure of these reports to relevant consumers is unknown."); *Alcatraz Media Inc. v. Chesapeake Marine Tours Inc.,* 107 USPQ2d 1750, 1758 (TTAB 2013).

73 *Id.* Respondent characterizes Petitioner's first use of its mark in association with the recited services as being in 1925: "While [Petitioner] may have 'admitted its first class and began offering educational services' in 1914, *id.* (citing Alston Decl. ¶14), that was at a graduate level, not college level." 176 TTABVUE 14 n. 4. However, the recitation of services in Petitioner's registrations, "providing courses of instruction at the college and graduate level," include both levels of teaching. Thus, we find its first use to be in 1914. Alston Decl., 119 TTABVUE 6; Exhibit 3 at 120 TTABVUE 21-94.

74 *See* Exhibits E38-E40 attached to Housey Decl. E, 175 TTABVUE 82-110.

75 192 TTABVUE 23.

76 Al-Binali Decl., 184 TTABVUE 3, 4. Her statements have been reiterated by Awwad and Eickelman in their declarations, creating an unnecessary burden on the Board's limited resources caused by the duplicative filings. Moreover, Respondent improperly includes hyperlinks to various online web pages and websites. The inclusion of hyperlinks is insufficient to introduce the underlying information into the record. *See In re Aquitaine Wine USA, LLC*, 126 USPQ2d 1181, 1195 n.21 (TTAB 2018) ("we do not consider websites for which only links are provided"); *In re Olin Corp.*, 124 USPQ2d 1327, 1332 n.15 (TTAB 2017) ("Because the information displayed at a link's Internet address can be changed or deleted, merely providing a link to a website is insufficient to make information from that site of record."). The Board will not utilize a link or reference to a website's internet address to access the site to consider whatever content may appear therein.

77 184 TTABVUE 4-5.

78 176 TTABVUE 44.

79 192 TTABVUE 14.

80 184 TTABVUE 6.

81 Al-Binali Decl. Exhibit 7, 185 TTABVUE 39.

82 184 TTABVUE 9.

83 *Id*. at 9-10.

84 *Id*. at 18.

85 Exhibit 33, 186 TTABVUE 112-121.

86 The fifth simply notes that Petitioner has programs abroad with American University of Cairo and American University of Rome, but that they are separate institutions. Exhibit 33, 186 TTABVUE 119.

87 184 TTABVUE 18.

88 *Id*. at 11.

89 *Id*. at 12.

90 *Id*. at 11 and 16. Petitioner submitted copies of its confidential license agreements with AUS and AUN, under which it licenses the AMERICAN UNIVERSITY mark. 189 TTABVUE 10-11 (confidential), Exhibits 8 at 189 TTABVUE 130 (confidential) (AUS); Exhibits 9 and 10 at 189 TTABVUE 139-167 (confidential) (AUN and successor ABTI).

91 184 TTABVUE 11.

92 *Id*. at 16-17.

93 Petitioner "operates three international centers, AU BRUSSELS, AU MADRID, and AU NAIROBI. These centers are the University's home base for study abroad programs in Belgium, Spain, and Kenya." Alston Decl., 119 TTABVUE 20.

94 158 TTABVUE 116.

95 *Id*. at 50.

96 *Id*. at 85.

97 *Id*. at 120.

98 *Id*. at 178.

99 159 TTABVUE 4.

100 184 TTABVUE 14; Exhibit 17, 185 TTABVUE 164.

101 *Id.*

102 We also note that on its face, it refers to Petitioner by name.

103 Staples, Emma, "AUK-the new face of education in Kuwait"; Exhibit 18, 185 TTABVUE 167-68.

104 158 TTABVUE 14; Exhibit A45a-b, 158 TTABVUE 232-250.

105 158 TTABVUE 15; Exhibit A46, 158 TTABVUE 251-252.

106 Chajon Decl., 107 TTABVUE 5; Exhibits 9-158, 108-110 TTABVUE.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

107 173-175 TTABVUE and 180 TTABVUE.

108 The evidence primarily consists of personal correspondence from the then-president of the university in Beirut.

109 *See, e.g.,* Jacques Barzun, The American University How It Runs Where It Is Going, 1968 (Harper & Row), Housey Decl., Exhibit E4, 174 TTABVUE 75-86.

110 Betty S. Anderson, THE AMERICAN UNIVERSITY OF BEIRUT ARAB NATIONALISM AND LIBERAL EDUCATION, 2011 (Univ. of Tex. Press), Housey Decl. Exhibit E13 at 174 TTABVUE 174.

111 *See, e.g.,* Housey Decl. Exhibit E36, 175 TTABVUE 43, "Studying the American Way/ An Assessment of American-Style Higher Education in Arab Countries," Washington Institute for Near East Policy, June 2007.

112 Housey Decl. Exhibit E36, 175 TTABVUE 43.

113 For example, Respondent submitted pages from Amazon.com showing sale of a book published in 2015 titled "Designing the New American University," Exhibit A42, 158 TTABVUE 229, and a book published in 2010 titled "The Great American University," Exhibit A44, 158 TTABVUE 231. The pages fail to provide the context in which the titles are used.

114 176 TTABVUE 15.

115 *Id*. at 16.

116 158 TTABVUE. Housey's position or affiliation is not identified in her declaration; she is identified as Respondent's counsel in Respondent's main trial brief, 176 TTABVUE 13.

117 Housey Decl. A; 158 TTABVUE; specific Exhibits relating to each website noted above.

118 Respondent's declarant also lists the "Anglo-American University," and cites to Exhibits A29a-29b. There are no such exhibits, or any webpages displaying the use of "Anglo-American University."

119 181 TTABVUE 3, 182 TTABVUE 7, and 184 TTABVUE 5. The declaration statements vary slightly, but the general endorsement is the same.

120 177 TTABVUE 19-23 (confidential).

121 Reply Brief, 202 TTABVUE 9.

122 Perillo Decl., 101 TTABVUE 3.

123 Opp. No. 91177645 and Can. No. 92052923. *See* 101 TTABVUE 4-6.

124 101 TTABVUE 3-7.

125 Filed under seal at 189 TTABVUE.

126 While the Board is sensitive to the confidential nature of the agreements, it is the general policy of the Board that all papers in a proceeding be public. *Kohler Co. v. Honda Giken Kogyo K.K.*, 125 USPQ2d 1468, 1476 n.19 (TTAB 2017). Petitioner did not file a redacted copy of its 189 TTABVUE submission, in noncompliance with Trademark Rule 2.126(c). That rule requires parties who file confidential filings to concurrently file a copy of the submission for public viewing with the confidential portions redacted. At the end of this decision, the Board will allow Petitioner time to submit a redacted version of 189 TTABVUE, failing which it will be made public.

127 *See* Reg. No. 2618194 and 1846403, AUC's registrations for the mark. Perillo Decl., Exhibits 29 and 30, 101 TTABVUE 7. Copy of the agreement at 189 TTABVUE 15-23.

128 189 TTABVUE 3.

129 101 TTABVUE 8.

130 "Hellenic American University is not affiliated with, sponsored by or related to American University." 158 TTABVUE 205.

131 176 TTABVUE 42. Petitioner did not rely solely on use of its mark for the five years preceding the filing date of its applications for its AMERICAN UNIVERSITY marks. Petitioner also provided a copy of the 1893 Act of Congress (27 Stat. 476), a newspaper article from "The American University Courier" dated September 1892, and copies of webpages from Petitioner's website ("to show exclusive and continuous use of the mark"). *See* September 15, 2006 Response to Office Action in Reg. No. 3559022 at TSDR 2-4; January 17, 2001 Response to Office Action in Reg. No. 4774583 at TSDR 8-9.

132 192 TTABVUE 28.

133 *Id.*

134 *Id.* We note that Petitioner did not rely solely on a declaration of five years use during prosecution of the applications that resulted in registrations of its pleaded marks.

135 In a cancellation proceeding, "we look at both the time when the registrant registered its marks as well as at the present day to determine whether the mark must be cancelled." *Milwaukee Elec. Tool Corp. v. Freud Am., Inc.,* 2019 USPQ2d 460354, *16 (TTAB 2019); *see also* *Neapco Inc. v. Dana Corp.,* 12 USPQ2d 1746, 1747 (TTAB 1989) ("In most cases, the time period of primary concern is the time when the registration issued."); *cf.* *Coach Servs.,* 101 USPQ2d at 1730 ("Acquired distinctiveness and buyer recognition is to be tested in an opposition proceeding as of the date the issue is under consideration."); *cf.* *In re Chippendales,* 96 USPQ2d at 1686 (proper time for measuring distinctiveness of a mark in a pending application is at the time it is being considered for registration).

Here, we have three dates of registration: Reg. No. 3559022 issued on January 6, 2009; Reg. No. 4127891 issued on April 17, 2012; and Reg. No. 4774583 issued on July 21, 2015. In examining the evidence, we have measured the distinctiveness of Petitioner's mark against all three registration dates.

136 Alston Decl., Exhibit 8, 119 TTABVUE 5. The university was incorporated in 1891 as The American University and began publishing a newspaper under the title "The American University Courier" in September 1892. *Id.*; *see* Exhibits 4-7 (representative samples of the newspaper distributed from 1892 to 1926).

137 *Id.* at 6.

138 119 TTABVUE 9; *see also* Alston Decl. Exhibit 22, 125 TTABVUE 1245-53.

139 119 TTABVUE 8-9; *see also* Exhibit 20, 125 TTABVUE 1231.

140 Alston Decl. Exhibit 9, 120 TTABVUE 132-196.

141 Alston Decl. Exhibit 19, 125 TTABVUE 13-1230.

142 Exhibits 159-258, 107 TTABVUE 27.

143 Alston Decl., Exhibits 146 and 147, 119 TTABVUE 38.

144 119 TTABVUE 40-44.

145 *Id.* at 49.

146 *Id.*, Exhibit 165 (confidential) at 141 TTABVUE.

147 119 TTABVUE 50, Exhibits 166-188 at 142 TTABVUE 4-75.

148 119 TTABVUE 52, Exhibits 189-90 (Exhibit 189 is confidential) at 143-144 TTABVUE.

149 119 TTABVUE 21.

150 *Id.*

151 *Id.* at 22.

152 *Id*. at 46, Exhibit 151 at 138 TTABVUE 77.

153 119 TTABVUE 36.

154 *Id*.

155 Perillo Decl., 101 TTABVUE 9. *See* fn. 7, listing examples of branded merchandise registered under the AMERICAN UNIVERSITY mark, Reg. No. 4774583.

156 *Id.* at 8.

157 *Id.* Sales and advertising figures, as well as other information regarding Petitioner's policing efforts and customers have been filed under seal. We will discuss those portions of the evidence and briefs that are properly designated "confidential" only in general terms as necessary to support our determination. *See Grote Indus.*, 126 USPQ2d at 1201 (TTAB 2018); *Poly-America, L.P. v. Ill. Tool Works Inc.*, 124 USPQ2d 1508, 1511 (TTAB 2017).

158 119 TTABVUE 31 (confidential); Exhibit 31 (confidential).

159 119 TTABVUE 32.

160 23.

161 *Id*. at 8-9.

162 *Id*. at 17.

163 *Id*.

164 *Id. See also* Exhibits 46 and 47 at 127 TTABVUE 36-67.

165 119 TTABVUE 19.

166 *Id.*

167 Alston Decl. 118 TTABVUE 15 (confidential). Exhibits 39 (confidential) at 126 TTABVUE; 40 and 41 at 27 TTABVUE 4-16.

168 *Id.,* Exhibit 37 at 125 TTABVUE at 1668-69.

169 Chajon Decl., 107 TTABVUE 5, Exhibits 9-158 at 108-110 TTABVUE.

170 107 TTABVUE 6-27.

171 This definition of "use in commerce" is coextensive with the limits of the Commerce Clause of the U.S. Constitution, which provides that "'The Congress shall have Power...to regulate Commerce with foreign nations, and among the several States, and with the Indian Tribes[.]' *U.S. Const.* art. I, § 8, cl. 3." 15 U.S.C. § 1127.

172 176 TTABVUE 19.

173 The allegations regarding dates of use made by Respondent in its application for the involved registration are not evidence on Respondent's behalf, nor are the specimens of use filed in support of the registration admissible to prove use. Trademark Rule 2.122(b)(2), 37 CFR § 2.122(b)(2). ("Specimens in the file of an application for registration, or in the file of a registration, are not evidence on behalf of the applicant or registrant unless identified and introduced in evidence as exhibits during the period for the taking of testimony.").

174 Exhibits 22 and 46 to the Al-Binali declaration display a modified version of the mark, which we do not consider to be (and which Respondent has not argued to be) sufficiently similar to the registered mark to qualify as showing use thereof. *See, e.g.,* 186 TTABVUE 15




(Exhibit 22) and 186 TTABVUE 234




(Exhibit 46).

175 As noted, Trademark Act § 45, 15 U.S.C. § 1127, defines the type of use that will qualify to support a registration of a mark identifying services: "For the purposes of this Act a mark shall be deemed to be used in commerce ... on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." Respondent argues that it displayed its mark in advertising its services in the United States, but does not argue that it has used the mark in the sale of services in the United States. To the extent Respondent contends that using its mark on a website that has been accessed in the United States is a "sale," as discussed infra, Respondent has not proven that it used its mark on a website prior to May 15, 2006 or that it "sold" educational services via its website.

176 Respondent also argues that it rendered services affecting interstate commerce, discussed more fully below.

177 176 TTABVUE 55.

178 *Id.*

179 *Id*. at 56.

180 184 TTABVUE 30.

181 181 TTABVUE 7.

182 184 TTABVUE 32. *See also* 182 TTABVUE 11 (Eickelman Decl., "AUK hosts American national scholars in a Fulbright Program at AUK, under the Subject AUK Mark, arranging to sponsor its first Fulbright scholar in 2005.").

183 We further note that Professor McCarthy has criticized the court's analysis in *Bancorp* as failing to account for specific provisions in Section 43(a), and suggesting that "the case should have been analyzed as an application of the 'famous marks' doctrine." MCCARTHY § 29:4 (5th ed.). The famous marks doctrine has not been invoked in this proceeding, and Section 43(a)(1) is inapplicable in any event.

184 176 TTABVUE 56.

185 These include Exhibits 22, 45 and 46 to Al-Binali's Decl., 186 TTABVUE 11-33, 186 TTABVUE 220-25, and 186 TTABVUE 227-34.

186 112 TTABVUE 47.

187 Applicant's Brief, 176 TTABVUE 56.

188 Awwad Decl., 181 TTABVUE 7.

189 Al-Binali Decl., Exhibit 102, 187 TTABVUE 90-102,.

190 To the extent Respondent engaged with U.S. citizens as prospective or as actual students, such contacts do not qualify as use of the mark "in the United States and a foreign country." *See Linville II,* 45 USPQ2d at 1376 (sporadic trips to the United States, cursory investigations of potential sites for salons, and half-hearted attempts to initiate the business relationships necessary to open a salon did not amount to use in commerce); *Linville I*, 41 USPQ2d at 1737 (that United States residents availed themselves of respondent's services while in Canada did not constitute "technical trademark use... sufficient to obtain or maintain a registration in the United States"); *Mother's Rests.,* 218 USPQ at 1048 (evidence that Canadian restaurant had distributed promotional material at tourist information booths, and Cancellation No. 92049706 that U.S. citizens had dined in the restaurants did not qualify as use in commerce); *Stagecoach Props.,* 199 USPQ at 349 (use of a trademark on hotel and restaurant services in Mexico did not qualify).

191 Petitioner is allowed until thirty (30) days from the mailing date of this decision to comply with Trademark Rule 2.126(c) by filing a redacted version of 189 TTABVUE, failing which 189 TTABVUE will be treated as part of the public record. *Kohler Co.*, 125 USPQ2d at 1476 n.19 (TTAB 2017) *quoting Ayoub, Inc. v. ACS Ayoub Carpet Serv.*, 118 USPQ2d 1392, 1398 n.39 (TTAB 2016). The parties are reminded that the Board may treat as not confidential that material which cannot reasonably be considered confidential, notwithstanding a designation as such by a party. Trademark Rule 2.116(g).

2020 WL 919246 (Trademark Tr. & App. Bd.)

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3001432 (Trademark Tr. & App. Bd.)

THIS OPINION IS NOT A PRECEDENT OF THE TTAB

Trademark Trial and Appeal Board

Patent and Trademark Office (P.T.O.)

IN RE MELANIE HART

Serial No. 77909807
April 12, 2013

***1** Robert O'Connell, Jr. and Anthony H. Cataldo, of Goodwin Procter LLP, for Melanie Hart
Anne M. Farrell
Trademark Examining Attorney
Law Office 105
(Thomas G. Howell, Managing Attorney)

Before Bucher, Shaw and Kuczma
Administrative Trademark Judges
Opinion by Kuczma
Administrative Trademark Judge:

Melanie Hart ("applicant"), appeals from the final refusal to register the following mark in standard character format:

CALLULA LILLIBELLE

for the following goods:
Towels that may be worn as a dress or similar garment in Class 24; and

Dresses; Skirts; Slacks in Class 25. [1]

The examining attorney issued a final refusal to register the mark [2] pursuant to § 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), citing the following Registration, owned by Kahn Lucas Lancaster, Inc. as reflected in the Office records, as a bar to registration:
Registration No. 3634829 [3]

Mark: KALULA KIDS

For: Children's clothing, namely, girls' dresses, tops, pants, and skirts, separately and in sets in Class 25.

After the refusal was made final, applicant appealed and filed a request for reconsideration which was denied. Applicant and the examining attorney have filed briefs. For the reasons set forth below, the refusal to register is affirmed.

<u>Likelihood of Confusion</u>

Our determination under § 2(d) is based on an analysis of all probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 567 (CCPA

1973); *see also In re Majestic Distilling Co., Inc.,* 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods and services. *See Federated Foods, Inc. v. Fort Howard Paper Co.,* 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976). We have considered these and any other *du Pont* factors on which applicant and the examining attorney have submitted evidence and argument. To the extent that other factors are applicable, we treat them as neutral.

A. Similarity of Goods, Channels of Trade and Classes of Consumers

***2** We first consider the *du Pont* factor involving the similarity or dissimilarity of applicant's goods (towels that may be worn as a dress or similar garment, and dresses; skirts; slacks), in relation to the goods in the cited registration (children's clothing, namely, girls' dresses, tops, pants, and skirts) and their channels of trade and classes of consumers. It is well-settled that the issue of likelihood of confusion between applied-for and registered marks must be determined on the basis of the goods and services as they are identified in the involved application and registration. *Paula Payne Products Co.* v. *Johnson Publishing Co., Inc*., 473 F.2d 901, 177 USPQ 76, 77 (CCPA 1973); *In re Accelerate s.a.l*., 101 USPQ2d 2047, 2050 (TTAB 2012).

Because the identification of goods in Class 25 in the cited registration is not limited to a particular type of dresses, skirts and slacks, we must presume that it covers all types of such items, including the girl's dresses, skirts and pants in applicant's application. Therefore, the goods of applicant and the cited registrant are, at minimum, identical in part to the extent they both include dresses, skirts and pants or slacks. In determining the similarity of applicant's and registrant's goods, it is sufficient if likelihood of confusion for each Class of goods is established for any item encompassed by the identification of goods for that Class. *See In re Wacker Neuson SE*, 97 USPQ2d 1408, 1409 (TTAB 2010) citing *Tuxedo Monopoly, Inc. v. General Mills Fun Group, Inc.,* 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981).

Similarly, the identification of the remaining goods in applicant's application, namely, towels that may be worn as a dress or other garment, is not limited, and therefore includes towels that may be worn by children. Towels that may be worn by children as a dress or other garment are clearly related to the children's clothing items in the cited registration. Accordingly, applicant's goods in Class 24 are closely related to the goods in the cited registration.

Applicant argues that the clothing items in her application and the cited registration differ because her clothing is for women while the cited registration covers children's clothing. The identification of goods in applicant's application is not limited to women's clothing. However, even if the clothing items were limited to women's clothing, they would still be related to the children's clothing recited in the cited registration. The relatedness of women's clothing and children's clothing is demonstrated by the evidence submitted by the examining attorney showing third-party retailer websites which offer women's and children's clothing.[4] Indeed, the evidence from *www.oldnavy.com* and *www.gap.com* demonstrates that girls' dresses in particular (identified in the cited registration) are sold alongside men's and women's clothing; and the *www.landsend.com*, *www.llbean.com* and *www.hannaandersson.com* websites demonstrate that children's clothing, and men's and women's' clothing, are sold alongside each other. This evidence shows applicant's goods and the goods in the cited registration are related because they are the types of products offered for sale together and sold by the same entity. The fact that these entities concentrate their businesses on clothing and are not mass retailers selling all types of products, increases the probative value of this evidence.

***3** While there is no per se rule that all clothing items are related, many cases have recognized different types of clothing items to be related goods. *See Cambridge Rubber Co*. v. *Cluett, Peabody & Co*., 286 F.2d 623, 128 USPQ 549, 550 (CCPA 1961) (women's boots related to men's and boy's underwear); *In re Melville Corp*., 18 USPQ2d 1386, 1388 (TTAB 1991) (women's pants, blouses, shorts and jackets related to women's shoes); *In re Pix of America, Inc*., 225 USPQ 691, 691-92 (TTAB 1985) (women's shoes related to outer shirts); and *In re Cook United, Inc*., 185 USPQ 444, 445 (TTAB 1975) (men's suits, coats and trousers related to ladies' pantyhose and hosiery). Thus, there is sufficient evidence that applicant's goods and the goods in the cited registration are closely related.

The relatedness of the products is also amply demonstrated by the thirteen use-based, third-party registrations, that recite men's, women's and children's clothing items, submitted by the examining attorney. [5] Although these registrations are not evidence that the marks shown therein are in use or that the public is familiar with them, they nonetheless have probative value to the extent they are based on use in commerce and serve to suggest that the goods identified therein are of a kind which may emanate from a single source under a single mark, i.e., that it is common for the same entity to provide men's, women's and children's clothing under the same mark. *See In re Davey Products Pty Ltd.*, 92 USPQ2d 1198, 1203 (TTAB 2009); and *In re Albert Trostel & Sons Co.*, 29 USPQ2d 1783, 1785-86 (TTAB 1993). Thus, consumers encountering applicant's clothing items and the cited registrant's children's clothing sold under similar marks are likely to believe the goods emanate from the same source.

Because there are no limitations as to trade channels or classes of purchasers in the description of goods in either of the applications or the cited registration, we must presume that the respective goods travel through all usual trade channels for such goods and to all classes of prospective purchasers for those goods. *See In re Linkvest S.A.,* 24 USPQ2d 1716, 1716 (TTAB 1992) and *In re Elbaum*, 211 USPQ 639, 640 (TTAB 1981).

The website evidence submitted by the examining attorney shows that applicant's goods and the goods in the cited registration are related, move in the same channels of trade, and are sold under conditions that would create a potential for confusion such as being offered for sale on the same websites. The evidence also indicates that the goods would be purchased by the same consumers. To the extent applicant's and registrant's respective clothing items are not restricted to particular trade channels and are therefore offered to the general consuming public, the classes of purchasers overlap and this overlap also weighs in favor of a finding of likelihood of confusion under *du Pont*. *In re Wilson*, 57 USPQ2d 1863, 1866 (TTAB 2001).

***4** Based on the legally identical or highly related nature of the goods set forth in the application and cited registration, and the similar trade channels and customers, the *du Pont* factors of the similarity of the goods, trade channels and customers favor a finding of likelihood of confusion.

B. Similarity of the Marks

We now turn to the *du Pont* factor focusing on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, meaning and commercial impression. *du Pont*, 177 USPQ at 567.

Looking at applicant's CALLULA LILLIBELLE mark and the cited KALULA KIDS mark, the marks are different in appearance. However, the first word in each mark is phonetically identical.

In comparing the marks, we are mindful that the test is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks in their entireties are sufficiently similar in terms of their overall commercial impression so that confusion as to the source of the goods offered under the respective marks is likely to result. *Coach Services Inc. v. Triumph Learning LLC,* 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012) and *San Fernando Elec. Mfg. Co.* v. *JFD Electronics Components Corp.*, 565 F.2d 683, 196 USPQ 1, 3 (CCPA 1977). The focus is on the recollection of the average purchaser who normally retains a general rather than specific impression of trademarks. *See L'Oreal S.A.* v. *Marcon,* 102 USPQ2d 1434, 1438 (TTAB 2012); and *Sealed Air Corp.* v. *Scott Paper Co.*, 190 USPQ 106, 108 (TTAB 1975).

As to the meaning of the marks, CALLULA LILLIBELLE is the name of applicant's daughter. [6] In the absence of any evidence as to the meaning of the word “Kalula” in the cited mark, we concur with applicant's speculation that the word is a contraction formed from the beginning letters of the words in the name of the owner of the registration, Kahn Lucas Lancaster, Inc. In view of the apparent origin of the word “Kalula” and given the context in which it is used in the KALULA KIDS mark, the word “Kalula” would be perceived as identifying a name. Thus, both marks begin with an identical sounding name.

Because the word KIDS in the cited mark is descriptive of children's clothing, the dominant portion of the cited mark is KALULA; this is also consistent with the disclaimer of the word KIDS. Although a disclaimed portion of a mark cannot be

ignored, and the marks must be compared in their entireties, one feature of a mark may be more significant in creating a commercial impression. Disclaimed matter is typically less significant or less dominant when comparing marks. *See In re Dixie Restaurants, Inc.*, 105 F.3d 1405, 41 USPQ2d 1531, 1533-34 (Fed. Cir. 1997); *In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 752 (Fed. Cir. 1985); and *SMS, Inc.* v. *Byn-Mar, Inc.*, 228 USPQ 219, 220 (descriptive feature can be afforded less weight in confusion analysis). Thus, the dominant portion of the cited mark is the word KALULA.

***5** The first word in applicant's mark and in the cited mark are phonetic equivalents, which can be enough for us to find a likelihood of confusion. *In re White Swan Ltd.*, 8 USPQ2d 1534, 1535 (TTAB 1988) (similarity in any one of the elements of appearance, sound, meaning or connotation may be sufficient to find the marks confusingly similar); *and In re 1st USA Realty Professionals, Inc.*, 84 USPQ2d 1581, 1586 (TTAB 2007) (similarity in sound alone may be sufficient for finding of likelihood of confusion) citing *Krim-Ko Corp*. v. *The Coca-Cola Bottling Co. of New York*, 390 F.2d 728, 156 USPQ 523, 526 (CCPA 1968). This is particularly so because consumers are generally more inclined to focus on the first word in any trademark or service mark. *See Palm Bay Imports, Inc*. v. *Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005); see also *Mattel Inc. v. Funline Merchandise Co.*, 81 USPQ2d 1372, 1374-75 (TTAB 2006) and *Presto Products, Inc.* v. *Nice-Pak Products, Inc*., 9 USPQ2d 1895, 1897 (TTAB 1988) ("it is often the first part of mark which is most likely to be impressed upon the mind of a purchaser and remembered" when making purchasing decisions).

Applicant argues that the word LILLIBELLE in its mark is sufficiently distinctive to distinguish its mark from the cited mark. Whether or not LILLIBELLE is distinctive, the inclusion of the word LILLIBELLE in applicant's mark is not sufficient to avoid confusion, particularly in view of the distinctiveness of the name KALULA. In the absence of evidence that "Kalula" or "Callula" are weak terms for clothing, consumers familiar with the cited mark may well believe that applicant's CALLULA LILLIBELLE mark is used in connection with a new line of clothing from the maker of the KALULA KIDS clothing. This is especially so with respect to fashions where "the reference to a feminine name could be taken by the customer as identifying the designer." *Lilly Pulitzer, Inc.* v. *Lilli Ann Corp.*, 376 F.2d 324, 153 USPQ 406, 407 (CCPA 1967) (THE LILLY confusingly similar to LILLI ANN); *In re Southern Belle Frozen Foods Inc.*, 48 USPQ2d 1849, 1851 (TTAB 1998) (consumers familiar with registrant's SHRIMP ROYALE packaged shrimp meal may conclude applicant's SEAFOOD ROYALE frozen crab product is a new line of seafood from the maker of the SHRIMP ROYALE product); *NutraSweet Company* v. *K & S Foods Inc*., 4 USPQ2d 1964, 1968 (TTAB 1987) (purchasers familiar with NUTRASWEET product, upon viewing NUTRA SALT, would be likely to believe it was a new product line put out by the NUTRASWEET producer or that the product was somehow associated with or sponsored by the people producing the NUTRASWEET product); *Nina Ricci S.A.R.L.* v. *Haymaker Sports Inc*., 134 USPQ 26, 28 (TTAB 1962) (persons familiar with NINA RICCI or RICCI for women's apparel would logically assume that women's clothing bearing RICCI OF HAYMAKER emanates from same source or is connected in some way). Accordingly, applicant's mark is similar to the cited mark.

**Conclusion**

***6** Where the goods of the applicant and cited registrant are identical in part and/or closely related as they are in this case, the degree of similarity between the marks required to support a finding of likelihood of confusion is not as great as would be required with diverse goods. *In re J.M. Originals Inc.*, 6 USPQ2d 1393, 1394 (TTAB 1987); also see *Shen Mfg. Co*. v. *Ritz Hotel Ltd*., 393 F.3d 1238, 73 USPQ2d 1350, 1354 (Fed. Cir. 2004). After considering the applicable *du Pont* factors, we find that the goods involved are so closely related that their sale under marks beginning with phonetically identical names is reasonably likely to cause confusion, or to cause mistake or to deceive.

**Decision**: The refusal to register the mark in application Serial No. 77909807 under § 2(d) of the Trademark Act is affirmed.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

## Footnotes

1 Application Serial No. 77909807 filed on January 12, 2010, under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b).

2 In the June 13, 2011 Final Office Action, the requirement that applicant pay the applicable surcharges for loss of Teas Plus status was also made final. Pursuant to authorization to charge the designated deposit account provided by applicant subsequent to filing her appeal briefs, the $50 additional surcharge fee per Class for both Classes has been paid.

3 Registration No. 3634829 issued June 9, 2009, for a standard character mark; the word "KIDS" is disclaimed.

4 See attachments to June 13, 2011 Final Office Action consisting of printouts from *www.gap.com*, *www.landsend.com*, *www.llbean.com*, *www.hannaandersson.com* and *www.oldnavy.com*.

5 Copies of these thirteen third-party registrations, owned by twelve different registrants, were attached to the June 13, 2011 Final Office Action. Although fourteen registrations were actually submitted, Registration No. 2985118 was not considered because it only identifies "infants and childrens clothing" [sic].

6 See October 14, 2010 Response to Office Action, "Mark identifies name of living individual, Callula Lillibelle Hart, minor daughter of applicant."

2013 WL 3001432 (Trademark Tr. & App. Bd.)

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Cavern City Tours Ltd v. Hard Rock Cafe International (USA), Inc., M.D.Fla., October 31, 2014

2013 WL 1305332 (Trademark Tr. & App. Bd.)

THIS OPINION IS NOT A PRECEDENT OF THE TTAB

Trademark Trial and Appeal Board

Patent and Trademark Office (P.T.O.)

NEW YORK YANKEES PARTNERSHIP
v.
EVIL ENTERPRISES, INC.

Opposition No. 91192764
February 8, 2013

***1** Maryann E. Licciardi of Cowan, Liebowitz & Latman, P.C. for the New York Yankees Partnership
Gerard F. Dunne of the Law Offices of Gerard F. Dunne, P.C. for Evil Enterprises, Inc.

Before Cataldo, Wolfson, and Shaw
Administrative Trademark Judges
Opinion by Shaw
Administrative Trademark Judge:

Evil Enterprises, Inc. ("applicant") has filed an application to register on the Principal Register the mark BASEBALLS EVIL EMPIRE, in standard character format, for "clothing, namely, shirts, t-shirts, sweatshirts, jackets, pants, shorts and hats" in International Class 25. [1]

Registration has been opposed by the New York Yankees Partnership ("opposer"). Opposer alleges that prior to applicant's constructive first use date, the term EVIL EMPIRE has come to identify opposer's baseball entertainment services, and by extension, the source of opposer's wide variety of merchandise, including shirts, T-shirts, sweatshirts, jackets, pants, shorts, hats and other apparel.

As grounds for opposition, opposer alleges the grounds of (1) priority and likelihood of confusion under Section 2(d) of the Trademark Act, (2) a false suggestion of a connection with opposer under Section 2(a) of the Act, and (3) disparagement of opposer and/or that applicant's mark brings opposer into contempt or disrepute, also under Section 2(a) of the Act. In its answer to the notice of opposition, applicant denied the salient allegations.

## The Record

By rule, the record includes the application file and the pleadings. Trademark Rule 2.122(b), 37 CFR § 2.122(b). In addition, the parties introduced the following testimony and evidence.

### *A. Opposer's evidence.*

Opposer, by stipulation, submitted the Declaration of Howard Smith, Senior Vice President of Licensing for Major League Baseball Properties, Inc. (the licensing agent for opposer) with seventeen attached exhibits including news stories using the term EVIL EMPIRE to refer to the Yankees, Internet blogs and message boards where the term EVIL EMPIRE is used to refer to

the Yankees, a Wikipedia baseball glossary, printouts of applicant's web pages showing use of the phrase BASEBALLS EVIL EMPIRE to refer to the Yankees, and a dictionary definition of "evil." By Notice of Reliance, opposer submitted applicant's responses to certain interrogatories and admission requests; printed publications; excerpts from internet blogs and message boards; dictionary definitions; and status and title copies of opposer's pleaded registrations for its Yankees marks, i.e., its "interlocking NY" mark and its "Yankees top hat" mark.

***B. Applicant's evidence.***

***2** Applicant, by stipulation, submitted the declaration of Tracy Carey, the president of applicant, Evil Enterprises, Inc., with two attached exhibits consisting of a copy of applicant's Facebook page and copies of emails from fans; the declaration of Joseph A. Dunne, Esq., attorney for applicant, with five attached exhibits consisting of news articles about baseball; and the declaration of Gerard F. Dunne, Esq., attorney for applicant, with two attached exhibits consisting of a blog article and a news story. By Notice of Reliance, applicant submitted internet material in the nature of news stories, articles, and advertisements, as well as opposer's responses to applicant's interrogatories. [2]

**Findings of Fact**

Opposer is the owner of the well-known New York Yankees baseball club (the "Yankees" or the "Club"), founded in 1903. The Club is the owner of a number of marks, including the two shown below, which are used on player's uniforms as well as on or in connection with a wide variety of licensed goods and services, including the same clothing articles that applicant has listed in its application. [3]






The Club, through its licensing agent Major League Baseball Properties ("MLBP"), has extensively licensed various Yankees marks for a wide variety of goods and services. The goods include apparel such as shirts, t-shirts, sweatshirts, jackets, pants, shorts and hats, as well as posters, toys, and a wide variety of other goods sought by sports fans. The licensed merchandise is sold over the Internet through opposer's website and the website of Major League Baseball, among others, as well as in official team stores and through numerous national retail store and sporting goods chains. Opposer's retail sales in the United States of licensed products bearing Yankees' marks or otherwise promoting the Yankees have exceeded $1.1 billion since the year 2000.

Applicant, Evil Enterprises, Inc., filed its application for the mark BASEBALLS EVIL EMPIRE, for use on clothing, on July 7, 2008, based on an assertion of its intent to use the mark in commerce. Applicant has not yet filed an allegation of use of the mark. Applicant's website indicates that the goods are or will be directed to consumers seeking merchandise relating to the New York Yankees Baseball Club, proclaiming: "If you are passionate about the New York Yankees then you have come to the right place." [4]

Both applicant and opposer agree that the term EVIL EMPIRE, as it relates to baseball and these proceedings, was coined in 2002 by the president of the rival Boston Red Sox baseball club upon learning that a sought-after Cuban pitcher, Jose Contreras, had signed a contract to play for the Yankees and not the Red Sox. Upon hearing the news of Contreras' signing, Red Sox club president, Larry Lucchino, is reported to have said: "The evil empire extends its tentacles even into Latin America." [5] The term EVIL EMPIRE has since been taken up by the media, Yankees' fans, and detractors as a reference to the Yankees. The Yankees

have "implicitly embraced" the nickname EVIL EMPIRE, including playing ominous music from the soundtrack of the STAR WARS movies at baseball games. [6] Opposer, however, does not own an application or registration for the term EVIL EMPIRE. Nor has opposer used the mark itself in connection with any goods or services.

**Standing**

***3** Any person "who believes that he would be damaged by the registration of a mark upon the principal register" may oppose registration of the mark under Trademark Act § 13, 15 U.S.C. § 1063. To oppose registration, the opposing party must show both standing and valid grounds for opposition. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000). Standing requires only that the petitioner have a "real interest" in the opposition proceeding. *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025 (Fed. Cir. 1999). In most instances, a direct commercial interest satisfies the "real interest" test. *Cunningham*, 55 USPQ2d at 1844. Opposer has made its pleaded registrations of record and has shown that the registrations are valid and subsisting. Further, opposer has demonstrated that applicant "was aware that the NEW YORK YANKEES baseball team has been referred to and known as the 'Evil Empire' by the press, fans, media and/or public prior to filing Application Serial No. 76/691,096 on July 7, 2008." [7] Accordingly, Opposer has established its real interest in opposing the registration of applicant's mark for the identified goods. Inasmuch as opposer has established its standing, opposer may raise any statutory ground for opposition to registration of the mark under the Trademark Act. *Lipton Indus., Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185, 190 (CCPA 1982).

**Likelihood of Confusion**

**Priority**

Opposer has established its priority through applicant's response to Opposer's First Set of Requests for Admissions indicating that applicant was aware "that the NEW YORK YANKEES baseball team has been referred to and known as the 'Evil Empire'" prior to applicant's filing date of July 7, 2008. [8] *See Herbko Int'l Inc. v. Kappa Books Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1378 (Fed. Cir. 2002).

Opposer asserts likelihood of confusion under Section 2(d) of the Trademark Act. 15 U.S.C. § 1052(d). Opposer alleges that applicant's mark, BASEBALLS EVIL EMPIRE, when used in connection with applicant's clothing so resembles the mark EVIL EMPIRE which has become associated with opposer, as to be likely to cause confusion.

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence relevant to the factors bearing on the likelihood of confusion issue. *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). Not all of the *du Pont* factors are relevant to every case, and only factors of significance to the particular mark need be considered. *In re Dixie Restaurants, Inc.*, 105 F.3d 1405, 41 USPQ2d 1531, 1533 (Fed. Cir. 1997). In appropriate cases, a single *du Pont* factor may be dispositive of the likelihood of confusion analysis. *See Champagne Louis Roederer S.A. v. Delicato Vineyards*, 148 F.3d 1373, 47 USPQ2d 1459 (Fed. Cir. 1998); and *Kellogg Co. v. Pack 'Em Enter. Inc.,* 14 USPQ2d 1545 (TTAB 1990), *aff'd*, 951 F.2d 330, 21 USPQ2d 1142 (Fed. Cir. 1991). Moreover, it is the opposer's burden to establish facts sufficient to support the conclusion that confusion, mistake, or deception is likely. *Bridgestone Americas Tire Operations LLC v. Fed. Corp.*, 673 F.3d 1330, 102 USPQ2d 1061, 1063 (Fed. Cir. 2012).

***A. Opposer's rights in EVIL EMPIRE***

***4** It is well-settled that in order to establish rights in a mark, a party need not have actually used a mark if the public nevertheless associates the mark with the goods or services of that party: "even if a company itself has not made use of a term, it may have 'a protectable property right in the term' if the public has come to associate the term with the company or its goods or services." *Big Blue Prods. Inc. v. Int'l Bus. Machines Corp.*, 19 USPQ2d 1072, 1074 (TTAB 1991). *See Martahus v. Video Duplication Servs. Inc.,* 3 F.3d 417, 27 USPQ2d 1846, 1853 n.9 (Fed. Cir. 1993)("[T]he public's adoption of [the mark] to refer

to [opposer] is enough to establish trade name and service mark use."); *Nat'l Cable Television Ass'n., Inc. v. American Cinema Editors, Inc.*, 937 F.2d 1572, 19 USPQ2d 1424, 1428 (Fed. Cir. 1991)("public use by others inures to the claimant's benefit and, where this occurs, public use can reasonably be deemed use 'by' that party in the sense of a use on its behalf."); *George & Co. LLC v. Imagination Entertainment Ltd.*, 575 F.3d 383, 403, 91 USPQ2d 1786, 1798 (4th Cir. 2009)("The Public Use doctrine . . . states that abbreviations or nicknames used only by the public can give rise to protectable trademark rights to the owner of a mark which the public has modified."); *American Stock Exch., Inc. v. American Express Co.*, 207 USPQ 356, 363 (TTAB 1980) ("[W]here the public has come to associate a term with a particular company and/or its goods or services as a result, for example, of use of the term in the trade and by the news media, that company has a protectable property right in the term even if the company itself has made no use of the term."); *Coca Cola Co. v. Busch*, 44 F.Supp. 405, 52 USPQ 377, 382 (D.Pa. 1942)(holding the public's use of "COKE" to refer to Coca-Cola sufficient to enjoin defendant's use of KOKE-UP for soft drinks). *See also*, 1 *J. Thomas McCarthy, Trademarks and Unfair Competition* § 7:18 (4th ed. 2012), and additional cases cited therein.

Opposer has made of record hundreds of news articles, stories, and blog entries, as well as admissions by applicant, demonstrating that the term EVIL EMPIRE is widely used as a shorthand reference or nickname for the New York Yankees baseball club. The following is a representative sample of newspaper articles and other sources attached to the Smith declaration referring to the Yankees as the EVIL EMPIRE: [9]

• *The Denver Post*, February 9, 2003, "There is so much to love about baseball. . . . We love it that baseball has an Evil Empire, a team to beat, the perpetual villain in the New York Yankees."

***5** • *The New York Post*, October 17, 2003, "Yankees 6 Red Sox 5 The Evil Empire lives!"

• *Dallas Morning News*, May 22, 2004, "[Rangers] traded Rodriguez to the 'Evil Empire,' for second baseman Alfonso Soriano and minor-leaguer Joaquin Arias."

• *Bangor Daily News*, Oct. 16, 2004, "Onetime Red Sox pitching ace Pedro Martinez . . . served up a two-run homer to Yankee first baseman John Olerud that put the Evil Empire up 3-0 in the sixth inning."

• *Ventura County Star,* March 3, 2005, "The only thing that is even more exciting to Perry is the end of The Curse as the Red Sox finally defeated the Evil Empire (the Yankees) en route to their first World Series win in ages."

• *Daily News*, July 23, 2008, "But these are the Yanks, after all, and everything is breaking right again for the Evil Empire since the All-Star break."

• *The Baltimore Sun*, Nov. 3, 2009, "The Evil Empire still stands poised to conquer all of baseball."

• A Wikipedia glossary of baseball terms including a definition of EVIL EMPIRE as a "common name for the New York Yankees due to its wealth and winning by far the most championships. This nickname is used especially by fans of the Boston Red Sox and by fans of other teams to a lesser extent. Even some Yankees fans have been known to call themselves and their team the 'Evil Empire' as a badge of honor."

By notices of reliance, opposer submitted hundreds more similar news stories, internet articles, blog entries, and message board postings since 2002 showing that the Yankees are known as the EVIL EMPIRE. Opposer also has stated that it "implicitly embraced" the EVIL EMPIRE theme by adopting music and other indicia from the STAR WARS movies in connection with games played at Yankee Stadium. [10]

Applicant, in its response to Opposer's First Set of Requests for Admissions, has admitted that "the New York Yankees baseball team has been referred to and known as the 'Evil Empire' by the press, fans, media, other Major League baseball teams and/or

public."[11] Moreover, applicant's web page proclaims that "Baseballs Evil Empire takes pride in our merchandise and our great task of alerting all baseball fans and the like to send the message out loud that the NY Yankees are Baseballs Evil Empire . . . ."[12]

In view of the evidence submitted by opposer, we find that the term EVIL EMPIRE, when used in connection with baseball, refers to opposer, the Yankees.

Applicant nevertheless argues that opposer cannot claim a protectable right in the term EVIL EMPIRE because "[t]oo many baseball teams are now referred to by the media as an 'Evil Empire"' for the term to point exclusively to opposer.[13] We disagree.

***6** Applicant's evidence showing a small number of stories discussing other sports teams as "evil empires" does not counter the weight of opposer's evidence. Rather, applicant's evidence shows only that these other teams aspire to be in the position of the Yankees, i.e., spending more on salaries and winning more championships. In short, the record shows that there is only one EVIL EMPIRE in baseball and it is the New York Yankees. Accordingly, we find that opposer has a protectable trademark right in the term EVIL EMPIRE as used in connection with baseball.

***B. The fame of opposer's marks.***

Having found that opposer has a protectable interest in the term EVIL EMPIRE, we turn first to the factor of fame, because the fame of the prior mark, if it exists, plays a "dominant role in the process of balancing the *DuPont* factors." *Recot, Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000). A famous mark has extensive public recognition and renown and enjoys a broad scope of protection or exclusivity of use. *Bose Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002); *Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992). Regarding fame, the Court of Appeals for the Federal Circuit has stated the following: [T]here is "no excuse for even approaching the well-known trademark of a competitor . . . and that all doubt as to whether confusion, mistake, or deception is likely is to be resolved against the newcomer, especially where the established mark is one which is famous." *Nina Ricci S.A.R.L. v. E.T.F. Enters. Inc.*, 889 F.2d 1070, 12 USPQ2d 1901, 1904 (Fed. Cir. 1989), *quoting, Planter's Nut & Chocolate Co. v. Crown Nut Co.*, 305 F.2d 916, 134 USPQ 504, 511 (CCPA 1962).

Fame may be measured indirectly in a number of ways: by the volume of sales and advertising expenditures of the goods and services identified by the marks at issue, "the length of time those indicia of commercial awareness have been evident," widespread critical assessments and through notice by independent sources of the products identified by the marks, as well as the general reputation of the products and services. *Bose Corp. v. QSC Audio Prods. Inc.*, 63 USPQ2d at 1305-1306 and 1309.

Finally, because of the extreme deference that we accord a famous mark in terms of the wide latitude of legal protection it receives, and the dominant role fame plays in the likelihood of confusion analysis, it is the duty of the party asserting that its mark is famous to clearly prove it. *Leading Jewelers Guild Inc. v. LJOW Holdings LLC*, 82 USPQ2d 1901, 1904 (TTAB 2007).

***7** Opposer has submitted hundreds of news articles from major metropolitan newspapers, such as The Boston Globe, The New York Times, The Washington Post, The Los Angeles Times, and The Atlanta Journal-Constitution, among others, referring to the Yankees as the EVIL EMPIRE. These articles, dating back to 2002, show that a broad segment of the population has been exposed to the use of the term EVIL EMPIRE to refer to the Yankees.

Based on the evidence, the term EVIL EMPIRE certainly has achieved a level of fame such that most baseball fans would recognize the term as a nickname for the Yankees. We have no doubt that EVIL EMPIRE, in the world of baseball at a minimum, has become famous in identifying the Yankees for purposes of likelihood of confusion. EVIL EMPIRE, thus, is entitled to a broad scope of protection, especially since applicant markets its goods to opposer's baseball fans.

***C. Similarity or dissimilarity of the goods, the channels of trade, and classes of consumers.***

The goods identified in the application, which include shirts, t-shirts, sweatshirts, jackets, pants, shorts and hats, are identical to the items of clothing sold by opposer to promote its baseball team under its Yankees marks.

Furthermore, because there are no restrictions in the application, we must presume that applicant's clothing will be sold, not just over the Internet, but in all the normal channels of trade for such goods, including the department stores and sporting goods stores where opposer's clothing is sold; and that applicant's clothing will reach all the usual purchasers, including ordinary consumers who are also among the purchasers for opposer's clothing. *See Octocom Sys. Inc. v. Houston Computers Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783 (Fed. Cir. 1990).

It is also important to consider that t-shirts and many of the other casual, everyday items of wearing apparel identified in applicant's application are relatively inexpensive and are therefore likely to be purchased by consumers on impulse, and without a great deal of care. This is a factor that increases the likelihood of confusion. *See Recot v. Becton*, 54 USPQ2d at 1899 ("When products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care."). This *du Pont* factor favors opposer.

***D. The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.***

We next consider the similarity of the marks as to appearance, sound, connotation and commercial impression. *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772,* 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005). The test, under this *du Pont* factor, is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impression that confusion as to the source of the services offered under the respective marks is likely to result. The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. *See Sealed Air Corp. v. Scott Paper Co*., 190 USPQ 106 (TTAB 1975). While we must consider the marks in their entireties, in articulating reasons for reaching a conclusion on the issue of likelihood of confusion, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark. See *In re Nat'l Data Corp*., 753 F.2d 1056, 224 USPQ 749 (Fed. Cir. 1985).

***8** Opposer claims proprietary rights in the term EVIL EMPIRE as a mark. Applicant's mark consists of the words BASEBALLS EVIL EMPIRE in standard characters and incorporates opposer's EVIL EMPIRE mark in its entirety. EVIL EMPIRE is the dominant feature of both marks. The presence of the term BASEBALLS in applicant's mark merely defines the reach of opposer's "empire" and does little to create a commercial impression different from opposer's mark, EVIL EMPIRE. Instead, the addition of the term BASEBALLS to EVIL EMPIRE increases the likelihood of confusion by defining opposer's field of use and pointing even more directly to opposer's baseball team.

In comparing the marks in their entireties, we find that on the whole they are similar in appearance, sound, connotation and commercial impression and that the additional wording in applicant's mark is not sufficient to distinguish the marks when used in connection with related goods. This *du Pont* factor favors opposer.

***E. Remaining du Pont factors***

We have considered any remaining arguments and evidence put forth by applicant but in light of the fame of the designation EVIL EMPIRE as applied to opposer, the similarity of the goods, the similarity of the marks, and the overlapping channels of trade, we find these arguments unpersuasive. *Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 1001, 1003 (Fed. Cir. 2002) ("The likelihood of confusion analysis considers all *du Pont* factors for which there is evidence of record but 'may focus . . . on dispositive factors, such as similarity of the marks and relatedness of the goods."').

**F. *Balancing the factors.***

On balance, the relevant *du Pont* factors weigh heavily in favor of a finding of likelihood of confusion. We conclude that consumers familiar with usage of the term EVIL EMPIRE to refer to opposer, upon encountering applicant's mark BASEBALLS EVIL EMPIRE for clothing, would be likely to believe that the goods originate from or are associated with or sponsored by the same entity.

Notwithstanding the similarity of the marks and the similarity of the goods, applicant argues that its use of BASEBALLS EVIL EMPIRE is a "spoof and parody of the New York Yankees baseball club, and thus no likelihood of confusion can be established by opposer." [14]

Parody, however, is not a defense to opposition if the marks are otherwise confusingly similar, as they are here. *Boston Red Sox Baseball Club LP v. Sherman*, 88 USPQ2d 1581, 1592 (TTAB 2008); *Nike Inc. v. Maher*, 100 USPQ2d 1018 (TTAB 2011); *Columbia Pictures Indus., Inc. v. Miller*, 211 USPQ 816, 820 (TTAB 1981) ("The right of the public to use words in the English language in a humorous and parodic manner does not extend to use of such words as trademarks if such use conflicts with the prior use and/or registration of the substantially same mark by another.").

## Section 2(a) - False Suggestion of a Connection

***9** Section 2(a) prohibits registration of "matter which may . . . falsely suggest a connection with persons, living or dead, institutions, beliefs or national symbols." 15 U.S.C. § 1052(a). To establish this claim, opposer must prove (1) that applicant's mark is the same or a close approximation of opposer's previously used name or identity; (2) that applicant's mark would be recognized as such by purchasers, in that the mark points uniquely and unmistakably to opposer; (3) that opposer is not connected with the goods that are sold or will be sold by applicant under its mark; and (4) that opposer's name or identity is of sufficient fame or reputation that when applicant's mark is used on its goods, a connection with opposer would be presumed. *See Boston Red Sox Baseball Club LP v. Sherman,* 88 USPQ2d at 1593; *Buffett v. Chi-Chi's, Inc.*, 226 USPQ 428, 429 (TTAB 1985). *See also University of Notre Dame du Lac v. J.C. Gourmet Food Imports Co. Inc.,* 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

Beginning with the first element, we find that applicant's mark is the same as or a close approximation of opposer's previously used name or identity. That is, applicant's BASEBALLS EVIL EMPIRE differs only slightly from opposer's EVIL EMPIRE by the addition of the term BASEBALLS. Given that opposer has shown that it is identified by the designation "Evil Empire" within the context of a baseball club, i.e., the well-known New York Yankees baseball club, this is a distinction without a difference.

Similarly, we find that applicant's mark would be recognized by prospective purchasers as pointing uniquely and unmistakably to opposer. The weight of evidence submitted by opposer clearly demonstrates that the mark BASEBALLS EVIL EMPIRE would be understood by consumers to refer to the New York Yankees. Television, radio, newspapers, and the Internet are full of stories recounting the exploits of baseball's "EVIL EMPIRE." Moreover, applicant's own web page is directed to selling clothing to Yankees' fans:

The official home of Baseballs Evil Empire. The one source for all the latest tee-shirts and hats for all the Yankee Fans around the world. Be seen in our Yankee apparel and help us in our message that the Yankees are truly "Baseballs Evil Empire" . . . "Thank you, for being a Yankee Fan" [15]

Simply put, we have no doubt that BASEBALLS EVIL EMPIRE would be understood by consumers to point uniquely and unmistakably to the New York Yankees because that is precisely applicant's demonstrated intent: to associate its products with the New York Yankees baseball club.

Regarding the third element, opposer states that applicant does not have any association with the Yankees and applicant has not submitted any evidence to the contrary, thus, we must presume that there is no connection between the parties.

***10** Finally, the evidence regarding "fame or reputation" is sufficient to show that the term EVIL EMPIRE has such fame or renown that the use of BASEBALLS EVIL EMPIRE as a trademark by an unauthorized user will falsely suggest a connection with the Yankees. Simply put, consumers, upon seeing applicant's mark, BASEBALL EVIL EMPIRE, on clothing, would be likely to assume that these goods are connected with the Yankees baseball club when there is no such connection.

After considering all of the testimony and evidence of record in regard to the Section 2(a) false suggestion of a connection factors, as well as the argument of counsel, we find that applicant's mark BASEBALLS EVIL EMPIRE falsely suggests a connection with opposer.

**Section 2(a) - Disparagement**

Section 2(a) of the Trademark Act also prohibits registration of a mark that "consists of or comprises . . . matter which may disparage . . . persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute." 15 U.S.C. § 1052(a). *See Greyhound Corp. v. Both Worlds Inc.*, 6 USPQ2d 1635, 1639 (TTAB 1988) ("Disparagement is essentially a violation of one's right of privacy -- the right to be 'let alone' from contempt or ridicule.").

The Board in *Greyhound* set forth the two elements of a claim of disparagement: 1) that the communication reasonably would be understood as referring to the plaintiff; and 2) that the communication is disparaging, that is, would be considered offensive or objectionable by a reasonable person of ordinary sensibilities.

As discussed above, given opposer's evidence and the references to opposer in applicant's web page, we have no doubt that the term BASEBALLS EVIL EMPIRE would be understood as referring to opposer's identity.

Whether use of the term BASEBALLS EVIL EMPIRE would be considered offensive or objectionable by a reasonable person is much less clear. Applicant argues that the definitions of the term EVIL "speak for themselves in outlining a host of offensive meanings."[16] But the offensiveness of "evil" isn't as obvious as a dictionary definition would suggest, especially in matters of popular culture.

Opposer's evidence demonstrates that a number of its fans have adopted the EVIL EMPIRE moniker as a "badge of honor" so that it now has a "positive connotation" among Yankees' fans.[17] The Smith declaration admits that opposer has "implicitly embraced" the EVIL EMPIRE designation.[18] For example, opposer has played the ominous theme from the STAR WARS movies at baseball games. Opposer's embracing the EVIL EMPIRE characterization, whether explicitly or implicitly, undermines its argument that use of BASEBALLS EVIL EMPIRE disparages the Yankees. In other words, having succumbed to the lure of the dark side, opposer will not now be heard to complain about the judgment of those who prefer the comfort of the light. We find that use of the term BASEBALLS EVIL EMPIRE is not disparaging to opposer.

***11 Decision**: The opposition is sustained on the ground of likelihood of confusion under Section 2(d) of the Trademark Act and on the ground that the mark falsely suggests a connection with opposer under Section 2(a) of the Act. The opposition is dismissed on the ground that the mark is disparaging under Section 2(a) of the Trademark Act.

## Footnotes

1 Serial No. 76691096, filed July 7, 2008, based on an allegation of applicant's bona fide intention to use the mark in commerce.

2 The Board notes with approval the parties' stipulation to utilize testimony by declaration and the efficiencies realized thereby. *See* TBMP §§ 528.05(a)(2) and 702.04 (October 2012) and authorities cited therein.

3 Registration Nos. 1076665, 3320067, 1032767, and 3320070.

4 Applicant's Responses to Opposer's First Set of Requests for Admission, Request No. 12.

5 Smith Declaration at 7.

6 *Id*. at 20.

7 Applicant's Responses to Opposer's First Set of Requests for Admissions, Request No. 3.

8 *Id*.

9 Smith declaration, Exhs. 4, 5, and 8.

10 Smith Declaration at 20.

11 Opposer's First Notice of Reliance, Exh. A, Applicant's Responses to Opposer's First Set of Requests for Admissions, Request No. 2.

12 Smith Declaration, Exh. 13.

13 Applicant's Br. at 7.

14 Applicant's Br. at 1.

15 Smith Declaration, Exh. 13.

16 Opposer's Br. at 44.

17 Smith Declaration, pp. 8, 11.

18 Smith Declaration, p. 20.

2013 WL 1305332 (Trademark Tr. & App. Bd.)

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 3333839 (Trademark Tr. & App. Bd.)

THIS OPINION IS NOT A PRECEDENT OF THE TTAB

Trademark Trial and Appeal Board

Patent and Trademark Office (P.T.O.)

University of Southern California
v.
The University of South Carolina

Opposition No. 91125615 to application Serial No. 75358031 filed on September 16, 1997
August 1, 2008
Hearing: November 15, 2007

***1** Scott A. Edelman of Gibson Dunn & Crutcher LLP for University of Southern California
John C. McElwaine of Nelson Mullins Riley & Scarborough, L.L.P. for The University of South Carolina

Before Bucher, Grendel and Zervas
Administrative Trademark Judges
Opinion by Grendel
Administrative Trademark Judge:

**INTRODUCTION**

In this opposition proceeding, University of Southern California ("California") is the opposer and counterclaim defendant. The University of South Carolina ("Carolina") is the applicant and counterclaim plaintiff. University of Southern California is a private university located in Los Angeles, California. (Stip. Facts No. 89.) The University of South Carolina is a public university located in Columbia, South Carolina. (Stip. Facts No. 81.) Both schools' athletic programs compete in NCAA Division I-A, the top tier of collegiate athletics. (Stip. Facts Nos. 35-36.) California is a member of the Pacific-10 Conference, and Carolina is a member of the South Eastern Conference. (Stip. Facts Nos. 88, 95.)

In the application which is the subject of the opposition case, Carolina seeks registration on the Principal Register of the mark depicted below for goods identified in the application as "clothing, namely, hats, baseball uniforms, T-shirts and shorts." [1] Like the parties, we primarily shall refer to this mark as the Carolina Baseball Logo mark.



California has opposed registration of Carolina's mark, alleging priority and likelihood of confusion under Trademark Act Section 2(d), 15 U.S.C. §1052(d), as its ground of opposition. [2] In its June 11, 2004 amended notice of opposition (the operative pleading herein), California has pleaded ownership of two registrations. The first is Reg. No. 1844953 (the ′953 registration), [3] which is an incontestable registration of the mark **SC** (in typed or standard character form) for goods identified in the registration as:

keyrings of non-precious metals; decorative emblems or plates of non-precious metal, for attachment to autos; art work statuary of non-precious metals, all goods being offered and sold to persons through university authorized channels of trade, in Class 6;

umbrellas, hand luggage, tote bags, luggage; namely, tote bags, hand luggage, garment bags for travel, and small traveling bags for overnight trips, fanny packs, toiletry bags sold empty, briefcases, back packs, all goods being offered and sold to persons through university authorized channels of trade, in Class 18;

***2** towels, blankets, cloth pennants, and cloth flags, all goods being offered and sold to persons through university authorized channels of trade, in Class 24; and

sweatshirts and T-shirts, all goods being offered and sold at university-controlled outlets, in Class 25.

California's second pleaded registration is Reg. No. 2683137 (the ′137 registration), which is of the mark depicted below



for various goods in Classes 12, 16, 18, 21, 24, 25 and 28, and for services in Classes 35 and 41.[4] As do the parties, we shall refer to this mark primarily as the California Athletic Interlock mark.

In addition to the rights derived from its two pleaded registrations, California also alleges prior common law rights in the marks depicted in the registrations, as well as prior common law rights in the mark depicted below for various goods including shirts and hats.



As do the parties, we shall refer to this mark primarily as the California Baseball Interlock mark.

In Carolina's September 20, 2004 amended answer (the operative pleading herein), Carolina denied the salient allegations of the amended notice of opposition and asserted various affirmative defenses.[5] Carolina also asserted a counterclaim for cancellation of California's pleaded ′137 registration (the California Athletic Interlock mark), alleging as its ground for cancellation that if a likelihood of confusion exists, it is Carolina, not California, which has Section 2(d) priority.[6]

California filed an answer to the counterclaim in which it denied the salient allegations thereof and asserted various affirmative defenses, including abandonment.[7]

After many rounds of interlocutory motion practice, both parties presented evidence at trial. The case is fully and ably briefed, and an oral hearing was held on November 15, 2007 at which counsel for both parties presented arguments.

The evidence automatically of record consists of the pleadings; the file of Carolina's ′031 application involved in the opposition; and the file of California's ′137 registration involved in the counterclaim. Trademark Rule 2.122, 37 C.F.R. §2.122. Also of record are the parties' Stipulation of Facts filed December 19, 2005 (Stip. Facts) and the parties' various stipulations regarding documents.

California's evidence consists of: the testimony deposition of Elizabeth A. Kennedy (Kennedy Depo.), California's Director of Trademarks and Licensing, with California's Exh. Nos. 1-15 and Carolina's Exh. Nos. 1-6;[8] the testimony deposition of

Dan Stimmler (Stimmler Depo.), California's Associate Vice-President of Auxiliary Services, with California's Exh. Nos. 16-19 and Carolina's Exh. No. 7; the testimony deposition of California's private investigator Kenneth H. Taylor (Taylor Depo.) with California's Exh. Nos. 328-351 and Carolina's Exh. Nos. 23-49; California's Notices of Reliance Nos. 1-27 on California's Exh. Nos. 20-297 and 371-428; and the testimony declarations of New Era Cap Company employees Becky Foote and Donna McMillan and attached exhibits, submitted by California after completion of briefing pursuant to the parties' August 20, 2007 stipulation (which was approved by the Board on September 6, 2007).

***3** Carolina's evidence consists of: the testimony deposition of Elizabeth C. West (West Depo.), Carolina's University Archivist, with Carolina's Exh. Nos. 14-22 and California's Exh. Nos. 314-327; the testimony deposition of Kenneth M. Corbett (Corbett Depo.), Carolina's Licensing Director, with Carolina's Exh. Nos. 50-87 and California's Exh. Nos. 352-370; the testimony deposition of C. “Kit” Walsh (Walsh Depo.), Senior Vice-President for Marketing at Collegiate Licensing Company (CLC), with Carolina's Exh. Nos. 8-13 and California's Exh. Nos. 298-314; and Carolina's Notices of Reliance Nos. 1-28 on Carolina's Exh. Nos. 88-458.

The record in this case is voluminous, and each party has asserted numerous objections to the other's evidence. Given the large number of objections, we shall not address each of them specifically. We have considered only those objections which pertain to the evidence upon which we specifically rely in making our factual findings and legal conclusions in this case. Generally speaking and unless otherwise specifically stated in our opinion, we overrule these objections to the extent that they challenge the admissibility of the evidence, and we shall consider the evidence for whatever probative value it may have.

**THE OPPOSITION PROCEEDING**

We turn first to the opposition proceeding, in which California opposes registration of Carolina's Baseball Logo mark for “clothing, namely, hats, baseball uniforms, Tshirts and shorts” on the grounds of priority/ownership of a registration and likelihood of confusion under Trademark Act Section 2(d). To prevail on its Section 2(d) claim, California must prove either priority of use or ownership of a registration, as well as likelihood of confusion. California also must establish its standing to oppose.

**California's Standing to Oppose**

Initially, we find that because California has properly made its pleaded registrations of record (O-Ex. Nos. 296-297), California has established its standing to oppose registration of Carolina's mark. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); *see also Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

**California's Section 2(d) Claims**

California has asserted three separate bases for its Section 2(d) claim, i.e., its ownership of its ′953 registration of the standard character “SC” mark, its ownership of its ′137 registration of the California Athletic Interlock mark, and its prior common law rights in “SC” marks, particularly its California Baseball Interlock mark. We shall discuss each of these in turn, below.

**CALIFORNIA'S OPPOSITION BASED ON ITS ′953 REGISTRATION**

***4** We first shall consider California's Section 2(d) opposition to registration of Carolina's mark which is based on California's ownership of its ′953 registration of its standard character “SC” mark for various goods in Classes 6, 18, 24 and 25.

**Section 2(d) - Priority/Ownership of Registration**

Because California has made its pleaded incontestable '953 registration of record (O-Exh. No. 296), Section 2(d) priority is not at issue as to that registered mark (the standard character "SC" mark) and as to the goods in Classes 6, 18, 24 and 25 identified in that registration. *See King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

**Section 2(d) - Likelihood of Confusion**

Our likelihood of confusion determination under Section 2(d) is based on an analysis of all of the facts in evidence that are relevant to the factors bearing on the likelihood of confusion issue (the *du Pont* factors). *See In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). *See also Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005).

**Factor 1 - Comparison of the Marks**

The first *du Pont* factor requires us to determine the similarity or dissimilarity of the marks when viewed in their entireties in terms of appearance, sound, connotation and commercial impression. *Palm Bay Imports, Inc., supra.* The test, under the first *du Pont* factor, is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impression that confusion as to the source of the goods offered under the respective marks is likely to result. The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. *See Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106 (TTAB 1975).

California's '953 registered mark is **SC**, registered in standard character or typed form. The Carolina Baseball Logo mark Carolina seeks to register is depicted below.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 



The parties have stipulated that Carolina's Baseball Logo mark is a stylized form of the letters **SC.** (Stip. Facts Nos. 1, 2.)

We find that California's registered **SC** mark and Carolina's Baseball Logo mark are legally identical in terms of appearance. Because California's **SC** mark is registered in standard character or typed form, we must presume for purposes of our comparison of the parties' marks that California may display its mark in all reasonable manners. *See Cunningham v. Laser Golf Corp.*, *supra.* We find that the manner in which Carolina's Baseball Logo mark is displayed is or would be a reasonable manner for California to display its registered **SC** mark. Indeed, the record shows that California in the past has used a version of its **SC** mark which is essentially identical to Carolina's Baseball Logo mark. (O-Exh. Nos. 89.2, 94.4 and 95.2.) We also find that the two marks are identical in terms of sound, and that on their face they have the same arbitrary connotation and create the same commercial impression, i.e., the letters “SC.”

***5** For these reasons, we find that the marks are similar when viewed in their entireties, and that the first *du Pont* factor weighs in favor of a finding of likelihood of confusion.

**Factors 2 and 3 - Comparison of the Goods and Trade Channels**

The second *du Pont* factor requires us to determine the similarity or dissimilarity of the goods as identified in Carolina's application and in California's pleaded ′953 registration, respectively. The related third *du Pont* factor requires us to consider the similarity or dissimilarity of the trade channels for the goods as identified in Carolina's application and in California's registration, respectively.

Initially, we are not persuaded by Carolina's argument that the parties' respective goods are inherently dissimilar for purposes of the second *du Pont* factor merely because the marks used thereon are secondary source indicators. (Carolina brief at 32-33.) Carolina cites no persuasive authority for this proposition. As discussed *infra* in connection with the fourth du Pont factor (conditions of purchase), Carolina's argument begs the question before us, which is whether consumers encountering applicant's mark will be confused as to who that secondary source is, i.e., California or Carolina.

**Factors 2 & 3 as Applied to California's ′953 Class 25 Goods; The ′953 Class 25 Opposition is Dismissed.**

In our analysis under the second and third *du Pont* factors we first will consider Carolina's Class 25 goods and trade channels as compared to the Class 25 goods and trade channels identified in California's ′953 registration. We then will consider Carolina's Class 25 goods and trade channels as compared with the Class 6, 18 and 24 goods and trade channels identified in California's ′953 registration.

Carolina's Class 25 goods are identified in the application as "clothing, namely, hats, baseball uniforms, T-shirts and shorts." The Class 25 goods identified in California's ′953 registration are "sweatshirts and T-shirts, all goods being offered and sold at university-controlled outlets."

We find that Carolina's Class 25 goods as identified in the application are identical to the Class 25 goods identified in California's registration as to "T-shirts," and that they also are closely related to the Class 25 "sweatshirts" identified in California's registration. The second *du Pont* factor thus weighs in California's favor as to Class 25.

Under the third *du Pont* factor, we must presume from the fact that Carolina's identification of goods is unrestricted as to trade channels that Carolina's goods are or could be marketed in all normal trade channels for such goods. *See, e.g., In re Elbaum*, 211 USPQ 639 (TTAB 1981). However, we find that the specific trade channel limitation set forth in California's Class 25 identification of goods, i.e., "all goods being offered and sold at university-controlled outlets," is highly significant. [9] The parties have stipulated that no products bearing Carolina's marks are sold through retail outlets operated by California. (Stip. Facts No. 78-79.) Therefore, though we must presume that Carolina's Class 25 goods move in all normal trade channels for such goods, we find that California's "university-controlled outlets" are not among the normal trade channels in which Carolina's goods are or would be sold. California's Class 25 trade channel limitation eliminates any possibility that purchasers might encounter Carolina's Class 25 goods in California's trade channels, or vice versa. The third *du Pont* factor therefore weighs in Carolina's favor as to the Class 25 goods identified in California's ′953 registration.

***6** Moreover, we find that as to the Class 25 goods as they are identified in California's ′953 registration, the dissimilarity of the trade channels under the third *du Pont* factor outweighs all of the other *du Pont* factors in our likelihood of confusion analysis, including the similarity of the marks under the first *du Pont* factor, the similarity of the goods under the second *du Pont* factor, and the evidence discussed below in connection with the other pertinent *du Pont* factors. In a particular case, a single *du Pont* factor may be dispositive. *See Champagne Louis Roederer S.A. v. Delicato Vineyards*, 148 F.3d 1373, 47 USPQ2d 1459 (Fed. Cir. 1998); *Kellogg Co. v. Pack' Em Enterprises Inc.*, 951 F.2d 330, 21 USPQ2d 1142 (Fed. Cir. 1991); *Pure Gold, Inc. v. Syntex (U.S.A.) Inc.*, 221 USPQ 151 (TTAB 1983), *aff'd*, 739 F.2d 624, 222 USPQ 741 (Fed. Cir. 1984).

Thus, we find that the trade channel limitation set forth in the Class 25 identification of goods in California's ′953 registration is dispositive of California's likelihood of confusion claim to the extent that such claim is based on the Class 25 goods identified in California's ′953 registration. To the extent that California's Section 2(d) ground of opposition is based on the Class 25 goods identified in the ′953 registration, we dismiss the opposition. [10]

**Factors 2 & 3 - '953 Classes 6, 18 and 24**

If California's Section 2(d) claim based on its '953 registration is to succeed, it must do so on the basis of the Class 6, 18 and 24 goods identified in the registration. Our discussion of the remaining *du Pont* factors with respect to California's '953 registration shall focus only on those goods. We begin with the second and third *du Pont* factors, which involve a comparison of the parties' respective goods and trade channels.

To review, the Class 6, 18 and 24 goods identified in California's '953 registration are:
keyrings of non-precious metals; decorative emblems or plates of non-precious metal, for attachment to autos; art work statuary of non-precious metals, all goods being offered and sold to persons through university authorized channels of trade, in Class 6;

umbrellas, hand luggage, tote bags, luggage; namely, tote bags, hand luggage, garment bags for travel, and small traveling bags for overnight trips, fanny packs, toiletry bags sold empty, briefcases, back packs, all goods being offered and sold to persons through university authorized channels of trade, in Class 18;

***7** towels, blankets, cloth pennants, and cloth flags, all goods being offered and sold to persons through university authorized channels of trade, in Class 24.

For purposes of the second *du Pont* factor, it is not necessary that the goods be identical or even competitive in order to find that the goods are related for purposes of our likelihood of confusion analysis. That is, the issue is not whether consumers would confuse the goods themselves, but rather whether they would be confused as to the source of the goods. *See In re Rexel Inc.*, 223 USPQ 830 (TTAB 1984). It is sufficient that the goods be related in some manner, or that the circumstances surrounding their use be such, that they would be likely to be encountered by the same persons in situations that would give rise, because of the marks used thereon, to a mistaken belief that they originate from or are in some way associated with the same source or that there is an association or connection between the sources of the respective goods. *See In re Martin's Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 223 USPQ 1289 (Fed. Cir. 1984); *In re Melville Corp.*, 18 USPQ2d 1386 (TTAB 1991); and *In re International Telephone & Telegraph Corp.*, 197 USPQ 910 (TTAB 1978).

Applying these principles in the present case, we find that Carolina's Class 25 goods are related to the Class 6, 18 and 24 goods identified in California's '953 registration, for purposes of the second *du Pont* factor. The relatedness of these goods is evidenced by the fact that Carolina itself markets both clothing items and other goods like those identified in California's registration. (Stip. Facts Nos. 5, 40.) [11] Carolina and California license their marks for use on apparel and non-apparel items to many of the same licensees. (Stip. Facts No. 41.) Additionally, the third-party use-based registrations submitted by both parties (although submitted in support of arguments pertaining to *du Pont* factors other than the second factor) include in their identifications of goods both clothing items and the other types of goods listed in California's registration. [12] Although such registrations are not evidence that the marks shown therein are in use or that the public is familiar with them, they nonetheless have probative value to the extent that they serve to suggest that the goods listed therein are of a kind which may emanate from a single source under a single mark. *See In re Albert Trostel & Sons Co.*, 29 USPQ2d 1783 (TTAB 1993); and *In re Mucky Duck Mustard Co. Inc.*, 6 USPQ2d 1467 (TTAB 1988). Based on this evidence, we find that the second *du Pont* factor weighs in favor of a finding of likelihood of confusion in our comparison of Carolina's Class 25 goods and the Class 6, 18 and 24 goods identified in California's '953 registration.

***8** We also find, under the third *du Pont* factor (similarity or dissimilarity of trade channels), that the normal trade channels for Class 25 goods of the type identified in Carolina's application are the same as or overlap with the “university authorized channels of trade” to which California's Class 6, 18 and 24 goods are restricted in the '953 registration.

Initially, we must address the issue of what effect to give the wording "university authorized channels of trade" in California's Class 6, 18 and 24 identification of goods. Like the Class 25 "university-controlled" trade channel limitation discussed above, the "university authorized channels of trade" limitation to the Class 6, 18 and 24 goods identified in California's ′ 953 registration came about during the prosecution of the application (Serial No. 74094681) which matured into California's ′953 registration. California agreed to the restriction of trade channels in order to overcome the Office's Section 2(d) refusal based on the existence of a prior third-party registration, Reg. No. 1146441. (Stip. Facts Nos. 65-70.)

Carolina argues that this "unversity authorized channels of trade" trade channel restriction would be rendered meaningless if we were to find that California's "university authorized" trade channels are so broad as to include general and specialty retailers (like those discussed below) who are not directly controlled by or directly affiliated with California. We disagree. On their face, the words "university authorized" in the identification of goods would include any trade channels which are or could be authorized or approved by California. If the Trademark Examining Attorney had intended or understood that the Class 6, 18 and 24 goods were to be restricted to trade channels "controlled" by California, as Carolina argues, she could have required such a restriction, as she did for the Class 25 goods. She did not do so, but instead expressly distinguished between "university-controlled" trade channels (in Class 25) and "university authorized" trade channels (in Classes 6, 18 and 24). We therefore interpret "university authorized" trade channels to mean what it says, i.e., that the registration covers Class 6, 18 and 24 goods which move in any and all trade channels which are or may be authorized by California. The record shows that California has authorized the sale of its Class 6, 18 and 24 goods in the same trade channels as those in which Carolina's Class 25 goods are marketed.

In general, Class 25 clothing items like Carolina's are marketed in the same trade channels as Class 6, 18 and 24 giftware items like California's. (E.g., O-Exh. Nos. 328-351 to Taylor Depo.;[13] O-Exh. No. 225; A-Exh. Nos. 60, 71.) In particular, the record shows that Carolina and California each license their goods to many of the same licensees. (Stip. Facts No. 41.) Carolina markets its goods through the Internet websites of apparel and sporting goods retailers like Foot Locker, Sport Chalet, Champs, Dick's Sporting Goods, Oshman's and Sports Authority. (Stip. Facts Nos. 13-33.) The exhibits to the deposition of California's investigator Kenneth Taylor show that Carolina's goods also are sold at bricks-and-mortar stores like Wal-Mart (O-Exh. No. 305), Lids (O-Exh. Nos. 306, 334), J.C. Penney (O-Exh. No. 307); Champs (O-Exh. No. 333), and Foot Locker (O-Exh. No. 346). Carolina's witness Kit Walsh of Collegiate Licensing Company (CLC), the company which administers Carolina's trademark licensing program (Walsh Depo. at 5, 9-10), testified that Carolina's products are sold at retailers like Wal-Mart, Dillard's, Kohl's, Sports Authority, and Bed, Bath & Beyond. (Walsh Depo. at 33-38.)

***9** The record establishes that California's "university-authorized" trade channels for its Class 6, 18 and 24 goods include many of the same general and specialty Internet and bricks-and-mortar retailers that market Carolina's goods. California's Director of Trademarks and Licensing, Elizabeth Kennedy, testified that California's goods "are sold in retail stores of all sectors of the retail marketplace." (Kennedy Depo. at 21.) These include sporting goods retailers like Foot Locker, Champs Sports, Chick's, Sports Authority, Dick's Sporting Goods and Sport Chalet (id. at 22-23), "mid-tier mass" retailers like J.C. Penney, Sears and Kohl's (id. at 21-22), mass merchandisers like Wal-Mart, Kmart and Target (id. at 22), gift stores and boutiques (id. at 24), and home furnishings stores like Bed, Bath & Beyond (id. at 24).

For the reasons discussed above, we find that Carolina's Class 25 goods as identified in Carolina's application are related to California's Class 6, 18 and 24 goods as identified in the ′953 registration. We also find that the trade channels in which these types of goods are or may be marketed are the same or overlapping. Thus, as to the Class 6, 18 and 24 goods identified in California's ′953 registration, the second and third *du Pont* factors weigh in favor of a finding of likelihood of confusion.

**Factor 4 - Conditions of Purchase**

The fourth *du Pont* factor requires us to consider evidence pertaining to the buyers to whom and the conditions under which the goods are marketed. First, we find based on the evidence that many of the Class 6, 18 and 24 items identified in California's registration are or would be relatively inexpensive. These include goods such as keyrings in Class 6, tote bags and fanny packs in Class 18, and towels and cloth pennants in Class 24. Elizabeth Kennedy, California's Director of Trademarks and Licensing,

testified that many of these giftware items would retail for ten dollars or less. (Kennedy Depo. at 32.) We likewise find that the clothing items like those identified in Carolina's application would include items such as baseball hats and t-shirts which likewise can be relatively inexpensive, many of them retailing for under twenty dollars. (Stimmler Depo. at 16-18.)

Next with respect to the purchasers and the conditions of purchase under the fourth *du Pont* factor, we find that many purchasers of collegiate merchandise items [14] are likely to have a loyalty to and affinity for a particular school or team, that they are to be knowledgable about a particular school's trademarks as used on the merchandise, and that they are likely to exercise a degree of care in looking for and making their decisions to purchase such goods. (Walsh Depo. at 19, 25-27.) These purchasers would include those directly affiliated with the school such as students, faculty and alumni, and others who are "hardcore" fans of the school's athletic teams. Such "hardcore" fans of California's athletic teams are estimated by Dan Stimmler, California's Vice President of Auxiliary Services, to constitute twenty percent of the purchasers of the school's collegiate merchandise. (Stimmler Depo. at 34-35.) These purchasers are likely to be able to distinguish between similar collegiate marks based on their familiarity with the different schools and their marks, and their familiarity with national collegiate sports generally. (Walsh Depo. at 76.)

***10** However, the record also clearly shows that the purchasers of collegiate merchandise include those who are not necessarily knowledgable about different schools' trademarks. These include persons such as relatives or friends who are purchasing the goods as gifts. (Corbett Disc. Depo. at 85 (O-Exh. No. 252).) These less knowledgable purchasers also would include new or casual fans nationwide who are likely to purchase a school's athletics-based merchandise such as hats and t-shirts in years in which the school's sports teams win national championships or are otherwise especially successful on a national level. Carolina's witness Kit Walsh, of Collegiate Licensing Company, testified that in such years the sales of a school's merchandise may double, and that these new purchasers are less knowledgable than the school's more longstanding fans who would be familiar with the school and its trademarks. (Walsh Depo. at 65, 76-78.)

In short, we find that although some purchasers of the parties' goods will be knowledgable fans who are less likely to be confused, there are others who may not be so knowledgable about different schools' marks. These less knowledgable purchasers are likely to exercise a lesser degree of care in purchasing the goods given the inexpensive nature of many of the products sold under the marks.

Next with respect to the conditions of purchase under the fourth *du Pont* factor, the record shows that, in addition to the primary logo or mark appearing on the product (such as the marks at issue here), collegiate merchandise (especially clothing), often bears another school mark, or a school mascot logo, or even the name of the school. Carolina argues that the presence of these additional source indicators on the products enables purchasers to distinguish between the sources of the products. However, the mark Carolina seeks to register does not include any of these secondary marks, and we therefore cannot consider them in our Section 2(d) likelihood of confusion analysis. The presence of secondary marks on the products might be relevant to a likelihood of confusion determination in an infringement or unfair competition context, but not in this case where we are determining the registrability of the mark depicted in Carolina's application.

Similarly, it is not relevant in this case that purchasers (especially knowledgable fans) are likely to be aware of a school's colors or color combinations and likely to be able to identify or distinguish the source of a clothing item by virtue of the color or colors in which the logo, or even the clothing item itself, appears. The parties have disputed whether Carolina's school colors (in particular the "garnet" shade of red) are similar to California's school colors (in particular the "cardinal" shade of red). However, color is not a feature of the mark Carolina seeks to register. The similarity or dissimilarity of the color of the marks or of the goods themselves as encountered by purchasers, and purchasers' ability, vel non, to distinguish source based on such colors, might be relevant in an infringement or unfair competition case, but has no bearing on our case.

***11** Finally, as noted in the cases cited by Carolina, [15] a mark appearing on collegiate or professional sports teams merchandise such as hats and shirts usually serves as an indication of secondary source; it refers to or identifies the school or the team itself. The purchaser's decision to purchase the product often is not based on who actually manufactured the product, but rather is based on the ornamental presence of the secondary source mark itself on the product. The decision to purchase arises from the

purchaser's desire to demonstrate his or her connection to or affiliation with that secondary source (the school, or the team) or, if the purchaser is purchasing the product as a gift, to allow the gift recipient to demonstrate that connection or affiliation.

However, we are not persuaded by Carolina's contention that just because both parties' marks are secondary source indicators, there will be no confusion among purchasers. [16] That begs the question before us, which is not whether collegiate marks are recognized as being secondary source indicators (they usually are), but rather whether all of the relevant purchasers necessarily would know by the mark itself which school is the secondary source of a particular product. As discussed above, the relevant purchasers of the parties' goods in this case would include purchasers who are not necessarily familiar with or up-to-date on all of the various trademarks currently or formerly used by a particular school. These purchasers, upon encountering Carolina's mark, are likely to be confused as to whether it is Carolina or California that is the secondary source of the goods bearing the mark.

For all of the reasons discussed above, we find that the fourth *du Pont* factor (conditions of purchase) weighs in favor of a finding of likelihood of confusion.

**Factor 5 - Fame**

The fifth *du Pont* factor requires us to consider evidence of the fame of California's mark, [17] and to accord any such fame significant weight in our likelihood of confusion analysis. *See* *Bose Corp. v. QSC Audio Products Inc.*, 293 F.3d 1367, 63 USPQ2d 1303 (Fed. Cir. 2002); *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.*, 963 F.2d 350, 22 USPQ2d 1453 (Fed. Cir. 1992).
Fame of an opposer's mark or marks, if it exists, plays a "dominant role in the process of balancing the *DuPont* factors," *Recot*, 214 F.3d at 1327, 54 USPQ2d at 1456 [sic - 1897], and "[f]amous marks thus enjoy a wide latitude of legal protection." *Id*. This is true as famous marks are more likely to be remembered and associated in the public mind than a weaker mark, and are thus more attractive as targets for would-be copyists. *Id*. Indeed, "[a] strong mark … casts a long shadow which competitors must avoid." *Kenner Parker Toys*, 963 F.2d at 353, 22 USPQ2d at 1456. A famous mark is one "with extensive public recognition and renown." *Id.*

***12** *Bose Corp. v. QSC Audio Products Inc., supra*, 63 USPQ2d at 1305.

We have considered all of the evidence submitted by California on this issue (most if not all of which was submitted under seal pursuant to the parties' protective agreement and which we therefore shall not detail in this opinion). California's evidence of its sales and advertising volumes (O-Exh. Nos. 66-78, 240-46) pertains to its other marks and designations as well as the "SC" mark, including California's primary "USC" mark, and we find that California has not persuasively established the percentages of these sales and advertising figures which pertain specifically to its "SC" mark, or specifically to its sales of the Class 6, 18 and 24 goods identified in the '953 registration. Likewise, the 1996 and 2005 press articles (O-Exh. Nos. 163-222) which refer to California's sports teams as "SC" also prominently refer to California by other designations, such as "USC" and "Trojans," a fact which dilutes the significance of this evidence as proof of the fame of "SC" per se.

After reviewing all of the evidence, we find that although California has achieved a significant measure of national renown as a university and with respect to its athletics programs, the evidence is insufficient to support a finding that California's "SC" mark, per se, is a famous mark as contemplated by the fifth *du Pont* factor. We therefore find that the mark is not entitled to the expanded scope of protection to be accorded a famous mark under our case law. We conclude that the fifth *du Pont* factor is neutral in this case or at best weighs in California's favor only slightly.

**Factor 6- Third-party Marks**

Under the sixth *du Pont* factor, we consider evidence pertaining to the number and nature of similar marks in use on similar goods or services. "The purpose of a defendant introducing third party uses is to show that customers have become so conditioned by

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

a plethora of such similar marks that customers have been educated to distinguish between different such marks on the bases of minute distinctions." *Palm Bay Imports Inc., supra*, 73 USPQ2d at 1694. The probative value of third-party trademarks depends entirely upon their usage; the evidence must show that the marks are well promoted and recognized by consumers. *Id*. at 1693. In this case, we find that Carolina's evidence of third-party uses of "SC" marks is entitled to little probative weight under the sixth *du Pont* factor.

Carolina has made of record printouts from the websites of sixteen third-party universities and colleges which use "SC" on uniforms worn by their student-athletes. (A-Exh. Nos. 72-87.) In each case, the letters "SC" are apparently an abbreviation of the school's name. These third-party schools are: Springfield College in Springfield, MA; Stockton College, an NCAA Division III school in New Jersey; Stonehill College, an NCAA Division II school in Easton, MA; Sheridan College, a community college in Sheridan, WY; Simpson College, an NCAA Division III school in Indianola, IN; Smith College, a women's college in Northhampton, MA; Southeastern University, of uncertain location; Southwestern College, in Winfield, KS; Benedictine University-Springfield College in central Illinois, with an enrollment of 430; Sacramento City College, a community college in Sacramento, CA; Saddleback College, a junior college in Mission Viejo, CA; St. Catharine College, a junior college in St. Catharine, KY; St. Cloud State University, an NCAA Division II school in St. Cloud, MN (whose mark is a highly stylized "CST," not "SC"); Shasta College, a community college in Redding, CA; Snow College, a junior college of uncertain location; and Salem College, of uncertain location. [18]

***13** We find that this evidence is of little or no probative value under the sixth *du Pont* factor. It is apparent from the websites themselves that these schools using "SC" are small private colleges, community colleges and junior colleges. Even if we were to assume that these schools sell collegiate merchandise bearing an "SC" mark (and only one of the schools does so, on this record), we find that the schools are so small, localized and obscure that they are unlikely to have had any effect on the strength of California's mark in the national marketplace, or any effect on the ability of relevant purchasers to distinguish between California's and Carolina's "SC" marks. Kenneth Corbett, Carolina's director of licensing, when referred to these third-party websites and asked "do you know whether any of these schools sell any merchandise that carries the letters SC?", testified "I can't recall on every Web site if they had a store or not. The school may be so small that it's only sold in their bookstore and not on line anywhere." (Corbett Depo. at 55.) He further testified that apart from his review of the websites he had no other knowledge of these schools, including whether they are two-year or four-year institutions, whether they are NCAA Division I schools, whether they are known verbally as "SC," or whether they sell any merchandise that bears an "SC" mark. (Corbett Depo. at 55-62.) If Carolina's own director of licensing is not familiar with nature and extent of these other schools' use of "SC," it is unlikely that the relevant purchasers at issue in this case would be aware of any such use.

Carolina also cites to the apparent use by Santa Clara University in Santa Clara, California of a descending interlock "SC" mark (which is similar to the California Athletic Interlock mark of California's '137 registration). (Walsh Depo. at 85; A-Exh. No. 13.). However, the nature, extent and duration of this use, and the relevant purchasers' familiarity with the mark, are not proven on this record. Additionally, the record shows that California sent a cease and desist letter to Santa Clara University promptly upon learning of Santa Clara's use of an "SC" mark (O-Exh. No. 427 at 4-5; A-Exh. No. 421 at 2-3). The Board's records indicate that California has opposed registration of Santa Clara's mark (Opp. No. 91168693, currently suspended pending the outcome of this proceeding). On this record, we find that Santa Clara's use of an "SC" mark, if any, does not weigh significantly in Carolina's favor under the sixth *du Pont* factor.

Carolina also relies on the ownership of an "SC" mark by another third-party school, Spelman College. [19] However, there is no evidence in the record establishing the nature and extent of actual use by Spelman College, if any, and we therefore accord it no probative value under the sixth *du Pont* factor in this case.

***14** In short, Carolina's evidence does not suffice to support a finding under the sixth *du Pont* factor that relevant purchasers have been exposed to such a plethora of "SC" marks in use on collegiate merchandise that they would be able to distinguish California's and Carolina's "SC" marks on the basis of minute distinctions between the marks. We therefore find that the sixth *du Pont* factor is neutral in this case.

**Factors 7 & 8 - Actual Confusion**

The seventh *du Pont* factor requires us to consider evidence pertaining to the nature and extent of any actual confusion which has resulted from the parties' use of their marks. The related eighth *du Pont* factor requires us to consider evidence pertaining to the length of time during and conditions under which there has been contemporaneous use without evidence of actual confusion.

California has presented evidence which suggests that there may have been some confusion between the marks on the part of employees of its licensee, the hat manufacturer New Era Cap Company (Foote Decl.; McMillan Decl.), and on the part of several Internet retailers of the parties' goods (Kennedy Depo. at 42-50; O-Exh. Nos. 4, 6-13).[20] We find this evidence of actual confusion to be de minimis, and that in any event it is not evidence of actual confusion on the part of the relevant purchasers in this case. We also reject California's contention (rebuttal brief at 45-46) that this is evidence of reverse confusion. On this record, we find that the seventh *du Pont* factor is neutral in this case.

We further find, under the eighth *du Pont* factor, that the absence of evidence of significant actual confusion largely might be explained by the fact that there has not been any significant opportunity for actual confusion to have occurred. *See Gillette Canada, Inc. v. Ranir*, 23 USPQ2d 1768 (TTAB 1992). California and Carolina are on opposite coasts and in different athletic conferences. We cannot conclude on this record that the parties' marketing of their respective goods in each other's geographic areas has been so extensive that the absence of evidence of actual confusion is factually surprising or legally signficant. This difference in geographical trade channels is irrelevant to the third *du Pont* factor (similarity of trade channels, discussed above) because this is not a concurrent use proceeding and Carolina's application and California's registrations are nationwide in scope. However, the differences in the parties' actual geographical trade channels is relevant under the eighth *du Pont* factor to the extent that it might explain the absence of actual purchaser confusion to date. We find that the eighth *du Pont* factor is neutral in this case, or at best that it weighs in Carolina's favor only slightly.

***15** On balance, we find that the seventh and eighth *du Pont* factors regarding actual confusion are neutral in this case, and that if they are entitled to any weight, they essentially counterbalance each other in our likelihood of confusion analysis.

**Factor 10 - Market Interface Between the Parties**

The tenth *du Pont* factor requires us to consider evidence pertaining to the "market interface" between the parties, including evidence of any past dealings between the parties which might be indicative of a lack of confusion in the present case. In this case, the evidence of record pertaining to the tenth *du Pont* factor concerns two prior consent agreements between the parties, by which the parties settled an opposition proceeding (Opp. No. 91064006) in 1981, and settled a concurrent use proceeding (Concurrent Use No. 1089) in 1997.[21]

We consider first the August 10, 1981 agreement (A-Exh. No. 167), by which the parties settled Carolina's opposition (Opp. No. 91064006) to California's application (Serial No. 73176996) for registration of the mark "USC" (in typed or standard character form) for various goods in Classes 6, 10, 11, 12, 14, 16, 18, 20, 21, 24, 25, 26 and 28. The agreement's recitals stated that both Carolina and California had used the designation "USC" for over fifty years in connection with educational services and a wide variety of products as identified in California's '996 application, that the parties were not aware of a single instance of actual confusion in that time, and that "the parties desire to amicably resolve the above-identified opposition and, additionally, to reach agreement on their respective rights in and to the designation USC." Based on these recitals, the agreement went on to provide, in pertinent part:

1. SOUTHERN CALIFORNIA shall not object and hereby consents to the use by SOUTH CAROLINA or its licensees, distributors or other lawful designees of the designation USC on and in connection with educational and related services as well as consumer products of varying description. …

2. SOUTH CAROLINA shall not object and hereby consents to the use by SOUTHERN CALIFORNIA or its licensees, distributors or other lawful designees of the designation USC on and in connection with educational and related services as well as consumer products of varying description. …

3. Upon request by either party, the other party shall execute any acknowledgement or consent reasonably necessary to effect the intent of paragraphs 1 and 2 above.

4. The parties mutually agree not to obtain Federal registration of the designation USC in respect of educational services.

5. The parties mutually agree that it is permissible for SOUTHERN CALIFORNIA to obtain state registration of USC for educational services in the State of California and for SOUTH CAROLINA to obtain state registration of USC for educational services in the State of South Carolina.

***16** We find that this 1981 agreement is entitled to some weight as evidence under the tenth *du Pont* factor in this case, in that it suggests that California, in 1981, believed that the parties' contemporaneous use of "USC" was not likely to cause confusion. However, we find that the agreement's probative value on the likelihood of confusion issue before us is limited by the fact that the mark involved was "USC" rather than "SC," and by the fact that the agreement was executed some twenty-seven years ago, in an era before the significant expansion in the nationwide scope and extent of the collegiate merchandise licensing industry which has occurred since then.[22] On balance, we find that this 1981 agreement is evidence which weighs somewhat in Carolina's favor under the tenth *du Pont* factor.

We consider next the parties' October 1, 1997 concurrent use agreement (A-Exh. No. 166). The concurrent use proceeding (Conc. Use No. 1089) involved California's concurrent use application (Serial No. 75116291) to register "USC" in standard character form for various educational and entertainment services for the territory essentially comprising the western United States, and Carolina's concurrent use application (Serial No. 75138304) to register the same mark for the same services for the territory essentially comprising the eastern United States.

The parties' concurrent use agreement recited in pertinent part that Carolina had used the service mark "USC" since 1890 in connection with various educational and entertainment services in the territory essentially comprising the eastern United States; that California had used the service mark "USC" since 1910 in connection with the same types of educational and entertainment services in the territory essentially comprising the western United States; that the parties believe there would be no likelihood of confusion resulting from their concurrent use of USC "given the differences between the Carolina Territory and the California Territory"; that neither party is aware of any actual confusion resulting from their concurrent use of USC "within their respective territories"; and that the parties desire to reach an agreement "regarding their respective uses of the USC mark."

Premised on these recitals, the agreement went on to provide, inter alia, that neither party would seek to register the USC mark "or any related or derivative mark" in connection with educational and entertainment services in the other's territory; that neither party would "use any logo, trademark, service mark, mascot, school song or nickname" of the other party "in connection with the USC Mark"; and that each party shall use its best efforts to use its university name "someplace on all advertising and promotional materials for the Services which display the USC Mark."

***17** The Board accepted the parties' concurrent use agreement in an order dated November 3, 1999, finding that California was entitled to a concurrent use registration of the mark USC for the recited educational and entertainment services for the territory essentially comprising the western United States, and that Carolina was entitled to a concurrent use registration of the mark USC for the recited educational and entertainment services for the territory essentially comprising the eastern United States.

We find that this 1997 concurrent use agreement is entitled to little or no probative weight under the tenth *du Pont* factor in the present case. Again, the agreement involved the mark "USC" rather than "SC." More importantly, the agreement's recital

and the Board's finding that there was no likelihood of confusion clearly were based on the premise that that the parties were to use their “USC” marks only in their respective mutually exclusive geographic territories. No such geographic restrictions are involved in the present case. The agreement also imposed conditions on the manner in which each party would use its “USC” mark, prohibiting the use of each other's secondary marks in connection with “USC” and providing that each party's use of “USC” would be accompanied by use of its full university name. No such restrictions on the manner of use of the marks exist in this case. In these circumstances, we find that California's 1997 consent to issuance of a concurrent use registration to Carolina cannot be construed, under the tenth *du Pont* factor, to be evidence indicative of an absence of likelihood of confusion in the present case.

On balance, we find that the tenth du Pont factor (market interface) is essentially neutral, or at best weighs in Carolina's favor only slightly.

**Factor 13 - Other Facts in Evidence**

We turn finally to the thirteenth *du Pont* factor (“any other established fact probative of the effect of use”), under which we will consider evidence relevant to our likelihood of confusion determination which does not readily fall under any of the other *du Pont* factors.

First, the record establishes that California entered into an agreement in February 1993 with Spelman College (A-Exh. No. 168), which is a small NCAA Division III school in Atlanta, Georgia. (O-Exh. No. 428 at 4-5 (Kennedy Disc. Depo. at 195-96).) This agreement settled Spelman College's potential opposition to California's application Serial No. 74094681 (which eventually matured into the ′953 registration of the typed “SC” typed mark upon which California relies in the present case). In pertinent part, the agreement recites that Spelman College asserts ownership of the mark depicted below



for “alumni magazines” in Class 16, “college bookstore services” in Class 42, “educational services, namely providing courses of instruction at the college level” in Class 41, and “plastic shopping bags” in Class 18; that Spelman College has four pending applications to register its mark for these goods and services (Serial Nos. 74338417, 74338407, 74338414 and 74338579); that California asserts ownership in and has applied to register the mark “SC” for goods in Classes 6, 18, 24 and 25 (as identified in Serial No. 74094681, which would eventually become California's ′953 registration); and that the parties' respective marks marks do not currently conflict, have not resulted in any actual confusion or likelihood of confusion in the past, and will not cause confusion or likelihood of confusion in the future. The agreement then provides that neither party will oppose registration of the other's mark in the other's pending application(s); that if any of Spelman College's applications to register its mark are refused by the Office under Section 2(d) based on California's prior-pending “SC” application, California will provide a statement for Spelman College to submit to the Office saying that in California's opinion there is no confusing similarity between the two marks;[23] and that neither party will assert its registration or common law rights in its mark “to try to impede” the other from using its own mark “on typical college bookstore merchandise.”

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

***18** Carolina argues that this 1993 agreement between California and Spelman College constitutes an admission by California that there is no likelihood of confusion between California's and Carolina's respective "SC" marks in the present case. However, although we do not disregard the 1993 Spelman College agreement, we are not persuaded by Carolina's argument that the agreement is entitled to significant probative weight in our determination of whether a likelihood of confusion exists in the present case. *Cf. In re Majestic Distilling Co*., 315 F.3d 1311, 65 USPQ2d 1201, 1205 (Fed. Cir. 2003) (in an ex parte Section 2(d) case involving the Office's refusal to register Majestic's mark based on Stroh's prior registration, "… no presumption can be made [from Stroh's consent agreements with third parties] that Stroh consents to Majestic's use of the mark or that Stroh has determined or admits that confusion of the public by Majestic's concurrent use of the mark is unlikely").[24]

Moreover, we find that the specific circumstances surrounding the 1993 agreement between California and Spelman College preclude a finding that California has admitted that Carolina's use of its "SC" mark is not likely to cause confusion vis-à-vis California's "SC" mark. Spelman's highly distinctive "schoolhouse SC" mark is much more readily distinguishable from California's "SC" mark than is the "SC" mark Carolina seeks to register, and California's consent to Spelman's mark therefore is not an admission that there is no likelihood of confusion between California's mark and Carolina's mark. Also, Spelman College is a small school in Atlanta, and the market for its goods and services as identified in its four applications ("educational services, namely providing courses of instruction at the college level," "alumni magazines," "college bookstore services," and "plastic shopping bags"), as well as for the goods set forth in the 1993 agreement itself ("typical college bookstore merchandise") is likely to be highly localized and directed to a very small number of potential purchasers. By contrast, Carolina and California are prominent Division I schools with a potential nationwide market for their collegiate merchandise.

It is entirely reasonable to assume that these are the reasons why California consented to Spelman's use and registration of its mark in 1993. Indeed, at page 196 of her discovery deposition (O-Exh. No. 428 at 5) California's licensing director Elizabeth Kennedy explained that California consented to Spelman's use and registration of its mark because "the mark with the schoolhouse design would be significantly differentiated and specific to Spelman College, that the establishment of the little triangle above the stylized 'S' and 'C' would be very differentiating." We cannot conclude on this record that California's consent agreement with Spelman College arose from a belief by California that there would be no likelihood of confusion between its "SC" mark and any and all other third-party "SC" marks, including Carolina's mark. Therefore, although we find that the Spelman College agreement is some evidence in Carolina's favor in this case under the thirteenth *du Pont* factor, it is not entitled to significant probative weight in our likelihood of confusion determination.

***19** Also of potential relevance with respect to the thirteenth *du Pont* factor, we note that, for the first time in its briefs, California argues that Carolina is guilty of inequitable conduct because it had not used its mark on all of the goods identified in its present application as of the application filing date. To the extent that this is meant to be an assertion of fraud as a separate ground of opposition, it has not been pleaded or tried as such and we shall give it no consideration as such. Assuming that California's fraud or inequitable conduct argument is pertinent to our likelihood of confusion determination under the thirteenth *du Pont* factor, we find that the evidence fails to establish the elements of fraud, particularly the element of fraudulent intent.

Next with respect to the thirteenth *du Pont* factor, we note that in response to California's request for admission No. 3 (O-Exh. No. 251), Carolina admitted that it was aware of California's "SC" mark at the time it adopted the "SC" mark it seeks to register. If California is arguing that Carolina is guilty of bad faith adoption, and if we assume that such bad faith adoption is pertinent evidence under the thirteenth *du Pont* likelihood of confusion factor in this case, we find that the argument is not well taken because Carolina's mere awareness of California's mark does not suffice to establish bad faith adoption.

For the reasons discussed above, we find that the evidence of record pertaining to the thirteenth *du Pont* factor ("other facts") does not weigh significantly in either party's favor. The thirteenth factor is essentially neutral in this case.

**Likelihood of Confusion - Conclusion**

Balancing all of the evidence of record as it pertains to the relevant *du Pont* factors, and for the reasons discussed above, we conclude that a likelihood of confusion exists between Carolina's Baseball Logo mark as applied to the apparel items identified in Carolina's application, and California's registered ′953 standard character mark as applied to the Class 6, 18 and 24 goods identified in the registration (but not as to the Class 25 goods as identified). To the extent that any doubts might exist as to the correctness of this conclusion, we resolve such doubts against applicant. *See Starbucks U.S. Brands, LLC v. Ruben*, 78 USPQ2d 1741 (TTAB 2006).

**Section 2(d) Claim Based on ′953 Registration - Conclusion**

Because priority is not an issue, and because a likelihood of confusion exists, we conclude that registration of Carolina's mark is barred under Section 2(d) based on California's ′953 registration, and we sustain California's opposition insofar as it is based on the ′953 registration. This conclusion is in addition to and/or in the alternative to our conclusions, *infra*, that registration of Carolina's mark also is barred by California's ′ 137 registration and California's prior common law rights.

**CALIFORNIA'S OPPOSITION BASED ON ITS ′137 REGISTRATION**

***20** The second basis for California's Section 2(d) ground of opposition to registration of Carolina's Baseball Logo mark is its ownership of its ′137 registration of the California Athletic Interlock mark depicted below

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 



which covers a variety of goods and services in multiple classes, including (most importantly in the present case) "clothing, namely, t-shirts, sweatshirts, polo shirts, warm-up suits, jackets, rain ponchos, sweaters, jerseys, tank tops, shorts, sport shirts, baseball shirts, basketball jerseys, golf sweaters, night shirts, boxer shorts, socks, hats, caps, sport caps, visor caps, beanies and ties," in Class 25.

As discussed at length below, we deny Carolina's counterclaim for cancellation of California's '137 registration due to Carolina's failure to establish Section 2(d) priority. Therefore, California is entitled to rely on this registration in support of its Section 2(d) claim in the opposition.

**Section 2(d) - Priority/Ownership of a Registration**

Because California has properly made of record its '137 registration (O-Exh. 297), Section 2(d) priority is not an issue as to the mark and goods identified in that registration. *See King Candy Co. v. Eunice King's Kitchen, Inc.*, *supra.*

**Section 2(d) - Likelihood of Confusion**

Our Section 2(d) likelihood of confusion findings and analysis with respect to California's ′137 registration, vis-à-vis the mark and goods identified in Carolina's application, are largely the same as our findings and analysis as set forth above in connection with California's ′953 registration. For our likelihood of confusion determination with respect to California's ′137 registration, we adopt and incorporate here our findings and analysis as to *du Pont* factors 4-8, 10 and 13 as set forth above. However, several of the *du Pont* factors require additional findings and analysis. These are the first factor (similarity of the marks), the second factor (similarity of the goods), and the third factor (similarity of the trade channels).

**Factor 2 - Comparison of the Goods**

Turning initially to the second *du Pont* factor, we find that Carolina's Class 25 goods as identified in its application, i.e., "clothing, namely, hats, baseball uniforms, T-shirts and shorts," are legally identical to the Class 25 "t-shirts," "shorts" and "hats" identified in California's ′137 registration, and that they are closely related to the other Class 25 clothing items identified in the ′137 registration. As discussed above in connection with California's ′953 registration, we are not persuaded by Carolina's argument that the parties' respective goods are inherently dissimilar for purposes of the second *du Pont* factor merely because the marks used thereon are secondary source indicators. The issue is whether purchasers will be able to determine whether it is California or Carolina which is the secondary source of the goods they encounter.

***21** Because Carolina's and California's Class 25 goods as identified in Carolina's application and in California's ′137 registration are identical in part and otherwise closely related, we find that the second *du Pont* factor weighs in favor of a finding of likelihood of confusion.

**Factor 3 - Comparison of Trade Channels**

Under the third *du Pont* factor, we note that the Class 25 identification of goods in California's ′137 registration does not include any trade channel limitations, and specifically that it does not include the trade channel limitation set forth in the ′953 registration's Class 25 identification of goods ("all goods being offered and sold at university-controlled outlets"). Because there are no trade channel restrictions in either party's Class 25 identification of goods, and because those goods are legally identical, we find the parties' respective goods are or could be marketed in legally identical trade channels. Unlike our finding in connection with California's ′953 registration that the third *du Pont* factor weighs dispositively in Carolina's favor, we find, as to the opposition based on California's ′137 registration, that the third *du Pont* factor clearly weighs in favor of a finding of likelihood of confusion.

**Factor 1 - Comparison of the Marks**

We turn next to the first *du Pont* factor, which requires us to determine the similarity or dissimilarity of Carolina's Baseball Logo mark and California's ′137 California Athletic Interlock mark when viewed in their entireties in terms of appearance, sound, connotation and commercial impression. *Palm Bay Imports, Inc., supra*. As discussed above, the test, under the first *du Pont* factor, is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impression that confusion as to the source of the goods offered under the respective marks is likely to result. The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. *See Sealed Air Corp. v. Scott Paper Co., supra.* Moreover, because Carolina's Class 25 goods as identified in its application are legally identical to California's Class 25 goods as identified in the ′137 registration, the degree of similarity between the marks which is required to support a finding of likelihood of confusion is less than it would be if the goods were not identical. *Century 21 Real Estate Corp. v. Century Life of America,* 970 F.2d 874, 23 USPQ2d 1698 (Fed. Cir. 1992).

***22** The mark Carolina seeks to register (the Carolina Baseball Logo mark) is depicted below.



Carolina's mark is a stylized form of and stands for the letters “SC.” (Stip. Facts Nos. 1-2.)

California's ′137 registered mark (the California Athletic Interlock mark) is depicted below.



We turn first to a comparison of the marks in terms of appearance. Dan Stimmler, California's Associate Vice-President of Auxiliary Services (which includes California's bookstore operations), when presented with side-by-side photographs of a hat bearing the California Athletic Interlock mark and a hat bearing the Carolina Baseball Logo mark, testified that in his personal opinion the marks were not confusingly similar due to the difference in the manner of stylized lettering of each mark. “Looking at the nature of the script that's used for the actual embroidery on the hat, I see a difference between the two.” (Stimmler Depo. at 32-33.) We find that this testimony of California's own witness weighs in Carolina's favor under the first *du Pont* factor.

However, the probative value of Mr. Stimmler's testimony is limited by the fact that Mr. Stimmler, unlike the ordinary purchaser, deals with trademarks as part of his job. He went on to testify:
Q. Do you consider yourself to be more or less sophisticated than the average consumer about the differentiation of the logos?

…

A. Much more sophisticated.

Q. Why?

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

A. Because I've been involved in this type of business for USC, including these marks, for over 15 years.

(Stimmler Depo. at 33.) Similarly, Carolina's witness Kit Walsh, of Collegiate Licensing Company (which administers both Carolina's and California's trademark licensing programs), testified that he did not think that the two marks are confusingly similar. (Walsh Depo. at 31.) Again, though, it is his job to be familiar with different schools' trademarks. His experience and ability to distinguish between Carolina's mark and California's mark would not necessarily be shared by ordinary consumers.

We have considered the testimony of Mr. Stimmler and Mr. Walsh regarding the similarity or dissimilarity of the Carolina Baseball Logo mark and the California Athletic Interlock marks in terms of appearance. However, it is the Board which must make the ultimate determination under the first *du Pont* factor. When we compare the marks in terms of appearance, we find that they are similar. The marks are similar to the extent that they both appear as the letters SC depicted in interlocking form. The marks are dissimilar to the extent that the letters SC are depicted in differently-stylized lettering, and to the extent that in Carolina's mark the interlocking "S" and "C" are centered upon each other whereas in California's mark the interlocking "S" and "C" are descending to the right. On balance, however, we find that the similarity in appearance between the marks which results from the fact that both marks depict the letters "SC" and the fact that both marks depict these letters in interlocking form outweighs the dissimilarities between the marks in terms of the stylization of lettering and the different positioning of the interlocking letters.

***23** Comparing the marks in terms of sound, we find that the marks are identical. Both would be pronounced as "SC."

Comparing the marks in terms of connotation, we find that to the extent that the marks on their face have any connotation at all, the connotations are identical, i.e., the letters "SC."

In terms of overall commercial impression, we find that the marks as applied to the parties' goods are similar insofar as they each would be perceived as being a logo identifying or referring to a school or team whose initials are "SC." Consumers encountering the marks for the first time might well assume that both logos are different forms of "SC" used by the same school. The evidence of record shows that both Carolina and California use and have used multiple versions or stylizations of "SC." Indeed (as discussed below), in the years immediately prior to its 1997 adoption of the Carolina Baseball Logo mark it seeks to register, Carolina was using a descending interlocking "SC" mark which is identical to the California Athletic Interlock mark. In these circumstances, consumers could reasonably assume that the two "SC" logo marks originate with the same school, or that some other source connection exists.

In short, when we compare the marks in their entireties in terms of appearance, sound, connotation and overall commercial impression, we find that Carolina's Baseball Logo mark is similar to California's ′137 California Athletic Interlock mark. The marks are distinguishable when viewed side-by-side but, as noted above, that is not the test under the first *du Pont* factor. Also as noted above, because the parties' goods are in large part identical, the degree of similarity between the marks which is necessary to support a finding of confusingly similarity is lessened. We find that the two marks are sufficiently similar that, if used by the parties on their legally identical goods, source confusion is likely to result. For these reasons, we find that the first *du Pont* factor weighs in favor of a finding of likelihood of confusion.

**Likelihood of Confusion - Conclusion**

Balancing the evidence of record as it pertains to all of the relevant *du Pont* factors (including the evidence pertaining to factors 4-8, 10 and 13 discussed above in connection with California's likelihood of confusion claim based on its ′953 registration) we find that a likelihood of confusion exists as between Carolina's mark as applied to its goods and California's ′137 Athletic Interlock mark as applied to California's Class 25 goods as identified in California's ′137 registration. To the extent that any doubts might exist as to the correctness of this conclusion, we resolve such doubts against applicant. *See Starbucks U.S. Brands, LLC v. Ruben*, *supra.*

**Section 2(d) Claim based on ′137 Registration - Conclusion**

***24** Because priority is not at issue as to the mark and goods covered by California's ′137 registration, and because a likelihood of confusion exists, we conclude that California's ′137 registration bars registration of Carolina's mark under Section 2(d). This conclusion is in addition to and/or in the alternative to our conclusion, *supra*, that registration of Carolina's mark also is barred by California's ′953 registration, and to our conclusion, *infra*, that registration of Carolina's mark is barred by California's prior common law rights.

**COMMON LAW PRIORITY ISSUES PRESENTED**

As discussed above, priority is not an issue with respect to California's opposition to registration of Carolina's mark insofar as the opposition is based on California's ownership of its ′953 and ′137 registrations. *King Candy, supra.* However, priority is an issue with respect to California's opposition insofar as it is based on California's alleged prior common law rights. Priority also is an issue in Carolina's Section 2(d) counterclaim for cancellation of California's ′137 registration. Before we consider California's common law opposition claim and Carolina's common law counterclaim, we deem it appropriate at this point to clarify the priority issues presented in this case.

The bulk of the evidence and arguments pertaining to priority presented by both parties focuses on the issue of which of them was the first, in terms of absolute historical priority, to use any form of the designation "SC." Carolina asserts that it has been using "SC" in connection with its educational services and athletics programs since its founding in the early nineteenth century. Carolina further argues that the State of South Carolina has used and been referred to as "SC" since pre-Revolutionary War times, and that because Carolina is an agency of the State of South Carolina, it is entitled to rely upon any such use of "SC" by the state for purposes of determining priority in this case.

For its part, California asserts that its continuous use of the designation "SC" in connection with its educational and athletics goods and services goes back to the late nineteenth century, that any prior trademark or service mark rights in "SC" that Carolina might have asserted were lost as a result of several periods of abandonment over the past century, and that Carolina is not entitled to rely for priority purposes in this case on the use of "SC" by the State of South Carolina.

Although the voluminous evidence the parties have presented on the issue of priority is of likely interest to persons researching each school's history, we find that much of it is not necessary to our determination of the much narrower Section 2(d) priority issues to be decided in this case.

The issue to be decided in California's common law-based opposition to registration of Carolina's mark is not whether it is Carolina or California which has ultimate historical priority in any form of the designation "SC." Rather, the issue is whether Section 2(d) of the Trademark Act precludes Carolina from registering the specific mark depicted in its application, i.e., the Carolina Baseball Logo mark. For purposes of determining priority in the opposition, Carolina is entitled to rely only on its proven and constructive 1997 date of first use of the specific Carolina Baseball Logo mark it seeks to register, or upon its use immediately prior thereto of any legally equivalent mark which may be "tacked" onto the 1997 first use of the Carolina Baseball Logo mark. We find (as discussed below) that Carolina has no legally equivalent mark the prior use of which which it can tack onto its proven and constructive 1997 date of first use of the Baseball Logo mark depicted in its application. As a result, California can prevail on its common law claim in the opposition by establishing pre-1997 use of a non-abandoned, confusingly similar mark. Carolina's alleged absolute historical priority of use of "SC" in any form, even if proven, is irrelevant to the priority issue in the opposition case.

***25** Likewise in Carolina's counterclaim, the issue is whether California's registration of the specific California Athletic Interlock mark depicted in the ′137 registration should be cancelled based on Carolina's prior common law rights. Because we find (as discussed below) that California has no legally equivalent mark the prior use of which which it can tack onto its proven

1994 date of first use of the California Athletic Interlock mark depicted in the ′ 137 registration, all that Carolina needs to prove in the counterclaim is its own pre-1994 use of a non-abandoned, confusingly similar mark. California's absolute historical priority of “SC” in general, even if proven, is irrelevant.

**CALIFORNIA'S OPPOSITION BASED ON COMMON LAW RIGHTS**

**Section 2(d) Priority**

Having clarified the priority issues presented by this case, we turn now to the third basis for California's Section 2(d) ground of opposition to registration of Carolina's mark, i.e., California's claim of prior common law rights in the designation “SC” and in particular its alleged prior use of the California Baseball Interlock mark.

California's pleaded registrations are not involved in California's Section 2(d) claim based on prior common law rights. Therefore, priority is an issue and must be proven by California as an element of its Section 2(d) common law claim. Section 2(d) provides that registration may be refused based on a confusingly similar mark which is “previously used in the United States by another and not abandoned.” Thus, to establish common law priority in the opposition, California must prove that, prior to the earliest date upon which Carolina may rely for priority purposes, California was using, and has not abandoned, a mark with which Carolina's mark is confusingly similar.

We begin our priority analysis in the opposition with a determination of the earliest date upon which Carolina can rely for priority purposes in the opposition. That is the date behind which California must go to establish priority.

The parties have stipulated that Carolina began using and licensing the Baseball Logo mark depicted in its application on baseball and softball hats and uniforms and in connection with entertainment services in the nature of baseball and softball exhibitions in “early 1997.” (Stip. Facts No. 46-49). (Carolina also would be entitled to rely on the filing date of its involved application, i.e., September 16, 1997, as its constructive date of first use. Trademark Act Section 7(c), 15 U.S.C. §1057(c).)

According to Carolina's brief (but without citation to the record), the 1997 Baseball Logo mark was adopted as a “throwback” logo, hearkening back to the use of the same mark by Carolina's baseball team in 1952. (A-Exh. No. 127 (1952 yearbook photo).) There is no testimony or other evidence in the record showing any use of this mark after 1952. We find that any use by Carolina of the Carolina Baseball Logo mark after 1952 had ceased well prior to the time that Carolina adopted it as a throwback mark in 1997. Because the 1950's Carolina Baseball Logo mark was abandoned, Carolina may not rely on any 1950's use of that mark for purposes of priority in this case. Carolina's priority rights in the Carolina Baseball Logo mark started anew when the mark was re-adopted in 1997. *See* *L. & J.G. Stickley Inc. v. Cosser,* 81 USPQ2d 1956 (TTAB 2007).

***26** The next issue to be addressed in our determination of Carolina's priority date in the opposition is whether Carolina may go behind its January 1997 first use of the Baseball Logo mark by “tacking” onto such use any prior use of another “SC” mark.

Tacking is permitted if the later-used mark registered or sought to be registered (Carolina's Baseball Logo mark in this case) is the “legal equivalent” of the prior-used mark sought to be tacked. The earlier and later marks must be indistinguishable, creating the same, continuing commercial impression, such that the consumer would consider both marks to be the same mark. *See* *Van Dyne-Crotty Inc. v. Wear-Guard Corp.*, 926 F.2d 1156, 17 USPQ2d 1866 (Fed. Cir. 1991). The test for legal equivalence is very strict, much stricter than the test for confusing similarity. Thus, even if the earlier and later marks would be found to be confusingly similar for purposes of a likelihood of confusion analysis, they are not necessarily legal equivalents eligible for tacking. *Id.* Additionally, tacking requires that the goods and/or services marketed under the later mark must be the same as or similar to the goods and/or services marketed under the earlier mark. *See* *In re Baroid Drilling Fluids Inc. v. Sun Drilling Products*, 24 USPQ2d 1048 (TTAB 1992); *Big Blue Products Inc. v. International Business Machines Corp.*, 19 USPQ2d 1072 (TTAB 1991)(goods must be substantially identical). Tacking is permitted only in “rare instances.” *Van Dyne-Crotty, supra,* 17 USPQ2d at 1868.

As discussed below in connection with Carolina's counterclaim for cancellation of California's ′F137 Athletic Interlock mark registration, the record fails to establish that Carolina, or the State of South Carolina, used any form of an SC mark in connection with Class 25 goods (or even educational or athletics/entertainment services) between 1982 and 1991. On this record, we find that the only pre-1997 "SC" mark used by Carolina in connection with the Class 25 goods identified in its application which might possibly be tacked onto its 1997 first use of the Carolina Baseball Logo mark it seeks to register is the mark depicted below, which it adopted in 1991.



(Because this mark is essentially identical to California's ′137 California Athletic Interlock mark, and in the interest of clarity, we shall refer to this mark as the Carolina Descending Interlock mark.)

As discussed below in connection with Carolina's counterclaim, the record establishes that Carolina adopted and began using the Carolina Descending Interlock mark in 1991 on its baseball and softball team uniforms, and continued to use it until its 1997 adoption of the Baseball Logo mark it seeks to register, depicted below.


WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.



***27** We find that Carolina is not entitled to tack its 1991 use of the Carolina Descending Interlock mark onto its 1997 adoption of the Baseball Logo mark, because the two marks are not legal equivalents. They are distinctly different designs which would not be perceived by consumers to be the "same mark." *See Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes Inc.*, 971 F.2d 732, 23 USPQ2d 1701 (Fed. Cir. 1992)(difference in designs precludes finding of legal equivalence); *Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 1 USPQ2d 1483 (Fed. Cir. 1986)(same); *Pro-Cuts v. Schilz-Price Enterprises Inc.*, 27 USPQ2d 1224 (TTAB 1993)(same). *But see Wet Seal Inc. v. FD Management Inc.,* 82 USPQ2d 1629 (TTAB 2007); *S & L Acquisition Co. v. Helene Arpels Inc*., 9 USPQ2d 1221 (TTAB 1987).

As discussed above in connection with California's Section 2(d) claim based on its '137 registration of its California Athletic Interlock mark, we find Carolina's Baseball Logo mark and California's Athletic Interlock mark (which is identical to Carolina's Descending Interlock mark) to be confusingly similar. However, the "legal equivalence" tacking standard is much stricter than the "confusing similarity" likelihood of confusion standard, and we may find that the two marks are confusingly similar without finding that they also are legal equivalents. *See Van Dyne-Crotty Inc. v. Wear-Guard Corp., supra.* We also note that Carolina has argued throughout this proceeding that its Carolina Baseball Logo mark and California's Athletic Interlock mark (which is identical to Carolina's Descending Interlock mark) are not confusingly similar for purposes of determining likelihood of

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

confusion. Carolina thus has essentially conceded that, a fortiori, the two marks are not legal equivalents. They therefore may not be tacked.

It is important to note that even if we were to find that the Carolina Descending Interlock mark and the Carolina Baseball Logo mark are legal equivalents, such that Carolina could tack and rely upon the 1991 date of first use of its Carolina Descending Interlock mark for purposes of priority in the opposition, California (as discussed below) has established common law rights in its California Baseball Interlock mark which predate 1991. Tacking back to 1991 therefore would be of no avail to Carolina for purposes of determining priority in the opposition.

For these reasons, we find that Carolina has no legally equivalent prior mark the use of which might be tacked onto Carolina's 1997 date of first use of the Baseball Logo mark. Accordingly, and because Carolina cannot rely on its long-abandoned 1952 use of the Carolina Baseball Logo mark, the earliest priority date upon which Carolina may rely in the opposition is its 1997 date of first use of the Carolina Baseball Logo mark it seeks to register. If California establishes its own non-abandoned use of a confusingly similar mark prior to 1997, then California may prevail on its Section 2(d) common law claim.

***28** Carolina has acknowledged that California began using its California Baseball Interlock mark (depicted below) no later than 1967. (Carolina main brief at 11; O-Exh. No. 119.1.)



In any event, the record establishes California's continuous use of the California Baseball Interlock mark by its athletic teams from 1981 to at least 2004 (after commencement of this proceeding). (O-Exh. Nos. 127-162.) California's gift catalogs show continuous use of the California Baseball Interlock mark on apparel and other goods from 1976 to at least 2004. (O-Exh. Nos.

27-47.) California's licensing director Ms. Kennedy testified that California has been licensing the California Baseball Interlock mark since at least 1988, when she began her employment at California. (Kennedy Depo. at 26-27, 62-63.) California has licensed the California Baseball Interlock mark to New Era Cap Company since the late 1980's and to Nike since the mid-1990's, and these licensees have distributed products bearing the mark to a wide variety of retailers who in turn sell the goods to the public. (Kennedy Depo. at 77; O-Exh. Nos. 48, 77.)

Based on this evidence, we find that California has been continuously using its California Baseball Interlock mark on apparel and team uniforms since at least as early as 1976, a date prior to Carolina's 1997 date of first use of its Carolina Baseball Logo mark (and indeed prior to Carolina's 1991 date of first use of its Carolina Descending Interlock mark). We thus find that California has established its priority for purposes of its Section 2(d) claim based on its prior common law rights.

**Section 2(d) - Likelihood of Confusion**

We turn now to the second element of California's common law Section 2(d) claim, likelihood of confusion. We find that there is a likelihood of confusion between Carolina's Baseball Logo mark and California's previously used and not abandoned Baseball Interlock mark. Our analysis of the *du Pont* factors as set forth above in connection with California's Section 2(d) claims based on its ′953 standard character mark registration and its ′137 Athletic Interlock registration apply as well to California's Section 2(d) claim based on its prior common law rights, and we incorporate here our findings and conclusions from the ′953 and ′137 bases for California's opposition. Indeed, for purposes of the first *du Pont* factor, we find that the Carolina Baseball Logo mark is even more similar to California's common law California Baseball Interlock mark than it is to the ′137 California Athletic Interlock mark to the extent that, like the Carolina Baseball Logo mark, the California Baseball Interlock mark displays the interlocking letters “SC” in a centered design rather than in a descending interlock design.

**Likelihood of Confusion - Conclusion**

***29** After balancing all of the evidence as it pertains to the *du Pont* factors, we find that there is a likelihood of confusion between the Carolina Baseball Logo mark and California's common law California Baseball Interlock mark.

**Common Law Opposition - Conclusion**

For the reasons discussed above, we find that California has priority, and that a likelihood of confusion exists. We therefore conclude that California is entitled to prevail on its Section 2(d) claim based on its common law rights. Any doubts as to the correctness of this conclusion must be resolved in the favor of California as the prior user. *Starbucks U.S. Brands, LLC v. Ruben*, *supra*. This conclusion is in addition to and/or in the alternative to our conclusions that California is entitled to prevail on its Section 2(d) claim based on its ′953 and ′137 registrations.

**CAROLINA'S COUNTERCLAIM**

We turn now to the other claim at issue in this case, i.e., Carolina's counterclaim for cancellation of California's pleaded ′137 registration of the California Athletic Interlock mark.

**Carolina has Standing**

We find that Carolina has standing to petition to cancel California's ′137 registration, based on its status as defendant in the opposition and its proven use of its Carolina Baseball Logo mark. *Ohio State Univ. v. Ohio Univ.*, 51 USPQ2d 1289 (TTAB 1999).

**Section 2(d) Priority**

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

To establish its Section 2(d) priority, Carolina must prove ownership of a mark which, vis-à-vis California's registered mark, is “previously used … and not abandoned.” Trademark Act Section 2(d). Because we find that Carolina has failed to establish its priority, we deny the counterclaim on that basis.

**California's Earliest Priority Date**

We first shall determine the earliest date on which California may rely for priority purposes; it is that date which Carolina must go behind to establish its Section 2(d) priority in the counterclaim. The record shows that California began using its California Athletic Interlock mark in 1994. (Kennedy Depo. at 27, 64.) California was using the California Baseball Interlock mark continuously prior and up to 1994, as discussed above in connection with California's common law basis for its opposition. However, we find that the California Baseball Interlock mark is not the legal equivalent of the ′137 California Athletic Interlock mark which is the subject of Carolina's counterclaim. The two designs are materially different and readily distinguishable, and they would not be perceived by consumers to be the same mark. *See Lincoln Logs, supra; Torres, supra; Pro-Cuts, supra*.[25]

For these reasons, we find that California is not entitled to tack, and that the earliest priority date upon which California may rely in the counterclaim is the 1994 date of first use of the ′137 California Athletic Interlock mark.

**Carolina's Priority Theories**

***30** Carolina appears to be basing its Section 2(d) priority claim on three theories: on the continuous use by Carolina, as a university, of “SC” since the 1890's in connection with its educational and athletics services; on Carolina's use of the Carolina Descending Interlock mark beginning in 1991, three years prior to California's 1994 adoption of the California Athletic Interlock mark; and on the continuous use of “SC” by the State of South Carolina since colonial times, with such use inuring to Carolina's benefit because it is an agency of the state. We shall discuss each of these theories in turn.

**Priority Claim Based on University's Use Since 1890's**

Carolina contends that, as an educational institution, it has used “SC” in connection with its educational services and athletics programs “in almost every decade” since the 1890's. (Carolina's brief at 5-6.) In support of this claim, Carolina cites to team photographs in yearbooks and to other historical photographs and documents from each decade (except the 1910's) between the 1890's and the 2000's. (Carolina's notices of reliance nos. 2, 4-6, 15, 20, 28, on A-Exh. Nos. 88-90, 107-164, 214, 216, 381-382, 444-458.) Carolina also relies on the testimony of its archivist Elizabeth West and exhibits thereto, i.e., A-Exh. Nos. 17-22, consisting of yearbooks from 1902, 1924, 1949, 1961, 1973 and 1992.

California disputes Carolina's claim of continuous use of “SC” since the 1890's, arguing that there are gaps in the documentary evidence which show three periods of nonuse and thus abandonment from 1906-21, 1931-48, and 1974-91.[26] Carolina in turn contends that any yearbook gaps are not dispositive because yearbook evidence is not the only evidence of use in the record. Carolina specifically cites Ms. West's testimony that, based on her review of and knowledge of Carolina's archives, she believes Carolina has continuously used “SC” since the 1890's.

We have carefully considered the parties' evidence and arguments regarding Carolina's use (and alleged abandonments) of the “SC” mark over the last century. We find, however, that we need not go back any further than 1981, because Carolina ceased use of any “SC” mark beginning in 1982 and up until its adoption and use of the Carolina Descending Interlock mark in 1991. Three years of nonuse of a mark establishes a prima facie case of abandonment. Trademark Act Section 45, 15 U.S.C. §1127.

We will assume for purposes of this decision (and contrary to California's arguments) that Carolina had never abandoned the “SC” mark prior to 1982. But there is no evidence in the record which persuasively shows that Carolina used any form of an “SC” mark between 1982 and 1991 in connection with any goods or services. This nine-year period of nonuse resulted in

abandonment, and Carolina lost any priority rights it may have had before 1982. Its priority date was reset to 1991, the date it adopted the Carolina Descending Interlock mark. *See L. & J.G. Stickley Inc. v. Cosser*, *supra.*

***31** The only documents in the record that Carolina cites as evidence of the university's use of the "SC" mark in the 1980's are a photograph in Carolina's 1980 yearbook and a photograph in Carolina's 1981 yearbook. (A-Exh. Nos. 457-458.) Both photographs are crowd shots apparently taken at football games, which depict a single person in the crowd wearing a hat bearing the letters "SC." We will assume, for purposes of this decision, that these crowd shots suffice as evidence of Carolina's trademark or service mark use of "SC" prior to and during 1980 and 1981.

However, there is no yearbook or other documentary evidence in the record to support a finding that Carolina used an "SC" mark in the 1980's after this last use in 1981. We find this absence of documentary evidence of use after 1981 to be telling, in view of the fact that Carolina was able to locate and produce yearbooks and other documentary evidence of its use of "SC" from many decades earlier. If yearbooks and other documents from the early twentieth century were found in Carolina's archives, it would seem that documents from the relatively recent period of the 1980's also would have been located and produced if they exist.

In response to California's argument that the absence of yearbook or other documentary evidence showing use by Carolina of any "SC" mark during the 1980's establishes abandonment, Carolina argues that there in fact is other evidence in the record which shows such use, i.e., the testimony of Carolina's archivist Elizabeth West attesting to her belief that Carolina has continuously used "SC" throughout its history. She bases her testimony "on my experience as the university archivist and the research that I've done for patrons into the university's records." (West Depo. at 50.) Presumably in connection with this case, Ms. West spent twelve to fifteen hours reviewing Carolina's archives. She testified that "I went through the records that the university archives has, images and the documents." (West Depo. at 19.) She reviewed yearbooks, original photographs, correspondence and other written materials located in the archives, in order "to look for uses of 'SC' in representing the institution." (West Depo. at 19-21.) Ms. West testified that Carolina's yearbooks are "not necessarily a complete record of every use of every mark the university has ever had." (West. Depo. at 49.) "And based on my knowledge of other documents and images in the university, there is a variety of emblems that the teams and other units of the university have used." (West Depo. at 48.)

However, Ms. West does not identify any of the "variety of emblems" purportedly used by the university. More to the point in our case, she testified that she cannot identify or recall any specific instance where "SC" per se was used by the school during the abandonment periods alleged by California, including the period from 1982 to 1991. (West Depo. at 43-44.) When specifically asked for the basis of her stated belief that Carolina has continuously used "SC" throughout its history, Ms. West cited "the consistency with the use of South Carolina in the university or college's name." West Depo. at 48.) We find this testimony to be unpersuasive; the fact that "South Carolina" has always been used in the university or college's name is not probative evidence that Carolina also has continuously used "SC" per se as a mark. [27]

***32** In short, we find that Carolina has failed to present persuasive affirmative evidence which would support a finding that, as a university, it was using any form of "SC" in connection with any goods or services between 1982 and 1991. Despite the apparent availability of yearbooks and other documentary evidence of use in the early decades of the last century, there is no yearbook or other documentary evidence of such use during the much more recent period of 1982-1991 at issue here. If such evidence exists, we believe that it was incumbent upon Carolina to make it of record. *See Cerveceria Centroamericana S.A. v. Cerveceria India, Inc.,* 892 F.2d 1021, 13 USPQ2d 1307 (Fed. Cir. 1989). This is especially so given the fact that California expressly pleaded abandonment as an affirmative defense to Carolina's counterclaim. The only other evidence cited by Carolina as evidence of the university's use of "SC" between 1982 and 1991 is the testimony of Ms. West attesting to her belief in such use. For the reasons discussed above, we find her testimony to be vague and unpersuasive, and insufficient to overcome the presumption of abandonment arising from the nine-year period of nonuse.

In addition to the absence of any affirmative evidence from Carolina that Carolina, as a university, made continuous use of "SC" between 1982 and 1991, the record contains other evidence which supports an opposite finding that Carolina in fact was not using "SC" as a mark or otherwise during that period.

First, California has made of record Carolina's yearbooks from the years 1982 to 1991. (O-Exh. Nos. 397-405.) These yearbooks do not show any use of "SC" by Carolina's athletic teams or otherwise. Indeed, they instead show that throughout this period Carolina was using various other marks, primarily the "Block C" mark.

Second, Carolina's 2001 and 2003 Baseball Media Guides (A-Exh. Nos. 160, 163) include sections featuring photographs of Carolina's baseball players who have been named All-Americans over the years. These photographs show the players wearing their baseball caps, which presumably were the caps worn by the baseball team in each of the respective years. The caps worn by the teams in the 1980's (as well as in the 1970's) all displayed the "Block C" mark, not any "SC" mark. It is not until 1991 that the teams began wearing caps displaying an "SC" mark (the Carolina Descending Interlock mark which Carolina adopted in 1991). This evidence supports a finding that Carolina was not using any "SC" mark during the 1982-1991 period of abandonment at issue here, but rather was using the "Block C" mark.

Third, Carolina's licensing agreements with Collegiate Licensing Corporation (CLC) during the 1980's specifically identify numerous licensed marks, none of which is any form of "SC." These agreements are from 1983 (O-Exh. No. 282), 1985 (O-Exh. No. 283), and 1988 (O-Exh. No. 284). Carolina asserts that the absence of any "SC" marks from the agreements' listings of licensed marks (the "Indicia") is not dispositive, because each of the agreements includes a provision that "in addition to the Indicia shown above, any Indicia adopted hereafter and used or approved for use by the University of South Carolina shall be deemed to be additions to the Indicia as though shown above and shall be subject to the terms and conditions of the Agreement." Carolina argues that its "SC" marks fall under this "additional Indicia" provision of the licensing agreements.

***33** We are not persuaded. The provision by its terms covers any additional marks "adopted hereafter and used or approved for use by the University of South Carolina." We presume that if Carolina in fact had adopted and used an "SC" mark sometime after the 1983 agreement, that mark would have been specifically included among the licensed marks covered by the next agreement in 1985. Indeed, the 1985 agreement includes additional new marks apparently adopted after 1983, but none of them is an "SC" mark. Similarly, if Carolina had adopted an "SC" mark sometime after the 1985 agreement, it stands to reason that such mark would have been specifically included among the new licensed marks covered by the later 1988 agreement. No such mark appears in the 1988 agreement. In these circumstances, we find that the absence of any "SC" mark from any of the 1980's licensing agreements supports a finding that no such mark was ever adopted and used by Carolina during the 1980's. The presence of the "additional Indicia" clause in the licensing agreements does not prove otherwise.

Fourth, California also has made of record LEXIS/NEXIS printouts of all of the South Carolina state trademark registrations owned by Carolina, numbering 156 in total. (O-Exh. No. 256.) These registrations, most of which were issued in 1973 and 1983, include numerous other marks but fail to include any registration of any "SC" mark in any format at any time. We find that the absence of any "SC" mark in Carolina's large portfolio of state trademark registrations lends supports to a finding that Carolina was not using any "SC" mark in the 1980's.

In short, not only has Carolina failed to present any persuasive affirmative evidence that it, as a university, was using an "SC" mark in connection with any goods or services between 1982 and 1991, the record includes evidence, i.e., Carolina's 1980's yearbooks, Carolina's 2001 and 2003 Baseball Media Guides, Carolina's 1980's licensing agreements, and Carolina's state trademark registrations, which supports an opposite finding that Carolina in fact was not using any "SC" mark during that period.

For these reasons, we find that regardless of whether Carolina established common law rights in "SC" beginning in the 1890's (as Carolina has argued at length), and regardless of whether Carolina had abandoned the mark several times after that (as California has argued at length), the evidence clearly establishes that Carolina abandoned use of any "SC" mark in 1982, thus resetting its common law priority date to 1991 when it adopted and began using the Carolina Descending Interlock mark. We turn to that mark next.

**Carolina's Priority Claim Based on 1991 Adoption of Carolina Descending Athletic Interlock Mark**

As discussed above, the earliest date upon which California may rely for priority purposes in Carolina's counterclaim for cancellation of California's ′ 137 registration of the California Athletic Interlock mark is the 1994 date of California's adoption of that mark. Carolina, in addition to claiming common law priority based on its generalized use of "SC" continuously since the 1890's (a claim we have rejected), also relies on its 1991 date of first use of the Carolina Descending Interlock mark, a date three years prior to California's first use of the California Athletic Interlock mark in 1994. [28] To review, the California Athletic Interlock mark and the Carolina Descending Interlock mark are essentially identical:



***34** Trademark Act Section 2(d) requires that a non-registered mark which is asserted as the basis of the Section 2(d) claim must be "previously used … and not abandoned." Nonuse of a mark for three years is prima facie evidence of abandonment. Trademark Act Section 45.

The evidence of record establishes that Carolina used the Carolina Descending Interlock mark from 1991 to 1998. As noted above, Carolina's 2001 and 2003 Baseball Media Guides (A-Exh. Nos. 160 and 163) include a collection of photographs of Carolina baseball players who have been named All-Americans over the years. In the 1970's and 1980's, the players' (and presumably the teams') caps displayed a "Block C" logo. The Carolina Descending Interlock mark adopted in 1991 appears on the caps of players from 1991, 1993 and 1994. Beginning in 1997, however, all of the players' caps display Carolina's current Carolina Baseball Logo mark, not the Carolina Descending Interlock mark.

Other evidence in the record from the 1990's shows that the Carolina Descending Interlock mark was used between 1992 and 1998, but not thereafter. There are yearbook photos from 1992, 1993 and 1994 (A-Exh. Nos. 145-147) which show Carolina baseball players wearing uniforms and/or caps displaying the Carolina Descending Interlock mark. Carolina's 1997 Baseball Media Guide (A-Exh. No. 157 at pp. 41-43) includes a recap of the 1996 season which includes photographs of players wearing the Carolina Descending Interlock mark. A licensing artwork approval form from June 1998 (A-Exh. No. 206) is for a cap bearing the Carolina Descending Interlock mark. After that, however, there is no evidence in the record showing use of the Carolina Descending Interlock mark.

Instead, the record shows that the only "SC" mark in use after 1998 has been the Carolina Baseball Logo mark Carolina now seeks to register. All of the post-1998 All-American player photographs in the above-referenced 2001 and 2003 Baseball Media Guides (A-Exh. Nos. 160, 163) show the players wearing caps with the new Carolina Baseball Logo mark, not the Carolina Descending Interlock mark. With the exception of the June 1998 artwork approval form mentioned above (A-Exh. No. 206), none of Carolina's licensing artwork approval forms between 1998 and 2004 (A-Exh. Nos. 172-209) involve the Carolina Descending Interlock mark; instead, all of the forms are for the new Carolina Baseball Logo mark. Carolina's Baseball and Softball Media Guides for 1998, 2001, 2003 and 2004 (A-Exh. Nos. 158-164) all show use of the new Carolina Baseball Logo mark, not the Carolina Descending Interlock mark.

For the reasons discussed above, we find that Carolina is not entitled to rely for common law priority purposes in the counterclaim upon its Carolina Descending Interlock mark, because it has abandoned that mark. Carolina began its use of the mark in 1991, a date prior to California's first use of the California Athletic Interlock mark in 1994. But Carolina subsequently abandoned its Carolina Descending Interlock mark in 1997 or 1998, when it ceased use of that mark and adopted and began using instead the Carolina Baseball Logo mark it now seeks to register. The Carolina Baseball Logo mark is not merely an updated or evolving version of the Carolina Descending Interlock mark. As discussed above in connection with the tacking issue, it is a new and materially different mark. Because Carolina has abandoned the Carolina Descending Interlock mark, that mark is not "previously used … and not abandoned," and Carolina accordingly may not rely on it as a basis for its Section 2(d) counterclaim for cancellation of California's ′137 registration. [29]

**Carolina's Priority Claim Based on Use by the State of South Carolina**

***35** The third and final theory Carolina asserts in support of its claim of priority in the counterclaim is that because Carolina is an agency of the State of South Carolina, Carolina is entitled to rely on the state's own use of "SC" which dates back to colonial times. Carolina's archivist Elizabeth West testified that one basis for her belief that Carolina has continuously used "SC" is that "the institution has used the letters "SC" to represent itself since its establishment because it was a — the official university and official college of the State of South Carolina and is a state agency." (West Depo. at 22.) We are not persuaded.

The parties have stipulated (Stip. Facts Nos. 101-107) that "SC" is the official state abbreviation assigned by the United States Postal Service to the state of South Carolina; that the state of South Carolina is referred to on maps by the abbreviation "SC"; that various South Carolina state agencies use "SC" as part of their agency acronyms; that the state's official website uses the letters "SC" as part of its Internet address; that the South Carolina Air National Guard has used "SC" on aircraft for decades; that since 1936 or before, the state has used "SC" on official historical markers around the state; and that since Revolutionary War times the South Carolina militia and state military have used the letters "SC" on clothing, uniforms and equipment.

We find that all of these uses of "SC" by the state would be perceived by relevant purchasers not as trademarks or service marks, but as purely informational references to the state itself. However, even if these or other uses of "SC" by the State of Carolina were perceived to be source indicators, and even if these uses were deemed to inure to the benefit of Carolina (the university) merely because Carolina is a state agency (a questionable proposition), these uses obviously have nothing to do with the goods and services at issue in this case, or even with higher education services in general. They therefore do not suffice to establish, and indeed are irrelevant to, Carolina's Section 2(d) priority claim in this case. The issue in this case is not whether higher education

services are a traditional state government function, as Carolina contends. The issue is whether "SC" has been and is being used as an indication of source for such services. There is no evidence of use of "SC" by the state which conceivably might inure to Carolina's benefit in this case, because the only evidence of use of "SC" by the state in connection with educational services or related goods is Carolina's own use, which we have already determined is insufficient to establish Carolina's priority in the counterclaim due to Carolina's abandonments of the mark in 1982 and in 1997.

**The Counterclaim - Conclusion**

In summary, we find that Carolina's Section 2(d) counterclaim must fail because Carolina has not proven its priority, i.e., its ownership of a mark which is "previously used … and not abandoned." Any rights in "SC" Carolina might have had prior to 1982 were abandoned due to Carolina's nonuse of "SC" between 1982 and 1991. Carolina's priority date was reset when it adopted the Carolina Descending Interlock mark in 1991, but it abandoned that mark at least as early as 1998 upon adoption of the new and materially different Carolina Baseball Logo mark. Finally, apart from Carolina's own use, there is no evidence of any other use, prior or otherwise, of "SC" by the State of South Carolina in connection with the goods and services at issue in this case, and therefore there is no use by the state upon which Carolina might rely for priority purposes (assuming that Carolina would be entitled to rely on the state's use in any event).

**CONCLUSION AND DECISION**

***36** After careful consideration of all of the evidence in the record and all of Carolina's arguments, and for the reasons discussed above, we conclude that California has established its standing and its Section 2(d) ground of opposition, and that it therefore is entitled to prevail in its opposition to registration of Carolina's Baseball Logo mark, Serial No. 75358031.

We also conclude that although Carolina has standing to counterclaim for cancellation of California's ′137 registration of the Athletic Interlock mark, Carolina's Section 2(d) ground for cancellation must fail because Carolina has failed to prove its Section 2(d) priority.

**Decision:** California's opposition to Carolina's application Serial No. 75358031 is **sustained**.

Carolina's counterclaim for cancellation of California's Registration No. 2683137 is **denied**.

## Footnotes

1 Serial No. 75358031, filed on September 16, 1997. The application is based on use in commerce under Trademark Act Section 1(a), 15 U.S.C. §1051(a). January 1997 is alleged in the application to be the date of first use of the mark anywhere and the date of first use of the mark in commerce.

2 In its amended notice of opposition, California also asserted dilution and Trademark Act Section 43(a) as grounds of opposition. We deem California to have waived its dilution claim for lack of proof and argument. The Section 43(a) claim is not legally cognizable in this Board proceeding. See TBMP §102.01.

3 Reg. No. 1844953, issued on July 12, 1994. Section 8 and 15 affidavits accepted and acknowledged; renewed.

4 Reg. No. 2683137, issued on February 4, 2003 based on an application filed on February 22, 2002. In the application and registration, 1993 is alleged to be the date of first use of the mark anywhere and 1994 is alleged to be the date of

first use of the mark in commerce, as to all of the identified goods and services. The goods and services identified in the ′137 registration are:

metal frames for metal license plates; and metallic car emblems, in Class 12;

decals; folders; 3-ring binders; personal organizers; calendars; pencils; pens; erasers; pencil sharpeners, pen or pencil holders; desktop business card holders; note paper; wrapping paper; paper napkins; and paper tablecloths, in Class 16;

umbrellas; luggage, namely, tote bags, hand luggage, garment bags and overnight bags; shoe bags for travel; fanny packs; toiletry bags sold empty; briefcases; backpacks; duffel bags; wallets; business card cases; luggage tags; animal leashes; and dog collars, in Class 18;

porcelain and glass mugs; cups; drinking glasses, shot glasses; commemorative and decorative plates; coasters; paper plates; thermal insulated containers for food or beverage; portable beverage coolers; plastic sports bottles sold empty; and pet bowls, in Class 21;

towels; stadium blankets; cloth pennants; and cloth flags, in Class 24;

clothing, namely, t-shirts, sweatshirts, polo shirts, warm-up suits, jackets, rain ponchos, sweaters, jerseys, tank tops, shorts, sport shirts, baseball shirts, basketball jerseys, golf sweaters, night shirts, boxer shorts, socks, hats, caps, sport caps, visor caps, beanies and ties, in Class 25;

sporting goods, namely, baseballs, footballs, golf balls, golf tees, golf bags, putters, golf club covers, racket covers, flying discs, and foam fingers; arcade-type electronic video games; playthings, namely, plush toys, and ride-on toys; playing cards, in Class 28;

on-line retail store services featuring men's, women's and children's clothing, footwear, hats, accessories, sporting goods, gifts and novelty items, in Class 35; and

entertainment services, namely, conducting athletic competitions; organizing intercollegiate, community and national sporting and cultural events; sports instruction; and providing musical, band, dance, theatrical and dramatic performances, in Class 41.

5 Carolina's pleaded affirmative defense alleging that the amended notice of opposition fails to state a claim is not well-taken. As discussed below, we find that California has standing to oppose, and Carolina's affirmative defense alleging lack of standing therefore is not well-taken. Carolina's affirmative defense alleging that there is no likelihood of confusion is not properly an affirmative defense but rather is merely a restatement of its denials of California's likelihood of confusion allegations. Carolina's affirmative defense of laches is not available in this opposition proceeding, *see National Cable Television Association Inc. v. American Cinema Editors Inc.*, 937 F.2d 1572, 19 USPQ2d 1424 (Fed. Cir. 1991), and is unproven in any event. Carolina's affirmative defenses alleging estoppel, waiver and previous release of claims are waived due to lack of proof and argument. (The parties' prior agreements regarding use of the mark USC shall be considered below in connection with the tenth *du Pont* likelihood of confusion factor. See *infra* at footnote 20. Carolina's affirmative defense alleging that California's “SC” marks are “generic or descriptive and incapable of serving as an indicator of source” is waived for failure of proof and argument. We note that Carolina, in its brief, has argued that California's “SC” marks are geographically descriptive because “SC” would be perceived merely as an abbreviation for Southern California, the geographic location. Assuming arguendo that this contention falls within the generic/descriptive/incapable affirmative defense as pleaded, we find that it is not supported by any evidence in the record, and we give it no further consideration.

6 Carolina also alleged dilution as a ground for cancellation, but has waived the claim due to its failure to present evidence or argument in support thereof. We note as well that Carolina's June 26, 2003 initial answer included a counterclaim for

cancellation of California's ′953 registration on the grounds of fraud, Section 2(b) and Section 2(a). Those claims were dismissed by the Board upon California's motion in an order issued on July 31, 2003.

7 We find that California has waived its pleaded *Morehouse* prior registration defense and its laches, estoppel and acquiescence defenses by failing to present evidence or arguments in support thereof at trial. California's answer to the counterclaim included a reservation of the right to assert additional affirmative defenses, including unclean hands and fraud, but California never amended its answer to assert any such defenses and we have given them no consideration.

8 As do the parties, we shall identify California's exhibits as "O-Exh. No.__" and Carolina's exhibits as "A-Exh. No.__."

9 This trade channel limitation to the Class 25 goods identified in California's ′953 registration, i.e., to goods "being offered and sold at University-controlled outlets," came about during the prosecution of the application (Serial No. 74094681) which matured into California's ′953 registration. California agreed to the restriction of trade channels in order to overcome the Office's Section 2(d) refusal based on the existence of a prior third-party registration, Reg. No. 1146441. (Stip. Facts Nos. 65-70.)

10 However, and contrary to Carolina's arguments, the specific trade channel limitations set forth in California's ′953 registration are not relevant to California's Section 2(d) claim to the extent that such claim is based on California's ′137 registration of the Athletic Interlock mark, which includes no trade channel limitations. See discussion below. Similarly, to the extent that California's Section 2(d) claim is based on California's rights derived from its prior common law use of its "SC" mark (rather than on its ′953 registration of such mark), the ′953 trade channel limitations are not pertinent. California's common law rights in its mark are separate from, in addition to, and not delimited by the terms of its ′953 registration. Such prior common law rights, to the extent that they are proven, serve as an independent basis for California's Section 2(d) claim regardless of whether California relies on, or even owns, a registration.

11 Stip. Facts No. 5 reads: "Carolina licenses collegiate merchandise bearing Carolina's Mark which includes, but is not limited to baseball caps, visors, knit caps, t-shirts, golf shirts, jackets, magnets, rings, golfballs, and jewelry." Stip. Facts No. 40 reads: "Carolina licenses collegiate merchandise which includes, but is not limited to apparel, headwear, footwear, jewelry, watches, clocks, toys and games, sporting goods, auto accessories, blankets, cups, mugs, flags, banners, holiday items, office and school supplies, rugs, luggage and sportbags, wallets, and umbrellas."

12 See, e.g., California's Notice of Reliance No. 24, which includes O-Exh. No. 410 (Reg. No. 1974554, owned by University of Kansas); O-Exh. No. 411 (Reg. Nos. 3035527, 3035529, 3041269 and 3041812, owned by University of Oklahoma); O-Exh. No. 415 (Reg. Nos. 1995677, 1998319, 1998461 and 2025192, owned by Texas Christian University); O-Exh. No. 417 (Reg. No. 29155536, owned by Southern Methodist University); and O-Exh. No. 418 (Reg. Nos. 1579506, 1720351 and 1720424, owned by George Mason University). See also Carolina's Notice of Reliance No. 16, which includes A-Exh. No. 223 (Reg. No. 1685998, owned by University of Arizona); A-Exh. No. 224 (Reg. No. 2969139, owned by San Diego State University); A-Exh. No. 237 (Reg. No. 1737968, owned by Duke University); A-Exh. No. 261 (Reg. No. 1780230, owned by University of Iowa); A-Exh. No. 277 (Reg. No. 1323109, owned by University of Michigan); and A-Exh. No. 286 (Reg. No. 1699032, owned by Northwestern University).

13 Carolina's objection to the Taylor deposition and O-Exh. Nos. 328-351 on the grounds of foundation and relevance are overruled. Also, Carolina did not object to the introduction of these exhibits during Mr. Taylor's deposition.

14 Our analysis under this factor will focus on collegiate merchandise, although the identifications of goods in Carolina's application and California's registration are not expressly limited to such goods.

15 E.g., *University Book Store v. University of Wisconsin Board of Regents*, 33 USPQ2d 1385 (TTAB 1994); *Board of Supervisors of the Louisiana State University and Agricultural and Mechanical College v. Smack Apparel Co.*, 438 F.Supp.2d 653, 82 USPQ2d 1122 (E.D.La 2006). *See also* *Chicago Bears Football Club Inc. v. 12th Man/Tennessee LLC*, 83 USPQ2d 1073 (TTAB 2007).

16 See discussion *supra* in connection with the second *du Pont* factor.

17 The fifth *du Pont* factor pertains to the fame of a plaintiff's mark, which in this opposition proceeding is California's “SC” mark. Carolina's argument that its own mark is famous, even if it were proven, is not pertinent in the opposition, in which Carolina is the defendant.

18 Elizabeth Kennedy, California's director of trademarks and licensing, testified that she was aware of an additional third-party school which uses “SC,” namely, the University of Southern Colorado. (Carolina Ex. No. 421 (Kennedy Discovery Depo. at 166)). However there is no evidence as to the nature and extent of use of “SC” by that school.

19 Carolina's primary argument regarding Spelman College pertains to a 1993 settlement agreement between California and Spelman College which averted inter partes proceedings at the Board between the two parties. We shall discuss this settlement agreement more fully below, in connection with the thirteenth *du Pont* factor.

20 Carolina's objection to the admissibility of this evidence is overruled. We have considered the evidence for whatever probative value it may have.

21 In its brief, Carolina cites these prior consent agreements between the parties as evidence pertaining to the strength of California's mark under the sixth *du Pont* factor. We agree with California that these agreements are more properly considered to be evidence pertaining to the tenth *du Pont* factor, the market interface between the parties. Additionally, we note that although Carolina pleaded “estoppel” as an affirmative defense, Carolina has not argued that the parties' prior consent agreements operate as an actual legal or equitable estoppel to California's opposition to registration of Carolina's mark. We find that the agreements do not give rise to an estoppel in any event. In its brief, Carolina instead argues that these prior agreements between the parties constitute evidentiary admissions by California that confusion is unlikely in this case. We have considered the agreements in that context.

22 This expansion of the collegiate merchandise licensing marketplace beginning in the 1970's and 1980's has been noted by the Board and by courts in prior cases. *See, e.g., University Book Store v. University of Wisconsin Board of Regents*, 33 USPQ2d 1385, 1401 (TTAB 1994); *University of Arkansas v. Professional Therapy Services Inc.*, 873 F.Supp. 1280, 34 USPQ2d 1241, 1242 (W.D. Ark. 1995); and *University of North Carolina v. iHelpingstine*, 714 F.Supp. 167, 11 USPQ2d 1506 (M.D.N.C. 1989).

23 Review of the Office's records indicate that the Office did not issue a Section 2(d) refusal in any of Spelman College's applications.

24 We agree with California's suggestion that the Federal Circuit's 2003 decision in *In re Majestic Distilling Co.* limits the persuasive value of the case relied on by Carolina, *Swedish Beer Export Company Aktiebolag v. Canada Dry Corporation,* 469 F.2d 1096, 176 USPQ 59 (CCPA 1972), a decision in an opposition proceeding wherein the majority found that a letter of consent from a third party which helped the opposer to overcome an ex parte refusal to register the opposer's mark was evidence of the absence of a likelihood of confusion in the opposition proceeding between the opposer and an applicant not in privity with the third party. Chief Judge Markey dissented, stating that “… I can give no weight whatever to the letter of consent obtained from a nonparty during a prior ex parte prosecution for registration.”

25 We also find that the California Athletic Interlock mark is too highly stylized to allow California to tack any prior use of “SC” in block or non-stylized form. *Cf. Metromedia Steakhouses Inc. v. Pondco II Inc.*, 28 USPQ2d 1205 (TTAB 1993)(typed mark not legal equivalent of design mark for purposes of determining claim preclusion). *Compare S & L Acquisition Co. v. Helene Arpels Inc.*, 9 USPQ2d 1221 (TTAB 1987).

26 As noted above, California pleaded abandonment as an affirmative defense to Carolina's counterclaim.

27 Ms. West also testified that she based her belief that Carolina had continuously used the “SC” designation on the fact that “the institution has used the letters SC to represent itself since its establishment because it was a - the official university

and official college of the State of South Carolina and is a state agency." (West Depo. at 22.) As we shall discuss below, we find that Carolina's "state agency" argument is not persuasive. For now, we find that Ms. West's reliance on the "state agency" contention as the basis for her belief in Carolina's continuous use of the mark is misplaced.

28 We reject California's argument that Carolina should not be allowed to base its claim of priority in the counterclaim on its 1991 first use of the Carolina Descending Interlock mark because it did not specifically plead ownership of that mark in the counterclaim. We note that throughout this proceeding, California has asserted that the last period of Carolina's abandonment of the "SC" mark was from 1974 to 1991. California in its brief never specifies why it deems the last alleged abandonment period to have ended in 1991, or what new use of "SC" (other than the Carolina Descending Interlock mark) by Carolina would have ended the alleged abandonment in 1991. In these circumstances, we find that California was reasonably on notice that Carolina intended to rely on its 1991 first use of the Carolina Descending Interlock mark as a basis for its counterclaim. To the extent necessary, we find that this issue was litigated at trial and we deem the pleadings to have been amended accordingly. Fed. R. Civ. P. 15(b); Trademark Rule 2.107.

29 In the alternative, if we were to find (contrary to our finding above) that Carolina did not abandon the Carolina Descending Interlock mark in 1997 because the new Carolina Baseball Logo mark is a legally equivalent updated or evolving version of the same mark, such that Carolina may rely on its 1991 use of the Carolina Descending Interlock mark for purposes of establishing priority in the counterclaim, we still would find that California has priority. This is because we would find that the 1976 California Baseball Interlock mark is as similar as or even more similar to the 1994 California Athletic Interlock mark than Carolina's Descending Interlock mark is to the Carolina Baseball Logo mark. For that reason, if we were to find that Carolina's marks are legal equivalents, we also would find that, a fortiori, the California Baseball Interlock mark and the California Athletic Interlock mark likewise are legal equivalents. Because California's marks would be deemed to be legal equivalents, California would be able to tack its pre-1991 use of the California Baseball Interlock mark onto its 1994 use of the registered California Athletic Interlock mark, thereby pre-dating Carolina's 1991 date of first use of the Carolina Descending Interlock mark.

2008 WL 3333839 (Trademark Tr. & App. Bd.)

End of Document © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 1404223 (Trademark Tr. & App. Bd.)

THIS DISPOSITION IS NOT CITABLE AS PRECEDENT OF THE TTAB

Trademark Trial and Appeal Board

Patent and Trademark Office (P.T.O.)

IN RE TELECHAT NETWORK, INC.

Serial No. 76535248
May 11, 2006

***1** Robert J. Schapp, Esq. for TelechaT Network, Inc.
Melvin T. Axilbund, Trademark Examining Attorney
Law Office 113
(Odette Bonnet, Managing Attorney)

Before Quinn, Drost, and Zervas
Administrative Trademark Judges
Opinion by Drost
Administrative Trademark Judge:

On July 24, 2003, applicant TelechaT Network, Inc. applied to register the mark shown below on the Principal Register for services identified as "telephone and on-line dating service allowing participants to select, obtain and provide information and communicate with potential companions" in Class 45.




The application (Serial No. 76535248) contains a disclaimer of the term "network" and an allegation of a date of first use anywhere and a date of first use in commerce of September 1996.

The examining attorney [1] refused to register applicant's mark because the examining attorney required applicant to disclaim the term TELECHAT inasmuch as the term was held to be merely descriptive of applicant's services. 15 U.S.C. § 1056(a). See also 15 U.S.C. § 1052(e)(1). The examining attorney argues (brief at 3) that:

In the application the services are "telephone and online dating service[s] allowing participants to select, obtain and provide information, and communicate with potential companions." In part, therefore, applicant's service allows "participants to … communicate with potential companions." Since this is what TELECHAT signifies, the requirement that it be disclaimed is proper.

In response, applicant argues (brief at 8):

Applicant is not a telephone company, nor does applicant offer any other communication technology.

Therefore, the relevant public would not commonly understand the word TELECHAT as relating to dating services. In fact, based upon the actual definition of the prefix TELE and the word CHAT, it is far more likely that the relevant public would assume the word to be related to instant messaging. As such, the Examining Attorney has failed to show that the word is generic, or a compound word, because the word fails to meet the test as articulated in the Examiner's own Manual.

After the examining attorney made the refusal final, applicant appealed to this board. [2]

For a mark to be merely descriptive, it must immediately convey knowledge of the ingredients, qualities, or characteristics of the goods or services. In re Gyulay, 820 F.2d 1216, 3 USPQ2d 1009, 1009 (Fed. Cir. 1987); In re Quik-Print Copy Shops, Inc., 616 F.2d 523, 205 USPQ 505, 507 (CCPA 1980). [3] Courts have long held that to be "merely descriptive," a term need only describe a single significant quality or property of the goods or services. Gyulay, 3 USPQ2d at 1009; Meehanite Metal Corp. v. International Nickel Co., 262 F.2d 806, 120 USPQ 293, 294 (CCPA 1959). Descriptiveness of a mark is not considered in the abstract, but in relation to the particular goods or services for which registration is sought. In re Abcor Dev. Corp., 588 F.2d 811, 200 USPQ 215, 218 (CCPA 1978).

***2** We begin our analysis by looking at the evidence of record in this case. This evidence includes the following definitions:
Tele - 1. Distance; distant: *telesthesia.*
2. a. Telegraph; telephone: *telegram.*

b. Television: *telecast.*

Chat - To converse in an easy, familiar manner; talk lightly and casually [4]

The examining attorney also included several printouts from an automated database and the Internet that involve the term "Telechat."

ACC May Put Off Vote

Our esteemed academics — The Negotiating Nine — reportedly are scheduled for another telechat this morning. They will debate. They will deliberate. They will not ask how each other's chemistry departments are doing.

*Richmond Times Dispatch*, June 18, 2003.

My Britney Problem — And Yours

Her telechat unwittingly displayed her shallow knowledge of the musical traditions she references, but she may be completely aware of the how to use sex as a sales tool.

*Salon.com*, December 3, 2001.

E-Help Yourself

[T]he company will provide telechat (real time chat) support.

*ASAP*, March 1, 2000.

[T]his discussion was conducted by international conference call with 180 other people, with the help of a firm that specializes in largescale, hassle-free telechat.

*Newsweek,* May 24, 1993.[5]

The remainder of the evidence consists of newswire reports and Internet and electronic database articles from publications in countries such as Canada, Israel, and Australia. While the board no longer excludes evidence that consists of wire service excerpts and foreign publications, they are not entitled to as much weight as United States publications.

This Board would be blind if it did not recognize that during the past fifteen years, there has been a dramatic change in the way Americans receive their news. In the 1980's personal computers were in their infancy as was the transmission of news stories via the Internet. Put quite simply, we believe that communications have changed dramatically during the past fifteen years such that by now it is by no means uncommon for even ordinary consumers (much less sophisticated doctors and researchers) to receive news not only via tangible newspapers and magazines, but also electronically through personal computers. Thus, it is much more likely that newswire stories will reach the public because they can be picked up and "broadcast" on the Internet. In short, while we are not saying that newswire stories are of the same probative value as are stories appearing in magazines and newspapers, we think that the situation has changed such that said newswire stories have decidedly more probative value than they did when this Board decided the Professional Tennis Council and Appetito Provisions cases.

In re Cell Therapeutics Inc., 67 USPQ2d 1795, 1798 (TTAB 2003).

In another case, the board discussed the change in the traditional method of considering foreign publications.

***3** [I]t is reasonable to assume that professionals in medicine, engineering, computers, telecommunications and many other fields are likely to utilize all available resources, regardless of country of origin or medium. Further, the Internet is a resource that is widely available to these same professionals and to the general public in the United States. Particularly in the case before us, involving sophisticated medical technology, it is reasonable to consider a relevant article from an Internet web site, in English, about medical research in another country, Great Britain in this case, because that research is likely to be of interest worldwide regardless of its country of origin.

In re Remacle, 66 USPQ2d 1222, 1224 n.5 (TTAB 2002)

In this case, we do not think that potential users of applicant's telephone and online dating services are as likely to refer to foreign publications and newswire services and, therefore, the significance of the term in Israel, Australia, and even Canada, is less significant in helping us arrive at a conclusion as to the descriptiveness of the term in the United States.[6]

We now look at the evidence in light of the mark that applicant seeks to register, TELECHAT NETWORK and design. The examining attorney maintains that "applicant's service allows 'participants to … communicate with potential companions.' Since this is what TELECHAT signifies, the requirement that it be disclaimed is proper." The problem we have with this case is that it has been well more than one hundred years since Alexander Graham Bell invented the telephone and the Internet is no longer a novelty. There has been a significant length of time for people to "communicate with potential companions" by telephone or the Internet. Nevertheless, there is little evidence that consumers would understand that the examining attorney's suggested meaning is the one that will immediately come to mind when these consumers encounter the term. This is likely the case because of the nebulous nature of the term "Telechat." While consumers may understand that the term can mean using a telephone to converse in an easy, familiar manner with potential companions, it is not at all clear that consumers will draw

this conclusion. See In re Sundown Technology Inc., 1 USPQ2d 1927, 1928 (TTAB 1986) ("[W]e find that 'GOVERNOR' applied to applicant's [controls used to affect, compress, limit and shape the sound from the output stage of an electrical musical amplifier] is nebulous in meaning"); In re WSI Corporation, 1 USPQ2d 1570, 1572 (TTAB 1986) ("No doubt the SAT element [in SUPERSAT] would suggest satellite involvement to many but the nature of such involvement would not be at all clear, without imagination, perception or reflection on the part of potential customers"); In re Harrington, 219 USPQ 854, 856 (TTAB 1983) (COLLEGE ACADEMY "is at most suggestive of special summer learning programs for gifted and talented children in grades 4 to 8"). Similarly, it is not apparent that the examining attorney's interpretation of the mark will immediately come to mind when prospective purchasers encounter the term TELECHAT used in association with applicant's services. In re The Rank Organization Limited, 222 USPQ 324, 326 (TTAB 1984) (The "fact that the term 'LASER' is capable of being analyzed does not render the term merely descriptive"). See also Remacle, 66 USPQ2d at 1224 ("It is well-established that the determination of mere descriptiveness must be made not in the abstract or on the basis of guesswork"). When the terms are combined, they create a term that appears nebulous and non-specific.

***4** Because we have doubts as to whether applicant's mark is merely descriptive, we resolve those doubts, as we are required to do, in applicant's favor. In re Morton-Norwich Products, Inc., 209 USPQ 791, 791 (TTAB 1981) (The Board's practice is "to resolve doubts in applicant's favor and publish the mark for opposition"). See also Remacle, 66 USPQ2d at 1224.

Decision: The refusal to register applicant's mark without a disclaimer of the term "Telechat" is reversed.

## Footnotes

1 The current examining attorney was not the original examining attorney in this case.

2 We note that on April 18, 2006, Registration No. 3,081,158 issued to applicant for the following mark on the Principal Register for the identical services:




There is no disclaimer in that registration.

3 Obviously, applicant's argument that its mark is not generic and that the examining attorney did not show by clear evidence that its mark was generic is not relevant to the descriptiveness issue in this case.

4 The evidence also includes a definition of "network" and evidence supporting the descriptiveness of "network." Applicant has now disclaimed that term in this application.

5 There are also a few isolated references on website use guidelines that use the term "telechat."

6 We add that the examining attorney did include two similar references from websites for radio stations that use the same phrase: “proud to be a member of the telechat network.” This phrase is equivocal because it is not in proper trademark style but it appears to identify a single source. We note that applicant's specimen indicates that its services are marketed through radio stations.

2006 WL 1404223 (Trademark Tr. & App. Bd.)

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.